1   IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 09cr261 & 09cr301

3

UNITED STATES OF AMERICA,

4

        Plaintiff,

5

vs.

6

DANIEL ANDRES MORONES,

7

        Defendant.

8   _____

9

10              **REPORTER'S TRANSCRIPT**
                  SENTENCING HEARING

11  _____

12          Proceedings before the
    HONORABLE JOHN L. KANE, JR.,Judge, United States District Court

13  for the District of Colorado, commencing at 10:15 a.m., on the
    15th day of December,2011, in Courtroom A-802, United States

14  Courthouse, Denver, Colorado.

15                  **APPEARANCES**

16  For the Plaintiff:          RICHARD. A. HOSLEY

17  For the Defendant:          PAULA RAY

18

            TAMARA HOFFSCHILDT, Official Reporter
19             901 19th Street, Room A251
                Denver, Colorado, 80294
20                 (303) 292-1088

21      Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

22

23          *THE COURT:*  Thank you.  Good morning, and please be

24  seated everyone.  There are two cases against this Defendant

25  that come up for sentencing this morning.  The presentence

1    reports have been filed and updated.  Counsel and the Defendant

2    have had the opportunity to review them, and these cases, which

3    were filed separately, are going to be treated by me,

4    separately.

5          There was an original presentence report attempting

6    what I would sarcastically refer to as -- an effort to put all

7    sentencing into some kind of Cuisinart.  But I think each case

8    needs to be treated separately.  Not only does the defendant

9    deserve that, but I think the -- the victims, as well, deserve

10   to have each case treated separately and not homogenized.

11         Nevertheless, I will hear arguments from counsel and

12   the allocution of Mr. Morones, in both cases, before imposition

13   of either sentence.  We will first consider the objections to

14   the presentence reports, and make sure that the guideline

15   calculations are correct, and then proceed to the sentencing.

16         First, with case number 09cr261, the -- what I will

17   generically refer to as the assault case, and then with that

18   09cr301, which I will refer to even though there are more

19   counts, as the murder case.  Is it now, in addition to hearing

20   from counsel, is there any reason counsel is aware of why we

21   cannot proceed, at this time, to sentencing in both cases?

22         *MR. HOSLEY:*  No, Your Honor.

23         *MS. RAY:*  No, Your Honor.  We do have one housekeeping

24   issue though, I would like to bring up with you.

25         *THE COURT:*  All right.

1          *MS. RAY:*  The housekeeping piece is that Mr. Morones

2   has decided that he would request that I represent him in both

3   cases, and that he no longer go pro se on the 261 case.

4          *THE COURT:*  All right.  That is acceptable.

5          *MS. RAY:*  And we've asked -- we have run that by the

6   government.

7          *THE COURT:*  The order will enter that you're

8   representing him on both.  Thank you.  Is there anything else

9   on that?

10          *MS. RAY:*  No, Your Honor.

11          *THE COURT:*  All right.  The other thing I -- I think

12   you are entitled to listen, before you make up your mind, but

13   on the other hand you may already have, are you anticipating

14   making a statement to the Court?

15          *THE DEFENDANT:*  No, Your Honor.

16          *THE COURT:*  Okay.  All right.  And the reason I ask it

17   at this time is -- is to determine how much time we're going to

18   be spending, because I -- I'm ready to listen to anything you

19   say, but your co-defendants made no statements, and I assumed

20   that that might be your decision, as well.

21          *THE DEFENDANT:*  That is my decision, Your Honor.

22          *THE COURT:*  Thank you.

23          *THE DEFENDANT:*  You are welcome.

24          *THE COURT:*  Okay.  Mr. -- let me tell you what I

25   calculated, with respect to the -- and to the rulings on

1    objections by counsel and see if there is anything more.

2           With regard to case 09cr261, there were three

3    objections made by counsel.  The defendant appeared pro se, and

4    he also made some objections, one of which was that he did not

5    receive the presentence report in the time required by statute.

6    That was responded to by the probation department, and while it

7    was prepared, and apparently emailed, it was not personally

8    delivered within the time required by statute, to Mr. Morones,

9    and therefore, even though I find it was filed in time, the

10   defendant did not receive his copy in a timely manner, and

11   therefore I sustained the objection and continued the

12   sentencing date in order to give the defendant further time to

13   study the presentence report and file objections.  So that --

14   that objection has been taken care of, and is now mooted.

15          The objection to the presentencing report's statement

16   of facts supporting the offense conduct is overruled.  The

17   statement is consistent with my recollection of the evidence,

18   irrespective of it having been taken, verbatim, from the

19   prosecution's statement, and there was no specific objection as

20   to any reference in the offense conduct that I could address

21   myself to, and -- and I saw none, myself, that showed any

22   deviation from my own recollection of the evidence.

23          So I find that there's no substantive or otherwise

24   significant deviation from my recollection of the offense

25   conduct, and that the statement in the presentence report

1    accurately states the offense conduct.

2         Second, the jury determined the bodily injury to

3    Lieutenant Hansen was proved beyond a reasonable doubt, and I

4    see no reason to differ from a jury's finding.  Moreover, the

5    testimony from the paramedic, or the nurse, I can't recall

6    specifically the professional title, but the person giving

7    medical attention to Lieutenant Hansen, after the assault,

8    said, in view of the nature of the injury and the kinds of

9    things that happen with throwing of substances, and the -- just

10   the -- the hygiene of the institution, was that treatment was

11   necessary, and I find that to be the most highly persuasive

12   testimony in the case regarding whether there was bodily

13   injury, and therefore that objection is overruled.

14        Third, the objection to inclusion of the psychological

15   reports in the PSI is simply without merit.  The bureau of

16   prisons conducted a psychological examination and those reports

17   of that psychological examination, and the others, are already

18   in the possession of the bureau of prisons.

19        Further, the defendant has asked me to recommend that

20   he be administered an MRI exam in connection with seizures he

21   experiences and for which he is already medicated.  The

22   information in the reports is essential to his further

23   treatment, while in custody.

24        And finally, some of the information in the

25   psychological reports, which I will comment upon later, in

1    detail, redound to the defendant's favor, and have resulted in

2    my imposition of sentence being mitigated from what it would be

3    without having that information.  So that objection is

4    overruled.

5          And fourth, there is no finding necessary, in the

6    remaining objections made by the defendant himself, because the

7    controverted matters are simply not taken into account in

8    imposing sentence.  Most of them had to deal with his treatment

9    while in -- in custody and are not germane, in my view, to the

10   sentencing criteria that I must consider, and so they don't

11   affect the sentence and are therefore denied.

12         Now, neither the defendant nor the government has

13   challenged any other aspect of the presentence report, and I --

14   unless counsel have something to say at this point, I think the

15   remaining factual statements and the guideline applications can

16   be adopted without objection as to my findings concerning

17   sentencing.

18         Are there any further objections to the calculations

19   on the case number -- or the objections rather on 09cr261?

20         *MR. HOSLEY:*  No, Your Honor.

21         *THE COURT:*  Thank you.  Ms. Ray?

22         *MS. RAY:*  Your Honor, we have no further objections.

23         *THE COURT:*  All right.  Okay.  Then we're ready to

24   proceed with sentencing on that, and I will go through that in

25   a moment.

1          Regarding case number 09cr301, the defendant objects

2     to the presentence report taking the facts supporting the

3     offense conduct, verbatim, from the government's sentencing

4     statement, as was done in case 09cr261.  I find the statement

5     that is given fully comports with my recollection, and indeed

6     in examination of the partial transcripts show it to be fully

7     consistent with my recollection of the offense conduct and

8     therefore the objection is overruled.

9          Further, the defendant objects to the obstruction of

10    justice enhancements and result in the total offense level.  I

11    find the defendant did repeatedly perjure himself during his

12    testimony.  I have reviewed that testimony and find it fanciful

13    and imaginative in the extreme.  He falsely stated a

14    correctional officer advised him, on the morning of the murder,

15    that Alvarado wished to speak with him, but there is no

16    corroborative evidence supporting that assertion, and moreover

17    the videotapes show him entering Unit B and they belie that he

18    was entering the unit with permission.

19         The videotapes also show him leading the other

20    assailants down the hall to Zuniga's cell.  Although he falsely

21    claimed he was unaware they were following him.  They likewise

22    show Mr. Pluma, and not Mr. Alvarado, and it doesn't require a

23    gimlet-eyed view of those two to see the difference between

24    them.  Mr. Pluma was following Mr. Morones, and that denial was

25    false.

1    Mr. Morones testified that he went to Zuiniga's cell

2    to help and protect him, but the videos, again, refute this

3    testimony.  And it's important to know that Mr. Morones was the

4    first to enter and the last to leave Mr. Zuniga-Garcia's cell,

5    and that even one of his co-defendants, Mr. Ruiz, is shown on

6    video, and fully supported by corroborative testimony to have

7    implored the assailants inside the cell to assist.

8    Mr. Morones' denial that he beat Mr. Zuniga-Garcia is

9    also contradicted by the bruises and abrasions on his hands and

10   knuckles when he falsely claimed he had been injured on a

11   previous occasion playing football, and yet the fresh

12   inspection of his wounds, immediately after the murder, by

13   prison personnel, belie that those were old injuries.

14   He made other inconsistent statements to Dr. Fukutaki

15   and separately to Dr. Frederick.  In sum, the defendant's

16   testimony is inherently unbelievable and contradicted by all of

17   the other evidence, including the autopsy of the victim, which

18   I reviewed.  The objection that the defendant did not perjure

19   himself in his testimony is overruled.  I find that he did.

20   The Defendant next objects to inclusion of the

21   mental-health-examination reports in the presentence report.

22   That's the same objection that was made with regard to 261, and

23   for the same reasons I am denying -- or overruling that

24   objection.  It would -- the claim is that it would cause

25   unnecessary problems for him during his imprisonment, and

1    that's simply not a recognizable claim, and objecting to it as

2    part of the presentence report, but even so, as I have already

3    found, some of the information redounds to his benefit, in my

4    mind, in trying to determine what an appropriate sentence is,

5    and I find no legal basis to support it, therefore that

6    objection is, likewise, overruled.

7          Accordingly, I find the proper guideline calculations

8    have been made in the presentence report.  I find the total

9    offense level is 42, and the criminal history category is VI,

10   and therefore the guideline range for imprisonment is 360

11   months to life, but the guidelines' ranges, by operation of

12   guideline factors regarding two counts having statutory maximum

13   ranges lower than life, the range for Count 1, and Count 3

14   becomes 60 months, rather than life.

15         With that in mind, are there any further objections to

16   the guideline determinations or to the Court's rulings on these

17   objections?

18         MR. HOSLEY:  No objections, Your Honor.  Just two

19   points of clarification.  When the Court was making its ruling

20   regarding the perjury finding --

21         THE COURT:  Yes.

22         MR. HOSLEY:  -- I believe the Court accidentally

23   misspoke and said co-defendant Ruiz when it meant Ruelas.

24         THE COURT:  You are right.  You are right.  I

25   apologize for that, and it was Ruelas who testified, and it's

1    inexcusable for me to confuse them.  Thank you.

2         *MR. HOSLEY:*  And also, Your Honor, you mentioned that

3    Mr. Morones denied that Pluma was present, and the Court

4    correctly, in our view, noted that Mr. Pluma was present.

5         *THE COURT:*  Yes.

6         *MR. HOSLEY:*  But Mr. Morones claimed that it was the

7    witness, Coco, and I just wanted to clarify that that was the

8    Court's ruling; that it was, in fact, Pluma not Coco's claim.

9         *THE COURT:*  That's right.  You are correct.  I had the

10   name confused, and I stand corrected.  Okay.  Ms. Ray, any

11   further?

12        *MS. RAY:*  We have no further objections with regard to

13   guidelines.

14        *THE COURT:*  All right.  Let's go ahead with the --

15   well, let me take a couple of other things.  There is a motion

16   for variance, and -- with respect to case number 09-261.  It's

17   denied, because I find the sentencing advice to be well-taken

18   and I will impose, in 261, a guideline sentence.

19        With respect to 09cr301, having properly determined

20   the guideline calculations and considered the advisory

21   recommended sentences, I will not adopt the -- the guidelines

22   for reasons which I will explain in my sentencing statement.

23   Instead, I will sentence in 09cr301 on the basis of the

24   criteria established by congress in Title 18 United States

25   District Code 3553(a).

1    Now, having said that, counsel are welcome to combine,

2    in whatever fashion you wish, your comments, but I want to hear

3    first from the Prosecution, then from Ms. Ray, and then from

4    the Prosecution again, and Mr. Morones has advised that he does

5    not wish to make a statement in allocution, so I will then be

6    prepared to impose the sentence.

7        *MR. HOSLEY:*  Your Honor, I will first address case

8    261, and we ask in that case for an 87-month sentence, which

9    represents the high end of the guideline range.  We believe

10   that that sentence is also a reasonable and just sentence under

11   the 3553(a) factors.

12       What's important to note -- several things are

13   important to note, but what's important to note, first, about

14   the 261 assaults, is that there are multiple victims, and the

15   conduct takes place over a period of months, an extended period

16   of time.  All of those incidents occurred after the murder for

17   which the defendant now stands convicted in 301.  Why that's

18   important to the United States is because it shows to the

19   government that the defendant's violent conduct was not a

20   single act against a single victim, Pablo Zuniga-Garcia, but

21   rather, the defendant engaged upon a pattern of violent

22   behavior in this case, in 261, aimed towards the guards at the

23   institution.

24       In each case, the government believes it has proven

25   that these were not knee-jerk or reflective violent responses,

1    but instead they were planned, deliberate attacks against

2    guards whom he believed had wronged him.  However, in each case

3    those guards were simply performing their duties as bureau of

4    prisons correctional officers.  Lieutenant Hansen -- there was

5    no evidence of any kind that Lieutenant Hansen did anything to

6    provoke the attack.  That the defendant broke the sprinkler,

7    made himself to be moved to a different cell -- holding cell,

8    and then on the move back managed to slip his cuffs, punch the

9    lieutenant and inflict bodily injury.

10        In all of the other cases where the Defendant threw

11    feces or urine and other bodily fluids upon the correctional

12    officers, these were planned responses to the correctional

13    officers doing their jobs.

14        Officer Mansukhani discovered homemade intoxicants in

15    the defendant's cell.  The defendant, upon receiving a note --

16    word that the intoxicants had been confiscated and that there

17    would be a disciplinary report, because of it, threw bodily

18    fluids on to Officer Mansukhani.

19        Officer Trujillo, the day before the incident, had

20    confiscated a photograph that was contraband.  The following

21    morning, the defendant threw bodily fluids onto the officer,

22    after dropping his tray, intentionally, so that the officer

23    would bend down and be an easier target.

24        And what the defendant did to Officer Trujillo is,

25    quite frankly, reprehensible.  Throwing a substance believed to

1    be semen onto the victim, and then telling him that he has

2    AIDS, is -- it's a terroristic act, Your Honor.  He is

3    intending to terrorize that officer, because the officer was

4    doing his duties, and that is the same situation with the

5    others.

6         The defendant has shown repeated violent behavior.  He

7    has shown it towards correctional officers.  He has a complete

8    distain, in our view, for authority, and the officers who have

9    authority over him, and we believe that they warrant justice

10   for their offense, and that the 3553(a) factors warrant an

11   87-month sentence.

12        We ask that that sentence be consecutive, because, as

13   the Court noted at the outset of this hearing, these are two

14   totally separate cases, and these are two totally separate

15   cases with totally different victims, and those victims deserve

16   some justice for the crimes that the defendant inflicted upon

17   them, and they should not simply be wrapped up into the

18   underlying homicide case in 301.

19        With relation to 301 -- or with respect to 301, excuse

20   me, the government is asking for a life sentence.  We don't

21   make that recommendation lightly, but we believe that this

22   defendant, of the four individuals that entered that cell that

23   day, this defendant was the most violent of the four.  As the

24   Court noted, he was the first to enter and the last to leave.

25        As the evidence showed at trial, the victim's body was

1    mangled beyond -- beyond the ability to recognize him.  One of

2    the nurses testified that she was one of first responders on

3    the scene.  She had actually treated the victim as a patient

4    prior to that day.  Yet she was unable to immediately recognize

5    the victim because of the amount of violence that had been

6    inflicted upon him.

7         The victim was brutalized.  He was beaten

8    unrecognizable, and they had to identify him, ultimately,

9    through dental records and tattoos.  The defendant's handprint

10   was on the mop.  And we heard the testimony from the coroner,

11   and we saw the photographs about how that mop was jammed and

12   poked and stabbed into the victim's face and into the victim's

13   mouth and into the victim's body.  Slivers of that mop were

14   pulled from the victim's mouth.

15        This was an act of complete and total predatory

16   violence.  When that victim was laying on the cell of -- on the

17   cell floor of his own cell, bleeding to death, this defendant

18   continued to attack and brutalize that victim.

19        He testified at trial -- Mr. Morones testified at

20   trial that the victim was his friend.  He pretended to cry on

21   the witness stand when he was recalling the violence inflicted

22   upon the victim, but we know that this defendant left that man

23   to die.  Mr. Zuniga-Garcia was left, bleeding in his cell, and

24   the last few moments of his life slipped away while this

25   defendant went to the gym and celebrated with the other

1  Surenos.

2       He didn't go and get medical.  He didn't alert people

3  to what occurred.  He certainly didn't tell the correctional

4  officers what he had done.  He went to celebrate with the other

5  Surenos at the gym.

6       This defendant deserves a lengthy sentence, as shown

7  after this incident in 261, he continued to engage in acts of

8  violence, this time against correctional officers.

9       This defendant's criminal history has escalated as he

10  has grown older.  It has escalated as he has been in prison.

11  He has now murdered a fellow inmate.  He attacked numerous

12  correctional officers.  We believe he is a danger to the

13  public.  We believe he needs to be incarcerated for life, in

14  order to protect the public from future crimes of this

15  defendant.

16       He has shown, through his actions, that he will not be

17  deterred.  He was not deterred from committing future crimes by

18  being in prison.  He wasn't deterred from committing crimes by

19  being in the special-housing unit within the prison.  In fact,

20  attempted to escape from the special-housing unit.  We believe

21  that this case, the facts and circumstances of this case are

22  serious, they are alarming, and the death of Pablo

23  Zuniga-Garcia was brutal, and this defendant's history and

24  characteristics indicate that he will not be deterred from

25  additional criminal conduct, and we believe that the public

1   needs to be protected, and only a life sentence will accomplish

2   that.  Thank you, Your Honor.

3          THE COURT:  Thank you.  Ms. Ray.

4          MS. RAY:  Your Honor, we filed a lot of paper in this

5   case, and I know that this Court knows Mr. Morones as well as

6   anyone, having spent a lot of time with him in the courtroom

7   and two trials.  I'm not about to tell this Court anything that

8   it doesn't already know about the case.

9          One issue that I saw, and maybe it's just because I

10  came in late, to the case, is the question I had, as to why the

11  government gave Mr. Hernandez a break of four levels on his

12  guidelines, since he was the person who put this -- this whole

13  situation of the murder into -- into place?  That is -- that's

14  in my papers that I filed, and I know this Court has already

15  considered that --

16         THE COURT:  I didn't use the guidelines anyway, so it

17  didn't really matter.

18         MS. RAY:  Well, it just -- I just didn't understand

19  why.  At least the government's statement didn't, but maybe

20  that just goes to where the government comes out on this case.

21         What I wanted to talk about is I have gotten to know

22  Mr. Morones recently, and I have been out there talking to him,

23  and what I haven't seen in all of this paper, and there's a lot

24  of it, is the fact that there is a good side to Daniel Morones,

25  that is sometimes hard for people to recognize when you read

1    about what he did.

2         And one of the things is that he is quite intelligent.

3    He loves history, he loves reading, he likes geography, he is

4    good at languages.  He likes learning about other cultures, and

5    he intends to continue learning, wherever he is sent.

6         No matter what sentence this Court gives this man, it

7    will be a long sentence, and I don't think Mr. Morones is under

8    any illusion on that, on that score.  But -- and whether it's a

9    life sentence or 30 years in jail, to Mr. Morones, 30 years is

10   a life sentence.

11        So for those reasons we would ask that -- that he be

12   given the lesser sentence, as explained in the paperwork, and

13   to -- and to consider the fact that, in fact, Mr. Morones was

14   put in the SHU, he was segregated, and whether we like it or

15   whether we don't, segregating certain individuals, especially

16   individuals of Mr. Morones' background, can cause explosive

17   behavior, which, today, Mr. Morones realizes was not the way to

18   go, and which got him in a whole lot more trouble, and he will

19   probably be in that unit until he can work his way out of the

20   SHU Unit, and he realizes that as well, because that's bureau

21   of prison's way.  But this Court does have the ability to take

22   that into account.

23        Do you have any questions of me?

24        *THE COURT:*  No, I don't.  Thank you.  I do want to

25   commend you for coming in late to the case and giving it your

1    customary dedication.

2            MS. RAY:  Thanks.

3            THE COURT:  I appreciate that.

4            MR. HOSLEY:  First, with respect to Mr. Hernandez and

5    the four levels, certainly any omission of guideline

6    calculations was not purposeful by the government or probation,

7    but sometimes, when adding up a whole lot of numbers from a big

8    thick book, things are missed.  And as the Court noted,

9    ultimately, its sentence was based upon the 3553(a) factors,

10   not a rote resuscitation or calculation -- mechanical

11   calculation of the guidelines.  And the Court certainly noted,

12   at sentencing, that Mr. Hernandez was the ringleader and

13   organizer, so to speak, of this operation, and it sentenced

14   according to that theory.  And based upon Mr. Hernandez' level

15   of culpability as the Surenos leader and initiator of this.

16           But that doesn't, in any way, lessen Mr. Morones'

17   conduct, and certainly his conduct alone warrants, we believe,

18   a life sentence, because not only -- of all of the defendants

19   involved in this case, there's only one who continued to commit

20   violent acts after the murder, and that is this defendant,

21   Daniel Andres Morones.

22           We would also just point out this idea that he should

23   somehow receive a lesser sentence, because is he in

24   segregation,  we believe, is false.  And frankly, Mr. Morones

25   earned his way into segregation through his violent conduct.

 1   He was segregated from other inmates because he killed another

 2   inmate, and he continues to be held in segregation, because

 3   while he is in the special-housing unit, he attacked numerous

 4   guards, tried to escape, destroyed property, government

 5   property, and demonstrated himself to be a violent danger.  And

 6   so we believe that the SHU housing is appropriate, and is not a

 7   sentencing factor to be considered by this Court.  Thank you,

 8   sir.

 9        THE COURT:  Thank you.  Well, the SHU housing is not a

10   consideration for me.

11        Mr. Morones, you have already indicated that you don't

12   want to make a statement, but it's -- it's necessary for me to

13   tell you that, at this time, you can if you wish; and if you

14   don't, now is the time to tell me.  If you want to make a

15   statement, I will be glad to hear it, but it's up to you.

16        THE DEFENDANT:  I don't wish to make a statement,

17   Your Honor.

18        THE COURT:  All right.  Thank you.

19        THE DEFENDANT:  You are welcome.

20        THE COURT:  With regard to case number 09cr261, the

21   assault case, I find the total offense level is 20, and the

22   defendant's criminal history category is VI, which results in

23   an imprisonment range of 70 to 87 months.

24        Because the defendant is and will be incarcerated, he

25   has no income or assets and no prospects of obtaining either.

1   Further, no financial loss is involved in this particular case.

2   The supervise-release range is one to three years.  I am

3   sentencing at the high end of the imprisonment range because of

4   the multiple offenses occurring at separate times, rather than

5   a lower-end sentence, which I would apply for a single

6   violation.

7          Pursuant to the Sentencing Reform Act of 1984, it is

8   the judgment of the Court that the defendant,

9   Daniel Andres Morones, is hereby committed to the custody of

10  the bureau of prisons to be imprisoned for a term of 87 months

11  on each counts one, two, four, five, six, eight and nine, to be

12  served concurrently.  Because of the length of time Mr. Morones

13  will be incarcerated on this and his sentences in case number

14  09cr301, I decline to impose terms or conditions of the

15  supervise release.  Such matters would best be handled

16  consistent with conditions existing near the time of his

17  release from custody.

18          The Defendant in this -- in this case must pay the

19  mandatory special assessment of 100 dollars for each count of

20  conviction for a total of 700 dollars due and payable

21  immediately.

22          Now, with regard to the -- the next case, 301, I have

23  carefully considered the factors established in 18 U.S.C. 3553

24  in imposing a sentencing, and nevertheless the -- the sentence

25  I impose will be within the guideline range, but not because of

1    them.  The guidelines are advisory, but there is no articulated

2    basis for them in second-degree-murder cases.  Their merely

3    ubiquitous use does, however, form a baseline for sentencing,

4    and I find the guidelines useful in that regard.

5        Because the Supreme Court has ruled that I must first

6    determine whether the guideline calculations are correctly

7    computed and then consider the recommendation, I must first

8    determine what the basis is for the advice, in order to

9    determine how much weight to give it.

10        As reported to me, sentencing factors were based on

11   summary reports of 40,000 federal convictions for all sorts of

12   crimes, together with a subsample of 10,000 presentence

13   reports.  Later, responding to public comment, expressing

14   concern that a person convicted of second-degree murder might

15   serve as little as eight years imprisonment, and that as of

16   2002, Courts were departing upward in 34.3 percent of such

17   cases, the sentencing commission increased the base-offense

18   level in its calculations so as to arrive at 20 years.  No

19   empirical data was released to support this increase.

20        According to the Office of General Counsel of the

21   Sentencing Commission, there is no evidence that the commission

22   distinguished between types or classes of second-degree murder,

23   nor is there any evidence of an attempt to place recommended

24   sentences in contextual circumstances.  The calculation is thus

25   a matter of pure speculation.

1          In accordance with Federal Rule Criminal Procedure

2    32(1)(3)(B), I have first ruled on objections to the

3    presentence report and other convert -- controverted matters,

4    and -- or I have determined that a ruling is unnecessary,

5    either because the matter will not affect sentencing or because

6    I will not consider that particular matter in determining the

7    sentence to be imposed.

8          I then determined what the precise guideline

9    application is.  Now, I will determine and impose a sentence in

10   accordance with the requirements of Title 18, United States

11   Code Section 3553.  The base offense level for conspiracy to

12   commit assault is -- is 14.  And there's no -- there's no

13   possibility of my understanding why.

14         Let me go just directly to the nature and

15   circumstances and seriousness of this offense.  There is no

16   crime more ancient nor serious than murder.  Much has been said

17   in this case that the murder of Pablo Zuniga-Garcia was not

18   intended, but rather that the intent was to beat him severely

19   enough that he would have to be removed from the housing unit

20   to which he was assigned and placed elsewhere.

21         The death of Mr. Zuniga-Garcia resulting from a

22   15-minute beating at the hands of at a minimum of four men

23   armed with dangerous weapons, who left him helpless and

24   unattended on the floor of his cell is recognized in virtually

25   every legal system in the world as murder.

1          It has been argued that Pablo Zuniga-Garcia's death

2    was not intended.  Indeed, if it had been intended, and the

3    object of the conspiracy had been to kill him, the appropriate

4    charge would have been murder in the first degree, rather than

5    murder in the second degree.

6          Nevertheless, it is indisputably murder, and this

7    defendant, as well as his co-defendants is and will be

8    forevermore a murderer.  Inaccuracy in assessing the

9    consequences of a heinous and brutal act does not alter the

10   character, it only makes the actions of the perpetrator even

11   more lamentable.

12         What troubles me, with particular reference to

13   Mr. Morones, is he is 28 years old.  All the other defendants

14   were older.  I'm very concerned about his propensity to

15   violence, and I fully appreciate that the public needs to be

16   protected.  But if I were to suggest that I have not given

17   special attention to this case, I would be -- I would be

18   misrepresenting.  I have given this matter considerable

19   thought.  One of the things that keeps coming back to me in the

20   times which I'm thinking about this is -- was the word

21   indifference, and how it plays -- indifference plays such a

22   crucial role in this case.

23         The indifference of Mr. Morones' birth, and as to his

24   statement that he was born into a gang and knows nothing else,

25   shows a matter indifference on the part of others.  His

1    institutionalized treatment by the California Youth Authority

2    is the personification of indifference, and the turning of

3    human beings into mere widgets in the bureaucracy, and that he

4    has been -- was then launched on the streets to the only kind

5    of life he knew, of gang life, and then into prison and back

6    again and into prison, shows an indifference in the social

7    incompetence to deal with what has to be an accident at birth.

8         The next kind of indifference, and this one rang out

9    to me more than anything else in this.  There's a sentence in

10   one of the psychological reports, prepared in one of the

11   presentence reports, that says, in a most offhanded way, that

12   Mr. Morones -- it says that -- that he is not -- he does not

13   have intelligence which is below normal.  What a terrible

14   misrepresentation of an indifference that is.

15        I have watched Mr. Morones throughout two trials.  I

16   have seen him argue.  I have seen him, without any training as

17   a lawyer, observe facts and question on it.  I have seen him do

18   his best to understand the case law.  To -- to say in such an

19   indifferent way that he is not stupid, is not telling the

20   truth.  The truth is he is highly intelligent, and he deserves

21   respect for that.  That, to me, is a reflection on our system,

22   that that sort of thing can go unnoticed.  And I am not -- I'm

23   dwelling on it, because I don't want it to go unnoticed.

24        Now, his intelligence also means that he is to be held

25   accountable.  A couple of his co-defendants, I would perhaps

 1  coll -- well, it is colloquial, describe as being cement heads;

 2  but he is not, and it is -- his intelligence is -- is what his

 3  strength is, if he chooses to take the painful steps necessary

 4  to use it appropriately.

 5      Ms. Ray has said that he realized he made bad mistakes

 6  and explosive conduct with the assault cases.  He did, too, in

 7  this beating, and went way beyond what a controlled person,

 8  under the circumstances, would have done.  And it's that

 9  control that -- that lack of control, which denies him the

10  things that he is looking for the most, and he has got to find

11  that.  All the therapy in the world isn't going to help.  The

12  reading will.  The reflecting will.  And I -- I think that

13  incarceration and isolation will, as well.  But he is fully

14  capable of making better decisions about how he can get what he

15  wants.

16      And the other thing is he has demonstrated, just as

17  the probation department psychologist demonstrated

18  indifference, just as the California Youth Authority

19  demonstrated indifference, just as the members of the gang that

20  he was raised in, and fed him alcohol and drugs when he was an

21  infant, a child, were indifferent, he was indifferent to

22  Mr. Zuniga-Garcia.  And his indifference is the product of the

23  indifference which has been shown to him.

24      So what -- what I want from this sentencing is for

25  you, Mr. Morones, to understand that I'm not indifferent to

1   you, nor to Mr. Zuniga-Garcia and his family, or to society,

2   and we have to deal with that, and that's the reason for my

3   sentence.  There's no anger here.  There's no revulsion.  It's

4   deep sadness.

5           I have to promote respect for the law, that's not a

6   difficult task to do.  I have to provide just punishment.  The

7   government has asked for a life sentence, and I am not, because

8   I have to, also, under this case, with multiple defendants,

9   give a sentence which is not totally out of line with that

10  given to the others.

11          Mr. Hernandez got the heaviest sentence, and I think

12  it was well-deserved.  And something else, his plans to ascend

13  in the ranks of the Surenos and perhaps to the Mexican Mafia

14  are done.  I doubt seriously if he will ever be considered to

15  become a Llavero, again.  While I find that Mr. Morones

16  perjured him, it's interesting to me that he was remaining

17  loyal to his code.  He only condemned and implicated the former

18  Surenos who had violated that code, and that's what showed

19  through his testimony.  He couldn't bring himself to -- to

20  state the obvious, that Mr. Pluma was there doing the beating,

21  as well, and denied it.  That's a -- a misdirected kind of

22  loyalty, but it, nevertheless, shows something that I think

23  Mr. Morones has to -- has to put to better use than he has in

24  the past.

25          Mr. Morones has been convicted of a string of violent

1   crimes.  Throughout his lifetime of criminal activity, he has

2   stated he was born into a gang, and that that's all he knows.

3   At the time that he committed this murder, he was already in

4   prison, and he had no significant connection with Zuniga-Garcia

5   other than the gang relationship, no personal motive to

6   administer the beating, and in view of the brutality of the

7   murder, that my gravest concern is that Mr. Morones presents a

8   continuing danger from which the public needs protection.

9           It's up to the prison authorities to decide how much

10  protection the correction officers and the other prisons need,

11  but it's my responsibility to protect the public, and I am

12  sentencing with that foremost in mind.

13          Mr. Morones' life-long record of criminality and

14  violence argues, persuasively, that his commission of further

15  crimes is, in practical terms, a near certainty as long as he

16  harbors the rage inside him.  As long as he is not a man at

17  peace with himself, he can never be a man at peace with his

18  fellow man.

19          I find a lengthy sentence of incarceration is

20  necessary, both to provide some degree of justice to

21  Mr. Zuniga-Garcia and his family, and to protect society from

22  Mr. Morones' further depredations.

23          With regard to his history and character, I think I

24  have gone into that, but I need to -- I need to emphasize that

25  Mr. Morones has killed while in custody.  There is no reason to

1    assume that given the opportunity and motivation he will not

2    kill again.  The only treatment available for him, that which I

3    determine to be sufficient, but not excessive, is prolonged

4    incarceration, and indeed, if there is any treatment for his

5    dangerously aggressive, antisocial and explosive behavior, it

6    is confinement in a closed and restricted environment until

7    such time and age and his own education can reduce his

8    demonstrated proclivity to commit violent acts.

9         The Defendant's character is reflected in the

10   commission of the crime.  Mr. Pluma participated directly in

11   the beating of Pablo Zuniga-Garcia for 15 minutes with

12   Mr. Morones.  Those were the two that actually were the --

13   the -- the beaters in this case, and three others, at least,

14   watched, while the victim was on the floor of his cell and

15   unable to offer any resistence.

16        Mr. Morones persisted in beating the victim, even

17   though the victim told him to stop, it was enough, and even

18   after his co-defendant, Mr. Ruelas, told him to stop.

19        Mr. Morones has refused to accept responsibility for

20   his actions and has failed, entirely, to express remorse for

21   Pablo Zuniga-Garcia's death or for the suffering visited upon

22   his family.

23        The baseline sentences for these offenses, 60 months

24   to five years on Count 1, conspiracy to commit assault,

25   resulting in serious bodily injury, and 360 months; that is, 30

1   years to life imprisonment on Count 2, murder in the second

2   degree, and aiding and abetting are not unreasonable, because

3   of Mr. Morones' history of violent crime and his direct

4   participation in the actual assault which led to

5   Mr. Zuniga-Garcia's death, however, a minimum sentence is not

6   sufficient.

7          Justice requires that Daniel Andres Morones should

8   bear a heavy penalty.  Therefore the sentence to be imposed is

9   the maximum of 60 months on Counts 1 and 3, and 420 months on

10  Count 2.  All sentences to be served concurrently but

11  consecutively to the sentence imposed in the -- the assault

12  case.

13         In light of the length of time that Mr. Morones will

14  be incarcerated for this offense, I decline to impose the terms

15  or conditions of the supervise release.  Such matters will be

16  addressed better near the time of his release from custody.

17         As required by the mandatory Victim's Restitution Act,

18  Mr. Morones shall be jointly and severely liable with each of

19  the other seven co-conspirators for restitution in the amount

20  of $19,023.55, and he is liable, individually, for the special

21  assessment of 300 dollars.  Because Mr. Morones has no assets

22  or income, however, a fine is waived in this case, and he shall

23  not be required to pay interest on his restitution obligation.

24         Mr. Morones, you are advised in both cases of your

25  right to appeal the sentences imposed.  If you desire to

1    appeal, a Notice of Appeal in each case must be filed with the

2    Clerk of the Court within 14 days after the entry of judgment

3    or your right to appeal will be lost.

4         If you are unable to afford an attorney for an appeal,

5    the Court will appoint one to represent you.  If you so

6    request, the Clerk of the Court will immediately prepare and

7    file a notice of appeal on your behalf.  You are in custody,

8    and you are remanded to custody.  Court will be in recess.

9         (Recess at 10:56 a.m.)

10                      **REPORTER'S CERTIFICATE**

11    I certify that the foregoing is a correct transcript from

12    the record of proceedings in the above-entitled matter.  Dated

13    at Denver, Colorado, this 15th day of December, 2011.

14

15                                      *S/Tamara Hoffschildt*
                                        Tamara Hoffschildt
16

17

18

19

20

21

22

23

24

25