```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 09-cr-00261-JLK
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   DANIEL ANDRES MORONES,
7
        Defendant.
8  _____

9
                      REPORTER'S TRANSCRIPT
10                    Trial to Jury, Day 2

11 _____

12         Proceedings before the HONORABLE JOHN L. KANE, JR.,

13 Senior Judge, United States District Court for the District of

14 Colorado, commencing at 9:12 a.m., on the 14th day of December,

15 2010, in Courtroom A802, Alfred A. Arraj United States

16 Courthouse, Denver, Colorado.

17

18

19

20

21

22

23

24 Proceeding Reported by Mechanical Stenography, Transcription
          Produced via Computer by Kara Spitler, RMR, CRR,
25        901 19th Street, Denver, CO, 80294, (303) 623-3080
```

1              APPEARANCES

2          RICHARD HOSLEY and JAMES HEARTY, Assistant United

3  States Attorneys, 1225 17th Street, Suite 700, Denver, CO

4  80202, for plaintiff.

5          DANIEL MORONES, pro se.

6          ROBERT BERGER, P.O. Box 201088, Denver, CO  80222,

7  and MATTHEW CONNELL, Connell - Savela, P.C., 250 Arapahoe

8  Avenue, Suite 301, Boulder, CO  80302, advisory counsel to pro

9  se defendant.

10            P R O C E E D I N G S

11     (In open court at 9:12 a.m.)

12          THE COURT:  Good morning.  Be seated.

13          I understand we're waiting for one juror and that's

14  the delay, and counsel wanted to see me about something.

15          MR. HOSLEY:  Your Honor, I just wanted to point out a

16  misspelling on the instructions.

17          THE COURT:  Okay.

18          MR. HOSLEY:  Maybe we can fix it before they're

19  tendered finally to the jury.

20          On count eight, originally the Government charged it

21  as Michael Morse, and then we later amended that, the Court

22  agreed, to Micah, M-I-C-A-H.  And the count in, on pages 5 and

23  32 still references the victim as Michael, and so I would just

24  ask that that be corrected before the jury --

25          THE COURT:  Just scratch the EL, right?

1          MR. HOSLEY:  It's M-I-C-A-H.

2          THE COURT:  M-I-C-A-H.

3          MR. HOSLEY:  Yes, sir.

4          THE COURT:  And that's on page 5, I got that one.

5          MR. HOSLEY:  And also 32, Your Honor, at the bottom in

6    the footnote.

7          THE COURT:  We'll get that changed right now.

8          MR. HOSLEY:  Thank you, sir.

9          And I just wanted to alert the Court that we did have

10   an opportunity to play the videos for Mr. Morones yesterday

11   following proceedings, so he has had an opportunity to see

12   everything.

13         THE COURT:  All right.

14         There's nothing I can do about a juror that's late.

15         THE DEFENDANT:  Your Honor, this morning I'd like to

16   ask for a sequestration order.

17         THE COURT:  All right.

18         THE DEFENDANT:  On witnesses.

19         THE COURT:  Each side can retain one advisory witness.

20   You have your advisory counsel who are also not subject to the

21   rule.

22         THE DEFENDANT:  Yes.

23         THE COURT:  Any other witnesses shall be excluded

24   throughout the trial.

25         MR. HOSLEY:  Yes, sir.

1          THE COURT:  Until they testify, and then they may

2    remain after that.

3          MR. HOSLEY:  Thank you, Your Honor.

4          THE DEFENDANT:  Thank you, Your Honor.

5          THE COURT:  All right.  We're in recess.

6       (Recess at 9:14 a.m.)

7       (Reconvened at 9:29 a.m.)

8       (Jury in at 9:29 a.m.)

9          THE COURT:  Thank you.  Good morning.  Be seated,

10   everyone.

11          You have with you the instructions, and we're going to

12   go through those now.  I'm not going to read all of them to

13   you.  We're running a little bit late, but I do want you to get

14   a sense of the heft and feel of them so that when matters do

15   come up, you'll see what we're doing.

16                       **JURY INSTRUCTIONS**

17          THE COURT:  The instruction no. 1, beginning on

18   page 2, I've already read the indictment, the counts that are

19   charged in this case, as well as the pleas of not guilty.  And

20   I've talked to you about how the order of the trial will take

21   place with the Government presenting its evidence first and

22   then the defendant is entitled to present evidence and that can

23   include other witnesses or he may elect to testify or not as he

24   determines at that time.

25          The next thing is in trying to isolate what the

1  evidence is, let me describe it to you as this: evidence comes

2  from the witness stand or witness box, that we call it.  And

3  that means that a witness is placed under oath and obligated to

4  tell the truth.  I'm going to get to an instruction, the key

5  instruction on how you determine creditability in a little bit

6  and tell you the significance of this; but let me put it in, in

7  more conversational terms.

8          If you, if you were walking down the street and for

9  whatever reason, your dog made a mess in the kitchen, somebody

10  dented your fender of your car, whatever it might be, and the

11  sun can be shining and beautiful weather and somebody walks by

12  and says, isn't this a nice day.  And what you're thinking in

13  your own mind is, it absolutely is not.  This is a terrible

14  day.  But one of the things that you are not interested in

15  doing is carrying on a conversation about that.  And so what

16  you say is, yes, it is a nice day.  And you go on about your

17  business.  That happens.  It's perfectly acceptable conduct.

18  You wait in line at the airline counter and the poor person

19  working there says have a nice day and you want to say

20  something else to them, but you don't, you just go ahead about

21  your business.  That's acceptable and nobody criticizes that.

22          However, if you're placed under oath, people have a

23  right to expect that you're going to tell the truth.  It's a

24  different thing.  So if a person's placed under oath, that same

25  person who had the troubles with the car, the dog, or what have

you, gets on the stand and the question is, was it a nice day,

they are obligated to say, no, because that's the truth, for

them it was not a nice day; and you are entitled as jurors to

hear that and so you can expect, you have the right to expect

that when people are under oath, they're going to perform

according to the oath and not according to ordinary behavior.

          The same thing is true with you and the oath that

you've taken.  We frequently make up our minds about things

without studying them thoroughly, but you've taken an oath to

study it thoroughly.  We frequently use information we've

gathered that somebody else doesn't have to make up our minds

about things.  But you can't do that here.  We all have to work

with the same information.  And we expect that and the

Government, the defendant, and the Court itself has the right

to expect that that's what will happen.  So judging is not

simply what I do as a judge of the law, determining what law

applies and making rulings on what questions comply with the

rules of evidence and which ones don't and making those

rulings.  That's the judge of the law.

          You are the judge of the facts.  And your role is to

judge those facts; that is, to determine how much or how little

you accept -- how much of a witness's testimony you believe,

how much you don't.  I will instruct you that the law provides,

if you find that someone has willfully and deliberately lied

about one thing, you have the right, if you wish, to disregard

everything that that witness says, or as much or as little of

it as you wish.  In other words, you're the judge of that.

And what we're going to try and do is present this

evidence to you in an orderly fashion with questions being

asked first by the Government.  And you have to say to

yourself, okay, this is the Government and they're presenting

it in the strongest way they can because this is an adversary

system.  It works on the theory that if you have two sides that

are matched, each side is going to put forth the case the

strongest way they can, and they are also going to go after the

weaknesses they see on the other side's case.  And so we judge

it on that basis.

The questions that are asked can be tough.  That's

what, that's what advocates do.  That's what they're supposed

to do.  When I make a ruling, however, that's it.  That's the

end of the discussion.  Then we try to go forward with this

direct examination; and this is an important factor to

consider, that sometimes you will hear an objection made that a

question is leading.  What that means is this: in a direct

examination, the lawyer asking the questions is not permitted

to lead the witness.  And leading means that the question

contains the information necessary to provide the answer.  The

best example I can give you is this.  If I say, what is your

name, I'm not suggesting what that name is.  That's not a

leading question.  If I say, is your name John Jones, I am

leading you.  I'm providing you with the information to answer.
You're not allowed to lead on direct examination.

So you can hear that objection, and it gets a little
fuzzy because the rules of evidence provide that on preliminary
matters and to move things along, more obvious ones, I don't
have to enforce that rule strictly.  But when it comes to
matters of substance, I need to enforce that rule.

Now, the opposite rule applies on cross-examination.
That's when the opposing advocate starts asking questions after
the witness has testified on direct examination.  It's
cross-examination.  And we would question the competence of the
person cross-examining if they did not ask leading questions
because the whole purpose of cross-examination is to pin the
witness down, to point out weaknesses or inconsistencies in the
testimony.  So you will see that, that take place.

Now, then we have what's called redirect examination.
I'm not going to bore you with my lecture to law students about
this, but redirect is frequently abused in courts where they
never end.  They just keep going back and forth, back and
forth.  That's not what it's intended for, and that's not what
I do.  Redirect examination is to permit the attorney or the
advocate who called the witness to come back and clear up any
problems that were created by the cross-examination.  If any
new matters came up, then redirect is appropriate.  Or to clear
up confusion.  But not just to say, oh, I forgot something and

start going on again and again.  So you can expect to hear a
direct exam, cross-exam, and redirect exam.  And rarely, if
ever, a further direct examination.  Because then they're
entitled to a cross-examination on that.  So we don't do that.
We try not to.

All right.  Now, the -- I've already mentioned this to
you from instruction 1, but if I ask any questions, please
understand that I'm not trying to direct you to any verdict in
this case.  If I think -- if I don't understand something, and
lord knows that happens, especially with my hearing aids, which
I better get it out now.

But if I ask a question, it's either 'cause I didn't
hear something or possibly because I think something needs to
be brought out for you to consider.  But there are no hidden
messages.  None at all.  You may not be interested in my views
of the case, but I'm not going to tell you what they are, at
any time.  After this case is over, I will stop, when the
verdicts are rendered, I'll stop in the jury room and say hi to
you, and I'll answer whatever questions you might have there
that I can answer.

Now, you already know about the notes.  I want to just
point out one further thing about the notes.  And that is this.
You know when you were in school, there were people who took
notes and then you'd ask them what was said, and they couldn't
tell you because they were too busy taking the notes.  And it

wasn't, it wasn't registering.  And in the old days, before we

had these infernal machines, secretaries took shorthand and

they would take it down, and you'd say, what did I say, and

they didn't know 'cause they were focused on taking the note.

That's what I want you to avoid.  It's called being a

slave to your notes.  Use the notes as memory devices.  Don't

try and take them down verbatim, that sort of thing, but to

assist you in understanding what's going on at the present time

and as a memory device so that you can recall what you heard at

a later time.

There is one further thing about note-taking.  There

is a court reporter here, and she's taking everything down, but

her transcript will not be available to you.  That transcript

is prepared basically to cover my rulings, so that if I make an

error, a court of appeals can review my decisions.  The reason

it's not available to you is a very practical one.  The court

reporter -- and I have the highest admiration for what they can

do -- they need to look at their notes afterwards, and they

need to refine those notes; and then both the prosecution and

the defense, before it becomes a certified transcript, have a

right, or if it is certified, they have a right to object to it

afterwards before it's a final transcript.  So we can't get

that done in time for -- to provide a jury with a transcript.

So you have to rely on your memory.

The second reason is a historical one.  And that's

that from the beginnings of the Anglo American system of

jurisprudence, the court system, the jurors, we've evolved, it

began with only the jurors being witnesses.  There weren't any

other witnesses.  And the jurors were expected to know what had

already happened.  That evolved until we got to the point where

we wanted jurors that didn't know so they could focus only what

they hear about the case in court, and the idea has been in

existence and operation since long before we had reading and

writing.  And so this, again, is a tradition that we depend

more on the hearing, the oral means of communication than the

written means of communication.

Let's go on to -- I've already told you about the, if

you have questions, how that will be handled.

Now let me go to the instruction no. 3, and I'll read

this verbatim.

You, as jurors, are the judges of the facts, but in

determining what actually happened; that is, in reaching your

decision as to the facts, it is your sworn duty to follow all

of the rules of law as I explain them to you.  You may not

disregard or give special attention to any one instruction or

question the wisdom or correctness of any rule I may state to

you.  You must not substitute or follow your own notion or

opinion as to what the law is or ought to be.  It is your duty

to apply the law as I explain it to you regardless of the

consequences.  In your deliberations, you must see to it that

1  no one else on the jury ignores the instructions or attempts to

2  decide the case on anything other than the law and the

3  evidence.

4          It is always to be borne in mind that our collective

5  commitment is to equal justice under the law.  Matters of race,

6  creed, color, nationality, and gender have no place in this

7  process.  To the best of your ability, you are to judge others

8  and you would want others to judge you under the law I give

9  you.

10          The very heart of justice is that all apply the same

11  law to the same evidence and leave our personal desires out of

12  it.  You should not read into these instructions or anything

13  else I may have said or done any suggestion as to what your

14  verdict should be.  That is entirely up to you.  It is also

15  your duty to base your verdict solely upon the evidence,

16  without prejudice or sympathy.  That was the promise you made

17  and the oath you took.

18          Instruction no. 4.

19          The indictment or formal charge against the defendant

20  is not evidence of guilt.  Indeed, Mr. Morones is presumed by

21  the law to be innocent.  The law does not require him to prove

22  his innocence or produce any evidence at all.  The Government

23  has the burden of proving the defendant guilty beyond a

24  reasonable doubt, and if it fails to do so, you must find

25  Mr. Morones not guilty.

1      Proof beyond a reasonable doubt is proof that leaves

2  you firmly convinced of the defendant's guilt.  There are few

3  things in this world that we know with absolute certainty, and

4  in criminal cases, the law does not require proof that

5  overcomes every possible doubt.  It is only required that the

6  Government's proof exclude any reasonable doubt concerning

7  Mr. Morones's guilt.

8      A reasonable doubt is a doubt based on reason and

9  common sense after careful and impartial consideration of all

10  the evidence in the case.  It is a doubt based on the evidence

11  and not a hunch, a guess, or a whim.  If based on your

12  consideration of the evidence you are firmly convinced that the

13  defendant is guilty of the crimes charged, you must find him

14  guilty.  If, on the other hand, you think there is a real

15  possibility that the Government has failed to prove his guilt,

16  you must give him the benefit of the doubt and find him not

17  guilty.

18      Mr. Morones has decided to represent himself in this

19  trial and not to use the services of a lawyer.  He has a

20  constitutional right to do that.  His decision has no bearing

21  on whether he is guilty or not guilty, and it must not affect

22  your consideration of the case.

23      Because he has decided to act as his own lawyer, you

24  will hear Mr. Morones speak at various times during the trial.

25  He may make an opening statement and closing argument.  He may

ask questions of witnesses, make objections, and argue to the
Court.  I want to remind you that when he speaks in these parts
of the trial, he is acting as a lawyer in the case, and his
words are not evidence.  The only evidence in this case comes
from the witnesses who testify under oath on the witness stand
and from exhibits that are admitted.

You must make your decision based only on the evidence
that you see and hear in this court.  Do not let rumors,
suspicion, or anything else that you may have seen or heard
outside of court influence your decision in any way.  The
evidence in this case includes only what the witnesses say
while they were testifying under oath, the exhibits that I
allow into evidence, the stipulations that the lawyers agree
to, and the facts that I judicially notice.

Judicial notice is my recognition of commonly accepted
facts, such as date, time, place, as well as matters such as
existing government regulations.

Nothing else is evidence.  The lawyers' statements and
arguments are not evidence.  Their questions and objections are
not evidence.  My legal rulings are not evidence, and my
comments and questions are not evidence.

During the trial I may not let you hear the answers to
some of the questions that the lawyers ask or the defendant
asks.  I may also rule that you cannot see some of the exhibits
that the lawyers or the defendant want you to see.  And

1  sometimes I may order you to disregard things that you saw or

2  heard, or I may strike things from the record.  You must

3  completely ignore all of these things.  Do not even think about

4  them.  Do not speculate about what a witness might have said or

5  what an exhibit might have shown.  These things are not

6  evidence and you are bound by your oath not to let them

7  influence your decision in any way.

8       Generally speaking, two types of evidence are

9  available from which you may properly determine the facts of

10 the case.  One is direct evidence such as the testimony of an

11 eyewitness.  The other is indirect or circumstantial evidence;

12 that is, the proof of a chain of facts which point to the

13 existence or nonexistence of certain other facts.

14      As a general rule, the law makes no distinction

15 between direct and circumstantial evidence.  The law requires

16 that you find the facts in accord with all the evidence in the

17 case, both direct and circumstantial.  While you must consider

18 only the evidence in this case, you are permitted to draw

19 reasonable inferences from the testimony and exhibits,

20 inferences you think are justified in the light of common

21 experience.

22      An inference is a conclusion that reason and common

23 sense may lead you to draw from facts which have been proved.

24 By permitting such reasonable inferences, you may make

25 deductions and reach conclusions that reason and common sense

1   lead you to draw from the facts which have been established by

2   the testimony and evidence in this case.

3          Now, this is the instruction I mentioned to you about

4   judging the credibility of witnesses.

5          It is your job to decide whether the Government has

6   proved the defendant's guilt beyond a reasonable doubt.  In

7   doing so, you must consider all of the evidence.  This does not

8   mean, however, that you must accept all of the evidence as true

9   or accurate.  You are the sole judges of the credibility or

10  believability of each witness and the weight to be given to the

11  witness's testimony.  Any important part of your job -- excuse

12  me -- an important part of your job will be making judgments

13  about the testimony of the witnesses who testify in this case.

14  This includes the defendant, if he chooses to testify.

15         You should think about the testimony of each witness

16  you hear and decide whether you believe all or any part of what

17  each witness has to say and how important that testimony is.

18  In making that decision, I suggest that you ask yourself a few

19  questions.  Did the witness impress you as honest.  Did the

20  witness have any particular reason not to tell the truth.  Did

21  the witness have a personal interest in the outcome in this

22  case.  Did the witness have any relationship with either the

23  Government or the defense.  Did the witness seem to have a good

24  memory.  Did the witness clearly see or hear the things about

25  which he or she testified.  Did the witness have the

1  opportunity and ability to understand the questions clearly and

2  answer them directly.  Did the witness's testimony differ from

3  the testimony of other witnesses.

4      When weighing the conflicting testimony, you should

5  consider whether the discrepancy has to do with a material fact

6  or with an unimportant detail.  And you should keep in mind

7  that innocent misrecollection, like failure of recollection, is

8  not uncommon.  If he testifies, the defendant's testimony

9  should be weighed and his credibility evaluated in the same way

10  as that of any other witness.  In reaching a conclusion on a

11  particular point or ultimately in reaching a verdict in this

12  case, do not make any decisions simply because there were more

13  witnesses on one side than the other.

14      You will hear evidence that the defendant has been

15  convicted of a felony and is a prison inmate.  A felony is a

16  crime punishable by imprisonment for a term of years.

17  Mr. Morones's conviction has been brought to your attention

18  only because he was a prison inmate at the time of these

19  alleged crimes.  The fact that the defendant has been convicted

20  of another crime does not mean that he committed any crime

21  charged in this case, and you must not use his previous

22  conviction as proof of the crime charged in this case.  You may

23  find him guilty of a crime charged here only if the Government

24  has proved beyond a reasonable doubt that he committed it.

25      If Mr. Morones elects to testify, I will instruct you

that the credibility of his testimony is to be judged using the
same factors as you will apply to the testimony of any other
witness.  And those are the ones that I mentioned in the
previous instruction.

Scientific, technical, or other specialized knowledge
may assist you in understanding the evidence or in determining
a fact in issue.  A witness who has knowledge, skill,
experience, training, or education may testify and state an
opinion concerning such matters.  However, you are not required
to accept such an opinion.  You should consider opinion
testimony just as you consider other testimony in this trial.
Give opinion testimony as much weight as you think it deserves,
considering the education and experience of the witness, the
soundness of the reasons given for the opinion, and other
evidence in the trial.

The defendant -- this should not here.  Instruction
no. 11.  That's a mistake of mine.  Because I don't know at
this point whether he's going to testify or not.  So we'll just
pass that by, and if he doesn't testify, then I will repeat
this instruction to you.  I've already covered it, frankly, by
telling you that that's his right and you cannot use his
election not to testify in any way or manner against him.  He's
doing what the Constitution provides.  But he also has the
right to testify.  So we'll, we'll just bypass that instruction
at this time.

1          You will hear evidence -- this is no. 12 -- relating

2   to statements attributed to the defendant alleged to have been

3   made after the commission of the crimes charged in this case

4   but not made in court.  You should always consider such

5   statements with caution and weigh them with care.  You should

6   disregard any such statement entirely unless the other evidence

7   in the case convinces you that it is more likely than not that

8   the statement was made knowingly and voluntarily.

9          In determining whether any such statement was

10  knowingly and voluntarily made, you should consider, for

11  example, the age, gender, training, education, occupation, and

12  physical and mental condition of the defendant.  You should

13  also consider any evidence concerning his treatment while under

14  interrogation, if the statement was made in response to

15  questioning by Government officials, and all the other

16  circumstances and evidence surrounding the making of the

17  statement.

18         If, after considering all this evidence, you conclude

19  it is more likely than not that the defendant's statement was

20  made knowingly and voluntarily, you may give such weight to the

21  statement as you feel it deserves under all the circumstances.

22         If any reference by me or by counsel to matters of

23  testimony or exhibits does not coincide with your own

24  recollection of that evidence, it is your recollection which

25  controls during your deliberations and not my statements or the

statements of counsel.  You are the sole judges of the evidence received in this case.

The defendant, Daniel Andres Morones, has been charged in the second superseding indictment, with seven counts of alleged criminal violations.  In order for the Government to prove that Daniel Andres Morones committed one or more of the alleged crimes, it must prove the material elements of each of the crimes beyond a reasonable doubt.  I will now tell you what those elements are for each count.

For count one, assault on a federal officer or employee, physical contact, bodily injury, the defendant is charged in count one with the violation of title 18 United States Code sections 111(a)(1) and (b).  This law makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with a federal officer or employee while the officer or employee is engaged in the performance of his official duties.  Count one alleges there was a physical contact by the defendant upon the victim and that the victim suffered bodily injury as a result.

To find the defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

First, the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Steve Hansen;

Second, the person assaulted, resisted, opposed,

impeded, intimidated, or interfered with was a federal officer

or employee who was then engaged in the performance of his

official duties;

Third, the defendant did such acts intentionally;

Fourth, in doing such acts, the defendant made

physical contact with Steve Hansen; and

Fifth, as a result, Steve Hansen suffered bodily

injury.

The term "forcible assault" means any intentional

attempt or threat to inflict injury upon someone else, when

coupled with an apparent present ability to do so and includes

an intentional display of force that would give a reasonable

person cause to expect immediate bodily harm, whether or not

the threat or attempt is actually carried out or the victim is

injured.

The term "physical contact" means an intentional and

wrongful physical contact by the defendant upon the victim.

The contact between the defendant and the victim need not be

direct but rather can result from the indirect application of

force by some substance or agency placed in motion by the

defendant.

The term "bodily injury" means an injury that is

painful and obvious or is of a type for which medical attention

ordinarily would be sought.

The term "federal officer or employee" refers to any

1  officer or employee of the United States or of any agency and

2  any branch of the United States government.

3       You are instructed that the federal Bureau of Prisons

4  is an agency of the United States Department of Justice, within

5  the executive branch of the United States government.  Thus an

6  employee of the federal Bureau of Prisons is a federal officer

7  and/or employee.

8       A federal officer is, quote, engaged in the

9  performance of his official duties, close quote, if he is

10  acting within the scope of what he is employed to do rather

11  than engaging in a personal frolic of his own.

12       It is not necessary to show that the defendant knew

13  the person being forcibly assaulted, resisted, opposed,

14  impeded, intimidated or interfered with was at the time a

15  federal officer carrying out an official duty, so long as it is

16  established beyond a reasonable doubt that the victim was in

17  fact a federal officer acting in the course of his official

18  duties and that the defendant intentionally, forcibly

19  assaulted, resisted, opposed, impeded, intimidated, or

20  interfered with that officer.

21       Count one, lesser-included offense, assault on a

22  federal officer or employee, physical contact.  If you

23  unanimously find the defendant not guilty of the offense

24  charged or if, after all reasonable efforts you are unable to

25  agree on a verdict as to that offense, then you must determine

whether the defendant is guilty or not guilty of assault on a

federal officer or employee, dash physical contact.

The difference between these two offenses is that to

convict the defendant of the lesser offense, the Government

does not have to prove that Steve Hansen suffered bodily

injury.  This is an element of the greater offense but not of

the lesser-included offense.  For you to find the defendant

guilty of the lesser-included offense, assault on a federal

officer or employee, physical contact, a violation of

title 18 United States Code section 111(a)(1), the Government

must prove each of the following elements beyond a reasonable

doubt:

First, the defendant forcibly assaulted, resisted,

opposed, impeded, or intimidated with Steve Hansen.

Second, the person assaulted, resisted, opposed,

impeded, intimidated, or interfered with was a federal officer

or employee who was then engaged in the performance of his

official duties;

Third, the defendant did such act intentionally; and.

Fourth, in doing such acts, the defendant made

physical contact with Steve Hansen.

If you are convinced that the Government has proved

all of these elements beyond a reasonable doubt, you may find

the defendant guilty of the lesser-included offense.  If you

have a reasonable doubt about any of these elements, then you

must find the defendant not guilty of the lesser-included offense.

In counts two through nine, as charged, and there's two of those numbers in which there is no charge, but the counts that are charged, two through nine, charge this defendant with violations of title 18 United States Code section 111(a)(1).  This law makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with a federal officer or employee while the officer or employee is engaged in the performance of his official duties.  Counts two through nine allege there was physical contact by the defendant upon the various victims named in each count.  Counts two through nine, the elements of the offenses are the same except for the identity of the named victim.

To find the defendant guilty of these crimes, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

First, the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with the named victim;

The named victim for counts two through nine are as follows:

Count two, Shyam Mansukhani;

Count four, Ismael Trujillo;

Count five, Michael Browning;

1          Count six, Dominic Davis;

2          Count eight, Micah Morse.  And I have corrected that,

3    I hope yours is to M-I-C-A-H.

4          And count nine, Thomas Watson.

5          Second, the person assaulted, resisted, opposed,

6    impeded, intimidated or interfered with was a federal officer

7    or employee who was then engaged in the performance of his

8    official duties;

9          Third, the defendant did such acts intentionally; and

10         Fourth, in doing such acts, the defendant made

11   physical contact with the named victim.

12         The term, "forcible assault" means any intentional

13   attempt or threat to inflict injury upon someone else when

14   coupled with an apparent present ability to do so, and includes

15   any intentional display of force that would give a reasonable

16   person cause to expect immediate bodily harm, whether or not

17   the threat or attempt is actually carried out or the victim is

18   injured.

19         The term "physical contact" means an intentional and

20   wrongful physical contact by the defendant upon the victim.

21   The contact between the defendant and the victim need not be

22   direct, but rather can result from the indirect application of

23   force by some substance or agency placed in motion by the

24   defendant.

25         The term "federal officer or employee" refers to any

officer or employee of the United States or any employee in any

agency in any branch of the United States government.  You are

instructed that the federal Bureau of Prisons is an agency of

the Department of Justice, within the executive branch of the

United States government.  Thus, an employee of the federal

Bureau of Prisons is a federal officer and/or employee.

A federal officer is, quote, engaged in the

performance of his official duties, close quote, if he is

acting within the scope of what he is employed to do rather

than engaging in a personal frolic of his own.

It is not necessary to show that the defendant knew

the person being forcibly assaulted, resisted, opposed,

impeded, intimidated, or interfered with was at that time a

federal officer carrying out an official duty, so long as it is

established beyond a reasonable doubt that the victim was in

fact a federal officer acting in the course of his official

duties and that the defendant intentionally, forcibly

assaulted, resisted, or opposed, impeded, or intimidated that

officer.

The defendant is charged with having committed these

several crimes on or about a certain date.  This means that the

Government must prove beyond a reasonable doubt that the

defendant committed the crimes reasonably near the dates

charged.

The intent of a person or the knowledge that a person

possesses at any given time may not ordinarily be proved

directly because there is no way of directly scrutinizing the

workings of the human mind.  In determining the issue of what a

person knew or what a person intended at a particular time, you

may consider any statements made or acts done by that person

and all other facts and circumstances received in evidence

which may aid in your determination of that person's knowledge

or intent.  You may infer, but you are certainly not required

to infer, that a person intends the natural and probable

consequences of acts knowingly done.  It is entirely up to you,

however, to decide what facts to find from the evidence

received during this trial.

You are here to decide whether the Government has

proved beyond a reasonable doubt that the defendant is guilty

of each of the crimes charged.  The defendant is not on trial

for any act, conduct, or crime not charged in the second

superseding indictment.  It is not up to you to decide whether

anyone who is not on trial in this case should be prosecuted

for the crimes charged.  The fact that another person also may

be guilty is no defense to a criminal charge.  The question of

the possible guilt of others should not enter your thinking as

you decide whether the Government has proved this defendant

guilty of the crime charged.

If you find the defendant guilty on one or more of the

counts stated in the second superseding indictment, it will be

my duty to decide what the punishment will be.  You should not

discuss or consider the possible punishment in any way while

deciding your verdict.

You will hear of evidence of other acts or wrongs

engaged in by the defendant.  You may consider that evidence

only as it bears on the defendant's motive, opportunity,

intent, preparation, plan, knowledge, identity, absence of

mistake or accident, and for no other purpose.  Of course the

fact that the defendant may have previously committed an act

similar to the one charged in this case does not mean that the

defendant necessarily committed the act charged in this case.

I'm not going to read about the jury deliberation

process until the end of the case, and then we'll go over it;

but I will tell you, first of all, what you must do, and then I

have another instruction following this that gives you an idea

of how other juries have done this by electing a presiding

juror, possibly electing a secretary, how to stay on one point

until you've decided that rather than jump around.  There's a

few things like that that are of very practical value.  But I

don't think we need to go through them now.

Following those final instructions, there is a verdict

form, and it provides places for, for you to render your

verdicts.  And you can look at those at your leisure during the

course of the trial and during recesses.

I want to point out that we unfortunately got off to a

1  late start this morning, and rather than take a break, to catch

2  up, I'd like to proceed.  Now, I realize that I said that some

3  people take medications, and they need to know what the time is

4  and also there's some, with this many people, somebody has to

5  go to, as my Irish grandfather used to say, where even the

6  queen sits alone, and if that's the case, just let me know, and

7  we'll take a recess.

8          But otherwise, I'd like to proceed until noon.

9          Is that agreeable everyone?

10         All right.

11         You ready to proceed?

12         MR. HEARTY:  Yes, Your Honor.

13         THE COURT:  All right.  We'll hear the opening

14  statement of the Government at this time.

15                       **OPENING STATEMENT**

16         MR. HEARTY:  Thank you, Your Honor.

17         Ladies and gentlemen of the jury, good morning.  What

18  this case is about, this case is about a federal inmate, Daniel

19  Morones, who repeatedly assaulted men who work for the United

20  States Bureau of Prisons.  And these assaults, these numerous

21  assaults, by Mr. Morones were all unprovoked, they were all

22  planned and all calculated attacks.  They were all violent,

23  offensive, and frankly three of them, disgusting.  And all of

24  the men were the victims of these attacks, were all men who

25  were just doing their jobs.  And you will hear from all of

1    them, all the victims.

2           Now, this case will take you into a place that most of

3    us are entirely unfamiliar with.  And that is a prison.  The

4    prison is where Daniel Morones has been sentenced and is

5    serving his sentence, and it's where these men, the victims of

6    his assaults, work every day.

7           During all of these assaults, the -- Mr. Morones was

8    assigned to a place within the prison that is referred to as

9    the special housing unit.  And you'll hear witnesses refer to

10   the special housing unit as the SHU.  And the SHU is just an

11   acronym for "special housing unit."

12          And what's important to understand about the SHU is it

13   is different than the other places within the prison for what's

14   referred to as general population.  And inmates end up in the

15   SHU because of violations of the prison rules and not minor

16   violations, but serious violations of the prison rules.  And

17   because of those violations, they are assigned to the SHU to

18   protect both the staff at the prison and the other inmates at

19   the prison.  And one of the results of that is that those

20   inmates have considerably more restrictions on their freedom

21   and their movement about the prison when they're assigned to

22   the SHU.

23          And all of the incidents involved in this case, the

24   defendant was assigned to a SHU.  The first incident was he was

25   assigned to the SHU at the federal correctional institute in

1    Florence, Colorado.  And you'll hear "federal correctional

2    institute," again, abbreviated as FCI.  That's just the name of

3    the prison where he was assigned.

4           The next three incidents, the defendant was assigned

5    to the SHU, the special housing unit, at the federal

6    correctional institute in Englewood, Colorado.  That's the

7    federal prison that's just southwest of town down there off

8    Kipling and Quincy.

9           And Judge Kane alluded to this a little bit yesterday,

10   some of the evidence that you're going to hear in this case and

11   some of the videos that you're going to watch are uncomfortable

12   to watch.  And that's particularly true in a setting such as

13   this, a place formal, like a federal district court.  We need

14   to remember that we need to bring that evidence to show the

15   defendant's conduct that he's been charged with here in court.

16          The seven charges that Judge Kane just reviewed with

17   you break down into the four incidents that I just mentioned,

18   the first incident being at the federal correctional institute

19   in Florence, Colorado.  The next three charges or next three

20   incidents occur at the federal correctional institute in

21   Englewood.

22          On April 20, 2009, the defendant was assigned to the

23   special housing unit in Florence, Colorado, at the FCI.  Not

24   only was he assigned to the special housing unit, because of

25   his disruptive and destructive behavior, he had been moved in

1  an observation cell at that prison.  And what you'll hear is

2  that the observation cell is a cell closer to where the guard

3  station is.  It has windows so they can observe the conduct of

4  the inmate that's in that cell.

5         In the morning of April 20, 2009, the defendant broke

6  one of the fire sprinkler heads inside that cell.  These are

7  the kinds of fire sprinklers that we see in buildings, like the

8  ones right above you, that the defendant broke and of course

9  the result of that was water was spraying out into the cell.

10        So what the correctional officers had to do was to

11 shut off the water to the entire facility; that is, the entire

12 special housing unit, in order to stop the water.  Of course,

13 that endangers all the staff and the other inmates that are

14 there when water is shut off.  Then they had to call the

15 facility people to come make arrangements and get the part to

16 be able to go into that cell, fix that fire sprinkler head, and

17 so they could recharge the system and turn on the water.

18        Well, in order to do that, they had to move the

19 defendant out of that cell.  That cell is cell A100, and they

20 had to move him out of there for the facility people to be able

21 to come in, fix that sprinkler head, and also clean up the

22 cell.

23        But there were restrictions and precautions that were

24 taken when the correctional officers would move the defendant.

25 And what you'll hear is they refer to that as a lieutenant

three-man hold.  And what that meant is that not just any
correctional officer assigned to the special housing unit could
come move the defendant.  The lieutenant of the special housing
unit, who's basically the boss of the SHU, in this case, Steve
Hansen, who is the charged victim in count one, had to be there
for any movement that involved the defendant, anytime he was
being moved out of the cell.  Not only that, but two other
correctional officers had to be involved in that movement.

So what they did is once the facility people were
ready, had the part, they had the defendant submit to
restraints.  And what that means is in the cell door, he would
have to come back and put his hands back like this, and he'd be
handcuffed behind his back, before they'd open the cell door to
move him to the other cell.  When they did that, they moved him
over to another adjacent cell, B100, was that cell, while the
facilities people went in and fixed the fire sprinkler head and
cleaned up the cell.

Approximately a half hour later, that work was done
and they went to move him back.  So Lieutenant Hansen went over
to B100 where the defendant was still in that cell, still
restrained, still had the handcuffs on behind his back.  And
then began the move to move him back to cell A100.

And what you'll hear is that the way that prison, that
special housing unit is laid out, the cell was kind of on a
split level, a half level below a landing.  So to get from cell

B100 to cell A100, the defendant had to be escorted up a flight

of stairs, across a landing and a platform, down a half flight

of stairs, and back into the other cell.

And when Lieutenant Hansen was going up the stairs,

the stairs are so narrow that only one officer could have hands

on the defendant.  And so as he's leading the defendant up the

stairs, and as soon as he gets up to the landing, the defendant

somehow is able to get his hand free from the handcuff.  He

gets his hand free from the handcuff, turns around, and punches

Lieutenant Hansen in the face.  And Lieutenant Hansen's

immediate focus at that point is restraining the inmate,

getting control of the inmate for the protection of staff and

the other inmates.

And so in that process, what they're trained to do, is

they take the inmate to the ground.  They're less of a threat

when they're on the ground.  So Lieutenant Hansen gets the

defendant on the ground and then the other officers that are in

the area involved in the movement then help restrain him and

put on restraints.

And when that's happening, the defendant is continuing

to fight, to yell, and to try to spit on the officers.  And

when he's doing so, some of the things that he says includes

yelling out to other inmates, other inmates who can't see him;

the way the other cells are laid out, they can't see this area

where this is happening.  But they can hear that something's

1   going on.  And the defendant yells out to the other inmates,

2   basically bragging, that he's just punched this correctional

3   officer, Steve Hansen.

4        And he also then yells, essentially in bravado, at the

5   correctional officers, that you can't do this one on one, or

6   words to that effect.

7        So they get the restraints back on him and move down

8   to cell A100.  You're going to see a video that's in the

9   special housing unit in Florence, Colorado, but the video isn't

10  very good.  What happens is the location where the assault

11  takes place, the camera is obscured by what the correctional

12  officers refer to as the bubble.  And that's the area where

13  they set up and where the correctional officers stay.  It's

14  kind of their office and their space.  That area obscures the

15  view of the assault.

16       But what you will see, because it clears the bubble

17  from the camera, you'll see essentially the aftermath and that

18  is when the correctional officers are responding to restrain

19  the defendant and get him back into restraints, restraints

20  being handcuffs and in this case also leg irons, so restraints

21  on his legs.

22       The next incident occurred on October 26, 2009.  And

23  now the defendant is assigned to the federal correctional

24  institute in Englewood, Colorado, again assigned to the special

25  housing unit at that facilities.  And here you're going to hear

from correctional officer Shyam Mansukhani.  And what happened

in this instance, the day before, so on October 25, Officer

Mansukhani observed what he knew to be a smell of an

intoxicant, at least that's what he suspected it to be.  An

intoxicant from outside the area of the defendant's cell.

Well, probably for very obvious reasons, it's against

the rules of the prison for an inmate to have an intoxicant.

And of course you wonder, well, where would the inmate get an

intoxicant.  What is common, and you'll hear about this, is

that inmates will sometimes try to brew their own alcohol

essentially from items from food service.  And that's what he

suspected that the defendant had done in this case.

So the next day, on October 26, when the defendant was

taken out of his cell for his daily recreation period,

Officer Mansukhani went into his cell, and he found containers

containing a liquid where defendant appeared to be brewing some

type of intoxicant.  That was confiscated.

So then when the defendant came back to his cell, he

learned that this had been, that had been confiscated, and also

learned that he was going to be written up for it, have some

kind of violation report for it.

He asked one of the other correctional officers, hey,

I'd like to speak to Officer Mansukhani.  And the other officer

said, well, is there something I can help with you.

No, I need to speak with Officer Mansukhani.

1      So Officer Mansukhani comes down to his cell.  This

2   part you're going to see on the video.  You can't see inside

3   the cell, you'll see the hallway.  You'll see

4   Officer Mansukhani walking down the hall, no sound, and going

5   to up to the defendant's cell, and he's talking to the

6   defendant.

7      What the defendant has done is planned, calculated to

8   assault Officer Mansukhani, and he could reach out and touch.

9   So he's staged a cup full of feces and urine, and when he's

10  talking to Officer Mansukhani, he reaches and gets that cup and

11  throws it at Officer Mansukhani.  It hits him on the upper

12  torso, splashing on his upper neck and head, and that's the

13  assault that occurs on October 26.

14      A few months later, on August 19 of this year, the

15  defendant is still assigned to the federal correctional

16  institute at Englewood, still assigned to the special housing

17  unit; and the day prior, so on the 18th, August 18th,

18  Officer Trujillo and another officer, while engaged in a

19  routine cell move, they routinely will move the inmates' cells

20  periodically.  So when they were moving the contents of the

21  defendant's cell, they noted a photograph, and a photograph

22  depicting nudity, which is a violation of the rules of the

23  institution, and that photograph was confiscated.

24      So again, the next day, you see the same pattern here,

25  the next day when Officer Trujillo, one of the two officers who

1    confiscated that photograph, is delivering breakfast to the

2    inmates in the early morning, around six o'clock in the

3    morning, and you'll see this on the video, again, just the

4    hallway, you can't see into the cells, he delivers trays to the

5    inmates.  And approximately 20, 25 minutes later, he comes back

6    to retrieve those trays after the inmates have a chance to eat.

7    And when he goes by the defendant's cell, the defendant throws

8    the tray at him.  Doesn't hit him, lands on the floor.  And

9    Officer Trujillo then bends down to pick up the tray.  And when

10   he does so, the defendant again has planned to attack him.

11   This time with a cupful of semen and urine.

12          THE DEFENDANT:  I object, Your Honor.  There was no

13   scientific testing done on that liquid.

14          THE COURT:  This is an opening statement.  And if it

15   doesn't come into evidence, you have the right to attack it at

16   that time.

17          The objection is overruled.  But that will be up to

18   you to determine.

19          MR. HEARTY:  Yes, Your Honor, thank you.

20          THE DEFENDANT:  Thank you, Your Honor.

21          MR. HEARTY:  So the substance hits Officer Trujillo in

22   the face and shoulder, and then Officer Trujillo, as he stands

23   up, the defendant yells at him, calls him a derogatory term,

24   and then says, Now you're going to get AIDS.  So

25   Officer Trujillo then leaves what they call the range, that's

the area where the cells are, and obviously goes and cleans

himself and gets the clothes off.

Later that morning, after that assault on

Officer Trujillo has been reported, the SHU lieutenant, so

again the boss of the special housing unit, this time Thomas

Watson, walks down and makes contact with the defendant in his

cell.  And when he does, what he observes is a sheet, the

defendant has tied a sheet across the cell.  And for obvious

reasons, this creates a security concern from the prison.  The

correctional officers now can't view into the cell and see what

the defendant's doing behind the sheet.

So Lieutenant Watson orders the defendant to remove

the sheet and to submit to restraints.  And the defendant

refuses to do that.

So what are they supposed to do in that situation?

The protocol, you're going to hear about this from

Lieutenant Watson.  The protocol at the prison is now they

begin the process that leads to a use of force.  Use of force

is simply they are going to go into that cell and forcibly put

the restraints on the defendant.

However, in the steps, first of all, they have to get

the authorization of the warden, so the head of the

institution, before they can institute any use of force.  They

do a systematic confrontation avoidance to try to give the

defendant the opportunity to avoid the confrontation and avoid

1    the use of force.  This goes on over the period of a couple of

2    hours with different attempts to confrontation avoidance and

3    also they've got to assemble a team, a use-of-force team, with

4    correctional officers from all over the institution.

5        So the confrontation avoidance proves ineffective, the

6    defendant refuses to take down the sheet and he refuses to

7    submit to restraints.  And the confrontation -- or the

8    use-of-force team, it assembles outside the cell.  You'll see

9    this part on video now, when the use-of-force team is going to

10   the cell, they'll do one last attempt at confrontation

11   avoidance and so one of the counselors at the facility will

12   ask, ask and you'll see this on video, ask the defendant to

13   remove the sheet and submit to restraints.  And he refuses to

14   do so.  So now they begin their use-of-force process.

15       And part of their protocols is to video-tape all of

16   the use of force to make sure they document exactly what

17   happens.  And you're going to be able to watch that.

18       But what happens is before they enter, they put in a

19   chemical agent.  They refer to it as essentially just pepper

20   spray, is sprayed into the cell.  And when the officer whose

21   responsibility it is and who has been trained to disperse the

22   pepper spray goes in with the first member of the use-of-force

23   team, the defendant from behind the sheet again has staged cups

24   of feces and urine and is throwing those cups over the top of

25   the sheet onto the correctional officers who are attempting to

1 enter the cell.

2       And you'll watch the video and you'll see how the

3 officer who is the no. 1, referred to as the no. 1, Dominic

4 Davis, how he gets hit with the feces and urine getting thrown

5 over the top of the sheet.  You'll see Micah Morse, who is the

6 correctional officer who is responsible for dispersing the

7 chemical agent or the pepper spray and how he gets hit with

8 that substance.  The cameraman is Lieutenant Michael Browning,

9 and he's the one video-taping it, and he gets hit with the

10 substance that the defendant throws over the sheet and

11 Lieutenant Thomas Watson who is the boss kind of running the

12 use-of-force team and operation, how he gets hit with it.

13       The video then goes on from there, and you'll see the

14 team actually go into the cell and then put the restraints on

15 the defendant, get him lifted up and then walk him down the

16 hallway to a decontamination shower.  And the reason that they

17 go to the decontamination shower is pepper spray would be on

18 the defendant and they get that spray off his clothing and the

19 defendant and they get that spray off the defendant.

20       After the close of this case, after you've heard from

21 the victims, we're going to ask you to hold the defendant,

22 Daniel Morones, responsible for his attacks, his violent,

23 disgusting attacks on these Bureau of Prisons officers because

24 the evidence that will be presented to you in this case will

25 prove beyond any reasonable doubt that the defendant is guilty

1 of all the crimes he's been charged with.

2          Thank you.

3          THE COURT:  Mr. Morones, you have the right to make an

4 opening statement now if you wish, or you can reserve until the

5 Government's case is, the evidence is concluded, and that's a

6 tactical decision that doesn't affect whether you exercise your

7 right now or later.  But if you do exercise it now, you can't

8 later.  You get one opening statement.

9          THE DEFENDANT:  Yes, Your Honor.  I'd like to exercise

10 that now.

11          THE COURT:  All right.  Go ahead.

12                    **OPENING STATEMENT**

13          THE DEFENDANT:  Before I open up, I'd just like to say

14 I don't have any infectious or hazardous diseases.  If I did,

15 it would be a different story like a assault with a deadly

16 weapon-type of case.

17          But, ladies and gentlemen, my name is Daniel Morones.

18 I am representing myself during this trial.  I am happy to tell

19 you that this trial will most likely be a quick one.  Just a

20 few more days of your time will be taken and you will all go in

21 peace to enjoy freedom and family and appreciate the small,

22 simple, large, and complex joys that I cannot.

23          The Government, Mr. O'Hildy, seemed to spend his time

24 this morning telling you what he thinks all the evidence means

25 and who he thinks the defendant is.  I would advise you to

1    listen to the evidence and let your common sense tell you what

2    it all means.  And even though most of this case appears to be

3    a one-sided spectacle, there are two lenses, two sides of the

4    story and what really happened and why.

5         There are thin lines that yield sharp points.  They

6    are at risk of being overlooked, blotted out by bold lines that

7    lead to quick and instant decisions.  I ask that you read

8    between the lines, be watchful not to miss the thin markers

9    that may appear transklucent [phonetic].  I think that what you

10   will find here this week that opposed to what you see on TV,

11   there's more to a guard's use of force than a disruptive

12   noncompliant convict.  But a heavy element of oppression.

13        There are many motivators into why actions take place

14   and nothing is forgotten as the snowball rolls, a coin always

15   has two sides.  As I leave -- excuse me -- as you leave from

16   this trial and these proceedings become a distant memory, take

17   with you a new appreciation for freedom, being able to feel the

18   warmth of the sun and the kiss of the wind, weigh it with the

19   new reason and let that reason be freedom.

20        Thank you all.

21        THE COURT:  Thank you, Mr. Morones.

22        You can call your first witness, please.

23        MR. HEARTY:  Yes, Your Honor.  The United States calls

24   Steve Hansen.

25        THE COURTROOM DEPUTY:  Sir, if you could just stand

 1    and raise your right hand.

 2           I need your attention, please.

 3              (**STEVEN HANSEN, GOVERNMENT'S WITNESS, SWORN**)

 4           THE COURTROOM DEPUTY:  Please be seated.

 5           State your full name for the record and spell your

 6    last name.

 7           THE WITNESS:  Steven Lee Hansen, H-A-N-S-E-N.

 8           MR. HEARTY:  May I proceed, Your Honor?

 9           THE COURT:  Yes, please.

10           MR. HEARTY:  Thank you.

11                        **DIRECT EXAMINATION**

12    BY MR. HEARTY:

13    Q    Sir, could you please tell us what you do for a living?

14    A    Excuse me?

15    Q    What do you do for a living?

16    A    I am a lieutenant with the Bureau of Prisons, which is a

17    shift supervisor.

18    Q    How long have you been with the Bureau of Prisons?

19    A    September of 1999.

20    Q    Was that approximately 15 years?

21    A    Eleven years, three months.

22    Q    And where are you currently assigned?

23    A    FCC Tucson.

24    Q    What does "FCC" stand for?

25    A    Federal correctional complex.

Steven Hansen - Direct

1    Q    And I would like to take you back to April 20 of 2009.

2    A    Okay.

3    Q    Where did you work on April 20 of 2009?

4    A    At the FCC complex in Florence, Colorado, but specifically

5    at the FCI, which is the medium institution in that complex.

6    Q    And what does "FCI" stand for?

7    A    Federal correctional institution.

8    Q    And that's in Florence, Colorado?

9    A    Yes, sir.

10   Q    And what were your responsibilities on April 20, 2009?

11   A    I was the SHU lieutenant, which was six to two, six in the

12   morning till two in the afternoon.  I was the supervisor in the

13   special housing unit.

14   Q    Okay.

15        And you mentioned "SHU."  Is that an acronym that you

16   use to refer to the special housing unit?

17   A    Yes.  Sorry.

18   Q    Could you explain to us what the SHU is, special housing

19   unit?

20   A    The special housing unit -- in a prison setting, there's

21   the general population.  And there's the special housing unit.

22   The special housing unit's where there's -- we have incident

23   codes or disciplinary codes, and they -- the more severe ones

24   can place you in the special housing unit.  For the inmate

25   population.

Steven Hansen - Direct

1  Q   And could you just give us a sense of what are some of the

2  differences for an inmate that maybe is in general population

3  on the one hand at FCI Florence versus an inmate who's assigned

4  to the special housing unit at FCI Florence?

5  A   Sure.  Well, the general population, what we do, the

6  inmates do have what we call program.  They can be out on the

7  institution.  They have their own cells.  They'll have a

8  cellmate.  Another inmate inside their cell.

9       They can go to school, get their GEDs, they can do

10 hobby craft, they go to recreation, they have, they have that

11 freedom inside the institution.

12       Now, verse, you know, we keep the security of the

13 institution now in the general pop; but once they, like I said,

14 they have an incident out on the yard, whatever, they can be

15 placed in the special housing unit.  So that special housing

16 unit, from inside the prison is a disciplinary building where

17 inmates get in trouble outside on the general population,

18 they're placed in the special housing unit.  So it's like a

19 prison inside the prison.

20 Q   And you described that inmates in the general population,

21 some of the freedoms that they have and including, you know,

22 hobby and recreation, more association with other inmates.

23 A   Right.

24 Q   Working, that sort of thing?

25 A   Right, they could go to their work, they have job

 1    assignments, plumbing, paint shop, food service.  They could be

 2    orderlies within the housing units.  Compound orderlies.  So we

 3    give them, you know, opportunities to have jobs and get paid

 4    for those jobs.

 5    Q    When inmates in general population are fed, do they go to a

 6    cafeteria?

 7    A    Yeah, it's cafeteria setting.  It's kind of just like you

 8    walk in and they have inmates serving the food and they get

 9    their food and they'll go sit at a table and sit around with

10    other inmates.

11    Q    All right.

12          So can you contrast that for us, the general

13    population, as compared to the restrictions that an inmate who

14    is assigned to the special housing unit has?

15    A    So -- well, the difference in the special housing unit is

16    the inmate is, is in a cell for 23 hours a day, and then

17    there's they have the recreation and stuff.  But the security,

18    they're a security risk for the institution, so we do have them

19    placed in the special housing unit.  And the difference there

20    is we feed them inside their cell, they stay inside their cell,

21    and they're escorted out to the recreation, which is inside the

22    special housing unit itself, there's whole rec cages.

23    Q    Now, again, to kind of orient us to the prison, do

24    correctional officers carry guns?

25    A    No, sir.  The only time we carry weapons is when we take an

1   inmate outside the secured perimeters of the institution.

2   Q    And just some terminology for us.  Are you familiar with

3   the term "range"?

4   A    Yes.  Ranges in the special housing unit, there's -- excuse

5   me -- there's four ranges.  There's A100, A200.  They're kind

6   of right on top of each other.  There's the stairs that go up

7   to 200 and there's B100 and B200 and the ranges are, they just

8   go down and they're kind of like a wing, if you will, they go

9   down and there's cells on each side on the lower ranges, and up

10  on top, there's just on the outside wings, ranges, there's just

11  single cells on one side of the range.

12  Q    So each range would be two floors; is that right?

13  A    Yes, sir.

14  Q    So you'd have A100 would be the bottom floor and A200 is

15  the top floor?

16  A    Yes, sir.

17  Q    And that's all in the same wing?

18  A    Yes, sir.  On the same side of the special housing unit.

19  Q    On the other side, you'd have B100 on the bottom?

20  A    And B200 up on top.  So they sit kind of like this and they

21  just go down.

22  Q    What about the term "bubble"?

23  A    The bubble is what we call, the staff calls, it's basically

24  the officers' station inside the special housing unit.  And

25  it's like an octagon and then you have the two ranges that go

Steven Hansen - Direct

1  down, that are shaped away from the bubble.  Or the officers'

2  station.

3  Q   Now, from your, when you were assigned as the lieutenant of

4  the special housing unit in Florence, did you come to know the

5  inmate or the defendant in this case, Daniel Morones?

6  A   Yes, I did.

7  Q   Okay.

8         How did you come to know him?

9  A   I know, as a supervisor, I just, I was SHU lieutenant, so I

10  know pretty much all the inmates that are down in SHU.  So, I

11  mean, I just know of Morones and his, his actions down in the

12  SHU.

13  Q   Okay.

14         Do you see Daniel Morones in court today?

15  A   Yes, he's right here.

16  Q   So would you just for the record please identify where he's

17  sitting by -- and describe an article of clothing that he's

18  wearing?

19  A   He's wearing a shirt and tie.  He has a goatee and sitting

20  at the head of the table here.

21  Q   Thank you.

22         MR. HEARTY:  Your Honor, could the record reflect,

23  please that the witness has identified --

24         THE COURT:  Yes.  The record will so reflect.

25  BY MR. HEARTY:

1  Q   Now, prior to April 20, 2009, and without getting into the

2  specifics, just generally, had there been disruptive behavior

3  that the defendant was responsible for while he was in special

4  housing unit?

5  A   Yes.  Yes.  He's had -- what -- in the special housing

6  unit, we have the cells and then inmate Morones had some

7  disciplinary actions that he, he tore apart a cell --

8  Q   Let's try not to get into the specifics of it.

9  A   Okay.

10  Q   Just general, Lieutenant, I'm just tying to establish, the

11  cell, the reasons for the cell that he ends up in.

12  A   The holding cell.  The observation cell.

13  Q   Okay.

14  A   Okay.

15  Q   So which cell is he assigned to on April 20, 2009?

16  A   The A100 observation cell.

17  Q   Okay.

18       And generally, not talking about specifics related to

19  defendant here --

20  A   Uh-huh.

21  Q   -- why are inmates put in the observation cell?

22  A   Because they have disciplinary, displayed disruptive

23  behavior while they're inside the special housing unit.  And he

24  was -- that's why he was in A100, so we can observe them,

25  because it's a security risk for us.

171

1  Q   Where is the A100 cell located in relationship to the

2  bubble?

3  A   If this is the bubble, right, right across the -- there's a

4  walkway in front of the bubble and then there's observation

5  cell down -- there's A100 and there's B100, and they're just

6  both right there and they have a big window where you can see

7  inside of them.

8  Q   So it would be fair to say that A100 and B100, or the

9  observation cells, are the cells closest to the bubble where

10 the guards are?

11 A   Yes, sir.

12 Q   And on April 20, 2009, were there restrictions in place

13 regarding how the defendant, inmate Morones, was to be moved if

14 he was moved from one cell to another cell?

15 A   Inmate Morones was, he was on a three-man hold, what we

16 call three-man hold.  It's lieutenant three-man hold.  A

17 lieutenant has to be present anytime inmate Morones was taken

18 out of the cell he was in, whichever cell it may be, the

19 lieutenant had to be with him during that move, and two staff

20 members.

21 Q   On the morning of April 20, was there an event involving

22 the defendant based on his conduct within cell A100?

23 A   Yes.  A100, he broke a sprinkler head inside that cell.

24 Q   And would you just describe, what kind of a sprinkler head

25 are we talking about?

Steven Hansen - Direct

A    In case there's a fire inside the cell, it's the fire
suppression system for the each cell has one, and it's a
sprinkler head, just like one of these, and it was inside the
cell.  And he broke it.

Q    And what happened after he broke the sprinkler head?

A    Well, the water just gushes out there, and it floods 'cause
of the sprinkler head.  It's not going to obviously work right,
but it floods the cell.

Q    And then what had to be done by the correctional officers
assigned to the special housing unit after that happened?

A    I told a staff member to go out and turn off the water for
the special housing unit, shut the water-suppression system
down.  Due to his disciplinary -- or disruptive behavior.

Q    And was there, based on that conduct, was there a need to
move the defendant out of cell A100?

A    Yes.  But like I said, with lieutenant -- inmate Morones
being a three-man hold, we had to wait for facilities
department, which is the plumbers and maintenance -- excuse
me -- maintenance department inside the institution, to come
and fix the broken sprinkler head.

Q    So then after those arrangements were made, were there
steps taken to move the defendant out of cell A100?

A    Yes.

Q    Okay.

          And please describe, then, what was done to move the

1  defendant out of cell 100 and where he was taken to.

2  A    Okay.

3          So A100, he was in A100 and there is a, like a, we

4  call it a wicket, and it's a little door on the cell door, to

5  feed, you know, to put their food through the slot, it's a food

6  slot wicket.  We had that, we opened up that and told him to

7  come to the door and to be placed in restraints.

8          So he did.  Put the restraints on him.  Escorted him

9  from A100 to B100.  And placed him in B100 and left him in

10  restraints.  Until the sprinkler head was fixed.

11  Q    And just tell us, when you say "restraints," what is that?

12  What is the restraints that you used?

13  A    Handcuffs.

14  Q    Okay.

15          And there are things that, that, and based on your

16  experience as a correctional officer, that inmates sometimes do

17  when the restraints are being placed on their wrists that can

18  make it more difficult to apply the restraints?

19  A    Inmates can manipulate the restraints, we've seen it done

20  numerous times.  They could twist their -- 'cause when we

21  cuffed him up or we put him in restraints, it was behind his

22  back.  So inmates can turn their wrists, you have to just pay

23  attention, you learn the little techniques that they do to be

24  able to -- they might not ratchet down all the way.  Or they --

25  I don't know if I'm answering your question.  They can do

1  things like turning their wrists or just you have to be

2  cognizant of that.

3  Q   And those things would affect how secure the restraints or

4  the handcuffs are attached to them; is that right?

5  A   Right.

6  Q   Okay.

7      So after you moved the defendant to cell B100, was the

8  sprinkler head in A100 fixed?

9  A   They were fixing it while he was in B100.  And it took them

10  probably ten, 15 minutes to fix it.

11  Q   Was anything else done to the cell when the defendant was

12  out of cell A100?

13  A   Yeah, they squeegeed the water out of the cell, the

14  remaining water that was in there.

15  Q   And after that was done, did you then move the defendant

16  back from B100 to A100?

17  A   I was coughing; can you say that again.

18  Q   Yeah.  After the cell, you just testified the cell had been

19  cleaned and the sprinkler head fixed, did you move the

20  defendant from B100 back to A100?

21  A   Yes, I did.

22  Q   Okay.

23      Could you describe kind of how that move took place?

24  A   Yes.  I went down to B100 cell, and I told Morones that we

25  were going to move him back into A100.  We had another staff

1  member -- did you want me to say his name?

2  Q    Sure.

3  A    There's another staff member at the bottom.  And at the

4  bottom of B100, there's a set of stairs right there.  So me and

5  the other staff member took inmate Morones out of B100 and

6  escorted, we were escorting him up the stairs.

7  Q    And let me stop you there.  Who was the other staff member

8  that you referred to there?

9  A    Tom Vialpando.

10  Q    What is his position?

11  A    He was the DSA SHU 1 officer, special housing unit officer

12  no. 1.

13  Q    So he's there next to you when you're moving the defendant

14  out of cell B100?

15  A    Yes.

16  Q    Who has their hands, if anyone, on the defendant at that

17  time?

18  A    I have my hands on inmate Morones.

19          THE DEFENDANT:  Objection, Your Honor.  Leading.

20          THE COURT:  Sustained.

21  BY MR. HEARTY:

22  Q    Lieutenant Hansen, can you tell us if anyone had hands on

23  the defendant during the move?

24  A    I had my hands on inmate Morones's cuffs.

25  Q    And did anybody else have hands on the defendant?

Steven Hansen - Direct

1  A   No.  I was going, I was walking him up the stairs, and

2  Vialpando was behind me, 'cause like I said, the stair well is

3  real narrow.  And I got to the top of the stairwell, and I saw

4  just a real quick move, movement by inmate Morones.  And he

5  swung --

6  Q   Can I stop for you a second.

7       You said that you had hands on the defendant.  Can you

8  describe where your hands are, to the extent you remember?

9  A   Yes.  They were on the cuffs.  There's, on a set of cuffs,

10  there's the cuffs initially that go around the wrists, and then

11  there's the three links that hold the cuffs together.  I had

12  the three links on the cuffs.

13  Q   Okay.

14       When I stopped you, you had just gotten to the top of

15  the stairs, the landing?

16  A   Yes.

17  Q   Could you continue from there?

18  A   When I got to the top of the stairs, inmate Morones got to

19  the top of the stairs first, and I stepped up, and he did a

20  quick movement, and I backed like this, and then I just felt

21  something hit my face.

22       And when he hit my face, he kind of pushed me back

23  into the bubble, and then I grabbed his head and put head down

24  so he couldn't hit me anymore, and so then we took him to the

25  ground to regain control of inmate Morones.

Steven Hansen - Direct

1   Q   You say you took him to the ground.  Is there training that

2   you have when you're dealing with situations like this?

3   A   When inmates get combative, they've taken that to a

4   different level; and when they get unruly and display this type

5   of behavior, we have to get control of the situation

6   professionally and immediately as quick as possible.  So no

7   other staff gets injured.

8   Q   When the defendant hit you in the face, do you recall which

9   hand he hit you with or any more details like that?

10  A   I just, I can't really -- I couldn't tell -- all's I -- I

11  just saw the quick movement.  He just ripped his hand out of

12  the cuffs and just swung towards me.  And I just went like

13  this, and I felt get hit on the left side of my face.

14  Q   What was your focus on?

15  A   What's that?

16  Q   Sorry.  What was your focus on at that time?

17  A   At that time it was to regain control of the inmate.  I

18  mean, nobody goes to work to get assaulted every day, and I,

19  you know, I was, I knew who he was, what type of caliber inmate

20  he is, he's very, you know, you know, he's not very, he's an

21  inmate that you need to watch.  So I put -- shocked, you know,

22  the initial shock of getting, you know, assaulted, and then

23  taking him to the ground to regain control is my biggest

24  concern.

25  Q   And you testified that he hit you in the face --

1  A    Yes.

2  Q    -- isn't that right?

3         Did -- let me just ask you, did it hurt?

4  A    Yes, it hurt.

5  Q    Did you suffer any visible wounds?

6  A    Yes, I did.

7  Q    Can you describe generally those wounds?

8  A    I had a abrasion on my cheek and a cut on my cheek, kind of

9  on my eye area.

10  Q    Do you recall if the hand that he hit you with had the

11  handcuff hanging from it?

12  A    I believe that just the quick movement with him and him

13  hitting me, it had to be the hand that was, that still had the

14  other restraint on it, that was still ratched on it, so the

15  free-floating restraint was obviously pulled his other hand out

16  of that.

17  Q    When you were attempting to restrain the defendant, what

18  was he doing?

19  A    He was being very combative.  And when I got him on the

20  ground, he was yelling out, I just, I just stole on this, this

21  fool and he was yelling down the range to -- and he was saying,

22  homeys, call his homeys, saying, hey, dudes, I just stole on

23  this dude, it took five of them or whatever to get me down, he

24  was just yelling downrange, bragging what he had done.

25  Q    When you say he was yelling downrange, was he saying that

Steven Hansen - Direct

1   to you?

2   A   No.  He was saying it to his inmates, his companions that

3   were down A100 range.

4   Q   Could other inmates see, would they have visible

5   observation on the area where the assault took place?

6   A   No, not really.  Inmates are very inventive.  They, I mean,

7   unless they had, you know, they made like their little mirror

8   or something that they could have hanging out the door looking

9   down.  But other than that, I don't see how any other inmate

10  would be able to see what was going on.  Unless an orderly,

11  there's an orderly cage inside the SHU unit there, but that

12  would be the only thing that I would say.

13  Q   From the inmate cells, can you hear what would be going on

14  in this area around the bubble?

15  A   Yeah, it echoes down there.  You could hear.

16  Q   Did other officers come to your aid in your attempts to

17  restrain the defendant?

18  A   Absolutely.  Tom Vialpando was there.  Officer Sheriff was

19  also there.

20  Q   And were you able to get the defendant restrained?

21  A   Yes, we were.  But he was being very combative.  He was,

22  you know, we had to get the shield, 'cause he was spitting on

23  staff.  And so we had to get the shield so we weren't getting

24  spit on with bodily fluid.  And then he was on his -- he was on

25  his back -- when I fell on him, I fell on him, we were belly to

1  belly, and I had control of his head.  And the other officers

2  that were trying to get him restrained, but to get him

3  restrained, we had to get him from his back to his belly, and

4  he was being very combative at the time.

5  Q   When you say "get him restrained," you mean put handcuffs

6  back on his hands?

7  A   Yeah, 'cause he pulled out of them.

8  Q   Any other restraints?

9  A   There was leg irons.  Leg irons, they're cuffs for your

10  legs.  They go around your ankles, and then they have, you

11  know, a chain between the restraints like about that long.

12  Q   Okay.

13        And after you got the restraints put on the defendant,

14  what did you do with the defendant?

15  A   Can you say that again?

16  Q   After you got the restraints put on the defendant, both

17  arms and legs, what did you do with him?

18  A   We had -- like I said, it took us a minute to get him

19  turned around, and then we stood him up, and we placed him back

20  into A100 observation cell.

21  Q   Now, are there video cameras within the special housing

22  unit?

23  A   Yes, sir.

24  Q   Okay.

25        And have you previously reviewed a videotape that

1  shows at least in part this assault?

2  A   Yes.

3  Q   Okay.

4        Let me direct your attention to Government's

5  Exhibit 1, which is in the notebook in front of you.

6        Does that appear to be a DVD?

7  A   Yes, it does.

8  Q   Do you know if that DVD has on it a recording of the

9  videotape that was taken from one of the SHU cameras at the

10  Florence facility?

11  A   Yes, it does.

12  Q   How do you know that you've viewed the contents of that?

13  A   I've initialed it and dated it.

14        MR. HEARTY:  Your Honor, I move the admission of

15  Government's Exhibit 1.

16        THE COURT:  Any objection.

17        THE DEFENDANT:  No, Your Honor.

18        THE COURT:  All right.  The exhibits are admitted.

19     (Exhibit 1 admitted.)

20        MR. HEARTY:  Your Honor, I'd like to publish.

21        THE COURT:  You may.

22  BY MR. HEARTY:

23  Q   All right.  So before we play this, Lieutenant Hansen,

24  could you describe generally the view that we're seeing here on

25  this still, currently this still to the jury as it relates to

1   the layout that you described earlier in your testimony?

2   A    Yes.  You can see, okay, the tile there, you see this,

3   like, looks like a cart or something, with the window and then

4   the bars that are horizontal, that's the bubble right there.

5           The entry door, when you come in, you can't see the

6   entry door, but it's just before the bubble, and that's how you

7   enter the special housing unit.

8           The door that's closed there, the second door on the

9   left, that's the rest room.

10          And then the second door, it's like a, it's just a

11  storage room.  Basically.

12  Q    And just show you there.  That area that I just circled?

13  A    Yes.

14  Q    What's that area?

15  A    That's what we call the bubble, the officers' station, in

16  the special housing unit.

17  Q    Okay.

18          And do you know who this person is right there?

19  A    I believe that is, that's either Sheriff or that's Ben

20  Sandoval.  I think it might be Sheriff.

21  Q    And then where did the assault take place, where defendant

22  was able to get his hand out of the cuff and turn and punch

23  you?

24  A    Well, you can't see -- you see the bubble that you just

25  circled, and then it's on the other side of that bubble, and

Steven Hansen - Direct

1  then that's the stairwell that goes down to B100.  So it

2  happened right on the other side of that bubble.

3  Q   Okay, so the stairwell --

4  A   At the top of the stairs.

5  Q   -- that you testified that you brought the defendant up

6  from B100?

7  A   Right.

8  Q   Is on the other side of the bubble?

9  A   Yes, sir.

10  Q   And then, could you just tell us, you see there's kind of

11  lower windows kind of in that area?

12  A   Right.

13  Q   And like what cell is right there?

14  A   That's A100.

15  Q   And so is there a stairwell; you see where this person is

16  here, is there a stairwell?

17  A   Yes, there is.  That will take you down to A100 and a stair

18  that will take you up to A200.  Like a little switchback right

19  there.

20          MR. HEARTY:  Lieutenant Guillory, can you go ahead and

21  start that video.

22      (Videotape played but not reported.)

23          MR. HEARTY:  Let me have you stop it there,

24  Lieutenant.

25  BY MR. HEARTY:

1  Q   We just saw a lot of movement, people moving around.  I'll

2  give you the opportunity to describe what was happening there,

3  that part that we just saw.

4  A   Okay.

5       As I said before, on the other side of this bubble,

6  when we got to the top of the stairs, he made the reaction of

7  pulling out of his cuffs and assaulted me and pushed me back

8  into the bubble and then Tom Vialpando, the officer that was

9  with me on the stairs, and then Sheriff ran over, 'cause he saw

10 what was going on, and us three taking inmate Morones down to

11 the ground.

12 Q   Okay.

13      Are you, just to identify you on this, are you the

14 gentleman in the white shirt there that I circled?

15 A   Yes, sir.

16 Q   So basically what we have is a pile of people, right?

17 A   Yes.

18 Q   And you're trying to restrain inmate Morones?

19 A   Yes.  At this time he's being combative still and he's

20 unrestrained at this time.

21 Q   Let me ask you about that.  As you go downrange, are there,

22 in addition to each cell door, is there an additional level of

23 security at the entry to the range?

24 A   Yes.  What there is, we have, it's a door at the beginning

25 of each range that we have, and that stays secured.  And then

1  just for, you know, if an inmate was able to manipulate his

2  door to get out of his cell, we still have that door for, you

3  know, security purposes.

4  Q   Where the defendant slips out of his handcuffs and punches

5  you, is that outside of that secured area that is the secured

6  ranges?

7  A   Yes.  Oh, yes.

8  Q   So this area does not have an additional level of security?

9  A   No, this is where the officers are, you know, walking

10  around, doing the normal day-to-day operation in the special

11  housing unit.

12  Q   Okay.

13         MR. HEARTY:  Lieutenant Guillory, if you could

14  continue the video.

15     (Videotape played but not reported.)

16  BY MR. HEARTY:

17  Q   Now, is the defendant yelling at this time, as you're

18  trying to --

19  A   Yes.  You saw the female staff member, Gina Garcia, walk

20  into the bubble.  She's getting the shield.  Because -- there

21  she comes with the shield.  Because the -- 'cause he's

22  spitting.  And yelling down the range, he's yelling at us, he's

23  saying that he can't, he can't breathe or whatever 'cause we're

24  on top of him.  And he's yelling down to his, at the same token

25  yelling downrange to his inmate counterparts, yelling, bragging

1  about what he had just done.

2      (Videotape played but not reported.)

3          THE WITNESS:  Right here we're --

4  BY MR. HEARTY:

5  Q   Go ahead.

6  A   Right here we're trying -- now she's going to get the

7  shield, I think.

8          We're trying to get the inmate -- he's still being

9  combative.  You have to understand he's on his back and we have

10 to get him on his belly.  And with him being combative and

11 spitting bodily fluid on staff members, we're trying to figure

12 out a way to coordinate to get him to his belly to get him in

13 restraints.

14         MR. HEARTY:  Actually, Lieutenant Guillory, go a

15 little further.

16         THE WITNESS:  See the shield there.

17 BY MR. HEARTY:

18 Q   You can see the reflection?

19 A   Right, you can see the reflection of the shield.  You can

20 back it up and see it a little bit.

21         There it is.

22         MR. HEARTY:  Okay.  Lieutenant Guillory, go ahead,

23 please play some more.

24     (Videotape played but not reported.)

25 BY MR. HEARTY:

1  Q   Can you tell us what you were just doing there, you just

2  reached to your belt?

3  A   Right.  I was calling on the radio.  When this happens, we

4  have what we call body alarm.  We'll say staff needs assistance

5  over the radio.  And they were calling me on the radio for --

6  and you'll start seeing responding staff coming in.  He's going

7  to open the door right now.  Responding staff was coming in,

8  and I was keying them to come in.  It's security procedure that

9  we have, you know, the operations lieutenant -- or special

10 housing lieutenant has them keyed in to control.  Through

11 control has them keyed in to special housing unit.

12 Q   So somehow an alarm sounded from your radio, is that --

13 A   No, not from my radio.  A staff member got on the radio and

14 said staff needs assistance in the special housing unit.

15 Q   Okay.

16 A   And that alerts all other staff that are out in general

17 population or out in the other general part of the institution

18 to respond to wherever the incident is taking place.

19     (Videotape played but not reported.)

20 A   Okay.  Now, we're getting ready to . . . I believe we have

21 him restrained here.

22         And that's Vialpando letting staff in.

23 Q   Right here is Officer Vialpando?

24 A   Yes, sir.

25         We're picking him up.

 1          Keeping his head down so he can't spit bodily fluid on

 2    anybody anymore.  And here at this time, he's still yelling

 3    downrange, bragging about what he did.

 4    Q    And where are you escorting him?

 5    A    Back to the A100 observation cell.

 6    Q    And that would be the cell right behind this window?

 7    A    Yes, sir.

 8          MR. HEARTY:  Okay, Lieutenant Guillory, you can go

 9    ahead and stop the video there.

10    BY MR. HEARTY:

11    Q    When you were moving the defendant up through the stairs

12    and when he slipped the handcuff and punched you, were you

13    engaged in the performance of your duties?

14    A    Yes.  I was, I was in the performance of my duties, yes.

15    Q    And you testified a little bit about the wound that you

16    suffered, a scrape, an abrasion on the side of your head?

17    A    Yes.

18    Q    Right?

19          I'd like to have you look at, in the notebook in front

20    of you, what's been marked as Government's Exhibit 2A.

21    A    Okay.

22    Q    Lieutenant, is that a photograph that was taken after the

23    incident of you?

24    A    Yes, sir.

25    Q    And does that photograph fairly and accurately depict what

1  it shows, and that is the side of your head?

2  A   Yes.

3         MR. HEARTY:  Your Honor, move the admission -- offer

4  Government's Exhibit 2A.

5         THE DEFENDANT:  No, Your Honor.

6         THE COURT:  All right.  It's admitted.

7      (Exhibit 2A admitted.)

8         MR. HEARTY:  Permission to publish, Your Honor?

9         THE COURT:  Yes.

10  BY MR. HEARTY:

11  Q   All right, Lieutenant, would you just describe where the

12  wound is on your face there?

13  A   An abrasion on my cheek and then a laceration from, from

14  the assault on my, right by kind of my temple area, if you

15  will.

16  Q   The laceration you discuss is right there?

17  A   Yes, sir.

18  Q   Okay.

19         And this here that I just circled is the abrasion

20  you're talking about?

21  A   Yes, sir.

22  Q   Now, you testified that your focus, after you got hit in

23  the face, was restraining the defendant, right?

24  A   Yes.

25  Q   And then you also testified that he hit you with the hand

Steven Hansen - Direct

1  that had the handcuff still on it, the handcuff dangling below

2  his wrist?

3  A   Right.  I didn't know -- like I said, it all happened just

4  like that.  I mean, it was very quick, very quick.  So, yes, he

5  just -- he turned, and I felt something hit my face.

6  Q   Let me ask you, when you -- was this, these injuries on

7  your face there, were they obvious to other people?  When you

8  saw other people, went home and saw your wife, was the --

9  A   Oh, yeah.  Both my wife and kids were both asking me what

10 happened.

11 Q   All right.

12         I'm going to have you look at Exhibit 2B.  It's the

13 next exhibit in your notebook there.

14 A   2?

15 Q   Yeah, 2B.

16         And is that another photograph taken at approximately

17 the same time, after the assault by the defendant?

18 A   Yes, sir.

19 Q   And does that fairly and accurately again, show the side of

20 your head?

21 A   Right.  And also above my eye.  I had a little, I guess it

22 was abrasion.

23         MR. HEARTY:  Your Honor, offer the admission of

24 Government's Exhibit 2B.

25         THE DEFENDANT:  No objection, Your Honor.

1          THE COURT:  It's admitted.

2      (Exhibit 2B admitted.)

3  BY MR. HEARTY:

4  Q   Okay.

5          You just said, you mentioned an abrasion above your

6  eye as well?

7  A   Yes, sir.

8  Q   And did I just circle that?

9  A   Right there.

10          MR. HEARTY:  May I have a moment, Your Honor?

11          THE COURT:  Yes.

12  BY MR. HEARTY:

13  Q   Lieutenant Hansen, you had testified earlier, then I think

14  I cut you off before you finished your answer, that the assault

15  was on the left side of your face?

16  A   Oh, yeah.  No, it was on my right side.  I mean, this was

17  almost two years ago.  Almost two years ago.  It's on the right

18  side of my face.

19  Q   All right.

20          Thank you.

21          MR. HEARTY:  I have no further questions.

22                          **CROSS-EXAMINATION**

23  BY THE DEFENDANT:

24  Q   Mr. Hansen, have you known Mr. Morones prior to your work

25  at FCI Florence?

1   A   No, I knew of inmate Morones only at FCI Florence.

2   Q   Did you ever work at FCI Sheridan?

3   A   Yes, I did.

4   Q   Did you work there from the date of June 2005 to the date

5   of July 2006?

6   A   June 2005?

7   Q   Yes.

8   A   Yes, I did.  I was there.

9   Q   I was there, also.

10  A   Okay.

11  Q   While being assigned to the special housing unit at FCI

12  Florence, were you ever given special instructions regarding

13  inmate Morones?

14  A   Yes, I was.

15  Q   Would you elaborate?

16  A   As I said before, he was, inmate Morones was on a three-man

17  hold, which is a one lieutenant with two staff.

18  Q   When you came to the special housing unit at FCI Florence,

19  where was Mr. Morones housed?

20  A   I don't recall which specific cell.  You were, you were --

21  or inmate Morones was assigned in the special housing unit.

22  Q   Were you ever given, shall we say, instructions to sort of

23  break him in, kind of like a horse?

24  A   Absolute -- no.  No.

25  Q   So defendant Morones was never assigned your project case,

Steven Hansen - Cross

1  was sort of like a ghost assignment.

2  A   I don't understand your question.

3  Q   You were never assigned to kind of quell said incidents

4  that occurred in the SHU?

5  A   I don't -- I can't -- I can't say yes or no.  I don't

6  understand what you're trying to say.

7  Q   The A100 holding cell you identified, do you remember how

8  long inmate Morones was in this dry cell you stated?

9  A   Dry cell.  I never said "dry cell."

10  Q   The A100 holding cell?

11  A   Observation cell?

12  Q   Yes, sir.  I correct myself.

13  A   Yes.

14  Q   Do you recall how long inmate Morones was placed in that

15  cell?

16  A   I don't recall.

17  Q   It was 12 days.

18  A   12 days?

19  Q   And four after --

20        MR. HEARTY:  Objection, Your Honor.  I'm going to

21  object to the defendant testifying from the lectern.

22        THE COURT:  Yeah.  This is a little bit difficult.

23  You can't provide the information for him.  It's just his

24  answers.

25        THE DEFENDANT:  Sorry, Your Honor.

1           THE COURT:  That's all right.

2    BY THE DEFENDANT:

3    Q   Did you ever make Mr. Morones defecate into a 5-gallon

4    plastic bucket?

5    A   At the time of -- when inmate Morones was inside the

6    observation cell, there is no, there is not a bathroom inside

7    the observation cell.

8    Q   And is this standard Bureau of Prisons procedure?

9    A   Standard procedure?

10   Q   Yes.  Is it standard procedure?

11   A   For?  Procedure for what?

12   Q   To, to allow a inmate to defecate in a 5-gallon bucket?

13   A   Well, we do have -- we have a dry cell like you said

14   earlier, there is times when an inmate can digest something and

15   swallow something, balloons of drugs, you know, we put them on

16   dry-cell status --

17   Q   Excuse me, so you do recollect a dry cell, but you told me

18   you did not know what I was talking about?

19   A   No, what you asked me is if the 5-gallon bucket, so I was

20   answering your question on the 5-gallon bucket.  And you said

21   is it in policy, do we have them go inside, to use the bathroom

22   inside a 5-gallon bucket.

23   Q   So after Mr. Morones was finished with said bucket, was he

24   ever offered any sanitary functions after the bowel movements?

25   A   Yes.  We have, we had soap and for the inmate right there

1  outside the door.

2  Q   That never happened.

3        MR. HEARTY:  Your Honor, I'm going to object again to

4  the testifying from the lectern.

5        THE COURT:  It's not testimony.  Sustained.

6  BY THE DEFENDANT:

7  Q   Mr. Hansen, how long exactly have you been working for the

8  BOP, approximately?

9  A   As I stated before, September of 1999.

10  Q   And before you were a lieutenant, your day-to-day duties

11  were working the hand restraints, placing them upon inmates,

12  correct?

13  A   Yes, sir.

14  Q   Now, if you grasp the middle of the hand restraint and a

15  inmate makes a sudden move, wouldn't you feel that to counter

16  or recalibrate yourself?

17  A   Yes.  That's what I was explaining, when I had inmate

18  Morones's hand, the hand restraints, when I had inmate Morones

19  cuffed up, I walked to the top, escorted him to the top of the

20  stairs, and when he had that quick movement, I went like this.

21  Q   Now, you've been working with the Bureau of Prisons since

22  1999; and in your training, are you trained to sort of back up

23  in the way, in the manner that you did?

24  A   I don't understand your question.

25  Q   Is that your training, the, the counter that you did, with

1    your hands to your face, is that your training?

2    A    No, I think that's just a instinct for when somebody's

3    being assaulted, to try to protect themselves.

4    Q    So in the heat of your duty, you, you abandoned training

5    for instinct.

6    A    No.  I never said that that was my training.  That was what

7    I did to protect myself from being assaulted by inmate Morones.

8    Q    You also said that that was not your training.

9    A    I don't understand your question.  I don't think I said

10   that's not my training.

11   Q    How much do you weigh, Mr. Hansen?

12   A    250 pounds.

13   Q    And how much did you weigh at the time of said alleged act?

14   A    245, 250.

15   Q    Do you know Officer Daniel Sheriff?

16   A    Yes, I do.

17   Q    How much would you estimate grossly that he weighed?

18   A    I have no idea how much he weighs.

19   Q    So you, you couldn't tell me how much your coworker that

20   you work with on a gross scale weighed?

21   A    Well, that's not what you asked.  He weighs over

22   200 pounds.

23   Q    Over 200 pounds?

24   A    Sure.

25   Q    And Mr. Daniel Sheriff, how much would you estimate that he

Steven Hansen - Cross

1  weighs?

2  A   That's who -- that's who we're talking about.

3  Q   I'm sorry, Mr. Thomas Vialpando, I correct myself.

4  A   He's over 250.

5  Q   Over 250.

6           So here we have 250, 250, 500, and over 200, we'll put

7  it at 700.  So we have 700 pounds back behind a inmate Morones

8  placing him on the ground.

9           Is that correct?

10 A   Yes.  'Cause inmate Morones just got done assaulting a

11 staff member, so we had to control the inmate.  So that's the

12 reason the weight was on inmate Morones.

13 Q   Are you familiar with the SIS, meaning special

14 investigative service, camera tech area?

15 A   The SIS?  Yes, I know what SIS is, yes.

16 Q   Are you familiar where the center is, where they monitor

17 the cameras?

18           Like the cameras you just seen today in the

19 Government's exhibit?

20 A   Uh-huh.

21 Q   So you are familiar?

22 A   Yes.

23 Q   So you know the angles of those cameras?

24 A   No, I do not know the angles.

25 Q   You do not know the angles?

Steven Hansen - Cross

1  A    No.

2  Q    But you are familiar with the area?

3  A    Excuse me?

4  Q    But you are familiar with the area, the SIS camera area

5  tech where they monitor the videos?

6  A    No, I know there's an area with the cameras, yes, that's

7  what I answered your question.

8  Q    Whose responsibility was it to check the placement of the

9  handcuffs on inmate Morones?

10  A    It was me.  I put them on him.

11  Q    It was you?

12  A    I put them on him.

13  Q    When you pulled inmate Morones out of this cell with

14  assisting officers, did you check his hand restraints?

15  A    Can you -- 'cause there's two cells.  Can you clarify which

16  cell.

17  Q    Okay.

18        I'm speaking more right before the alleged assault

19  happened when you pulled inmate Morones out of the B100 holding

20  cell, did you check his hand restraints?

21  A    Yes, I opened up the food slot and I remember that I left

22  you in restraints.  I left inmate Morones in restraints.  While

23  the sprinkler head was being fixed.  And I shot back the food

24  slot, opened up the door, and escorted you out of the cell.

25  Q    I just wanted to know if you checked the hand restraints.

Steven Hansen - Cross

1        Now, you didn't notice anything wrong with the hand

2   restraints for surely you would have corrected the problem if

3   you noticed something wrong.

4   A   Absolutely.

5   Q   Absolutely.

6        Because you're trained for that, right?

7   A   Trained for --

8   Q   Because you're trained for that, it's a security duty,

9   you're trained for it, right?

10  A   How to administer restraints?

11  Q   Yes, sir.

12  A   Yep.

13  Q   Now, was there any type of instrument found on Mr. Morones,

14  a sort of a paper clip or slip key or anything to obstruct,

15  obscure, or delineate the handcuffs in any way?

16  A   Delineate?  I just want to make sure I know what you're

17  saying.

18  Q   I'm talking, was there any type of instrument used to open

19  the handcuffs?  Was it found on inmate Morones?

20  A   Not that -- not that I'm aware of.  I don't recall that.

21  Q   Now, so you say, you said earlier that when you were

22  assigned to the special housing unit, that inmate Morones had,

23  let's say, alerts upon him; is that correct?

24  A   You had a three-man hold -- inmate Morones had a three-man

25  hold.

1  Q   Any other alerts that you needed to be aware of at the

2  time?

3  A   What do you mean "alerts"?

4  Q   Red flags, watch out for inmate Morones, anything of that

5  nature, inmate Morones had a prior incident where staff was

6  assaulted during use-of-force extraction, were you aware of any

7  type of alerts to watch out for?

8  A   I was aware of inmate Morones --

9          MR. HEARTY:  Your Honor, I'm going to object and

10  actually request permission to approach.

11          THE COURT:  All right.

12      (At the bench:)

13          MR. HEARTY:  Your Honor, the danger of this line of

14  questioning is it risks bringing in the defendant's prior

15  violations while in the Bureau of Prisons up to and including

16  the homicide, which is what places him at the FCI SHU.

17          THE COURT:  Respond.

18          THE DEFENDANT:  Your Honor, I mentioned the prior cell

19  extraction.

20          THE COURT:  All right.  Let's limit it to that.

21          THE DEFENDANT:  That's what I articulated during the

22  questioning.

23          MR. HEARTY:  The question wasn't that narrow.

24          THE COURT:  It wasn't that narrow.

25          Let's rephrase your question, limit it to any prior

Steven Hansen - Cross

1  cell extraction, but you do not want to open that door.

2          THE DEFENDANT:  No.  Yes, I understand, Your Honor,

3  don't want to go through another *voir dire* or *voir dire*.

4      (In open court:)

5  BY THE DEFENDANT:

6  Q   Mr. Hansen, did you sustain injury to your face and head

7  from the floor while performing an immediate use of force on

8  inmate Morones?

9  A   No.

10 Q   You did not?

11 A   No.

12          THE DEFENDANT:  Your Honor, I move to ask the

13 Government if he can replace the use-of-force video of Steve

14 Hansen and he can set it at the time of 1:33:07.

15          THE COURT:  All right.

16          MR. HEARTY:  That's Government's Exhibit 1, Your

17 Honor.

18          THE COURT:  All right.  That's fine.  Go ahead.

19          THE DEFENDANT:  I'm sorry.

20          Government Exhibit 1.

21          MR. HEARTY:  Would you repeat the time you want it set

22 to?

23          THE DEFENDANT:  Yes, that's 1:33:07.

24      (Videotape played but not reported.)

25 BY THE DEFENDANT:

Q   If you pay attention, you have to look carefully, you see

Mr. Hansen hit his head with a hard impact on the floor and

there's a little more grinding, so to say.

        MR. HEARTY:  Your Honor, I'm going to object because

that's testifying from the lectern again.  He needs to ask the

witness a question.

        THE COURT:  You need to place that in a form of a

question rather than a statement.  Ask him if that's what he

sees.

BY THE DEFENDANT:

Q   Mr. Hansen, watching that video, do you kind of want to --

do you want to rephrase your answer that you gave me?

A   About what?

Q   About sustaining an injury due to hitting the floor while

performing an immediate use of force?

A   No, I don't want to change my answer.

        THE DEFENDANT:  Your Honor, I move to ask the

Government if they can show Government Exhibit 1 and -- I'm

sorry, Government Exhibit 2A, photograph.

        THE COURT:  All right.

BY THE DEFENDANT:

Q   If you look -- I'm sorry, Mr. Hansen, now I'm looking at

your face, and I'm noticing an abrasion, a scrape-type injury.

If you'd move over to your ear, you will see also more

abrasions, scrape-type injury, a small piece right there.

1          Now, can I move to Exhibit 2B on the Government's

2    exhibit, please.

3          THE WITNESS:  Can I say something?

4          THE COURT:  No, you haven't been asked.

5          THE WITNESS:  Okay.

6          THE DEFENDANT:  If you look right there, on top of his

7    eye, you'll see --

8    BY THE DEFENDANT:

9    Q   I'm sorry.  If you look on top of your eye, Mr. Hansen,

10   you'll see another abrasion-type injury.  Now, you state that I

11   move out of these restraints and I strike you one time.  So

12   you're saying all of this was done by a single hand restraint.

13   Correct?

14   A   If I'm understanding your question, your one, your one

15   strike when you assault -- when inmate Morones assaulted me?

16   Q   Yes.

17   A   That, everything, all those happened?

18   Q   Yes.

19   A   That's what you're asking me?

20   Q   Yes.

21   A   I can't say that, yes, that is what happened.

22   Q   Well, sir, sir, I earlier asked you if you sustained any

23   injuries while hitting the floor when you were performing the

24   immediate use of force --

25   A   I never hit the floor.

Steven Hansen - Cross

1  Q   -- on inmate Morones.

2         Now, you're a heavy fellow, 250 pounds.  I believe

3  that you would feel an impact and if you don't, maybe it was

4  something blocking your feel of the impact, but that's, that's

5  what I see in the evidence that the Government has broughten.

6         MR. HEARTY:  Your Honor, I'm going to object again to

7  the defendant testifying from the lectern.

8         THE COURT:  You have to put that into the form of a

9  question and ask him if that's what he sees.

10        THE DEFENDANT:  I'm sorry, Your Honor.

11        THE COURT:  That's all right.  It's all right.

12 BY THE DEFENDANT:

13 Q   Mr. Hansen, I have no further questions.

14        THE COURT:  Any redirect.

15        MR. HEARTY:  Yes, Your Honor.

16                    **REDIRECT EXAMINATION**

17 BY MR. HEARTY:

18 Q   Lieutenant Hansen, defendant Morones was asking you some

19 questions about the conditions in cell A100.  Do you remember

20 that?

21 A   Yes.

22 Q   The special housing unit cells, other than the observation

23 cell, do those cells have bathrooms, toilets in those cells?

24 A   Yes, sir.

25 Q   Do those cells have sinks --

1  A    Yes.

2  Q    -- in them?

3  A    Yes.

4  Q    The cell, the observation cell, A100, does not have a

5  toilet or a sink; is that correct?

6  A    No.

7  Q    Why was the defendant put into cell A100?

8  A    Inmate Morones was placed into cell A100 because, I can't

9  recall what cell it was, but he displayed disruptive behavior

10 by breaking out a back window in a cell, one of the cells that

11 you were talking about, that has a sink and a toilet.  He broke

12 the back window out, tore up the, the toilet, and had a piece

13 of sheet hanging off of the bar for the back window.  On the

14 cell.  Down one of the ranges.

15 Q    And it was as a result of that conduct that he was moved to

16 cell A100?

17 A    Yes.

18 Q    Let me just ask you this.  For correctional officers, like

19 yourself and the other officers that you supervise there, is it

20 difficult for you, from a work perspective, when you have an

21 inmate assigned or placed in A100 or B100, one of the

22 observation cells?

23 A    Is it difficult?

24 Q    Yeah, is it more work?

25 A    Yeah, it's more labor-intensive as far as we have to

Steven Hansen – Redirect

1  cater -- just because he's placed inside A100 cell doesn't mean

2  that us taking care of an inmate has -- we still have to

3  conduct our job with that inmate.  We still have to get him the

4  things that he needs.  That he's allowed to have.  But the

5  holding, the observation holding cell is -- excuse me -- is for

6  inmates that have displayed disruptive behavior inside the

7  special housing unit.

8       MR. HEARTY:  Lieutenant Guillory, can you put up

9  Exhibit 2A again, please.

10  BY MR. HEARTY:

11  Q   The defendant was asking you questions about if, it seemed

12  to me, if there was one punch, how can there be multiple

13  injuries.

14  A   Uh-huh.

15  Q   Can you explain that, why there might have been multiple

16  injuries to your face from one punch, if it was one punch from

17  the defendant?

18  A   At the top of the stairs, when he turned and he hit me, I

19  felt myself get struck in the face.  I backed up into the

20  bubble.  Like I stated earlier, he pushed me back into the

21  bubble, and I put my head down on him, to secure his head, I

22  put my head down so when he pushed me into the bubble, I mean,

23  there was altercation right there, too, and he was combative

24  all the way down to the ground and while we're still on the

25  ground.

Steven Hansen - Redirect

1  Q   You testified that the hand -- your recollection is the

2  hand he hit you with also had the handcuff swinging below it,

3  attached to that?

4  A   Right.

5  Q   Do you have a, since it's your face and you're the one that

6  was hit, do you have an opinion as to what might have caused

7  these two injuries that we're seeing right there?

8  A   Yes, being assaulted by inmate Morones, plus the physical

9  altercation that took place after the initial strike.

10 Q   And this particular one, what do you think caused that gash

11 there?

12 A   I would have to say it's the handcuffs.

13 Q   Was this photograph taken immediately after the incident?

14 A   Yes, it was.

15 Q   Did you have these injuries prior to the incident on

16 April 20?

17 A   No, I didn't.  Now --

18 Q   Go ahead.

19 A   If I can say, inmate Morones, right there, that's a mole on

20 my ear.  I still have that.  That's not a injury.

21          And the scrapes in the ear, I don't see what he's

22 talking about.

23 Q   All right.

24          Thank you, Lieutenant.

25          THE COURT:  Thank you very much, sir.

1    THE WITNESS:  Thank you.

2    THE COURT:  You may stand down.

3    THE WITNESS:  Thank you.

4    THE COURT:  Next witness, please.

5    MR. HOSLEY:  Your Honor, the United States will call

6  Officer Vialpando.  Or Lieutenant Vialpando.

7    THE COURTROOM DEPUTY:  If you can turn here.

8    Raise your right hand.

9    (**THOMAS VIALPANDO, GOVERNMENT'S WITNESS, SWORN**)

10    THE COURTROOM DEPUTY:  Please be seated.

11    State your full name for the record and spell your

12  last name.

13    THE WITNESS:  Thomas Vialpando, V-I-A-L-P-A-N-D-O.

14                    **DIRECT EXAMINATION**

15  BY MR. HOSLEY:

16  Q   Mr. Vialpando how are you currently employed?

17  A   I'm a lieutenant at the United States penitentiary in

18  Florence, Colorado.

19  Q   And what agency within the United States government is your

20  employer?

21  A   Department of Justice, Bureau of Prisons.

22  Q   I'm sorry, we talked over each other.

23  A   Department of Justice, Bureau of Prisons.

24  Q   How long have you been employed with the federal Bureau of

25  Prisons?

Thomas Vialpando – Direct

1  A    15 years.

2  Q    What year, since I'm bad at math, what year did you join

3  the Bureau of Prisons?

4  A    January 7, '96.

5  Q    Has there been any break in time in your employment since

6  January of 1996?

7  A    No, sir.

8  Q    Now, you said that you're a lieutenant with the Bureau of

9  Prisons at the United States penitentiary.  That's in Florence?

10  A    Yes, sir.

11  Q    That's part of the federal correctional complex?

12  A    Yes, sir.

13  Q    What is the name of the medium-security institution at the

14  federal correctional complex in Florence, Colorado?

15  A    Federal correctional institution.

16  Q    Prior to becoming a lieutenant, where were you employed

17  within the federal correctional complex?

18  A    I was at the FCI.

19  Q    First of all, when did you get promoted to lieutenant?

20  A    June or July of '09.

21  Q    Okay.

22        Prior to July of '09, what was your title with the

23  Bureau of Prisons?

24  A    Senior officer specialist.

25  Q    And where, as a senior officer specialist, before your

1  promotion, where were you assigned?

2  A   I was assigned to the FCI.

3  Q   Okay.

4       The FCI, just to clarify, FCI Florence, is that within

5  the state and district of Colorado?

6  A   Yes, sir.

7  Q   Okay.

8       Now, I want to talk about the SHU.  What is the SHU?

9  A   That is the special housing unit.  It's where the inmate is

10 housed once they have, it has been determined that he has

11 committed a prohibited act.

12 Q   What types of prohibited acts will get an inmate assigned

13 out of general population, into the special housing unit?

14 A   It varies.

15 Q   Are these minor infractions?

16 A   They would be major infractions.

17 Q   Okay.  April 20 --

18       THE DEFENDANT:  I object, Your Honor.  The question he

19 asked was irrelevant of --

20       THE COURT:  Overruled.

21 BY MR. HOSLEY:

22 Q   I'd like to go to April 20 of 2009.  Were you employed on

23 that day or were you on duty that day at the federal

24 correctional institution in Florence, Colorado?

25 A   Yes, sir.

1  Q   And what specific area of the FCI were you assigned on

2  April 20, 2009?

3  A   I was a special housing unit OIC.

4  Q   And the nickname for the special housing unit is the?

5  A   SHU.

6  Q   And that's S-H-U, not shoe like foot?

7  A   Correct.

8  Q   What is the special housing unit, OIC?  What is the job --

9  what's a job description for that job title?

10 A   You basically run and maintain the housing unit, make sure

11 the orderly running of the housing unit itself.  Identify the

12 people coming into the special housing unit, monitor the

13 recreation, basically monitor what the officers are doing.

14 Q   Is the SHU OIC also referred to as the SHU no. 1?

15 A   Yes, sir.

16 Q   Who is the immediate supervisor of a SHU OIC or the SHU

17 no. 1?

18 A   The SHU lieutenant.

19 Q   Back in April of 2009, how many SHU lieutenants were

20 employed at the special housing unit at FCI Florence?

21 A   One.

22 Q   And what was his name?

23 A   Lieutenant Hansen.

24 Q   Do you know his first name?

25 A   Steven Hansen.

1  Q   Okay.

2         He was the only lieutenant; is that correct?

3  A   Yes, sir.

4  Q   For both day shifts and night shifts?

5  A   Yes, sir.

6  Q   What is the SHU lieutenant's responsibilities within a

7  special housing unit at an FCI?

8  A   Basically to determine or to make sure the inmates are

9  getting what their basic needs, their SHU reviews, and

10 basically processing incident reports if infractions have

11 occurred in the special housing unit.

12 Q   What is a lieutenant three-man hold?

13 A   A lieutenant three-man hold is an escort which requires a

14 lieutenant and three officers.

15 Q   Is there, is there any type of a -- is that a normal escort

16 for inmates within a SHU facility?

17 A   No, sir.

18 Q   What's a typical escort for an inmate within a SHU

19 facility?

20 A   One officer, one inmate.

21 Q   What would make an inmate have a lieutenant three-man hold

22 placed upon him --

23         THE DEFENDANT:  I object, Your Honor.  This fact was

24 already established.

25         THE COURT:  Overruled.  Overruled.  It's a new

1   witness.

2   BY MR. HOSLEY:

3   Q    What would cause an inmate to get a lieutenant, three-man

4   hold placed upon him when an inmate was assigned to the SHU

5   unit?

6   A    Various disciplinary actions.

7   Q    You said normally it's one to one.  Here we're dealing with

8   three people to one.  What's the cost on the institution, when

9   you have a three people and an inmate?

10  A    It slows things down in the special housing unit.

11  Q    When you only have one lieutenant, what are the issues of

12  having a lieutenant be required to escort an inmate from cell

13  to cell?

14  A    It takes time out of his day.  It's going to take more

15  officers away from doing what needs to be done to accomplish

16  the escort.

17  Q    Okay.

18         Let's go back again to April 20, 2009.  You said you

19  were on duty that day as the SHU no. 1 or SHU OIC at the

20  federal correctional institution.  What shift were you working

21  on that day?

22  A    Day watch.

23  Q    What's the typical time period for a day watch?

24  A    8 a.m. to 4 p.m.

25  Q    Was there a SHU lieutenant on duty that day?

1  A   Yes.

2  Q   For the SHU?

3  A   Yes.

4  Q   Was that Steve Hansen that you described earlier?

5  A   Yes, sir.

6  Q   What other officers were at the SHU unit during that day

7  shift on April 20, 2009?

8  A   Officer Sheriff, Officer Sandoval, Officer Childress.

9  Q   Now, do you know the defendant, Daniel Andres Morones?

10 A   Yes, sir.

11 Q   How do you know defendant Morones?

12 A   He was an inmate in my special housing unit.

13 Q   And was that at FCI Florence?

14 A   That was at FCI Florence.

15 Q   Was he an inmate at the special housing unit at FCI

16 Florence on April 20, 2009?

17 A   Yes, sir.

18 Q   Do you remember what cell he was assigned to on April 20,

19 2009?

20 A   A100 holding cell.

21 Q   Where is that in relation to the B100 holding cell?

22 A   Opposite sides.

23 Q   And where are both of those holding cells in relation to

24 the bubble or the officer area within the SHU?

25 A   They're in front of the officer station.  The officer

1  station sits like this.  It is area A100.  This would be your

2  B100.

3  Q   You said he was assigned to the A100 cell.  The morning of

4  April 20, 2009, was Morones moved over to the B100 holding cell

5  just opposite the SHU --

6  A   Yes.

7  Q   Excuse me, just opposite the bubble?

8  A   Yes.

9  Q   Why was Morones moved from A100 to B100?

10 A   The fire suppression system in A100 cell was broken.

11 Q   And after the -- was that fire suppression you're referring

12 to a sprinkler?

13 A   Yes.

14 Q   Was that sprinkler fixed by maintenance with the facility?

15 A   Yes, sir.

16 Q   And it was fixed, that afternoon, the afternoon of

17 April 20, 2009, was there a moment, or a movement when Morones

18 was to be moved back from B100 to his A100 holding cell?

19 A   Yes, sir, after the suppression system was fixed.

20 Q   You mentioned before that there was a lieutenant three-man

21 hold is a type of movement within the facility.  What type of

22 hold was defendant Morones on on April 20, 2009?

23 A   I believe he was a lieutenant hold.

24 Q   Okay.

25        Did you participate in that movement from the B100

Thomas Vialpando - Direct

1  cell over to the A100 cell?

2  A   Yes, I did.

3  Q   What were your responsibilities during that movement?

4  A   Just helping with the escort.

5  Q   And who was the primary person escorting defendant Morones

6  from B100 to A100?

7  A   Lieutenant Hansen.

8  Q   I'd like to describe just a little bit, we've heard

9  testimony from other witnesses, I'd like to describe where B100

10 is in relation to A100, and how a movement would take place to

11 get from B100 to get to A100.

12         If you're inside the SHU in FCI Florence, how would

13 you move an inmate from B100 over to the A100?

14 A   You would have him submit to restraints at the door; once

15 he submitted to restraints at the door, you open the door.  He

16 come outside, he be pat-searched.  He come up the cells, come

17 around the two holding cells, back down the set of stairs and

18 placed in the A100 holding cell.

19 Q   You mentioned that you and Lieutenant Hansen participated

20 in the movement of Daniel Morones in the movement over to A100.

21 When you're coming up the stairs, describe those stairs and the

22 width of those stairs.

23 A   The stairs are approximately seven steps.  No more than

24 4 feet wide.  So they're kind of hard for Lieutenant Hansen,

25 myself, to get up those together.  You basically have to

Thomas Vialpando - Direct

1  stagger yourself when you go up the stairs 'cause you're not

2  going to fit side by side up the stairs.

3  Q   Now, as Lieutenant Hansen was the primary person conducting

4  the movement, as you described earlier, where was he in

5  relation to the defendant once the defendant was taken out of

6  the B100 cell?

7  A   Lieutenant Hansen was on the left-hand side of Mr. Morones.

8  Q   And what was Lieutenant Hansen doing as Mr. Morones was

9  being escorted from B100 to A100?

10 A   Can you repeat your question?

11 Q   What was Lieutenant Hansen doing as the defendant was being

12 moved from B100 to A100?

13 A   He was maintaining the hand restraints.

14 Q   And how is that done?

15 A   With his hand on the restraints.

16 Q   Okay.

17       And where were you in position to Lieutenant Hansen

18 and the defendant?

19 A   I was on the right-hand side.  Of Mr. Morones.

20 Q   Okay.

21       Were you immediately next to Mr. Morones?

22 A   In back.

23 Q   And in back of whom?

24 A   Mr. Morones.

25 Q   And where was Lieutenant Hansen compared to you?

1  A    I believe he was on the left-hand side of Mr. Morones.

2  Q    Okay.

3         Now, after you removed -- was Morones removed from

4  B100?

5  A    Yes.

6  Q    Okay.

7         And who actually had hands on defendant Morones as he

8  was taken out of the B100 cell?

9  A    Lieutenant Hansen.

10  Q    Now, as you began the movement up those seven steps that

11  you've described, was there enough room for you,

12  Lieutenant Hansen, and Morones to all be side by side as you

13  proceeded up those steps?

14  A    No, sir.

15  Q    So what was the position of positioning of the movement as

16  defendant Morones started up those steps from the B100 cell?

17  How were you positioned?

18  A    I was positioned, you had Lieutenant Hansen, inmate

19  Morones, and myself to the right rear.

20  Q    So you were behind Lieutenant Hansen and defendant Morones?

21  A    Yes, I was.

22  Q    What happened as defendant Morones and Lieutenant Hansen

23  made it up to the top step, the landing, after leaving the B100

24  cell?

25  A    We, we got to the top of the landing, started to -- we took

1  a couple steps on the landing, started to go around the bubble.

2  I remember looking down at the restraints.  The next thing I

3  know, I see an arm come up, catching Lieutenant Hansen in the

4  face.  And at that time we placed Morones on the floor.

5  Q   Now, you say that you saw an arm come up.  Whose arm came

6  up?

7  A   Inmate Morones's.

8  Q   And what did -- what did it look like when you saw that arm

9  come up?  Did it like an accidental, involuntary movement?

10  A   No, sir.

11  Q   Describe to the jury what you saw when you say an arm come

12  up.

13  A   Is it okay if I --

14  Q   Sure.

15  A   Hands placed behind his back, it came in motion, over the

16  top.

17  Q   And you just, for the record, you indicated that the

18  defendant's hands were behind his back and then with his right

19  arm, he came around with a closed fist.

20  A   Yes, sir.

21  Q   And what did he strike with that closed fist?

22  A   I believe Lieutenant Hansen in the face, right here.

23          MR. HOSLEY:  And, Your Honor, let the record reflect

24  that he has shown his right hand striking the right side of

25  his, indicating where Lieutenant Hansen was struck.

1          THE COURT:  All right.

2   BY MR. HOSLEY:

3   Q   Now, you said you were looking at the restraints

4   immediately before this hand came up.  When the defendant was

5   moved from B100 over to A100, was he handcuffed?

6   A   Yes, sir.

7   Q   And where was he handcuffed?

8   A   In the rear.  Behind his back.

9   Q   So were you able to tell how the defendant could get his

10  hands free from those cuffs to punch Lieutenant Hansen?

11  A   No, sir.

12  Q   What did it look like to you as this arm came flying

13  through the air?

14  A   Just came out of the restraints and come over the top with

15  his hand.

16  Q   Where was the handcuff, if the one arm, the right arm was

17  free?

18  A   I believe it was attached to his arm that he was swinging.

19  Q   So the arm that struck Lieutenant Hansen in the face, or

20  the fist that struck Lieutenant Hansen in the face, was that

21  the hand with the cuffs or without the cuffs?

22  A   I believe so.

23  Q   With or without?

24  A   With.

25  Q   What did Lieutenant Hansen do after he was punched in the

1  face by the defendant?

2  A   Lieutenant Hansen then, he started to take inmate Morones

3  down, and I took him down, also.

4  Q   Why is it so important to get an inmate down to the ground

5  after that inmate has just assaulted a guard?

6  A   To maintain control.

7  Q   Why not just maintain control while he's still standing up?

8  Why is it important to take him to the ground?  What does that

9  do for you?

10  A   It allows us the opportunity to put the restraints back on

11  the inmate and also place leg irons on the inmate, so he

12  doesn't cause any more harm.

13  Q   Now, you've been in the Bureau of Prisons since 1996, so

14  going on 15 years, have you been trained on how to restrain an

15  inmate who has assaulted guards?

16  A   Yes, sir.

17  Q   Is there training in taking an inmate to the ground versus

18  to just dealing with him standing up; what does your training

19  tell you?

20  A   If the inmate becomes combative, we're going to place him

21  on the ground and we're going to restrain him.

22  Q   All right.

23       Now, as you and Lieutenant Hansen took the inmate to

24  the ground, defendant Morones, what was defendant Morones

25  doing?

Thomas Vialpando - Direct

1  A    Fighting.

2  Q    Can you describe how was he fighting?

3  A    We were trying to get his arms restrained.  He refused to

4  give us his arms to restrain him.  And then that's when we

5  called for leg irons, to restrain his legs.

6  Q    Was he saying anything, was defendant Morones saying

7  anything as you were attempting to restrain him?

8  A    I don't recall.

9  Q    Do you recall if he was being vocal or not, or you just

10 don't recall what the words were?

11 A    I don't recall what the words were.

12 Q    Okay.

13          Was he, was he completely silent?

14 A    No, sir.

15 Q    Okay.

16          So describe -- you don't remember exactly what the

17 words were.  But describe what his demeanor was like as you

18 were attempting to --

19 A    Aggressive.

20 Q    Was he eventually restrained?

21 A    Yes, sir.

22 Q    And what was done with inmate Morones once you were able to

23 restrain him?

24 A    He was then escorted down to A100 holding cell.

25 Q    And did you have an opportunity to look at and see

1  Lieutenant Hansen following this incident?  Did you see his

2  face after he was assaulted by inmate Morones?

3  A   Yes, he had a red mark on the side of his face.

4  Q   Can you say that again?

5  A   He had a red mark on the side of his face.

6  Q   I want to clarify for the record, the person, inmate

7  Morones, who you saw punch Lieutenant Hansen on April 20, 2009,

8  is he seated in the courtroom?

9  A   Yes.

10 Q   Can you describe for the record what he's wearing?

11 A   He's wearing a gray shirt and a black tie.

12        MR. HOSLEY:  Your Honor, and may the record reflect

13 that the witness has identify the defendant.

14        THE COURT:  Yes, it shall.

15        MR. HOSLEY:  One moment, Your Honor.

16        No further questions at this time, Your Honor.

17        THE COURT:  Thank you.

18                        **CROSS-EXAMINATION**

19 BY THE DEFENDANT:

20 Q   Mr. Vialpando, when you were escorting defendant Morones up

21 the stairs in the SHU at FCI Florence, federal correctional

22 institution, what side of the defendant were you standing on?

23 A   The right side.

24 Q   The right side?

25 A   The right rear.

1  Q   And what side was Mr. Hansen standing on?

2  A   Left.

3  Q   Left side.

4      And where was Mr. Daniel Sheriff standing?

5  A   I believe he was at the top of the landing.

6  Q   At the top of the landing?

7      When Mr. Daniel Sheriff was on the top of the landing,

8  was he supervising this move also?

9  A   No, he wasn't.

10 Q   He wasn't supervising this move?

11 A   No.

12 Q   Do you remember the memorandum that you wrote on the date

13 of the incident?

14 A   Yes.

15 Q   On your memorandum, you state, Morones spun and threw a

16 punch with a closed fist and hand restraint attached to it,

17 hitting Lieutenant Hansen on the right side of the face.

18 A   Yes.

19 Q   So you have Mr. Hansen on the left side, you on the right.

20 That's a pretty wide spin to spin around and hit Mr. Hansen on

21 the right side of the face, wouldn't you believe?

22 A   No.

23 Q   No?

24     If you're an officer and you're conducting a move and

25 you're holding the inmate's handcuffs from the, from the rear,

Thomas Vialpando – Cross

1  from behind, in the middle, and a inmate makes the smallest

2  move, will you feel that?

3  A    Yes, you would.

4  Q    So let's say the inmate makes a sharp, quick move.  Would

5  you feel that, also?

6  A    You would.

7  Q    And don't you think your reaction would, would be to

8  recalibrate to counter the move?

9  A    It depends.

10 Q    What do you mean it depends?

11 A    If it's a quick move, I don't think you have time to react

12 to it.

13 Q    So you have you on the side of Mr. Hansen, on the left,

14 Mr. Hansen on the right --

15 A    Mr. Hansen was on the left.  I was on the right.

16 Q    I'm sorry.  I correct myself.

17 A    All right.

18 Q    You on the right, you on the left, and Mr. Sheriff in

19 front.

20       Supervising this move you wouldn't have time to react.

21 A    It depends how quick the movement was.

22 Q    Okay.

23       You said that when you seen Mr. Hansen struck, his,

24 his instant reaction was to take Mr. Morones to the ground, and

25 yours likewise also; is that correct?

1  A    Yes.

2  Q    Now, how long would you say it took to get Mr. Morones on

3  the ground or -- yes, on the ground?

4  A    To place Morones on the ground?

5  Q    Yes.

6  A    Approximately between 20 and 30 seconds.

7  Q    Approximately between 20 and 30 seconds?

8  A    Yes.

9  Q    And this is at a angle that the camera cannot see.

10  A    I don't know 'cause I don't know how the cameras are set

11  up.

12  Q    You do not know.

13         How much do you weigh?

14  A    280.

15  Q    280 pounds.

16         How much do you think Mr. Hansen weighs at your rough

17  estimate?

18  A    250.

19  Q    250.

20         And Mr. Sheriff?

21  A    He's about 250.

22  Q    About 250.

23         We have a lot of weight here.

24  A    Yes.

25  Q    How much would you say that Mr. Morones weigh at the time?

Thomas Vialpando - Cross

1   A    Maybe 190 pounds.

2   Q    Maybe 190 pounds.

3        Do you recall Mr. Morones being on a sort of

4   disciplinary diet at the time?

5   A    No.

6   Q    You don't?

7   A    No.

8   Q    If Mr. Morones was living or placed in a observation cell,

9   would he, would the common practice be to place him on a

10  disciplinary diet?

11  A    Not necessarily.

12  Q    Not necessarily.

13       Now, let's say Mr. Morones kicked out a window and was

14  disruptive prior.  Would you say he would be placed on a

15  disciplinary diet?

16  A    Possibly.

17  Q    What I'm getting at is you have three officers, you would

18  have them and the inmate and you say it takes 20 to 30 seconds

19  to place him on the ground.  But the video does not show that.

20  Is what I'm saying.

21       THE DEFENDANT:  Your Honor, I need a second.

22       THE COURT:  Yes.

23       THE DEFENDANT:  Counsel.

24       Your Honor, I have no further questions.

25       THE COURT:  Thank you.

1      Any redirect of this witness?

2         MR. HOSLEY:  Thank you, Your Honor.

3                    **REDIRECT EXAMINATION**

4  BY MR. HOSLEY:

5  Q    Sir, the defendant, and he's referring to himself as

6  Mr. Morones.  Mr. Morones is the defendant; is that correct?

7  A    Yes, sir.

8  Q    The defendant asked you if Mr. Farmer was -- excuse me,

9  Mr. Sheriff was supervising the move.  Who supervises

10 lieutenant hold move?

11 A    The lieutenant.

12 Q    Okay.

13        Now, as you were moving up the stairs, the defendant

14 asked repeatedly where you were in position to

15 Lieutenant Hansen.

16 A    Yes.

17 Q    Was there room for all three of you to be side by side,

18 abreast on the stairs at the same time?

19 A    No.

20 Q    So when were you in relation to Lieutenant Hansen and

21 Morones as you were proceeding up the stairs?

22 A    I was to the right rear of Morones.

23 Q    So you were behind them?

24 A    Yes.

25 Q    So when lieutenant Morones (sic) was punched -- excuse

1  me -- when Lieutenant Hansen was punched by Morones, were you

2  in the vicinity where you could immediately step forward to

3  block that punch?

4  A   No.

5  Q   Now, he asked you about the movements and how quick they

6  were, when you saw the defendant punch Lieutenant Hansen, was

7  that a slow process or fast process?

8  A   It was a fast process.

9  Q   Do you have lightning quick reflexes?

10  A   No, sir.

11  Q   Were you able to react in time to keep from landing on

12  Lieutenant Hansen?

13  A   No, sir.

14  Q   But you did react, didn't you?

15  A   Yes, sir.

16  Q   And you reacted by assisting Lieutenant Hansen in taking

17  the defendant to the ground?

18  A   Yes, sir.

19  Q   What was the defendant doing at that time?

20  A   He was agitated, very aggressive.

21  Q   Was he fighting back?

22  A   Yes.

23  Q   Did that make it harder to take him to the ground, to make

24  him compliant?

25  A   Yes, sir.

1  Q    You said it was 20 to 30 seconds long.

2         How long ago was this incident?

3  A    April 20 of last year, I believe.

4  Q    Of 2009.

5         So almost two years ago.

6         And at the time that you were wrestling with the

7  defendant, attempting to take him to the ground, where were you

8  focused on?

9  A    Trying to restrain him.

10 Q    Were you looking at your watch to see how much time was

11 elapsing?

12 A    No, sir.

13 Q    Have you actually had a chance to review the surveillance

14 video during that period of time?

15 A    No, sir.

16 Q    Who takes care of the videos?

17 A    Our SIS department.

18 Q    That doesn't fall within your purview, does it?

19 A    No, sir.

20 Q    Now, the defendant also was asking about how much everybody

21 weighed and you weigh 250 and Lieutenant Hansen weighs 250 and

22 Sheriff weighs 250.  Is there some -- is there any sort of

23 requirement within the Bureau of Prisons that you must get a

24 lighter guard to tackle an inmate after he's assaulted a guard

25 if the inmate weighs less than you?

Thomas Vialpando - Redirect

1  A   No, sir.

2  Q   Is there some responsibility within the Bureau of Prisons

3  that only one person should take an inmate to the ground if

4  they weigh significantly more than him?

5  A   No, sir.

6  Q   Why is it important that you bring all of the force to bear

7  to get that inmate to the ground once he's assaulted a guard?

8  A   To end that situation then.

9  Q   Now, the area where this assault occurred in relation to

10  the bubble, within each cell block, are there doors that keep

11  inmates from getting towards the bubble?

12  A   Yes.  Range doors.

13  Q   Range doors.  What's a range door?

14  A   A range door is a door that secures the entire wing.

15  Q   So if an inmate were to get out of his cell on one of the

16  ranges, would he be able to get through that range door to get

17  to the guards in the bubble?

18  A   No, sir.

19  Q   So where this incident occurred, was Daniel Morones inside

20  or outside of the range doors?

21  A   He was outside the range doors.

22  Q   So what is the danger of allowing him to continue to roam

23  free in that area near the bubble when he's outside of the

24  range doors?

25  A   He has access to the offices.

Thomas Vialpando - Redirect

232

```
 1  Q   And what types of things are kept inside of that bubble and

 2  inside of the offices?

 3  A   Sensitive information, keep-aways, separatees.

 4  Q   Is that something that you want an inmate to gain access

 5  to?

 6  A   No, sir.

 7  Q   All right.  Thank you.

 8          MR. HOSLEY:  I have no further questions, Your Honor.

 9          THE COURT:  Thank you very much.  You may stand down.

10          We will be in recess.  It's noon.  Until 1:15.

11          THE COURTROOM DEPUTY:  All rise.

12          You can leave your stuff.

13          JUROR:  Leave them?

14          THE COURT:  You can leave it there if you wish.

15      (Jury out at 12:04 p.m.)

16          THE COURT:  We'll be in recess till 1:15.

17      (Recess at 12:04 p.m.)

18      (Reconvened at 1:23 p.m.)

19      (Jury in at 1:23 p.m.)

20          THE COURT:  Thank you very much.  Be seated, everyone.

21          Next witness, please.

22          MR. HOSLEY:  Thank you, Your Honor.

23          The United States will call Daniel Sheriff.

24          (**DANIEL SHERIFF, GOVERNMENT'S WITNESS, SWORN**)

25          THE COURTROOM DEPUTY:  Please be seated.
```

1  State your full name for the record and spell your

2  last name.

3  THE WITNESS:  Daniel E. Sheriff.  S-H-E-R-I-F-F.

4  **DIRECT EXAMINATION**

5  BY MR. HOSLEY:

6  Q  Mr. Sheriff, how are you employed?

7  A  I am currently employed with the Bureau of Prisons as a

8  correctional officer.

9  Q  That's the federal Bureau of Prisons?

10  A  Yes, sir.

11  Q  And that is an agency within the Department of Justice,

12  executive branch of the United States government?

13  A  Yes, sir.

14  Q  How long have you been employed about the federal Bureau of

15  Prisons?

16  A  Just over seven years.

17  Q  Where are you stationed?

18  A  Right now I'm at the FCI in Florence, Colorado.

19  Q  And that's the federal correctional institution?

20  A  Yes.

21  Q  How long have you been at the FCI in Florence, Colorado?

22  A  Just over two years, two and a half years.

23  Q  Were you stationed at the FCI on April 20, 2009?

24  A  Yes, sir.

25  Q  Where were you working in the FCI on April 20, 2009?

1    A    In the special housing unit.

2    Q    Who was the lieutenant of the special housing unit?

3    A    Lieutenant Hansen.

4    Q    Steve Hansen?

5    A    Yes, sir.

6    Q    Was he on duty at the same time you were on duty?

7    A    Yes, sir.

8    Q    What time were you working?

9    A    The day-watch shift, eight to four.

10    Q    And who was the SHU no. 1 officer that day?

11    A    Tom Vialpando.

12    Q    Do you know the defendant, Daniel Andres Morones?

13    A    Yes, sir.

14    Q    How do you know him?

15    A    He was a inmate in the special housing unit.

16    Q    At the FCI in Florence?

17    A    Yes, sir.

18    Q    Was he an inmate in the FCI in Florence on April 20, 2009?

19    A    Yes, sir.

20    Q    Where was he housed on that day?

21    A    He was in the A1 holding cell.

22    Q    The A1 holding cell?

23    A    Yes, sir.

24    Q    Is that at the front of the A100 range?

25    A    Yes, sir.

1  Q   Is that a observation cell in front of the bubble?

2  A   Yes, sir.

3  Q   Were you present for a movement that took place from the

4  B100 cell to the A100 cell involving Daniel Morones?

5  A   Yes, sir.

6  Q   Where were you stationed during that movement?

7  A   I was on top of the platform, towards the A1 holding cell

8  side.

9  Q   When you say "on top of the platform," what are you

10 referring to?

11 A   Both of the holding cells, A1 and B1, you have to go down a

12 flight of six steps to get to the bottom.  When you go down the

13 steps, it's just a floor, a level.

14 Q   Where you were stationed, where is that in relation to the

15 bubble or the office area within the SHU?

16 A   Directly across from it.

17 Q   Who was actually conducting the move with -- I say

18 "conducting," who was walking with the defendant as he was

19 being led from B100 over to A100?

20 A   Lieutenant Hansen.

21 Q   And was there an officer behind Lieutenant Hansen?

22 A   Tom Vialpando.

23 Q   Okay.

24     What were your responsibilities when you were standing

25 up on the platform or the landing there during the course of

 1   the move?

 2   A   I was just there to make sure that everything went okay,

 3   nothing happened, and that he went into the A1 holding cell

 4   with no problems.

 5   Q   By "he," who are you referring to?

 6   A   Inmate Morones.

 7   Q   All right.

 8        I'm going to show you what's marked as Government

 9   Exhibit No. 1, it's already been entered into evidence.  Take a

10   look at that screen in front of you.

11   A   Okay.

12   Q   What are we looking at here in Government Exhibit No. 1?

13   A   On the right there, where the bars are, that's the bubble,

14   and directly across on the left side is the A1 holding window.

15   Q   The person outside the bubble, who is that person?

16   A   That should be me.

17   Q   Is that the area where you were positioned during that

18   movement on April 20, 2009?

19   A   Yes, sir.

20   Q   All right.

21        Now, I'm going to play this forward and have you watch

22   the screen in front of you.

23   A   Okay.

24       (Videotape played but not reported.)

25   BY MR. HOSLEY:

1   Q   All right.  I'm going to pause it.

2           You say that should be you.  Have you ever actually

3   seen the video?

4   A   I have not seen the video.

5   Q   Now that you've watched it, who was that person standing

6   there in the still shot?

7   A   That was me.

8   Q   On the video, you ran over there behind the bubble?

9   A   Yes, sir.

10  Q   What did you see; what took place that caused you to run

11  over there to the bubble area?

12  A   I saw inmate Morones turn around and strike

13  Lieutenant Hansen.

14  Q   Can you describe for the jury what you saw as

15  Lieutenant Hansen led the defendant up the steps from the B100

16  cell towards the A100 cell?

17  A   They came up the steps and they were coming towards me.  I

18  seen inmate Morones slip his cuffs, come around with his right

19  arm and swing at Lieutenant Hansen.

20  Q   And did he land?

21  A   Yes, I believe he did.

22  Q   Where did he strike Lieutenant Hansen?

23  A   In the face.

24  Q   What happened after Lieutenant Hansen was punched or struck

25  by the defendant in the face?

 1  A    I ran over and grabbed the defendant's right arm and

 2  Lieutenant Hansen, I had grabbed him, kind of like in a bear

 3  hug, and we took him to the ground.

 4  Q    Okay.

 5            Now, I'll play this forward just a little bit more.

 6        (Videotape played but not reported.)

 7  BY MR. HOSLEY:

 8  Q    So what's happening here on the video where we see

 9  Lieutenant Hansen laying on top of inmate Morones?

10  A    Lieutenant Hansen has inmate Morones in a bear hug.  I have

11  his right arm and I believe it's Tom Vialpando had his left arm

12  on the other side.  And we're trying to get the inmate into a

13  set of hand restraints to get him more compliant.

14  Q    Okay.

15            MR. HOSLEY:  You can escape.

16  BY MR. HOSLEY:

17  Q    Now, when you and Officer Vialpando and Lieutenant Hansen

18  were involved in taking the defendant to the ground, what was

19  defendant Morones doing as you were attempting to restrain him?

20  A    He was squirming a lot.  He was trying to fight us a lot.

21  We got him to the ground.  He was hollering, you know, I got me

22  one.  Just being real, like he was fighting us.  He was

23  fighting us.

24  Q    When he was yelling, who did he appear to be yelling to?

25  A    Other inmates down the A1 range.

Daniel Sheriff - Direct

1  Q   And you said that you heard him say, I got me one.  Do you

2  remember anything else that defendant Morones was yelling while

3  you were attempting to restrain him?

4  A   Yeah, he said, you know, I got me one.  Pardon the -- F the

5  po-po, which is police, and that's pretty much what I remember.

6  Q   Did he make any statements directly to the officers as they

7  were attempting to restrain him about whether they could take

8  him one on one?

9  A   He said that, you know, it takes five of you to take him

10  down.  When it was just really the three of us, we got him

11  down, so.

12  Q   After this incident was Morones -- during this incident was

13  Morones finally restrained?

14  A   Yes.  We put hand and leg restraints on him and moved him

15  to the A100 cell.

16  Q   Did you have an opportunity to observe Lieutenant Hansen

17  following him being struck in the face by inmate Morones?

18  A   Yes, I saw Lieutenant Hansen.

19  Q   Did he have any injuries?

20  A   Yes.

21  Q   Can you describe what you saw?

22  A   He had a lot of red marks on the left side.  One on the

23  right side.  Definitely you could tell that he was definitely

24  hit.

25  Q   Was it difficult, did you have to look at him really hard

1  to see the marks on his face?

2  A   No.  It was plain as day.  You could tell.

3  Q   All right.

4        Now, the person, I want to clarify for the record, the

5  person who you saw punch Lieutenant Hansen in the face or

6  strike Lieutenant Hansen in the face on April 20, 2009, is he

7  seated in this courtroom today?

8  A   Yes, he is, sir.

9  Q   And can you please point to him and identify what he's

10 wearing for the record?

11 A   He's wearing the blue shirt and tie right there, inmate

12 Morones.

13        MR. HOSLEY:  Your Honor, may the record reflect that

14 he's identified defendant Morones.

15        THE COURT:  Yes, it will.

16        MR. HOSLEY:  One moment, please.

17        We have no additional questions at this time.

18                        **CROSS-EXAMINATION**

19 BY THE DEFENDANT:

20 Q   Mr. Sheriff, do you remember the Bureau of Prisons

21 memorandum that you wrote and signed on the date of the

22 incident?

23 A   Yes, I do.

24 Q   Your memo reads, At 1:30 p.m. Lieutenant Hansen,

25 Officer Sandoval, Officer Vialpando, and myself were moving

1  inmate Morones from holding cell range B to holding cell range

2  A when he slipped his cuffs and turned on Lieutenant Hansen.

3  Immediately use of force was taken.  I grabbed his right arm

4  and placed him on the ground.  We placed hand and leg

5  restraints on the inmate.  He attempted to spit at me twice.

6  When -- we then -- excuse me -- we then placed him in A range

7  holding cell without further incident.

8          I notice something in your, your, your federal Bureau

9  of Prisons memorandum.  You never state that Mr. Morones struck

10  Lieutenant Hansen.  Just a few minutes ago when the Government,

11  Mr. Hosley, was cross-examining you, you said that I struck

12  Lieutenant Hansen.  And you also said that I struck

13  Lieutenant Hansen on the left side of his face.  And he

14  sustained injuries to the left side of his face and you think

15  maybe one on the right.

16          MR. HOSLEY:  Your Honor, I just ask if there's a

17  question in this.

18          THE COURT:  Right now there isn't.

19          You made a statement.  You have to make a question if

20  you want.

21          THE DEFENDANT:  Your Honor, I need a second to consult

22  with counsel.

23          THE COURT:  Sure.  Go ahead.

24  BY THE DEFENDANT:

25  Q   Mr. Sheriff, isn't it true that you stated a few minutes

1    ago that I struck Lieutenant Hansen?

2    A    Yes.

3    Q    It's true.

4    A    Yes.

5    Q    Now, isn't it something, isn't that something that you

6    would clearly, clearly put in your, your Bureau of Prisons

7    memorandum?

8    A    I probably should have put it in there, yes.

9    Q    You probably should have.

10   A    Yeah, I should have.

11   Q    Why would something like that be left out, sir?

12   A    Memorandum is there to explain the events that happened,

13   and I do the best that I can.  When I recall things, that's the

14   way I put it.  I say it as I recall it.  I just didn't put it

15   in there.

16   Q    You see it as you call it.  So your memorandum is what you

17   see and what you call it, correct?

18   A    Yep.

19   Q    And your memorandum says nothing of -- no reference of a

20   striking.

21   A    Correct.

22   Q    Correct.

23         There's several memorandums that follow, sir, that

24   state otherwise.

25         I'm trying to get a better understanding.

Daniel Sheriff - Cross

243

1          What follows a BOP memorandum of a, of a assault?

2   A    Explain the question again.  I don't understand what you're

3   asking.

4   Q    I'm asking you, after you report your memorandum?

5   A    Uh-huh.

6   Q    What follows it?

7   A    From me?

8   Q    Yes.

9   A    I write the memorandum, and it goes to the lieutenant's

10  office.

11  Q    And then?

12  A    You'll have to ask a lieutenant.

13  Q    Isn't it true that a incident report follows the

14  memorandum?

15  A    In most cases, I'm sure it does.

16  Q    Correct.

17          And isn't it true that the incident -- the incident is

18  an assault?

19  A    The incident in hand, yeah.

20  Q    So you say.

21          Mr. Sheriff, I have no further questions.

22  A    Okay.

23                       **REDIRECT EXAMINATION**

24  BY MR. HOSLEY:

25  Q    Officer Sheriff, are you legally trained?

1    A    By the Bureau of Prisons, yes, I am.

2    Q    Are you trained in -- when I say "legally trained," are you

3    an attorney?

4    A    No, I'm not.

5    Q    Have you been to law school?

6    A    No, I haven't.

7    Q    Have you discussed with attorneys prior to this incident,

8    did you know what made up assaults, the law surrounding

9    assaults?

10   A    No, I did not.

11   Q    Did you have any attorneys advising you at the time you

12   were drafting this memo?

13   A    No, I did not.

14   Q    I notice that this memo that Mr. Morones read from is just

15   a few lines long, five lines, six lines long?

16   A    Yes, sir.

17   Q    What was the purpose of that memorandum?

18   A    It just explain in basic detail about what happened, what I

19   saw.

20   Q    When you wrote this memorandum, did you anticipate that you

21   were going to be sitting here in a witness box testifying a

22   year and a half later?

23   A    No, sir, I did not.

24   Q    So who were you writing this for?

25   A    The lieutenant.

Daniel Sheriff - Redirect

1   Q    Which lieutenant?

2   A    The operations lieutenant of the day.

3   Q    Who was that?  Who was it addressed to in this day?

4   A    It would have been Lieutenant Hansen and I can't remember

5   who the opposite lieutenant was that day.

6   Q    So your memorandum is specifically addressed to

7   Lieutenant Hansen?

8   A    Yes, sir.

9   Q    The person who was just punched?

10  A    Yes, sir.

11  Q    So you're just advising him of your participation in that

12  incident?

13  A    Yes, sir.

14  Q    The same person who is the victim of that incident?

15  A    Yes, sir.

16  Q    Now, when you wrote, as Mr. Morones read to you, We were

17  moving inmate Morones from holding cell range B to holding cell

18  range A when he slipped his cuffs and turned on

19  Lieutenant Hansen.  When he slipped his cuffs and turned on

20  Lieutenant Hansen, what did you mean with that language?

21  A    He slipped his cuffs and he came with his right arm to hit

22  Lieutenant Hansen, who turned around.

23  Q    Okay.

24       And you don't -- you don't know where these

25  memorandums go after you give them to lieutenant?

1  A   No, sir.  I give them to the lieutenant, and they make up

2  whatever they need to make up.

3  Q   Did you see this defendant punch Lieutenant Hansen?

4  A   Yes, sir.

5  Q   On April 20, 2009?

6  A   Yes, sir.

7  Q   All right.

8         MR. HOSLEY:  I have no further questions.

9         THE COURT:  Thank you, sir, you may stand down.

10         Next witness, please.

11         MR. HOSLEY:  Your Honor, at this time the United

12  States will call Jacque Brown-Eldred.

13         THE COURTROOM DEPUTY:  Please raise your right hand.

14      **(JACQUE BROWN-ELDRED, GOVERNMENT'S WITNESS, SWORN)**

15         THE COURTROOM DEPUTY:  Please be seated.

16         State your full name for the record and spell your

17  last name.

18         THE WITNESS:  Jacque Brown hyphen Eldred, E-L-D-R-E-D.

19                    **DIRECT EXAMINATION**

20  BY MR. HOSLEY:

21  Q   Ms. Brown-Eldred, I understand that you're currently

22  retired; is that correct?

23  A   Yes.

24  Q   When did you retire?

25  A   July of 2010.

Jacque Brown-Eldred - Direct

1  Q   And what did you do professionally before you retired in

2  July of 2010?

3  A   I was a paramedic with the federal Bureau of Prisons.

4  Q   How long were you a paramedic with the federal Bureau of

5  Prisons?

6  A   Just shy of ten years.

7  Q   Before you retired, where were you stationed within the

8  federal Bureau of Prisons?

9  A   FCC Florence.

10  Q   And that's the federal correctional complex in Florence?

11  A   Yes, primarily the federal correctional institution.

12  Q   Also referred to as the FCI?

13  A   Yes.

14  Q   You on duty on April 20, 2009?

15  A   Yes, I was.

16  Q   I want to talk a little bit about what a paramedic does at

17  the federal correctional institute.  What was your

18  responsibilities and duties while you were employed there?

19  A   My general duties and responsibilities were basically pre

20  hospital care.  Typically I worked alone.  You know, I manage

21  my shift alone is what I should say.  So if any emergency came

22  up, I was responsible to respond to and take care of that

23  emergency, making any decisions necessary at that time, keep,

24  you know, if the inmate's in-house, do I have to send him out,

25  what needs to go on.  I also managed things like pill line,

1  handing out the medications that were controlled, just a

2  variety of duties like that.

3  Q  If a guard was assaulted or involved in a use of force

4  involving an inmate, what were your responsibilities as far as

5  medical assessments of the officers or the staff?

6  A  I was the one primarily responsible for the medical

7  assessments.  And that would range from, you know, basically I

8  would always do a head-to-toe so I didn't forget anything or

9  leave anything out.  So I would always look at them, get their

10  statement as to what happened and jot it down, and then go

11  through their injuries with them.  And, you know, were they

12  serious, were they life-threatening, you know.

13  Q  Now, you mentioned that you were a paramedic with the

14  Bureau of Prisons for a number of years, I think you said 12

15  years; is that correct?

16  A  Almost, yes.

17  Q  What did you do prior to joining the Bureau of Prisons?

18  A  Prior to joining the Bureau of Prisons, I actually worked

19  at Parkview Hospital, which is a level 2 trauma center in

20  Pueblo, Colorado.  They're actually the second busiest in the

21  state.  I worked in their emergency room for a couple of years.

22  I also taught paramedic and EMT classes, along with advanced

23  cardio support, EMT.

24  Q  You said you taught those classes?

25  A  Yes.

1  Q    Who did you teach them to?

2  A    To other staff members there at the hospital or ambulance

3  people or to, just students coming in.  You know, trying to get

4  their paramedic, trying to get their EMT, so a variety of

5  people, doctors, nurses, lay people.

6  Q    So folks who were attempting to become paramedics were

7  instructed by you as part of their training?

8  A    Yes.

9  Q    Now, you mentioned that it was a level 2 trauma facility.

10  For us nonmedical types, what does that mean?

11  A    As a level 2, it means that we had available operating

12  rooms, we had surgical staff ready or that could be there

13  within a specified time period.  We accepted in several

14  flights, you know, Flight for Life type things.  We could

15  handle high-level traumas, high-level surgeries.  It was a

16  cardiac care unit as well.

17  Q    As a emergency room paramedic at that trauma 2 level

18  facility, what types of injuries, wounds, did you see and

19  assess during the course of your duties?

20  A    Oh, gosh.  Everything from gunshot wounds to stabbings to

21  car accidents, severe head injuries.  Open fractures, severe

22  abdominal wounds, strokes, heart attacks.  Just the entire

23  gamut that you would expect in an emergency room.  Overdoses.

24  Seizures.

25  Q    And how long did you work at the Parkview Medical Center in

 1  Pueblo?

 2  A    I worked there for about two years before I came to the

 3  Bureau.

 4  Q    And did you have any medical jobs or medically related jobs

 5  prior to going to the Parkview Medical Center?

 6  A    Yes, I had also worked ambulance.  Before that I had worked

 7  ambulance for nearly five years.

 8  Q    What sort of training did you receive to become a paramedic

 9  to work ambulance, emergency room, and then later with the

10  Bureau of Prisons?

11  A    Basically everyone starts out as an EMT basic which kind of

12  gives you all the basic skills, how to apply oxygen, how to put

13  people on a back board, bandaging, things like that.  From

14  there, you go up into the advanced life support, where you're

15  the one making the decision, really.  Because you don't have a

16  doctor with you.  So you're responsible for taking care of

17  these people until you can get them to, to the hospital.  So

18  there was drug intervention, there were i.v.'s, you know, rapid

19  assessments, trauma assessments, rapid transport, and you just

20  had to learn how to identify all those.  And that's what would

21  get you to your paramedic.

22  Q    Were there any certifications required to become a

23  paramedic and are there any annual updates of those

24  certifications that you have to go through to maintain your

25  license?

 1   A    Yes.  CPR is one of them, which is basic life support.

 2   There's advanced cardiac life support.  There's pre hospital

 3   trauma life support, which is kind of optional.  I mean, you

 4   always learn trauma life support as you go through to becoming

 5   paramedic.  Keeping this certification is optional.

 6   Q    Did you keep that certification?

 7   A    No, I did not.

 8   Q    Did you have a trauma certification?

 9   A    Yes, I did.

10   Q    What does that entail?

11   A    How to take, how to give better care.  I should say how to

12   give better care to those with severe trauma situation, how to

13   recognize them.  How to treat them.  Not all traumas can you

14   stay on the scene.  We have what they call the load-and-goes as

15   well, and you have to be able to identify are we going to fly

16   them out, load them up into the ambulance or say we have enough

17   time to splint and do it here without having to do it en route.

18   Q    In order to keep and maintain that certification, did that

19   require any annual testing or any annual recertification

20   classes?

21   A    Yes.  Well, not annual.  They -- we are required to keep up

22   so many continuing education hours.  So in the span of two

23   years, for national registry, it was 72 hours of continuing

24   education.  Plus maintaining advanced cardiac life-support

25   skills.  And CPR skills.

Q    And throughout the course of your career, especially back
in April of 2009, did you keep and maintain your various
certifications that were required to be a paramedic?

A    Yes, I did.

Q    And did those certifications involve the identification and
assessment of injuries and wounds?

A    Yes.

        MR. HOSLEY:  Your Honor, at this time the United
States would offer the witness as an expert under 702 in the
field of emergency medical treatment and diagnosis.

        THE DEFENDANT:  No objection, Your Honor.

        THE COURT:  All right.  The tender is accepted.

        Ladies and gentlemen of the jury, let me tell you
what's happening.

        Normally, normally witnesses can't give opinions.  But
as I gave you an instruction on expert witnesses, if their
background, their training is such that they can explain things
that, that those of us of ordinary experience and understanding
don't really know, then you can call an expert to explain.

        The testimony is the same as any other witness in that
you are the judges of the credibility.  So you're not bound by
the testimony.  You're here to judge it, and it's up to you how
much of it you accept.

        Go ahead.

        MR. HOSLEY:  Thank you, Your Honor.

BY MR. HOSLEY:

Q   Now, I want to go back again to April 20, 2009, and you
stated that you were on duty at the FCI in Florence, Colorado,
on that day?

A   Yes.

Q   On April 20, 2009, did you have the opportunity to conduct
a medical assessment of Lieutenant Steve Hansen, the SHU
lieutenant?

A   Yes, I did.

Q   And was that following an incident that occurred in the SHU
at approximately 1:30 p.m. that day?

A   Yes, that was following an immediate use-of-force incident
in the special housing unit, SHU.

Q   And what is an immediate use-of-force incident, what does
that mean?

A   An immediate use of force is something -- it just like it
sounds, it happens immediately.  You're not planning for it.
Typically it's when an inmate might get out of control, start
assaulting staff, start assaulting other inmates, or even
threatening himself.  You've got to gain control of that inmate
right away.  You don't have time to call in a regular,
calculated use-of-force team.  You've got take care of it then.

Q   What was the nature of the immediate use of force involving
Lieutenant Hansen on April 20, 2009?

A   He had been assaulted by inmate Morones.

1  Q   All right.

2        And now, as part of the medical assessment, are you

3  required -- you said earlier that you do a head-to-toe

4  assessment to determine if there are any injuries or wounds?

5  A   Yes.

6  Q   When was the medical assessment done in relation to the

7  incident itself?

8  A   Within just a few minutes.

9  Q   Where did the medical assessment occur?

10 A   In the special housing unit in Lieutenant Hansen's office.

11 Q   Did you notice any injuries to the face and head of

12 Lieutenant Hansen during that April 20, 2009 medical

13 assessment?

14 A   Yes, I did.

15 Q   What did you see?

16 A   He had contusion, deep abrasions, swelling to the cheek,

17 the forehead area, another abrasion, contusion to the left

18 cheek as well.  He also had a deep scratch on his forearm.

19 Q   Okay.

20       Now, you've used a bunch of terms that we may know,

21 but I need you to clarify them for me.

22 A   Okay.

23 Q   What's an abrasion?

24 A   An abrasion is a break in the skin, it's like when you fall

25 down and it oozes and it's actively bleeding, but it's not

Jacque Brown-Eldred - Direct

1  heavily bleeding.

2  Q    What's a contusion?

3  A    A contusion is swelling, minor bruising.  So when someone

4  gets, gets punched in the lip -- punched in the eye, I should

5  say, that would be a better example, when they get punched in

6  the face or something like that, that's when you get that

7  swelling and a little bit of bruising in there.  And that's a

8  contusion.

9  Q    Now, you mentioned that there was a contusion and abrasion

10  on the same side of Lieutenant Hansen's face.  What side did

11  you notice that?

12  A    I believe that -- well, he had abrasions to both cheeks,

13  and then kind of towards the forehead and the eye of the right

14  side.

15  Q    Okay.

16  A    I believe.

17  Q    I'm going to show you what's been previously entered into

18  evidence as Government Exhibit 2A.

19          Can you see Government Exhibit 2A on the monitor in

20  front of you?

21  A    Yes.

22  Q    And who is that in the photograph?

23  A    That's Lieutenant Hansen.

24  Q    And now, did the injuries that you just described to the

25  jury, are they present in this photograph that's on the monitor

Jacque Brown-Eldred - Direct

1  in front of you?

2  A   Yes, they are.  You can see kind of the deep abrasion where

3  the blood has broken through, and if you look at the cheekbone,

4  it's slightly swollen.

5  Q   Now, there's a little fake pen, stylus on that monitor in

6  front of you.  You see it?

7  A   No.

8  Q   Maybe -- do you have fingernails?

9  A   I see it now.

10 Q   Okay.

11     I need you to do a John Madden for me.  Can you show

12 us where the deep abrasion is that you were just referring to?

13 A   The deep abrasion would be right here.  He's also got just

14 a small skin tear right there as well.

15 Q   A small skin tear?

16 A   Yeah.

17 Q   And when you saw those injuries, on April 20, 2009,

18 immediately following the incident with Mr. Morones, did they

19 appear to be fresh, or did they appear to be old injuries?

20 A   No, they were fresh.

21 Q   Now, you described that as a small skin tear.

22 A   Yes.

23 Q   In the outside world, maybe not a cause for concern.  But

24 why might an open wound like that be a serious cause for

25 concern within a prison setting?

A    Within a prison setting, we're in such an enclosed

environment, and we have a very high population of hepatitis C

positive inmates.  Everyone worries about HIV and that's also a

concern.  But your more immediate threat really is going to be

hepatitis C.  We have a much higher incidence of it.  And it's

something that can live outside the body and on various

surfaces for an extended period of time.  It survives days,

weeks outside the body.

So if you have an area that's been contaminated with

it and now you have a break in the skin and you have a blood

contact with that, there's a possibility that could be

transferred.

Another really big concern, and this was very true at

the federal correctional institution where I worked, was what

they call MRSA, which is methicillin-resistant staphylococcus

aureus.  It's a staph infection.  It's one of the super bugs

that you hear so much about.  With that type of infection and

this type of wound, it can actually eat away the face, should

it contaminate.

Q    Now, you mentioned hepatitis C and HIV and these other

communicable diseases.  Are staff members, nonmedical staff

members, such as lieutenants, correctional officers, are they

permitted to view the medical records of inmates?

A    No.  We are required to maintain privacy laws just like on

the outside.

258

1  Q    So do regular staff members or correctional officers, do

2  they know which inmates have HIC, hepatitis C, or any other

3  communicable disease?

4  A    No.  Not unless the inmates tell them.

5  Q    In your opinion, this wound that you see on

6  Lieutenant Hansen's face, the one that you saw on April 20,

7  2009, is that, in a prison setting, is that the type of injury

8  for which medical treatment ordinarily should be sought?

9  A    Yes.

10        MR. HOSLEY:  One moment, please, Your Honor.

11  BY MR. HOSLEY:

12  Q    Just to clarify as well, when you assessed

13  Lieutenant Hansen on April 20, 2009, was the injury obvious to

14  you upon conducting your medical assessment?

15  A    Very obvious.  As soon as I walked into his office, it was

16  noticeable.

17  Q    Thank you, ma'am.

18        MR. HOSLEY:  No further questions, Your Honor.

19        THE DEFENDANT:  Your Honor, I have no questions for

20  the witness at this time.

21        THE COURT:  All right.  Thank you very much.

22        You're excused.

23        Next witness, please.

24        MR. HEARTY:  Your Honor, the United States calls

25  Cedric Bradley.

1      THE COURTROOM DEPUTY:  Raise your right hand.

2         (**CEDRIC BRADLEY, GOVERNMENT'S WITNESS, SWORN**)

3      THE COURTROOM DEPUTY:  Please be seated.

4      State your full name for the record and spell your

5  last name.

6      THE WITNESS:  My name is Cedric Bradley.  First name

7  is C-E-D-R-I-C.

8                       **DIRECT EXAMINATION**

9  BY MR. HEARTY:

10  Q   Good afternoon, Mr. Bradley.

11  A   Good morning, sir.

12  Q   Will you please make sure that you try to make sure you

13  speak up so the members of the jury can hear you.

14  A   Yes, sir.

15  Q   Thank you.

16      Sir, how are you employed?

17  A   Say again, sir?

18  Q   How are you employed?

19  A   I'm employed with the federal Bureau of Prisons down in

20  Florence, Colorado, with the special investigative services.

21  Q   Special investigative services?

22  A   Yes, sir.

23  Q   And is that abbreviated SIS; is that a term that you use to

24  describe that?

25  A   Yes, sir.

1  Q   Okay.

2       Can you generally describe what are the special

3  investigative services division of the Bureau of Prisons?

4  A   We investigate any type of crimes that may happen inside of

5  prison, anything from -- anything that could happen out in the

6  civilian streets sometimes happens inside the prisons, so we're

7  the ones that go and collect the evidence, take the

8  photographs, do the interviews, just try and find the facts of

9  what happened.

10 Q   And do SIS members have the responsibility of gathering

11 information about inmates?

12 A   Yes, sir.  Yes.

13 Q   Let me bring you, draw your attention to April 20, 2009.

14 Where were you assigned on April 20, 2009?

15 A   At USP Florence.

16 Q   Okay.

17       And "USP" is United States penitentiary?

18 A   Yes, sir.

19 Q   Okay.

20       And Florence is in Florence, Colorado; is that

21 correct?

22 A   Yes, sir.

23 Q   Could you just describe for us where the USP, or the United

24 States penitentiary, is in relation to the federal correctional

25 institute at Florence?

1  A   It is on the complex of the correctional complex.  We're in

2  probably the back, the back of the complex.  When you come in,

3  you have the FCI, you have the camp, the USP, and then the

4  Super Max.

5  Q   So would it be fair to say that you have one campus, then,

6  with various different prison facilities on that campus?

7  A   Yes, sir.

8  Q   One of those facilities is the federal correctional

9  institute, and the other one is the United States penitentiary?

10 A   Yes, sir.

11 Q   Okay.

12        On April -- in late April 2009, you worked at the

13 United States penitentiary?

14 A   Yes, sir.

15 Q   Correct?

16        Okay.

17        What were your responsibilities in late April of 2009?

18 A   Late April?  I was a support technician during that time,

19 which means I would do interviews on inmates that come over to

20 USP from other institutions or maybe from the streets.  Again,

21 any type of information that's needed for an investigation, I

22 would attempt to gather that type of information, whether it be

23 through interviewing or videos, anything like that.

24 Q   Okay.

25        So that would be interviewing inmates that were new to

1  that facility, to the USP Florence?

2  A   Not necessarily new.  Any inmate that comes into our

3  facility, if we have the opportunity to interview them, we

4  will, so that way if there's anything that changes with their

5  status, we will know.

6  Q   In late April 2009, did you have the opportunity to

7  interview the defendant in this case, Daniel Morones?

8  A   Yes, sir, I did.

9  Q   And was that in context, in the context of this intake

10 interview that you're describing?

11 A   Yes, sir.

12 Q   Do you remember approximately when that was?

13 A   I believe, sir, it was on April 24 of 2009.

14 Q   Okay.

15      And do you see inmate Morones in the courtroom?

16 A   I do believe that's him sitting over there, sir.

17 Q   Okay.

18      Would you just describe an article of clothing that

19 he's wearing?

20 A   Kind of a lavender-type shirt.

21      MR. HEARTY:  Your Honor, I just ask for the record to

22 reflect that the witness has identified the defendant.

23      THE COURT:  It will.  But my describing lavender isn't

24 anything I can help him with.  I guess so.  But I think he has

25 described him adequately.

1          MR. HEARTY:  All right.  Thank you, Your Honor.

2     BY MR. HEARTY:

3     Q    Let's talk a little bit about this interview process that

4     you have.  Can you just give us a little more detail about what

5     the purpose is of this interview process for inmates that are

6     being processed into the United States penitentiary?

7     A    Yes, sir.  We give a intake interview so we can gather any

8     type of information of anything that the inmate's been involved

9     with, whether it be assault on a staff member, assault on a

10    police officer, federal agent, whether they have a escape risk,

11    whether they have escaped successfully or attempted to escape

12    at one point in time.  To find out if they're affiliated to any

13    type of gang or even just associated, not necessarily

14    affiliated, meaning that they would be a part of the gang or

15    maybe they just hung out with gang members.

16          We just need information, not only to keep our staff

17    members safe, by knowing the past, we know what they're capable

18    of doing as well as our community, too, because some of the

19    inmates that we have have escaped from state prisons, jails,

20    county jails, and we need to know this information in order, in

21    order to keep our, our population safe, the inmates, the staff

22    members, and our community as well.

23    Q    Do you have a form or check list that you go through as

24    part of that intake interview?

25    A    Yes, sir.

1  Q    And when you complete that form or that check list, do you

2  give the inmate an opportunity to review it and sign it?

3  A    Yes, sir.

4  Q    And you interviewed the defendant in this case, inmate

5  Morones, right?

6  A    Yes.

7  Q    And did you give defendant the opportunity to review the

8  form that you used?

9  A    Yes, sir, I did.

10  Q    And did he sign the form?

11  A    Yes, sir.

12  Q    Now, do you recall when you conducted that intake interview

13  of the defendant, the defendant saying anything about

14  assaulting staff members?

15  A    Yes, sir, I do.

16  Q    What do you recall him saying?

17  A    He, to my knowledge, he said that he assaulted a staff

18  member, specifically lieutenant, over at the FCI just prior to

19  him coming to our facility.  He said that he came out of his

20  restraints and hit the lieutenant several times in the face.

21  Q    And you said that this interview took place on April 24,

22  2009?

23  A    I do believe that is the date, sir, yes.

24  Q    Had you heard anything about an assault on a lieutenant at

25  the FCI prior to processing in inmate Morones?

A    Not pertaining to him, sir.  We always hear about assaults

that happen on people, so I wouldn't have thought anything of

it.

Q    So at the time you were interviewing inmate Morones, you

had no prior knowledge of the assault that he told you about?

A    No, sir.

Q    And what did you do with that information when you received

it?

A    Well, once I get the information, I'll take the forms that

I have, I'll take them back upstairs to my office, and I will

try and call the institution that person said that this

occurred and get all the information, the incident report, any

type of reports that they have on it, and as well as any

medical reports or anything that they have on it.  So that way

I can place a file together, put a file together so I can

present to staff members so they know that, okay, this person

did this on this date to this staff member or inmate, whoever

it might be, so that they can have the knowledge of what the

past is and what the facts are.

Q    And is the information that you just testified about; that

is, that he told you that he had assaulted a lieutenant --

A    Yes, sir.

Q    -- is that information important to you in doing your job?

A    Oh, yes, sir, it is.  It's very important.

Q    Did you document that information into the file?

 1  A    Yes, sir.

 2  Q    Thank you.

 3           MR. HEARTY:  I have no further questions at this time.

 4           THE DEFENDANT:  Your Honor, I have no questions for

 5  the witness at this time.

 6           THE COURT:  Thank you very much.

 7           You may stand down, sir.  Thank you.

 8           THE WITNESS:  Thank you, sir.

 9           THE COURT:  Next witness, please.

10           MR. HEARTY:  Yes, Your Honor.  The United States calls

11  Norma Hilde.

12           THE COURTROOM DEPUTY:  I'm sorry, raise your right

13  hand, please.

14              (**NORMA HILDE, GOVERNMENT'S WITNESS, SWORN**)

15           THE COURTROOM DEPUTY:  Please be seated.

16           State your full name for the record and spell your

17  last name.

18           THE WITNESS:  Norma M. Hilde, H-I-L-D-E.

19                        **DIRECT EXAMINATION**

20  BY MR. HEARTY:

21  Q    Good afternoon, Miss Hilde.

22  A    Good afternoon.

23  Q    Ma'am, how are you employed?

24  A    I work for the Bureau of Prisons at USP Florence.

25  Q    That's the United States penitentiary?

Norma Hilde – Direct

1   A    Yes.

2   Q    In Florence, Colorado?

3   A    Yes.

4   Q    How long have you worked there?

5   A    I've been at the penitentiary for almost five years.

6   Q    And how long have you been with the Bureau of Prisons?

7   A    16 years.

8   Q    What is your current position?

9   A    I am an SIS technician.

10  Q    And just describe what your responsibilities are generally

11  as an SIS technician.

12  A    Our responsibilities are we monitor inmate phone calls, we

13  monitor inmate correspondence, do case files for incident that

14  happen at the institution.

15  Q    And what is the purpose of monitoring inmates' phone calls

16  and mail?

17  A    To keep track of their activities and anything that's

18  important going out that we should be aware of.

19  Q    And do you monitor all the inmates' phone calls and mail or

20  just select inmates' phone calls and mail?

21  A    We have -- currently we do have required monitoring of

22  inmates, but we do monitor other inmates also.  We do pretty

23  good on doing that.  Then our correspondence, we have a list

24  that we print out every month.  And if there are inmates that

25  come from other places, they require special monitoring, we

1  monitor them.

2  Q   Okay.

3       I'd like to focus your attention on early May of 2009.

4  Where -- what was your position at that time?

5  A   I'm an SIS tech, I was inside the special investigative

6  services office.  And I monitor mail and phones.

7  Q   Were you assigned specifically to the special housing unit

8  at the United States penitentiary at that time?

9  A   I was -- I actually monitored the special housing unit and

10  a couple of other housing units, yes.

11  Q   Okay.

12       At that time, were you familiar with an inmate by the

13  name of Daniel Morones?

14  A   Yes.

15  Q   Why were you familiar with him?

16  A   He was brought over from the FCI on the complex to the

17  special housing unit at the penitentiary.  For an incident that

18  occurred over there.  When he was brought over, we placed him

19  on a special mail monitoring list, and we received all of his

20  incoming and outgoing mail.

21  Q   Okay.

22       And can you just explain that process a little bit?  I

23  want to focus not so much on the incoming mail for the purposes

24  of your testimony today, but rather the outgoing mail, how it

25  is that mail from inmate Morones would be collected and then

1  how your monitoring process would work?

2  A    Inmates that are inside the special housing unit, they're

3  in a cell.  And what happens was, when they get ready to put

4  out their mail, they slide it through the door.  The mail is

5  picked up by the special housing unit officer, and what they do

6  is make sure that the mail matches the ID card on the outside

7  of the cell door.  Then it is processed, placed in a special

8  mailbox for us in SIS, and then it's delivered to us.

9  Q    Okay.

10        So just to review that a little bit.  The inmates in

11  the special housing unit don't walk up to a drop box,

12  themselves, and drop the main in an outgoing drop box?

13  A    No.

14  Q    Rather, it's collected by correctional officers directly

15  from the cell where the inmate is and brought to the outgoing

16  mail?

17  A    Yes.

18  Q    And I believe you said this, but just to be clear on it,

19  the correctional officers, the process is that the correctional

20  officers check the return address on the envelope to make sure

21  that it matches the inmate that they collected that from; is

22  that correct?

23  A    Exactly, yes.

24  Q    Okay.

25        And you mentioned registration number.  Just explain

Norma Hilde - Direct

 1  that, what a registration number is and what significance that

 2  has to the inmate and their mail.

 3  A    Inmate is -- well, each inmate is given a register number

 4  that stays with them throughout their whole time in the BOP

 5  unless they're released and come back.

 6  Q    Is that number unique to each individual inmate?

 7  A    Yes.

 8  Q    And is that number required to be put on the return address

 9  of any outgoing mail?

10  A    Yes.

11  Q    And is that a number that would also be on the cell when

12  the correctional officer collects the mail from?

13  A    Yes.

14  Q    And then when you you're monitoring that mail, so once it

15  makes it to you from the correctional officers receiving it,

16  what do you do with that mail?

17  A    We read every piece of mail that comes into the -- that's

18  designated for our shop.  The mail is read.  If it has anything

19  pertinent, it is scanned into an inmate info file, and it's

20  kept there.  And then it's -- we advise our supervisors of the

21  details of what was written inside the letter.

22  Q    And what happens to the original letter?

23  A    That is left basically up to our -- my supervisor, what he

24  wants to do with it.  Sometimes we let the mail go out.

25  Sometimes it is held and returned to other inmates -- I mean,

Norma Hilde - Direct

1  well, to the inmate that was sending it out.

2  Q   And so if the, if the letter has something pertinent in it,

3  like you described, but the decision is made to send it out

4  anyway, what happens?

5  A   Most of the time -- I'm sorry, most of the time it's let

6  out if it doesn't pose a threat or it's threatening anybody on

7  the outside or if it's not threatening anybody on the inside,

8  we'll let it go out.

9  Q   And then what do you do with the letter before you send it

10  out?

11  A   I actually, I scan it into an inmate info file, and it's

12  saved in our computer system.

13  Q   So you're essentially making a copy of it?

14  A   Yes.

15  Q   Okay.

16      Can I have you turn to Government's Exhibit 3 in the

17  notebook in front of you.

18      And that's a multipage exhibit, isn't it?

19  A   It's got three pages, right?

20  Q   That's what it has in front of you, is three pages?

21  A   Yes.

22  Q   Do you recognize that document?

23  A   Yes, I do.

24  Q   And what is it?

25  A   It is a letter that's leaving our special housing unit,

1    going outside.  From inmate Daniel Morones.

2    Q    Now, is that a copy of a letter that you pulled from the

3    outgoing mail and scanned into the system?

4    A    Yes, it is.

5    Q    And what time frame is that done?

6    A    It's done early in the morning, about, I pick up mail

7    approximately between seven-thirty and eight.

8    Q    Was this early May 2009?

9    A    Yes.

10   Q    Okay.

11          And how do you know -- you just mentioned there that

12   this is a letter from inmate Morones.  How do you know that

13   from looking at Exhibit 3?

14   A    Well, I notice, I know that because it has his name, his

15   register number.  It's coming from the penitentiary, plus it

16   has special housing unit B2 range, cell 237.

17   Q    And is that information that you knew related to inmate

18   Daniel Morones?

19   A    Yes.

20   Q    Okay.

21          And while you were monitoring the mail at that

22   institution, did you have the opportunity to see other mail

23   that was being sent out by inmate Morones?

24   A    Yes.

25   Q    And from looking at the handwriting and other unique

1    aspects of what's written on this envelope, were you able to

2    recognize that it's consistent with what comes from inmate

3    Morones?

4    A    Yes.

5    Q    His handwriting and the other symbols.

6              Do you remember pulling this specific letter?

7    A    I mean -- I don't understand your --

8    Q    Do you remember pulling this specific letter out of the

9    mail and making a copy of it?

10   A    Yes.

11   Q    Okay.

12             MR. HEARTY:  Your Honor, at this time I'll offer

13   Government's Exhibit 3.

14             THE DEFENDANT:  Your Honor, I object.  Can I *voir dire*

15   this exhibit?

16             THE COURT:  Yes, you may.

17             THE DEFENDANT:  Your Honor, Miss Hilde answered the

18   question that she recognized this as being mine.  She answered

19   the question that it was my handwriting.

20             THE COURT:  Yes.

21             THE DEFENDANT:  I feel that that should be reserved

22   for expert, like a *per se* handwritten, a handwriting expert

23   because she didn't actually see me write this letter.

24             THE COURT:  You can certainly ask her questions about

25   how she knows that it's your handwriting, but she is able to

1  give an opinion on that, as any other person would.  It's not a

2  matter that comes up with expert testimony as to whether

3  there's a forgery or not.  That's the area that you're

4  referring to for experts.  But you can examine her about her

5  qualifications to and her familiarity or background with your

6  signature, if you wish.

7          THE DEFENDANT:  Thank you, Your Honor.

8                    VOIR DIRE EXAMINATION

9  BY THE DEFENDANT:

10  Q    A few questions, Miss Hilde.

11          Now, the mail comes from the cell block ranges in SHU,

12  this particular mail, you -- correct?

13          This particular mail, you say it came from SHU, from

14  one of the cell block ranges in the special housing unit at the

15  United States penitentiary; is that correct?

16  A    I'm having -- I don't exactly know what you mean by that.

17  Q    This letter, this exhibit that the Government was asking

18  you about, asking your opinion about, it came from the cell

19  block range B237 in the special housing unit at the United

20  States penitentiary, you stated that, correct?

21  A    Yes.

22  Q    How many cells would you say are on the special housing

23  unit range B200?

24  A    That, I don't know.

25  Q    That, you don't know.

1      It says 237.  So there would possibly be a lot, right,

2  maybe 37 cells on B200, if it says that, roughly?

3  A   Roughly.

4  Q   Okay.

5      So there's many cells on this particular range.  And

6  many inmates can slide mail outside of their cells, correct?

7  A   Correct.

8  Q   And the officer at night or day shift or evening watch

9  officer can pick up this mail and deliver it to the box in the

10 office for outgoing delivery, correct?

11 A   They could, yes.

12 Q   They could.  They normally do, yes or no?

13 A   No.  Usually the unit officers, when they pick up mail,

14 they take the mail only when it's slid out -- when they slide

15 it through the cell door that it's supposed to be coming from.

16 This way they can identify if that's where the mail is actually

17 coming from.  So when they pull the mail out of the door, they

18 look at the envelope, and if there's two inmates inside a cell,

19 they will look and make sure that the ID cards match the

20 letter.

21 Q   What's stopping another inmate from sliding a letter out

22 and, and writing any address and any return address on there?

23 A   There's nothing stopping an inmate from doing that.

24 Q   So you answered my question when I say any inmate can slide

25 a letter out and the officer can take it to the outgoing

1    delivery box, correct?

2    A    Any inmate can slide any letter out.  But with the

3    professionalism of the unit officers in that, working that

4    special housing unit, they usually and most likely will not

5    pick up the mail unless it is --

6    Q    The question is -- I'm sorry.  The question I asked you

7    wasn't about professionalism or integrity or anything in that

8    realm.  I'm just asking you, if any inmate can slide any letter

9    out and the officer can deliver it, and you stated that was

10   correct.

11   A    Yeah.

12          THE DEFENDANT:  I need a second, Your Honor.

13          THE COURT:  All right.

14          THE DEFENDANT:  Your Honor, I'm done with *voir dire* on

15   this exhibit.  I object to relevance and foundation and

16   hearsay, Your Honor.

17          THE COURT:  All right.

18          THE DEFENDANT:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          The objection is overruled.  The objections go to the

21   weight of testimony, but it has been sufficiently identified.

22   It's up to the jury to decide how much weight to give it.  The

23   exhibit is admitted.

24      (Exhibit 3 admitted.)

25          THE COURT:  Go ahead.

1    MR. HOSLEY:  Thank you, Your Honor.  Permission to

2  publish.

3    THE COURT:  Granted.

4                **DIRECT EXAMINATION CONTINUED**

5  BY MR. HEARTY:

6  Q   Miss Hilde, before we talk about some of the contents of

7  this letter, the defendant just asked you some questions about

8  what stops an inmate from sticking mail out under someone

9  else's return address and register number.  And you were

10 starting to answer that question.  What is the answer to that

11 question; what prevents just any inmate, someone other than,

12 let's say, Daniel Morones, from dropping this envelope into the

13 outgoing mail where the correctional officers are collecting

14 it?

15 A   Actually, I'm sorry, could you repeat that again, please?

16 Q   The process, you described a process in your testimony --

17 A   Yes.

18 Q   -- about how correctional officers check the ID and

19 registration number of the inmate in the cell as they collect

20 the mail and make sure that the return address matches the

21 inmate that they're collecting it from.  Is that a fair

22 characterization of your testimony?

23 A   Yes.

24 Q   Okay.

25    So if they do that process -- and of course I

1   understand your qualification; your qualification was, look, I

2   wasn't there, it's possible that a correctional officer may not

3   have checked, but that's the process that we have in place,

4   right?

5   A   Yes.  Yes.

6   Q   So with that process in place, what prevents some other

7   inmate other than Daniel Morones, from mailing this letter that

8   makes it to you, is that the correctional officer wouldn't have

9   collected it and deposited it into the mail; is that fair?

10  A   Yes.

11  Q   Okay.

12          MR. HEARTY:  And can we zoom in just on the envelope

13  itself a little bit.

14          Actually, let's stay -- I want to talk about

15  the . . . .

16  BY MR. HEARTY:

17  Q   Are there unique identifiers on this envelope that you

18  recognized, on this envelope that are similar to other emblems

19  and pictures that you've seen on envelopes from inmate Morones

20  on other occasions?

21  A   Yes.  That would be like the native blood and the Meshica

22  warrior.  The designs on the outside of the envelope.

23  Q   These two designs here?

24  A   Yes.

25  Q   And it's unique to see those designs on an envelope.

Norma Hilde - Direct

1 That's not typical, is it?

2 A   No.

3         MR. HEARTY:  And if we could zoom in on the return

4 address part.

5 BY MR. HEARTY:

6 Q   Here this is what you were talking about on the return

7 address, right, and that's the registration number right there?

8 A   Yes.

9 Q   And that's a unique number that relates only to Daniel

10 Morones, correct?

11 A   Yes.

12 Q   And here is where you were describing the unit, the SHU

13 unit; S-H-U stands for special housing unit, correct?

14 A   Yes.

15 Q   And then B2, no. 237, that's the specific cell that inmate

16 Morones was assigned, correct?

17 A   Yes.

18 Q   And let's turn to the letter itself.

19         I'd like to have you focus on, yeah, the top -- I

20 guess the first two paragraphs there, please.

21         MR. HEARTY:  Yeah, you were doing exactly right.

22         Okay.

23 BY MR. HEARTY:

24 Q   And you see the date there, that's May 4, 2009?

25 A   Yes.

1  Q   Was there, was there anything about -- what was it about

2  the contents of this letter that caused you to pull it and scan

3  it into the system?

4  A   Actually, when we, when I read it, when I came down to the

5  middle part where it says -- am I allowed to read that?

6  Q   Yes, please read it.

7  A   Being charging for a hot one, too, they got me in the SHU,

8  I got the boot from the other spot because I busted this

9  lieutenant's dome.  I'm sorry, the lieutenant's dome piece,

10  punk was . . . I'm having a hard time reading that.

11  Q   This word here, maybe "disrespecting"?

12  A   Disrespectful.  Thought that I was some punk or something.

13  Q   Yeah, and actually, Miss Hilde, something that might help

14  you, the actual hard copy of the paper is right in front of you

15  there in Exhibit 3.

16  A   Oh.

17  Q   If that helps you read that.

18  A   Yeah, disrespected.

19  Q   Now, you testified earlier that you knew something about

20  inmate Morones and why he ended up in the United States

21  penitentiary, correct?

22  A   Yes.

23  Q   And what was that?  What was the reason that he ended up

24  being moved from the federal correctional institute to the

25  United States penitentiary?

 1   A    He was brought over -- there was an incident at the FCI,

 2   and he was brought over and he was placed in the special

 3   housing unit.  And when they were trying to take care of him, I

 4   understand that he assaulted a staff member over there, and so

 5   that's why they sent him over to the penitentiary.

 6   Q    And the statement that you just read that drew your

 7   attention to the letter, is that also another aspect or fact

 8   related to that letter that links it to the defendant, Daniel

 9   Morones?

10   A    Yes.

11   Q    Miss Hilde, I have no further questions for you at this

12   time.

13            Thank you.

14            You need to stay there.

15            THE DEFENDANT:  Your Honor, I have no questions for

16   the witness at this time.

17            THE COURT:  All right.  Thank you, Mr. Morones.

18            You may stand down, thank you.

19            Next witness, please.

20            MR. HOSLEY:  Your Honor, the United States will call

21   Officer Shyam Mansukhani.

22            THE COURTROOM DEPUTY:  You can actually stand in the

23   box.

24            THE WITNESS:  All right.

25            THE COURTROOM DEPUTY:  Up there in the witness stand.

1          Raise your right hand.

2          (**SHYAM MANSUKHANI, GOVERNMENT'S WITNESS, SWORN**)

3          THE COURTROOM DEPUTY:  Please be seated.

4          Spell your first name and your last name.

5          THE WITNESS:  First name is S-H-Y-A-M.  Last name is

6  M-A-N-S-U-K-H-A-N-I.

7                       **DIRECT EXAMINATION**

8  BY MR. HOSLEY:

9  Q    Mr. Mansukhani, how are you employed?

10  A    Correctional officer with the Bureau of Prisons, the last

11  ten years.

12  Q    Is that the federal Bureau of Prisons?

13  A    Yes.

14  Q    And are you an officer and employee of the United States

15  federal government?

16  A    I am.

17  Q    The Department of Justice?

18  A    Yes.

19  Q    Bureau of Prisons is an agency within the Department of

20  Justice?

21  A    Correct.

22  Q    Now, you said you had been employed with the Bureau of

23  Prisons for the last nearly ten years?

24  A    Yes.

25  Q    What's your current title with the Bureau of Prisons?

1  A    A senior officer specialist.

2  Q    And where have you been employed or what duty station, so

3  to speak, have you had during that ten-year period with the

4  Bureau of Prisons?

5  A    Basically every correctional post throughout the

6  institution.

7  Q    And which institution are you assigned to?

8  A    FCI Englewood.

9  Q    How long have you been assigned to FCI Englewood?

10  A    Just under ten years.

11  Q    What does "FCI" stand for?

12  A    Federal correctional institute.

13  Q    FCI, is that located within the state and district of

14  Colorado?

15  A    Yes, it's right here in Englewood, or Littleton, Colorado.

16  Q    It's on the border of Littleton and Englewood, Colorado; is

17  that correct?

18  A    It's in Littleton; even though it says FCI Englewood, I

19  think the property lines changed.

20  Q    That's here in the greater Denver area?

21  A    Yes.

22  Q    For those of us not familiar with the facility.

23  A    Yeah, right near here.

24  Q    What kind of facility is FCI Englewood?

25  A    It's just an all-male correctional facility.

Shyam Mansukhani – Direct

1  Q   And what are your duties currently with the federal Bureau

2  of Prisons there at FCI Englewood?

3  A   The same as they always have been, correctional officer

4  working various posts throughout the institution.

5  Q   Back in October of 2009, where were you working at that

6  time period?

7  A   I was working in the special housing unit.

8  Q   And where is the special housing unit located within the

9  FCI facility?

10  A   It's on the second floor as you enter.  It's separate from

11  the regular compound.  It's isolation basically of inmates that

12  have violated the rules within the prison, so they're

13  separated.

14  Q   And you kind of answered my next question.  What types of

15  inmates are housed there at the special housing unit at FCI

16  Englewood?

17  A   Ones that have violated the rules that are in the prison

18  and also we have some court inmates that are here for court,

19  that we house from other areas.

20  Q   Do you know the defendant, Daniel Andres Morones?

21  A   Yes, I do.

22  Q   And how do you know defendant Morones?

23  A   He was an inmate at that time in October of last year, and

24  I worked with him on a daily basis, or worked around him.

25  Q   Where was he an inmate specifically; what part of the FCI

Shyam Mansukhani - Direct

1  was he an inmate in October of 2009?

2  A   He was in the special housing unit where I worked.

3  Q   Had he been transferred to Englewood from the federal

4  correctional complex in Florence, Colorado?

5  A   Yes.

6  Q   On October 26, 2009, you said you were working in the

7  special housing unit.  What was your specific assignment?

8  A   I was SHU no. 1.

9  Q   What does that mean?

10  A   I'm in charge of opening and closing the barred grille,

11  which is the door at the end of the range, in which the inmates

12  are housed.  And also for processing inmate information as they

13  come and go and just various duties.  Helping serve chow or

14  serve the meals to the inmates and other things like that.

15  Q   You said the range; how many ranges are there within the

16  SHU at FCI Englewood?

17  A   There's four ranges.

18  Q   As the SHU no. 1, are you responsible for one of the ranges

19  or all of the ranges?

20  A   You're responsible for all.  There are gates at the end of

21  each particular range that I secure.  And also I open the door

22  for another officer in front of the cell door so it's

23  electronically opened, and I will do that with the other

24  officer standing in front of the inmate cell.

25  Q   What range was defendant, Daniel Morones, assigned to and

Shyam Mansukhani – Direct

286

1  living on on October 26, 2009?

2  A   He was on A range.

3  Q   Do you remember the cell?

4  A   I believe it's 6.

5  Q   Okay.

6        Now, you mentioned that you were on duty October 26,

7  2009.  Were you on duty the day before, October 25, 2009?

8  A   Yes, I was.

9  Q   Did anything catch your attention as you were patrolling or

10  conducting your rounds on the A range near Daniel Morones's

11  cell on October 25, 2009?

12  A   Yes.  There was a smell of intoxicants, homemade

13  intoxicants.  Around that area.  Where he was housed.

14  Q   Now, describe for those of us who have not been in a prison

15  facility, what are homemade intoxicants, and how are they made?

16  A   Inmates make them with tomatoes, bread, sugars, food

17  service items that they get on their meal trays that they'll

18  hold and ferment in their own cell over a period of day, and

19  the smell of this will build and build over a period of days as

20  the alcohol content gets stronger as it's fermenting.

21  Q   What is the -- are homemade intoxicants allowed at the FCI

22  facility?

23  A   No, they're not.

24  Q   Why not?

25  A   They're against Bureau policy.  Obviously inmates can drink

Shyam Mansukhani - Direct

1   and get out of hand and do things that like any drunk person

2   would do.  I mean, it's the same thing.  So that the inmates

3   don't get out of hand.

4   Q   Okay.

5         So what is the normal procedure if you believe that an

6   inmate is brewing homemade intoxicants in his cell?

7   A   You will go into the cell, search it, and see if you can

8   find the intoxicants, and then write him an incident report if

9   you do find them.

10  Q   Now, do you search the cell immediately or do you wait

11  until the inmate is removed from the cell and then conduct a

12  search while he is gone?

13  A   You can do it either way.  You can ask, request the inmate

14  to submit to hand restraints and take him out and search then.

15  Or, you know, for convenience, if he -- you want to check it

16  when he's out, you can do that as well.

17  Q   What are the advantages of waiting for an inmate to be

18  removed from his cell before conducting your search of that

19  cell?

20  A   If he, if the inmate knows that he has something in there

21  and he doesn't want you to come in, then he'll resist, resist

22  you putting the hand restraints on him, he'll refuse that, and

23  it will be more difficult to go in there and get him and

24  actually find out what's in the cell.  So it's more convenient

25  to do it whenever they're already leaving the cell for another

1  purpose.

2  Q   What are some reasons why an inmate might be removed from

3  his cell that would then give you an opportunity to conduct a

4  search of that cell?

5  A   Generally in the special housing unit, they'll leave for

6  showers or recreation; they're offered one hour of rec five

7  days a week, so they'll leave their cell for those things.

8  Q   So going back to October 25, 2009, you said that you

9  smelled the odor of intoxicants near as you were patrolling --

10  I keep saying "patrolling"; what is the term you use when

11  you're walking up and down?

12  A   Just touring the range, walking the range.

13  Q   So as you're touring the range, you smelled the odor of

14  homemade intoxicants coming from Morones' cell?

15  A   Correct.

16  Q   Did you search the cell immediately?

17  A   No, I did not.

18  Q   Why not?

19  A   It wasn't that strong.  I wasn't sure that it might have

20  been in there.  I had a good idea that it might have been in

21  there, but I wasn't sure.  And we were doing several duties,

22  other duties that we were doing, so I was kind of busy.  So it

23  wasn't convenient for me at that time.

24  Q   Did you, the following day, the following morning,

25  October 26, 2009, did you indeed conduct a search of the

1  defendant's cell?

2  A   I did, yes.

3  Q   And what was the opportunity that -- was Morones present in

4  his cell at the time you conducted that search?

5  A   No, he had just left the cell and was down in the

6  recreation area.

7  Q   And so what did you find when you conducted a search of the

8  defendant's cell in the A range of the SHU on October 26, 2009?

9  A   I found four containers containing what appeared to be

10 intoxicants.

11 Q   And when you say "four containers," what are you referring

12 to?

13 A   They were squeeze cheese containers that they're allowed to

14 buy in the commissary, so they had been emptied out and

15 refilled with liquid approximately this high, maybe that big

16 around.

17        MR. HOSLEY:  Your Honor, may the record reflect that

18 the witness held his hands approximately 6 inches apart and

19 made a round circle with his fingers indicating the size of the

20 container.

21        THE COURT:  It will.

22 BY MR. HOSLEY:

23 Q   You said there were four containers.  What was fermenting

24 within those containers to create the homemade intoxicants that

25 you found?

Shyam Mansukhani – Direct

A    I'm not exactly sure of the ingredients that made it.  It

had like an orangeish kind of tint to it.  Most of the time I

find it, it has a darker red from tomato paste.  But I'm not

exactly sure what his ingredients were.

Q    How did you determine that this was in fact a intoxicant

rather some other stuff?

A    You can smell it.  It has a strong smell.  And I also used

a intoximeter that we have for testing purposes, after I

removed the intoxicants from his cell.

Q    I'm sorry, I spoke over you, what was the last part?

A    I tested them with a sensor, a meter that we have.

Q    Explain to me what a intoximeter is.

A    We use it for breathalyzers; it measures the alcohol

present through a plastic tube that's attached.  And when using

it for testing intoxicants, you'll put the intoxicants in a bag

with air, place the tube on the end, to where you can press the

air and the air goes through it and reads the level of alcohol

in the material.

Q    And have you received specialized training to use this

intoximeter in your duties?

A    We all know how to use them, yeah, we all have been

trained.

Q    And you said that you personally used the intoximeter to

test the four plastic containers you found in defendant's cell?

A    Correct.

1  Q   What was the reading?

2  A   It's .076, which is just under 8 percent.

3  Q   And that's an alcohol reading?

4  A   Yeah, uh-huh.

5  Q   Now, the defendant, you said, was gone to recreation at the

6  time that you found, you searched his cell and found these

7  homemade intoxicants; is that right?

8  A   Yes.

9  Q   And was there a time later that morning that he was

10 returned to his cell?

11 A   Yeah, he was out for recreation for an hour, but it may

12 have been an hour and ten minutes or an hour and 15.

13 Q   Did you have a discussion with the defendant about the fact

14 that you had found and confiscated these homemade intoxicants?

15 A   I did let him know that I did write him a shot for it,

16 which is an incident report.  Is our slang that we use.  So I

17 went down to his cell and said something like, Hey, man, I had

18 to write you an incident report for that.

19 Q   How did he respond to that?

20 A   He didn't say anything.  He had no response.

21 Q   You mentioned a shot or an incident report.  What is an

22 incident report, what does that mean?

23 A   Whenever the inmates violate the Bureau rules, then they're

24 written an incident report which documents that rule; and based

25 upon that, they might be placed into the special housing unit.

Shyam Mansukhani - Direct

292

1  Q   What if an inmate's already in the special housing unit,

2  what sort of ramifications might he receive from getting this

3  type of disciplinary or incident report?

4  A   Well, they can lose good-conduct time which is time off

5  their sentence, if they have some available to be taken,

6  depending on nature of shot or incident report.  And also they

7  can lose privileges such as commissary and phone privileges.

8  Q   Now, why did you go and tell defendant Morones that you had

9  written this shot based upon the intoxicants; why not just let

10  him find out on his own when he knows that his liquor is gone?

11  A   In my history in working, it's always better to tell

12  somebody what's going on rather than surprising him at a later

13  time.  Typically there's a better response from the inmate

14  whenever you just inform him what's going on.

15  Q   What time of day was it when you located the intoxicants

16  and then informed Morones that he was going to receive an

17  incident report?

18  A   I located them around 8:15 in the morning, as he was

19  leaving, and I'm sure I informed him around probably 9:30,

20  whenever he was back from his cell.  Or back from recreation.

21  Q   Okay.

22      What shift were you working that day?

23  A   I was working day watch, which is 8 a.m. to 4 p.m.

24  Q   So were you still on duty at approximately eleven o'clock

25  on October 26, 2009?

1  A   Yes, I was.

2  Q   Now, I want to talk about what happens next.

3       So what goes on within the SHU at approximately

4  eleven o'clock on a typical day?

5  A   We serve meals at roughly around 10:30 a.m., and then

6  around the eleven o'clock hour, we go around and pick up the

7  trays from the individual inmates in their cells.

8  Q   Now, around the time that the trays were being picked up,

9  did you receive word from another officer that defendant

10  Morones wished to speak to you?

11  A   Yes, Officer Rafferty told me that he wanted to talk to me.

12  Q   And do you know Officer Rafferty's first name?

13  A   Shawn.

14  Q   What was his duty within the SHU that day?

15  A   I believe he was SHU no. 2.

16  Q   So did you in fact go down to speak to defendant Morones

17  after you were informed by Officer Rafferty that the defendant

18  wanted to talk to you?

19  A   I did.  I went down there to speak to him.

20  Q   Where did you go?

21  A   In front of his cell.  On A range, cell 6.

22  Q   Okay.

23       What happened when you walked down to defendant

24  Morones's cell to talk to him after being summoned?

25  A   He was, wanted to talk about the incident report.  And he

1  was just trying to kind of talk his way out of it.  And he was

2  irritated that he received this.  He felt, came across that he

3  didn't feel like he had the right to -- or I didn't have the

4  right to come in and take these intoxicants from him.

5  Q   What did he tell you that gave you the impression that he

6  thought you didn't have the right to take his contraband, his

7  homemade intoxicants?

8  A   He was saying things like, this is our house or this is my

9  house, you know, you don't have any right to come in here and

10  just things along that line.  I don't know the specific words,

11  other than that.

12  Q   Now, you mentioned that you conducted a search of his cell

13  while he was gone.

14  A   Right.

15  Q   Is that the normal standard operating procedure within the

16  SHU, at FCI Englewood?

17  A   Yes, you can do it either way.  Like I said, you can

18  restrain them and pull them out.  But more commonly, that's

19  when we do it, yes.

20  Q   So there's no requirement that you give him advance notice

21  that you're going to search his cell?

22  A   Oh, no.

23  Q   Well, when Morones was telling you that you didn't have the

24  right to search his cell, how did you respond?

25  A   Well, I was really just trying to calm him down, so I was

Shyam Mansukhani - Direct

1    just speaking softly and just told him, you know, that that's

2    what we had to do.  And I was basically trying to use my lower

3    tone to bring his tone down.

4    Q    Did that work?

5    A    No.  Not really.  No.

6    Q    What was his demeanor and state like when you were speaking

7    to him?

8    A    He was agitated.  And he was speaking in and his voice was

9    raising, and the things that he was saying.

10   Q    And so what happened next as you attempted to talk to

11   defendant Morones?

12   A    Well, he was continuing on with the same line of thing,

13   like you shouldn't be in my house and things like that.  And I

14   looked down and when I looked back up, he had his arm through

15   the grille or through the bars of his cell, and he threw a

16   substance on me.

17   Q    Okay.

18           Let's talk about the setup or the setup of the cell

19   for a moment.  You mentioned the grille.  What is the grille?

20   A    It's a barred door, so it's just all vertical and

21   horizontal bars.  But there's no Plexiglas, there's no barrier

22   other than the bar.

23   Q    So would an inmate be able to reach his arm through those

24   bars if he wanted to throw something at you?

25   A    Yes, he could.  And there's also a food slot which is

1  probably 16 inches wide and maybe 3 and a half, 4 inches tall,

2  that you could put your arm through.

3  Q   Now, is that the only door to his cell, or is there a door

4  on the exterior?

5  A   There's an exterior, which is a solid door with a glass

6  window in it.  Which can be slide -- you can slide it and lock

7  it.

8  Q   So in this case, when you were talking to defendant

9  Morones, was the sliding door open or closed?

10  A   It was open.  And we normally have those open.

11  Q   Now, you mentioned that as you looked away and looked back,

12  the defendant had a cup and he threw a substance at you?

13  A   Yeah.

14  Q   Can you describe the motion.

15  A   It was just down, through, up, and forward.

16  Q   And did the substance strike you?

17  A   Yes, it did.  It covered my left arm, hit me in the upper

18  torso, side torso on my left side, and my left leg and as well

19  as my lower neck and my forehead.

20  Q   Do you know what the substance was?

21  A   I believe it to be feces, urines, milk.

22  Q   Now, you didn't conduct any scientific testing on this

23  substance that was thrown at you, did you?

24  A   No, I did not, no.

25  Q   How is it that you believe the substance was feces, urine,

Shyam Mansukhani – Direct

1  and milk?

2  A    Well, there was extremely strong smell of feces.  Had the

3  color and there was actually bits of it in the substance.  And

4  there's no doubt in my mind that's what it was.

5  Q    This is going to be a stupid question, but you've smelled

6  feces before?

7  A    Yes, I have.

8  Q    And you've seen feces before?

9  A    Yes, I have.

10  Q    And this substance that struck you was consistent with

11  that?

12  A    Yes, it was.

13  Q    So what did you do after the defendant threw this feces and

14  urine substance upon you?

15  A    Well, I think I probably cussed at him as a immediate

16  response, and then I turned away and walked down the range.

17  Q    Was the defendant saying anything to you as he flung this

18  substance on you?

19  A    Not as he was flinging it, I don't remember him saying

20  anything.  But as I was walking off, he was, you know, shouting

21  things and -- at me as I was walking away.

22  Q    Do you remember the specifics of what he was saying?

23  A    I really don't.  You know, I was focused on seeing where he

24  had hit me with this stuff and kind of basically doing damage

25  assessment of where I was at just to see, 'cause I wasn't

1  expecting it, obviously.  So I really don't know the details of

2  what he was shouting.  I wasn't focused on that.

3  Q   Now, are there surveillance cameras within the SHU A range?

4  A   Yes, there are.

5  Q   Now, the camera, it doesn't have any audio, does it?

6  A   No.

7  Q   Just video?

8  A   Yeah.

9  Q   Now, was there a surveillance footage, video footage, of

10  this incident that you've had an opportunity to review?

11  A   Yes, there was.

12  Q   I'm going to ask you to open that binder in front of you,

13  and take a look at Government Exhibit No. 4.

14        What is Government Exhibit No. 4.

15  A   It's a DVD which I've reviewed and has my initials on it,

16  where I had signed it.

17  Q   Is that a DVD containing video footage of the incident that

18  you just described where Mr. Morones threw a substance on you

19  on October 26, 2009?

20  A   Yes, it is.

21  Q   And you said that you have reviewed that?

22  A   Yes, I have.

23  Q   And you initialed the outside to verify that that's the

24  disk that you reviewed?

25  A   Yes, I did.

1   Q   And does the video footage fairly and accurately represent

2   the events that you just described to the jury?

3   A   Yes, it does.

4         MR. HOSLEY:  Your Honor, at this time we offer

5   Government Exhibit No. 4 into evidence.

6         THE DEFENDANT:  I have no objection, Your Honor.

7         THE COURT:  It's admitted.

8      (Exhibit 4 admitted.)

9         MR. HOSLEY:  And I ask that it be published at this

10  time.

11        THE COURT:  Yes.

12  BY MR. HOSLEY:

13  Q   What are we looking at on the still?  We haven't started

14  playing the video yet.

15  A   This is the back of the range.  What you're seeing on the

16  far side would be the grille or the barred doors which I look

17  at the end.  To your left and up front, you can see the cell

18  numbers on top of the individual cells.  So this is the alpha

19  range of the SHU.  The A range.

20  Q   And you mentioned before that Mr. Morones, inmate Morones

21  at that time was in A range cell 6; is that correct?

22  A   I believe so, yes.

23  Q   And where is cell 6 on this video?

24  A   Right here on your left.

25  Q   You can pick up that little pen right there and just draw

1  an X for me, will you, or just use your finger.

2  A   Okay.

3        Yeah, here.

4  Q   Okay.

5        So this door that's immediately closest to us on this

6  video, is that the doorway into defendant Morones's cell?

7  A   Yes, it is.

8        MR. HOSLEY:  At this time I'm going to ask Lieutenant

9  Guillory if you could play the video.

10     (Videotape played but not reported.)

11  BY MR. HOSLEY:

12  Q   What is on the far end through those bars, what is that

13  room we're looking at?

14  A   That is the staff office.

15  Q   And where were you when Officer Rafferty informed you that

16  defendant Morones wanted to speak to you?

17  A   I believe I was on the B range which is basically identical

18  to this, but opposite, and it's, if you walk down this door

19  that's opening right now, it's over there to your left.

20  Q   Now, who's that we can see strolling towards us?

21  A   That would be me.

22  Q   Where are you going at this point?

23  A   I'm going to speak to officer -- or inmate Morones 'cause

24  Rafferty told me he wanted me to speak to him.

25  Q   Now, you mentioned before in your testimony that you were

1  discussing with inmate Morones the fact that you had

2  confiscated the intoxicants.  Is that what's taking place right

3  now?

4  A    Yes.

5  Q    And what was his demeanor like when you're having this

6  conversation with him that we're watching on the video?

7  A    This is when he's, you know, starting to get agitated.  He

8  started off just talking and saying that I shouldn't have been

9  in his cell and things like that, and kind of raises up in

10  intensity.

11  Q    And what are you telling inmate Morones as you're standing

12  in the doorway of his cell basically?

13  A    Basically, that I had to do it, you know, that you had this

14  in your cell, and so I wrote you up for it.  Like I said, I'm

15  basically trying to calm him down, too, like with a lower tone.

16          And now, yeah.

17  Q    What just happened right there, where you ducked away?

18  A    He just threw the material on me.

19  Q    And as you're looking down at your sleeve and your arm as

20  you're walking away, what did you see?

21  A    I was covered in feces, my entire arm.  My left side.

22  Q    And I notice you have a short-sleeved shirt on there.  Did

23  it actually strike your skin?

24  A    Yes, my entire left side of my arm, it was almost as if it

25  was dipped in a bucket.  There was quite a bit of material

Shyam Mansukhani - Direct

302

1  there.

2  Q   All right.

3         MR. HOSLEY:  Let's stop this.

4  BY MR. HOSLEY:

5  Q   Now, following the incidents, did you have an opportunity

6  to look at the cell block, specifically the area immediately in

7  front of Daniel Morones's cell we saw in this area?

8  A   Yes, I saw it after that.

9  Q   I'm going to have you take a look in your binder at

10  Government Exhibit 5A.

11         What is 5A?

12  A   That's outside of the inmate's cell.  All the material and

13  things that were thrown.

14  Q   And this photograph was taken on October 26, 2009?

15  A   Yes.

16  Q   Immediately following the incident that we just saw on the

17  video?

18  A   Yes.  There had been no one else around there.

19  Q   All right.  Have you flip over to Government Exhibit

20  No. 5B.

21         What is Government Exhibit 5B?

22  A   This is the wall on the far side.  On the video it would

23  have been to your right.  And the wall where the material has

24  come out all the way over there.

25  Q   And again, this photograph was taken immediately following

Shyam Mansukhani – Direct

1   the incident that we've just reviewed on the video?

2   A   Yes.

3   Q   And what is Government Exhibit No. 5C, if you can flip

4   over.  This one is a little hard to see on this paper picture.

5   But can you tell what that is?

6   A   Looks like a wall, the wall facing the far side of his cell

7   door.

8   Q   So this wall from the video we just saw, where was the wall

9   in relation to you when the substance was thrown at you from

10  the cell?

11  A   That was behind me by about probably 3 feet.

12  Q   And what is in this photograph, what's on the wall behind

13  you on October 26, 2009?

14  A   Feces and same concoction that was thrown at me.

15  Q   All these photographs, 5A, 5B, and 5C, do they fairly and

16  accurately depict the cell SHU A range as it existed on

17  October 26, 2009?

18  A   Yes, they do.

19       MR. HOSLEY:  Your Honor, at this time we move for the

20  admission or offer 5A, 5B, and 5C into evidence.

21       THE DEFENDANT:  I have no objections at this time,

22  Your Honor.

23       THE COURT:  All right.  No questions of this -- or no

24  objection to the exhibit?

25       THE DEFENDANT:  No objections to the exhibits.

Shyam Mansukhani – Direct

1       THE COURT:  The exhibits are admitted.

2    (Exhibit 5A,5B,5C admitted.)

3       MR. HOSLEY:  Thank you, Your Honor.

4       May we publish 5A to the jury, Your Honor?

5       THE COURT:  Yes.

6  BY MR. HOSLEY:

7  Q   5A, you said what area?

8  A   That's right in front of the inmate's cell.  Just above

9  these bars that you see in this photo, the inmate would be

10 housed in there.

11 Q   Are those the bars through which Daniel Morones threw the

12 substance on you?

13 A   Yes, they are.

14      MR. HOSLEY:  Flip over to 5B, please.

15 BY MR. HOSLEY:

16 Q   And where is this?

17 A   That's the wall on the outside of the cell, so

18 approximately, I would say 6 feet from the actual door to his

19 cell.

20 Q   What am I circling right here?

21 A   That would be feces.

22 Q   We'll take a closer look at the wall if we look at 5C.

23      MR. HOSLEY:  Lieutenant Guillory, can you, since this

24 is kind of faint, can you zoom in on this area right here,

25 please.

Shyam Mansukhani – Direct

BY MR. HOSLEY:

Q   What are we looking at in this photograph, Mr. Mansukhani?

A   That's the far wall, and where the feces hit the wall, struck the wall, which was behind me.

Q   At the time that the defendant threw that substance onto you and struck your body, were you in the performance of your official duties?

A   Yes, I was.

Q   What are the dangers of having a bodily fluid thrown upon you from an inmate in a federal prison?

A   Well, it's any disease that's out there is possible to be transmitted through things like that.  I mean, it's the worst possible thing that you could have.

Q   Now, you're the SHU no. 1, the OIC of the SHU.  Do you know which inmates have diseases and don't have diseases?

A   No.  We have no idea who has anything, and we're instructed to treat everyone as if they do have something.

Q   So what's going through your mind now that you're walking away from that cell and you have feces on and urine, you said your forehead, neck, clothing and bare arm?

A   I was checking my arm and making sure I didn't actually have any open cut to my hand or anything like that.  I was actually quite thankful that it didn't get me in the eye, mouth, and other open areas.

Q   Defendant Morones, do you still continue to see him day in

Shyam Mansukhani – Direct

306

1  and day out?

2  A   Yeah, actually after this incident happened, I probably

3  worked in the same area, under the same post for a month and a

4  half, two months probably.

5  Q   Did you change your course of business or your usual

6  practice of dealing with inmates as a result of being, having

7  that substance thrown on you by the defendant?

8  A   Well, whenever, especially when I found out that there was

9  going to be some sort of case about this, I would try to defer

10 any duty that I would normally go down there to, to someone

11 else, just so I wouldn't antagonize the situation, to someone

12 else.

13 Q   So prior to this incident, you would go and directly have

14 communication with the defendant?

15 A   Yeah.

16 Q   And you're saying after this incident, after having this

17 substance thrown on you, you would no longer do that?

18 A   Not completely.  I would still go in there sometimes.  If I

19 would have the opportunity to defer something, I would.  But I

20 didn't completely avoid him.

21 Q   How does it harm your ability to maintain control of the

22 SHU, if the inmates are allowed to dictate who's going to deal

23 with them based upon assaultive action of officers?

24 A   Say that again.

25         THE DEFENDANT:  Objection, Your Honor.  Relevance.

1      THE COURT:  Sustained.

2  BY MR. HOSLEY:

3  Q   Officer Mansukhani, clearly identify the defendant for the

4  record, the person from that video, the person who threw feces

5  and urine on you on October 26, 2009, is he present in this

6  courtroom today?

7  A   Yes, he is.

8  Q   Where is he seated and what is he wearing and please point

9  to him?

10 A   He's seated right over here with the dark-colored tie and

11 the light-colored shirt.

12     MR. HOSLEY:  And, Your Honor, may the court reporter

13 reflect on the record that he has identified the defendant.

14     THE COURT:  Yes, the record will so reflect.

15     MR. HOSLEY:  Just a moment.

16     No further questions at this time.

17     THE COURT:  Thank you.

18     Cross-examination, please.

19                    **CROSS-EXAMINATION**

20 BY THE DEFENDANT:

21 Q   Mr. Mansukhani, on October 26, 2009, you were assigned to

22 the special housing unit at the FCI, federal correctional

23 institute, Englewood; is that correct?

24 A   Yes, that's correct.

25 Q   What time did you enter the special housing unit on

 1  October 26, 2009?

 2  A   I'm not sure the exact time, but typically I would get

 3  there probably around 7:50 in the morning.

 4  Q   I see.

 5        How were you feeling that morning?  How was your mood?

 6  Were you sad, tired, angry, did someone cut you off on your way

 7  to work?

 8  A   I didn't have anything, any mood that I recall, actually.

 9  So it was just a normal day.

10  Q   What was your position and duties that day?

11  A   I was the SHU no. 1 officer.  And I'm in charge of opening

12  and closing cell doors and helping serve chow and other things

13  throughout the special housing unit.

14        THE DEFENDANT:  Your Honor, can I have a exhibit --

15  something marked for exhibit?

16        THE COURT:  Yes.

17        Take it to Mrs. Abiakam.  She'll mark it for you.

18        MR. HOSLEY:  Your Honor, I just ask to see what he's

19  marking, if I may.

20        THE COURT:  Show it to Mr. Hosley.

21        THE DEFENDANT:  It's a incident report, incident

22  no. 5048.

23        THE COURTROOM DEPUTY:  Do you still want it marked?

24        THE DEFENDANT:  Yeah, I'm sorry.

25        Your Honor, may we have permission for the clerk to

1  make a copy of this marked exhibit?

2         THE COURT:  Yes.

3         THE COURTROOM DEPUTY:  Okay.

4         THE COURT:  It's going to take a little time and we're

5  a little bit early, but let's take the recess now and we'll

6  come back and have those ready and continue with the

7  cross-examination at that time.

8         THE COURTROOM DEPUTY:  All rise.

9         THE COURT:  I think we should still plan on 15

10  minutes, but it might be a little longer.

11     (Jury out at 3:04 p.m.)

12         THE COURT:  All right.  We'll be in recess.

13     (Recess at 3:04 p.m.)

14     (Reconvened at 3:36 p.m.)

15     (Jury in at 3:36 p.m.)

16         THE COURT:  Thank you very much.  Be seated, everyone.

17         Mr. Morones, please proceed.

18  BY THE DEFENDANT:

19  Q   As I was . . . Mr. Mansukhani, do you have Exhibit A in

20  front of you?

21  A   I do have one.

22  Q   Do you know what that is?

23  A   This is the incident report that I wrote for the

24  intoxicants.

25  Q   Is that your signature under your name and title?

1   A    Yes, it is.

2   Q    And that's the correct date, 10-26-09?

3   A    Yes.

4   Q    Okay.

5        Earlier, earlier you stated that you were on the

6   eight-to-four shift; is that correct?

7   A    Correct.

8   Q    Okay.

9        Could you just read the first line?

10  A    In the body?

11  Q    Of this incident report and stop at cell 6?

12  A    Okay.

13       On 10-26-09, at approximately 8:15 a.m., I conducted a

14  shakedown of SHU cell no. 6.

15  Q    For those of us who are not familiar with BOP, Bureau of

16  Prisons, terminology, can you let the jurors and Judge know

17  what a shakedown is or consists of?

18  A    Yeah.  That's simply a cell search.  So you would go in,

19  look through articles, anything in the inmate's cell, and look

20  for contraband.

21  Q    Now, can you tell me what your duties of that day were?

22  A    I was the SHU no. 1 officer.

23  Q    And your duties?

24  A    I opened and closed doors, I processed paperwork, and

25  actually everybody in the SHU does, is responsible for all the

1    duties for the day there.

2             So we share in the duties is what I'm saying.

3    Q   I understand.

4             Is it normal practice or protocol, procedures, or in

5    your rules for the no. 1 officer of the special housing unit at

6    FCI, federal correctional institute, Englewood to conduct or

7    perform shakedown searches?

8    A   We do do it every day.  It's more common for the no. 2 or

9    no. 3 officer, but as we have food carts that enter the unit,

10   we have to shake --

11   Q   Sir, I'm sorry.  I asked you is it normal procedure, rules,

12   or practice or protocol for the no. 1 officer to conduct or

13   perform a shakedown search?

14   A   And you're speaking of the inmate cell, correct?

15   Q   Yes, sir, I am.

16   A   Normally that's typically done by the no. 2 or no. 3

17   officer.

18   Q   And was there a no. 2 and a no. 3 officer present that day?

19   A   Yes.

20   Q   I see.

21            So you came in at, you said, 7:40, 7:45?

22   A   I don't remember the exact time, but typically --

23   Q   Before eight o'clock.

24   A   Yeah, uh-huh.

25   Q   And this incident report that is signed and dated, titled

Shyam Mansukhani – Cross

1   by you, says that at approximately 8:15, you conducted a

2   shakedown search of SHU cell no. 6; is that correct?

3   A   Yes, it is.

4   Q   I see.

5       Mr. Mansukhani, when you executed this shakedown, were

6   you deviating from your official duty?

7   A   No.  I don't believe so.

8   Q   You were not?

9   A   No.

10  Q   But you just told me that the no. 2 and no. 3 are the ones

11  to perform these, these shakedown, these searches; is that

12  correct?

13  A   They typically do.

14  Q   They typically do or they do do.

15  A   Well, they typically do, but they're not the only one

16  responsible.  As a group, we have a total of five shakedowns

17  that were performed that we're required to perform per shift,

18  and those can be done by anybody.

19  Q   Mr. Mansukhani, you hold in your possession as the no. 1

20  officer a certain key, is that correct, a special key that is

21  not supposed to be allowed on the cell block ranges; is that

22  correct?

23  A   That is correct.

24  Q   Now, when you were conducting this, this shakedown, you

25  took that key down the range?

1    A    Yes, I did.

2    Q    Didn't you?

3         Why did you do that?

4    A    Well, technically we're not supposed to, but as a common

5    practice, we do that quite regularly.

6    Q    So it appears to me that you, instead of dispatching

7    officer of lesser rank, no. 1 -- I mean, I'm sorry, no. 2,

8    no. 3 officer, you kind of went out on your own, let's say,

9    personal frolic to conduct this, execute this shakedown search,

10   when there was available officers no. 2 and no. 3 available to

11   execute that, right; is that correct?

12   A    It was just an opportunity because the inmate had been

13   taken from the cell and I recalled that there might have been

14   intoxicants from the previous day.  So I just used that

15   opportunity to go in there.

16   Q    So deviating from duty is, is opportunity to you?

17   A    I don't think I was deviating from my duties.

18   Q    You just jeopardized the safety and security of the special

19   housing unit at the federal correctional institution in

20   Englewood, Colorado.  Correct?

21   A    I don't believe that I was.

22   Q    You don't believe that you were.  But you told me that this

23   key is not allowed on the cell block, cell ranges, correct?

24   A    By policy, it is not supposed to go down that range.

25   However, in common practice, we do take it on a regular basis.

1    Q    On common practice.

2    A    Yes.

3    Q    So it appears to me that common practice is going outside

4    of official Bureau rule.  Right?

5    A    In this case, it probably does.

6    Q    Probably or it does, sir?

7    A    It does.

8         THE DEFENDANT:  I have no further questions, Your

9    Honor.

10        THE COURT:  Thank you very much.

11        Redirect, please.

12                   **REDIRECT EXAMINATION**

13   BY MR. HOSLEY:

14   Q    Officer Mansukhani, as the SHU no. 1, who's responsible for

15   the safety and welfare of the officers within the SHU facility?

16   A    We all are.

17   Q    Every officer is responsible?

18   A    Yeah, uh-huh.

19   Q    As the SHU no. 1, are you no longer responsible for

20   determining if there's contraband in inmates' cells?

21   A    No, everyone is.

22   Q    Now, you mentioned before that it's a safety hazard to the

23   facility for inmates to have intoxicants; is that correct?

24   A    Absolutely.

25   Q    Now, who was the person on October 25, 2009, that actually

1  noticed the odor of intoxicant emanating from the defendant's

2  cell?

3  A    That was myself.

4  Q    Now, on October 26, the following morning, who was the

5  person who conducted the shakedown or the search of the

6  defendant's cell?

7  A    That was myself.

8  Q    Now, you said that it's usually the duties of the 2 and the

9  3.   Who tasks the SHU no. 2 or the SHU no. 3 with conducting a

10  search?  Who would tell them to conduct that search?

11  A    They do it on their own accord, depending on need, to fill

12  a requirement for the day, or if they have suspicion.

13  Q    Now, you mentioned before that there's a certain

14  requirement of a number of shakedowns that must be held on any

15  given day; is that correct?

16  A    Correct.

17  Q    Can you please explain to us what that policy is?

18  A    Each shift, the three during the day, eight to four, four

19  to midnight, midnight to 8 a.m., each have to conduct five

20  shakedowns of common areas or inmate cells.

21  Q    Now, who -- you said "each shift."  Who is responsible for

22  conducting all of those shakedowns?

23  A    That's anybody on shift on that post.

24  Q    Does that include the SHU no. 1?

25  A    It does.

Shyam Mansukhani - Redirect

1  Q   So were you deviating outside of your duties by conducting

2  a search of the defendant's cell to determine if there were

3  homemade intoxicants?

4  A   No.

5  Q   Why did you personally conduct that search that day rather

6  than tasking it to the no. 2 or the no. 3?

7  A   It came to my recollection from the previous day from

8  smelling the odors, and it just popped in my head, and it

9  seemed like a good opportunity to shake it down.

10 Q   Now, the defendant asked you if you were off on a frolic of

11 your own.  Were you on duty schedule at that time, 0815?

12 A   Yes.

13 Q   So you weren't there on your own accord on your off time?

14 A   No.

15 Q   You were there acting as an officer and employee of the

16 federal Bureau of Prisons?

17 A   Absolutely.

18 Q   Do you find -- is it common practice for you on your days

19 off, just go in and hang around the SHU units and conduct

20 searches of inmates' cells?

21 A   No, I do not do that.

22 Q   When do you actually conduct searches of inmates' cells?

23 A   When I am working.

24 Q   If something happens within the cell or within the SHU, if

25 there's an incident within the SHU, such as an inmate does

Shyam Mansukhani - Redirect

1    something bad because he's hopped up on intoxicants, homemade

2    intoxicants, who's the person who's going to be found

3    responsible for --

4           THE DEFENDANT:  I object, Your Honor, relevancy.

5           THE COURT:  Sustained.

6    BY MR. HOSLEY:

7    Q   Who is the person ultimately responsible, the officer

8    within the SHU who is going to be responsible for the security

9    of the SHU, if an incident were to occur?

10   A   Every officer is in charge of security.

11   Q   So that includes the SHU no. 1?

12   A   Yes.

13   Q   Now, there was a lot of talk about taking the key

14   downrange.  And you admitted, you were candid that that is a

15   violation, a technical violation of the strict policies of the

16   Bureau of Prisons.

17   A   Yes.

18   Q   But you said that it's a common practice.

19   A   Uh-huh.

20   Q   Why is it that the SHU key is oftentimes taken downrange,

21   even if technically you're not suppose to do?

22   A    It doesn't compromise anything because the inmates are

23   locked in their cells, and if an inmate were to grab that key,

24   he would have to be out of his cell, at the end of the range,

25   and he would have to use that key on another box to open

1    another cell.  That would be his only means of use for that

2    key.  He would already be out of his cell to have any use of

3    it.

4    Q    The defendant asked you, he said you endangered the

5    security of the entire facility by carrying that key downrange.

6    Is that a correct assessment?

7    A    No, I don't believe so.

8    Q    Now, were there any inmates, when you took the key

9    downrange, so to speak, to conduct the shakedown or the search

10   of the defendant's cell, were any inmates present who could

11   have gained control or access of that key?

12   A    No, there were not.

13   Q    And was the defendant himself present in his cell as you

14   were searching the cell?

15   A    Yes, he was locked in his cell.

16   Q    While he was --

17   A    Not while I was searching, no, he was locked in the

18   recreation cage, which was away from that area.

19   Q    More importantly, when you went down to talk to the

20   defendant, after he requested to talk to you, at the time that

21   the feces was thrown upon you, were you acting in the scope of

22   your official duties at that time?

23   A    Yes.

24   Q    And the defendant said that it is common practice within

25   the Bureau of Prisons for you to violate policy, isn't that

1  correct, that was the question.  Do you remember that question?

2  A    Yeah.

3  Q    And you said, yes, but what were you referring to at that

4  time?

5  A    Just the common practice --

6         THE DEFENDANT:  Objection, leading the witness, Your

7  Honor.

8         THE COURT:  Sustained.

9  BY MR. HOSLEY:

10  Q    When you said "yes" in response to his question, what did

11  you mean by that?

12  A    I meant it's common operational procedure for the no. 1 to

13  go downrange with that key.

14         MR. HOSLEY:  One moment, please, Your Honor.

15         Sir, I have no further questions.  Thank you, sir;

16  thank you, Your Honor.

17         THE COURT:  Thank you very much.

18         Officer, you may stand down.

19         Thank you.

20         THE WITNESS:  Okay.

21         THE COURT:  Next witness, please.

22         MR. HOSLEY:  Your Honor, we will call officer Ismael

23  Trujillo.

24         No, I'm sorry, I jumped ahead.  We're going to call

25  Officer Shawn Rafferty at this time, Your Honor.

1          THE COURTROOM DEPUTY:  Just stand there, please.

2          THE WITNESS:  Stand on the witness stand?

3          THE COURTROOM DEPUTY:  Yes.

4          Raise your right hand.

5          (**SHAWN RAFFERTY, GOVERNMENT'S WITNESS, SWORN**)

6          THE COURTROOM DEPUTY:  Please be seated.

7          State your full name for the record and spell your

8    last name.

9          THE WITNESS:  Shawn Patrick Rafferty, R-A-F-F-E-R-T-Y.

10         THE REPORTER:  Spell your middle name, please.

11         THE WITNESS:  Patrick, P-A-T-R-I-C-K.

12                        **DIRECT EXAMINATION**

13   BY MR. HOSLEY:

14   Q    Officer Rafferty, how are you employed?

15   A    Say again?

16   Q    What's your job?

17   A    I'm a senior officer at FCI Englewood.

18   Q    Who pays you, who gives you your paycheck?

19   A    Department of Justice.

20   Q    And specifically within the Department of Justice?

21   A    Federal Bureau of Prisons.

22   Q    All right.  Thank you.

23         You said that you're a correctional senior officer?

24   A    Yes, sir.

25   Q    With the FCI in Englewood?

1   A   Yes, sir.

2   Q   How long have you been employed by the Bureau of Prisons?

3   A   Since November of '95, just over 15 years.

4   Q   And how long have you been with the FCI Englewood facility?

5   A   I've started there, and I've never left.

6   Q   Were you -- have you ever had any break in your employment

7   in the time that you've, in that 15 years that you've been

8   employed by the Bureau of Prisons?

9   A   No, sir.

10  Q   Now, I want to go specifically to October 26, 2009.  Where

11  were you assigned on that day?

12  A   I was assigned in the special housing unit as the

13  recreation officer.

14  Q   Who was the SHU no. 1 on October 26, 2009?

15  A   Officer Mansukhani.

16  Q   And what's Mansukhani's first name?

17  A   Shyam.

18  Q   And what was your duty schedule on that day?

19  A   Seven to three.

20  Q   7 a.m. to 3 p.m.?

21  A   Yes, sir.

22  Q   Do you know the defendant, Daniel Andres Morones?

23  A   Yes, sir.

24  Q   How do you know Daniel Morones?

25  A   He's an inmate at our facility, assigned to the special

1  housing unit.

2  Q    Was he an inmate at the FCI, special housing unit, on

3  October 26, 2009?

4  A    Yes, sir.

5  Q    I want to go to approximately 11 a.m. on October 26, 2009.

6  Did you have a conversation with the defendant in which he

7  asked to speak to Officer Mansukhani?

8  A    Yes, I did.

9  Q    Can you please describe for the jury how that conversation

10 went.

11 A    We were picking up the food trays from lunch.  As I was

12 picking them up from Mr. Morones's cell, he asked if I could

13 send Officer Mansukhani down to speak to him.  And I asked him

14 what he needed, I'll help you out if you need anything.

15          And he said, no, I just need to speak to Mansukhani.

16 Q    Did you relay that conversation to Officer Mansukhani?

17 A    Yes, sir.

18 Q    And as a result of that conversation, did Mansukhani go

19 down to speak with defendant Morones?

20 A    Yes, sir.

21 Q    And how many -- approximately how many minutes was it after

22 Morones had requested Mansukhani's presence?

23 A    Just a couple minutes.  I went up, put the food trays away,

24 and told Officer Mansukhani, he went down to speak to Morones.

25 Q    And after Mansukhani came back from speaking to Morones,

1  did you have a chance to see him?

2  A   Yes, sir.

3  Q   What did he look like?

4  A   He had a substance on his shoulder, right in this area

5  here, just under his neck and on his arms, said that he got hit

6  with something from Morones while he was down at his cell.

7          THE DEFENDANT:  Objection, Your Honor, hearsay.

8          THE COURT:  Overruled.

9  BY MR. HOSLEY:

10 Q   You said that Officer Mansukhani had a substance on him.

11 What did the substance look like?

12 A   Looked like human waste.

13 Q   By human waste, you mean?

14 A   Brown and yellow and had an odor to it.

15 Q   What type of odor?

16 A   Just like human waste.

17 Q   Okay.

18          MR. HOSLEY:  One moment, please.

19          I have nothing further.

20                    **CROSS-EXAMINATION**

21 BY THE DEFENDANT:

22 Q   Mr. Rafferty, since your employment with the Bureau of

23 Prisons at FCI, federal correctional institution, Englewood,

24 have you ever been assigned to the duties of SHU no. 1 officer?

25 A   Yes, sir.

1  Q    And when you were SHU no. 1 officer, was it common practice

2  for you ever to take the no. 1 key down the range?

3  A    I don't understand what you're asking.

4  Q    I'm asking you, if it was ever common practice when you

5  were the no. 1 officer to go down the housing cell block range

6  with the no. 1 key that opens the doors?

7  A    No.

8  Q    It's not a common practice to do that, correct?

9  A    No.

10  Q    Now, is there any way that -- hold on.  I rephrase.

11        The cells that the inmates live in consist of -- on A

12  range, consist of steel walls and steel bars and outer steel

13  door, correct?

14  A    Concrete walls.

15  Q    Concrete walls?

16  A    Yes, sir.

17  Q    Okay.

18        And steel bars.

19  A    Yes, sir.

20  Q    Could at any time these bars ever be cut?

21        MR. HOSLEY:  Your Honor, I'm going to object.  This is

22  all beyond the scope of direct.  And I'm not sure the relevance

23  to the testimony that was provided by this witness to that.

24        THE COURT:  I'm going to permit it -- go ahead.  We'll

25  see where it leads.

Shawn Rafferty - Cross

BY THE DEFENDANT:

Q   At any time, Mr. Rafferty, could these bars be cut or

broken?

A   I suppose they could.

Q   You suppose.  I'm asking you, could they, not if you

suppose; could they, sir?

A   I've never seen it done.  Heard about it, but never seen it

done.

Q   In your line of corrections work, have you ever heard of

steel bars being cut and inmates getting out of secure areas?

A   Yes, sir.

Q   Now, if a -- if an inmate was ever to get out of his cell,

could he attack an officer that was walking down the range?

A   Yes, sir.

Q   And if this officer had a certain key, would that inmate be

able to attain that key?

A   Possibility.

Q   No, I'm asking you, would he be able to obtain that key?

        MR. HOSLEY:  Your Honor, this calls for speculation.

        THE COURT:  Sustained.

BY THE DEFENDANT:

Q   Would he, sir?

        THE COURT:  No, I've sustained the objection.

        THE DEFENDANT:  I'm sorry.

BY THE DEFENDANT:

1    Q   Mr. Rafferty, out of all your years, you're a well-seasoned

2    guy.  You have a lot of experience with the federal Bureau of

3    Prisons.  Out of all your years, have you ever noticed it to be

4    common practice to step outside of the line of official duty?

5    A   No.

6    Q   Common.

7    A   No.

8    Q   No.  That's not so.

9    A   I don't understand what you're asking right there.

10   Q   I'm asking you is it common practice to step outside of the

11   line of your official duties at the Bureau of Prisons, sir.

12   A   No.

13   Q   Okay.

14          THE DEFENDANT:  I have no further questions, Your

15   Honor.

16          THE COURT:  Thank you.

17          Anything else.

18                    **REDIRECT EXAMINATION**

19   BY MR. HOSLEY:

20   Q   Officer Rafferty, when you're on official duty, when you're

21   on your, in this case, when you're in your shift --

22   A   Yes, sir.

23   Q   -- are you on your time or the Bureau's time?

24   A   The Bureau's time.

25   Q   And when you're dealing with inmates while you've on your

1  shift, are you on your time or the Bureau's time?

2  A    The Bureau's time.

3  Q    When a SHU no. 1 or a recreational officer has professional

4  dealings with an inmate in their cell through those bars, are

5  you on your time or the Bureau's time?

6  A    Bureau's time.

7  Q    Do you have personal frolics or personal time with the

8  inmates while you are on your shift?

9  A    Professionalism is what we uphold.  We don't have personal

10  conversations with the inmates, no.

11  Q    Now, you said that -- there was a lot of questions about if

12  an inmate managed to saw through steel bars; have you ever, in

13  your 15 years, have you ever seen an inmate who managed to get

14  through the bars at the SHU in FCI Englewood?

15  A    No, sir.

16  Q    And if someone were to get through the actual bars, what

17  door is there on the other side of the bars?

18  A    Sometimes there's no door.

19  Q    Okay.

20  A    Sometimes that's the only, sometimes that's the only, the

21  bar grille door for the cell is sometimes the only door that's

22  there.

23  Q    Let's talk specifically about the A range in the SHU at FCI

24  Englewood.

25  A    Sure.

1  Q    On those cells, how many doors are there on each cell?

2  A    There's two.

3  Q    What's the outside door like?

4  A    The outside door is a solid door that locks with a key so

5  that if the, if the grille door from the actual cell was open,

6  you could have that other door locked and that inmate would not

7  be able to get out of that area.

8  Q    Have you ever heard of an inmate being able to saw through

9  the steel bars of the interior door and then being able to saw

10  through the exterior steel door to gain access to the hallway

11  of the FCI at Englewood?

12  A    Never.

13          MR. HOSLEY:  I have no further questions.

14          THE COURT:  Thank you, sir, you may stand down.

15          Next witness, please.

16          MR. HOSLEY:  Your Honor, we will call Officer Ismael

17  Trujillo.

18          THE COURTROOM DEPUTY:  Stand up there.

19          Raise your right hand.

20          (**ISMAEL TRUJILLO, GOVERNMENT'S WITNESS, SWORN**)

21          THE COURTROOM DEPUTY:  Please be seated.

22          State your full name for the record and spell your

23  last name.

24          THE WITNESS:  Ismael Trujillo, T-R-U-J-I-L-L-O.

25                      **DIRECT EXAMINATION**

BY MR. HOSLEY:

Q   Officer Trujillo, could you please tell us how you are employed?

A   I work for the Bureau of Prisons.  Been there for seven years.

Q   That's the United States federal Bureau of Prisons?

A   The United States federal Bureau, yes, sir.

Q   Are you an officer and employee of the United States government?

A   Yes, I am, sir.

Q   The Department of Justice?

A   Yes.

Q   The federal Bureau of Prisons is an agency within the United States Department of Justice?

A   Yes, it is, sir.

Q   How long have you been with the Bureau of Prisons?

A   For seven years.

Q   And how are you -- what facility are you stationed to?

A   FCI Englewood.

Q   What did you do prior to joining the federal Bureau of Prisons seven years ago?

A   I used to work for Texas Department of Criminal Justice.

Q   Do you know the defendant, Daniel Andres Morones?

A   I've seen him, yes.

Q   How do you know him?

1  A    He's an inmate at our facility.

2  Q    What facility is that?

3  A    FCI Englewood.

4  Q    Is FCI Englewood, is that located within the state and

5  district of Colorado?

6  A    Yes.

7  Q    Was the defendant an inmate in August of this year,

8  specifically August 19 of 2010?

9  A    Yes, he was.

10  Q    Do you know what range or what -- excuse me, what part of

11  the FCI facility was he an inmate of?

12  A    He's in the SHU.  He's in the segregation area.

13  Q    The SHU is the special housing unit?

14  A    Special housing unit, yes, sir.

15  Q    Back on August 18 and August 19 of 2010, do you know what

16  range he was assigned to?

17  A    Yes, I do.  A unit.

18        He was in A range.

19  Q    Okay.

20        Now, were you working on August 18 of 2010?

21  A    Yes, I was.

22  Q    And were you working, was there a time when you worked in

23  the SHU on that day and specifically when you conducted a

24  search of the defendant's cell?

25        Let me rephrase that question.

1    While you were working on August 18 of 2010, did you

2  participate in a search of the defendant's cell?

3  A   Yes, I did.

4  Q   What other officer was present during that search?

5  A   Officer Kemp.

6  Q   What was the reason for the search?

7  A   It was routine cell rotation.

8  Q   What is a cell rotation?

9  A   Once they -- we rotate cells every 21 days.  Then that's

10  for that, so that they won't be in the same cell for more than

11  21 days.  It's just for security of institution.

12  Q   Why don't we want inmates in the same cell more than 21

13  days?

14  A   For, just in case they start, maybe, trying to escape or so

15  they won't feel comfortable being in the same, in that same

16  cell.

17  Q   Now, you said there was a routine cell rotation.  What cell

18  was the defendant in and what cell was he being moved to?

19  A   I don't recall which one he was in.  But he was moved to

20  cell 3.

21  Q   Still within the A unit?

22  A   Yes.

23  Q   Or the A range, I should say?

24  A   A range.

25  Q   During that search with you and Officer Kemp, was the

1  defendant present for that search?

2  A   No, he was in court.

3  Q   So he was not at the FCI facility at that time?

4  A   No, sir.

5  Q   What did you find, if anything, during the search of the

6  defendant's cell in August 18, 2010?

7  A   During the cell search, we found some picture, a nudity

8  picture that he had.

9  Q   A nudie picture, what's a nudie picture?

10  A   A nude picture of a woman in his paperwork.

11  Q   Was this, did it appear as if it had been cut from a

12  magazine?

13  A   It seemed like somebody did a photocopy of it and then he

14  had it in his paperwork, in his legal work, actually.

15  Q   Are inmates allowed to possess naked photographs?

16  A   No, it's unauthorized.

17  Q   And so when you and Officer Kemp located this naked

18  photograph, what did you do with it?

19  A   We confiscate it and I put it in my lieutenant's office.  I

20  put it in his box.

21  Q   Now, you mentioned that the defendant was not present in

22  his cell at the time the cell was moved?

23  A   Right.

24  Q   And this was during a cell move that you guys located this

25  photograph?

1  A    Yes, sir.

2  Q    Did you see defendant on August 18, 2010?

3  A    No.

4  Q    When was the next time that you saw the defendant?

5  A    The following day.

6  Q    August 19, 2010?

7  A    Yes, sir.

8  Q    And where did you see him?

9  A    In the A range in the SHU again.

10  Q    Were you on duty on August 19, 2010?

11  A    Yes, I was.

12  Q    At approximately six o'clock in the morning, where were you

13  assigned?

14  A    I was assigned for the -- to work in the SHU.  In the

15  special housing unit.

16  Q    How is morning breakfast conducted for inmates at the

17  special housing unit?

18  A    We feed the inmates by range.  We go range by range, and we

19  start giving the cold tray, hot tray to every inmate.  That's

20  how, that's kind of how it's done.

21  Q    Do the inmates eat inside their cell, or are they taken

22  somewhere else?

23  A    No, they eat inside their cells.

24  Q    Okay.

25        Did you participate in the breakfast handout on

1  August 19, 2010?

2  A    Yes, I did.

3  Q    Approximately what time does that occur?  Typically what

4  time in the morning?

5  A    Five maybe.  Five, six, the morning.

6  Q    Okay.

7  A    I don't recall that.

8  Q    It's first thing in the morning?

9  A    Yes.

10  Q    Now, what is -- what's typically given -- you said you give

11  the inmates their tray?

12  A    Right.

13  Q    How is that provided to the inmates; how does that get into

14  the cell?

15  A    They come in in food carts from the food service.  They

16  come in in trays.  One tray is a cold tray.  The other one is a

17  hot tray.  We put them in our cart and we just run down the

18  ranges and we just give them the cold tray and hot tray.

19  Q    How is the cell configured that you're able to get the tray

20  inside the defendant's cell or inmates' cell?

21  A    On A range, there's a door that can be closed, and then

22  there's a grille behind that, and that's where they're at.

23  Q    When you say a "grille," what are you referring to?

24  A    A metal, metal door with rods.

25  Q    Metal bars?

1   A   Metal bars.  There you go.

2   Q   Is there a food slot where you can put the tray through?

3   A   Yes, there is.

4   Q   We're kind of talking over each other.  And it makes her

5   job really hard.

6   A   Sorry.

7   Q   I know you're nervous, but wait for me to finish before

8   you've answered.  You ever testified before?

9   A   No.

10   Q   Nervous?

11   A   Little bit.

12   Q   Okay.

13          So when you go and hand out the breakfast, did you

14   actually hand out breakfast on the A range of the SHU on

15   August 19, 2010?

16   A   Yes, I did.

17   Q   Did you see the defendant that day?

18   A   Yes, I did.

19   Q   What cell was he in that morning?

20   A   That would be cell 3.

21   Q   What happened when you went to deliver the food tray to the

22   defendant in cell A 3?

23   A   When I went to, to his cell, I give him his trays, and he

24   asked me why did I take away his, why did I take some stuff

25   from him.

1          I informed him that --

2  Q   Did he specifically identify the stuff that he was asking

3  about?

4  A   He really didn't.  He just why did you take my shit.

5  That's kind of the word that he used.

6          I told him that anything -- anything that I took from

7  that cell, it was anything that was unauthorized, I told him

8  that even though that I did take it away from him, I had put it

9  and left it in lieutenant's box, which is my supervisor.  I

10 told him if my supervisor felt that he could give it back to

11 him, then I was just doing my job.  I had no, I had no problem

12 with him gaining stuff back if our supervisor would give it

13 back to him.

14          I knew he wasn't going to give it back to him because

15 it was unauthorized item that he had in his cell.

16 Q   How did the defendant respond to that when you told him

17 that you had confiscated his item and gave it to your

18 supervisor?

19 A   It was kind of weird.  He was calm, just nodded his head.

20 I was thinking everything was okay with that.

21 Q   Now, approximately -- when you do a breakfast-tray handout,

22 how long is it typically before you retrieve those trays?

23 A   At least 20 minutes.  We give them sufficient time for them

24 to finish their meal.

25 Q   Did you retrieve the defendant's tray approximately 20

Ismael Trujillo - Direct

1  minutes later?

2  A   Yes, I did.

3  Q   What happened as you attempt to go and retrieve the tray

4  from inmate Morones' cell?

5  A   As I was going to his cell, he gave me this look, he threw

6  the trays out.  Once he threw the trays out, it fell on the

7  floor.  As I went down to pick them, when I went down and I was

8  coming up, he had a container, a cup, and just splashed, I

9  mean, it was warm, smelly, in my mind, first thing I see is

10  feces, you know, just my word would be shit, that's what he did

11  to me, that's what he threw on me.

12  Q   You said that was your initial reaction.

13  A   Yes.

14  Q   Describe what the substance smelled like and felt like when

15  it struck your body.

16  A   As soon as it in my face, it was like warm, warm and it had

17  a smell to it and I had little particles stuck to my shirt.

18  You know, I told him that what kind of man was he once he, once

19  he did that, you know, I said, what kind of man does throw shit

20  on another, another person.

21  Q   And how did he respond?  What did he say to you after he

22  threw that stuff?

23  A   He said, That's where you'll know what time it is, you

24  fucking *mojado*.

25  Q   What's a *mojado*?

1   A   *Mojado*, it's, it's calling like a wetback or illegal alien.

2   That's kind of what *mojado* means.

3   Q   And Trujillo, what type of last name is that?

4   A   Mexican name.

5   Q   After he told you that's what you get, F'ing *mojado*, did he

6   say anything else to you?

7   A   He cussed a lot, but one of the things when I was walking

8   away, he said, Now you're going to get AIDS, you fucking

9   asshole.

10          You know, and that really worried me.  I was really

11   worried after he told me that.  I mean, I don't know his

12   history, I don't know nothing about him.  I got family, and

13   that really worried me.

14   Q   Now, you said initially when you first were struck, you

15   thought that it was feces; is that correct?

16   A   Yes.

17   Q   Did you have a chance to go back and look at yourself in

18   the mirror, look at your clothing?

19   A   Yes.

20   Q   And did you form a different opinion as to what the

21   substance was?

22   A   I sure did.  The particles that were stuck on my shirt had

23   to be sperm, you know.  They had to be.

24   Q   Now, there was no -- you didn't take this to the FBI lab in

25   Quantico?

Ismael Trujillo – Direct

1  A    No.  No.

2  Q    So there was no scientific testing done?

3  A    No.

4  Q    And this is kind of an uncomfortable question, but I have

5  to lay the foundation.  Have you ever seen semen before?

6  A    Of course.  I'm a man, and I know what semen looks like,

7  and I know what it looks like when it's stuck to your clothes,

8  yes.

9  Q    The substance that was stuck to your clothes, the substance

10  that was thrown on you by this defendant, what did it look like

11  when you had a chance to examine it?

12  A    I could say that it was semen, sperm, yes.

13  Q    Now, you said that you were really nervous when he yelled,

14  now you got AIDS?

15  A    Yes, I was.

16  Q    Why were you nervous?

17  A    Well, I got a wife and I got five kids, so that's the last

18  thing that I want.  And what worried me the most is I explained

19  to him what happened to the picture, so I don't even know what

20  made him do that to me, you know, 'cause I explained to him

21  that I had, you know, what I did with the contraband.  So I

22  don't know why he would do that.  But I was very nervous, my

23  family, my kids, taking home.

24  Q    Are you officers, are you given access to inmates' medical

25  files?

Ismael Trujillo – Direct

340

1   A   No.

2   Q   So do you know if an inmate, a particular inmate, has HIV

3   or hepatitis or some other disease?

4   A   No, we take them all as universal precaution, that's kind

5   of what it is.

6   Q   Now, the A range of the SHU, is there a surveillance

7   camera?

8   A   Yes, there is.

9   Q   And have you had an opportunity to review the surveillance

10  footage from this incident?

11  A   Yes, I have.

12  Q   I'd ask you to open that binder in front of you to

13  Government Exhibit No. 6.

14          What is Government Exhibit No. 6?

15  A   It's a video.

16  Q   A DVD?

17  A   Yes, sir.

18  Q   Have you seen that DVD before?

19  A   Yes, I have.

20  Q   Does that DVD fairly and accurately represent the incident

21  that you just described that took place on August 19, 2010.

22          When you watched that, is that in there?

23  A   Well, it's not, the one that has my initial.  No.

24          MR. HOSLEY:  One moment, please.

25          May I approach, Your Honor?

1            THE COURT:  Yes.

2            MR. HOSLEY:  You were on no. 1.  Flip over to no. 6.

3            THE WITNESS:  Yes.

4  BY MR. HOSLEY:

5  Q   1's a DVD.  That's different.

6            Look at no. 6.

7  A   Yes.

8  Q   Do you see no. 6?

9  A   Yes.

10  Q   Have you watched that DVD previously?

11  A   Yes, I have.

12  Q   How do you know that's the one that you watched?

13  A   I signed it.  I put my initials on it.

14  Q   When you watched that video, did it fairly and accurately

15  represent the incident that you just described that occurred on

16  August 19, 2010?

17  A   Yes.

18  Q   Had the video or the images been altered or manipulated in

19  any way?

20  A   No.

21            MR. HOSLEY:  At this time, Your Honor, we offer

22  Government Exhibit No. 6 into evidence.

23            THE DEFENDANT:  I have no objections, Your Honor.

24            THE COURT:  It's admitted.

25       (Exhibit 6 admitted.)

1          MR. HOSLEY:  I ask Lieutenant Guillory to pull that up

2     on the computer.

3          I'd ask to publish.

4          THE COURT:  Yes.

5     BY MR. HOSLEY:

6     Q   Okay.  What are we looking at here, what is displayed on

7     Government Exhibit No. 6?

8     A   This is how it starts, how we start our day, feeding the

9     inmates.  As you can see, we have the cart, the trays.  The

10    blue one is the, is the cold tray.  The brown one is the hot

11    tray.

12    Q   And who's the person on that video?

13    A   That would be me.

14    Q   All right.

15          And this is from August 19, 2010?

16    A   Yes.

17          MR. HOSLEY:  All right.  Let's play the video.

18       (Videotape played but not reported.)

19    BY MR. HOSLEY:

20    Q   What are you doing as you -- is this the A range?

21    A   This is the A range.

22    Q   What are you doing as you're handing off these trays?

23    A   I'm handing off the trays, this is what I do, my job.  You

24    start cell by cell.  I'm in cell 1 there.

25    Q   You mentioned previously that the defendant was in cell 3?

Ismael Trujillo - Direct

1   A   Yes, sir.

2   Q   Do these just go chronologically 1, 2, 3, all the way down

3   the range?

4   A   Yes, they do, sir; yes, they do.

5   Q   So now appears that you're going into the third cell; is

6   that right?

7   A   Yes.

8   Q   And who is inside that cell?

9   A   That's Morones.

10  Q   And it appears that you're talking.  What's going on here

11  as you're handing off those breakfast items?

12  A   That's when he's asking me why did I take stuff away from

13  him.  Like I said, I told him that the contraband that he had,

14  the only thing I took was contraband, and I gave it to my

15  supervisor; and if the supervisor want to give it back to him,

16  I have no problem with it.

17  Q   Now, I notice that you're sliding the doors closed behind

18  you after you hand off the tray?

19  A   Yes, that was the first door that we have access to that

20  door, we can open that door at any time that we want, or secure

21  it for security reasons.  And then there's a grille.

22  Q   And are the grilles open or closed?

23  A   They're always closed.

24  Q   Now, are you responsible for handing out food in only the A

25  range or other ranges?

1  A    No, we're responsible for all four ranges that we have.  We

2  have four ranges.  That would be A range, B range, C range, and

3  delta range, D range.

4  Q    Just out of curiosity, why did you unplug the fan there?

5  A    The inmate next to me had asked me if I can turn the fan

6  off.

7  Q    Okay.

8          All right.  So now you left.  And you testified

9  earlier approximately 20 minutes or so goes by and then you

10  return to pick up trays; is that right?

11  A    Yes.  Yes.

12  Q    I'm going to fast-forward through this tape to when you

13  return.

14     (Videotape played but not reported.)

15  BY MR. HOSLEY:

16  Q    Now, who's that coming back into the SHU, A range?

17  A    That's my coworkers, that's Riddle.

18  Q    Officer Riddle?

19  A    Yes, sir.

20  Q    And who's that in the back?

21  A    That's me.

22  Q    So what are you and Officer Riddle doing at this point?

23  A    We're picking up the trays.  I'm putting my gloves on.  He

24  starts from 6 back, and I start from 1.

25  Q    Why do you wear gloves?

1  A    They have food or liquid substance on them, after they've

2  finished eating.

3  Q    What's happening here?

4  A    Right there he threw the tray at me, and that's where he

5  just threw all that, all that feces and stuff on me.

6  Q    Who is he?

7  A    Morones.

8  Q    Now, it looks like you kind of lost your cool there for

9  just a second, went towards him?

10 A    Yes, I did.

11 Q    What happened?

12 A    Just a reaction, you know, protect myself.  For that

13 moment, I wanted to protect myself.  And till I just, you know,

14 I found out there's a grille there, I really can't do anything

15 to him anyways.  But I felt like I got assaulted, and I just

16 felt that I had to protect myself.

17 Q    Now, what is Morones yelling at this point as you're

18 exiting the SHU range?

19 A    That's when he's yelling, you know, he's cussing at me and,

20 you know, he's telling me, That's so you'll know what time it

21 is, you fucking *mojado*; and when I'm walking away, that's when

22 he's telling me, Now you're going to catch AIDS, you fucking

23 motherfucker.  He's just yelling a bunch of stuff.  I'm just

24 telling him, What kind of man are you, what kind of man are you

25 for you to throw feces on me.  Seriously, I would have rather

1  him hit me than him throw feces at me.

2  Q   Now, were there any photographs taken of your uniform to

3  document the substance after this incident?

4  A   Yes.

5  Q   When were the photographs taken in relation to the

6  photographs that we watched?

7  A   As soon as I went down the range, I took my shirt off.  My

8  coworker took my shirt, and I went to wash my face because you

9  don't want that stuff in your face.

10 Q   So when it came at you, did it actually strike skin?

11 A   Oh, yeah, right in my face.  I'm glad I had my mouth

12 closed.  If not, he would have got it in my mouth.

13 Q   Let's take a look at Government's Exhibit 7 and 7A in that

14 binder in front of you.  Open that binder and flip open to 7A

15 first.

16        You got 7A in front of you?

17 A   Yes.

18 Q   What is 7A?

19 A   It's my shirt.

20 Q   And then is that taken on the date of this incident,

21 August 19, 2010?

22 A   Yes.

23 Q   And I'll have you flip open to 7B, the next page over.

24        What is that?

25 A   It's my shirt.

1  Q    A little closer shot?

2  A    Yes.

3  Q    Do 7A and 7B fairly and accurately depict the items

4  contained within; that is, the uniform that you were wearing at

5  the time of the incident we just watched?

6  A    Yes, I was.

7  Q    And both of those photographs were taken on August 19,

8  2010?

9  A    Yes, they were.

10        MR. HOSLEY:  Your Honor, at this time we'd offer 7A

11  and 7B into evidence.

12        THE DEFENDANT:  I have no objections, Your Honor.

13        THE COURT:  They're admitted.

14    (Exhibit 7A,7B admitted.)

15        MR. HOSLEY:  May we please publish 7A.

16        THE COURT:  Yes.

17  BY MR. HOSLEY:

18  Q    And you said that that's your uniform?

19  A    Yes.

20        MR. HOSLEY:  And then we'll flip over to 7B.  A little

21  closer shot.

22        I'm going to have Lieutenant Guillory zoom in slightly

23  on the substance, get a better look.

24  BY MR. HOSLEY:

25  Q    What was that substance; what do you, in your opinion, what

1   was the substance that we see on your shirt from August 19,

2   2010?

3   A    Well, I would say it was urine and sperm and feces.  He's

4   known for that.

5           THE DEFENDANT:  Object to that, Your Honor.

6           THE COURT:  Yes, sir.

7           The objection is, the basis for it?

8           THE DEFENDANT:  It's prejudicial by saying he's known

9   for that.

10          THE COURT:  That part of the objection is sustained

11  and that statement is stricken and the jury is instructed to

12  disregard it.

13  BY MR. HOSLEY:

14  Q    I'd like to clarify for the record, the person who threw

15  that substance onto you on August 19, 2010, is he seated in

16  this courtroom today?

17  A    Yes, he is.

18  Q    Can you please point to him and identify what he's wearing

19  for the record?

20  A    Right there.  Blue shirt, blue tie.

21          MR. HOSLEY:  And, Your Honor, may the record reflect

22  that the witness has pointed to and identified the defendant.

23          THE COURT:  Yes.

24  BY MR. HOSLEY:

25  Q    At the time that this defendant threw that substance on

1  your body, on your face, on your shirt, were you in the

2  performance of your official duties?

3  A   Yes, I was.

4          MR. HOSLEY:  One moment, please.

5          No further questions, Your Honor.

6                    **CROSS-EXAMINATION**

7  BY THE DEFENDANT:

8  Q   Mr. Trujillo, let's, let's go back one day from the day you

9  said you were assaulted on August 18.  You said that you

10  confiscated a photograph because it had a nude image.  Is that

11  correct?

12  A   Yes.

13  Q   As I remember clearly, that photograph, along with a letter

14  and several other photographs, were sent in via U.S. mail?

15          MR. HOSLEY:  Your Honor, we object to what the

16  defendant remembers and ask that he ask a question rather than

17  testifying.

18          THE COURT:  Overruled.

19  BY THE DEFENDANT:

20  Q   Mr. Trujillo, how do photographs and mail come into the

21  correctional institution at Englewood?

22  A   By mail.

23  Q   By mail?

24  A   Mail or their property.

25  Q   Mail or property?

1  A    In their property, yes.

2  Q    Now, property is scanned by a designated officer called the

3  property officer; is that correct?

4  A    Right.

5  Q    And this property officer, one of his main duties is to go

6  through the property and log it and while he's logging the

7  property onto a property slip, he's also checking for

8  contraband; am I correct?

9  A    Yes.

10  Q    Now, there's a big issue in the Bureau of Prisons with

11  property because if a inmate loses property, he's able to file

12  tort claim; am I correct?

13  A    Yes.

14  Q    Now, I want to ask you if nude photos are prohibited,

15  surely they wouldn't come in through the mail room, would they?

16  A    No.

17  Q    No.  Because the federal correctional institution at

18  Englewood mail room is, is, is not breachable by outside

19  contraband; am I correct?

20  A    Yeah, you're correct.

21  Q    So . . . hold on, Your Honor.

22        Let me get a second to consult with advisory counsel?

23        THE COURT:  Yes.

24  BY THE DEFENDANT:

25  Q    Mr. Trujillo, after you said you were assaulted, and --

Ismael Trujillo - Cross

1  after you said you were assaulted, what did you do?

2  A    What do you mean what did I do?

3  Q    What was -- what did you do after you were allegedly

4  assaulted by this said fluid?

5  A    What did --

6          THE DEFENDANT:  Your Honor, can you instruct the

7  witness to answer the question.

8          THE COURT:  Yes.  What he's asking you is what was

9  your next action after this fluid was put --

10          THE WITNESS:  My next action, my next action was to

11  defend myself.

12  BY THE DEFENDANT:

13  Q    To defend yourself?

14  A    Yes.

15  Q    And that was by grabbing the floor off the tray and

16  attacking me with the tray?

17  A    I didn't attack you.

18  Q    That's what I'm asking.

19  A    Nope.

20  Q    The video on 6:32:07 that you just watched, you, you, it

21  shows you leaning on the floor and then lunging in a motion

22  like the one I just emulated, correct?

23  A    For a second, yes.

24  Q    For a second?

25  A    Uh-huh.

1   Q   Mr. Trujillo, do you always follow the rules at the Bureau

2   of Prisons?

3   A   Yes, I do.

4   Q   Have you ever received any unsatisfactory grades in your

5   evals?

6   A   I have not.

7   Q   What about when you were with the Department of Corrections

8   in Texas?

9   A   I have not.

10  Q   When being assaulted by somebody behind a, a, a door or a

11  partition, where they, where they are unable to proceed to

12  attack you, is, is that common Bureau practice to lunge back

13  and initiate more to the incident?

14  A   No.

15  Q   It is not.

16         So in this instant --

17  A   For that second.

18  Q   -- you did not follow your Bureau protocol?

19  A   When you get assaulted, your first instinct is to protect

20  yourself, and that's what I was trying to do.

21  Q   The question, sir, was did you follow Bureau protocol by

22  your instant action?

23  A   Yes, I did.

24  Q   You did?

25  A   Uh-huh.

Ismael Trujillo - Cross

1  Q    So it is Bureau protocol for an officer to go outside of

2  his professionalism and integrity and to attack a person behind

3  a partition or a wall.

4  A    I won't consider it attack.

5  Q    What was that movement if there was no partition, then

6  basically you would have struck the person behind the

7  partition, correct?

8  A    I was defending myself.  If that was --

9  Q    Defending yourself.

10  A    If that was the case.  There was a partition, for the

11  second, and I stopped.

12  Q    Sir, was there a instant threat to your safety and

13  livelihood --

14  A    For that second, yes.

15  Q    -- at that time?

16  A    Yes, of course, yes.

17  Q    There was a threat.

18  A    Yes.

19  Q    To your life?

20  A    Yes.

21  Q    Mr. Trujillo, the exhibit in front of you, the Government's

22  Exhibit 7B, how long, when you took your shirt off, how long

23  did it take for these pictures to be photographed?

24  A    I don't know.  I took it off.  I handed it over to my, to

25  my coworker; and I went up to, I went up to medical.

1  Q    What was your coworker's name?

2  A    Reynolds.

3  Q    Reynolds or Riddle?

4  A    Riddle.  Riddle, I'm sorry.

5  Q    Donny Riddle?

6  A    Yes.

7  Q    You, you gave your uniform shirt --

8  A    My shirt.

9  Q    -- to Mr. Riddle, and he -- what he did he do with it?

10 A    I don't know.

11 Q    You don't know.

12       THE DEFENDANT:  Your Honor, I'm move to ask the

13 Government to bring Government Exhibit 7B up to publishment.

14       THE COURT:  Can you put it on.

15       There.

16       All right.

17 BY THE DEFENDANT:

18 Q    You see that picture in front of you?

19 A    Yes.

20       THE DEFENDANT:  Your Honor, I'll move to ask the

21 Government to flip to 7A now.

22       And kind of zoom in a little bit.

23       Now, zoom out to the normal setting.

24 BY THE DEFENDANT:

25 Q    Mr. Trujillo, I'm not a physicist, but I know when you're

 1    in a standing position or you're in a time of that you're

 2    walking and there is a liquid substance on you, the nature, the

 3    law of gravity will pull that substance down.  If you notice in

 4    this picture, the Government's exhibit, you will see puddle

 5    formulation on your uniform shirt.  Could you agree with that?

 6    A    It looks like, well, it's in my shirt.  It's on my shirt.

 7    Q    I'm asking you if it looks like puddle formulation.  Like

 8    these droplets are forming a puddle.

 9    A    Some of them they do.

10    Q    Some of them they do.

11    A    Uh-huh.

12    Q    Now, how would a puddle form if you're walking and you're

13    taking off your shirt and you're giving your shirt to another

14    officer for him to set down and photograph it?

15    A    Can't answer that question.

16    Q    Excuse me?

17    A    I don't know.  I just gave my shirt.

18    Q    You don't know how it would be formed.

19          It's a common-sense question, sir.

20    A    I don't know.

21    Q    Can you notice the droplets on the back of the table or on

22    the table where the shirt is laying.  You notice there's

23    droplets there.

24          You see those droplets.

25    A    Okay.

1    Q    Sir, Mr. Trujillo, how would those droplets reach that

2    table if said fluid was thrown down the range?

3    A    I didn't take that picture.

4    Q    You didn't take this picture?

5    A    No.

6    Q    So you don't know if somebody in fact maybe soddened your

7    shirt a little more.

8    A    I don't know.

9    Q    You don't know?

10   A    No.

11   Q    Do you remember what was being served for breakfast that

12   day?

13   A    No.

14   Q    Do you remember if it was oatmeal?

15   A    I don't remember.

16   Q    Do you remember getting oatmeal on your hands from the time

17   when you picked up the tray that spilled and you did the

18   motion?

19   A    No.

20   Q    And you hit the bars?

21   A    No.

22   Q    No.

23        You know the trays leak.  You stated it for the Court.

24   If there was oatmeal in the tray, it's going to leak out,

25   correct?

1   A   Not oatmeal.

2   Q   Not oatmeal?

3   A   Huh-uh.

4   Q   Is it true that the oatmeal they serve at federal

5   correctional institution Englewood is runny, poor quality?

6   A   No.

7   Q   No, it's not?

8   A   No.

9   Q   Well, earlier, sir, you stated that you tend to wear gloves

10  because the trays leak, there's substance?

11  A   Not oatmeal.

12  Q   Not oatmeal?

13  A   No.

14  Q   I want to clarify something.  Earlier you said that there

15  was urine, semen, feces thrown on you.

16  A   Yes.

17  Q   It does not look like there's feces on there.

18          Mr. Trujillo, after the confiscation of any property,

19  personal property, from an inmate, isn't the common practice,

20  the common protocol, the rule, to conduct a confiscation form?

21  A   No, not if it's not authorized.

22  Q   Not if it's unauthorized.

23  A   Right.

24  Q   So you're allowed to take items from an inmate and deem

25  them unauthorizable and not fill out a confiscation form; is

1  that -- that's the practice?

2  A   If they are unauthorized, yes.

3  Q   How would a nude photograph get into the federal

4  correctional institution at --

5         MR. HOSLEY:  Your Honor, this has been asked and

6  answered.

7         THE COURT:  Overruled.

8  BY THE DEFENDANT:

9  Q   Sir, how would --

10 A   It was in your property.

11 Q   It was in my property?

12 A   Yes.  It was in your legal work.

13 Q   Sir, is it true that when inmates come from another

14 institution on the writ, their property stays in their home

15 institution that they are designated to?

16 A   Like I said, it was in your property, it was your legal

17 work.  That's where it was at.

18 Q   In front of you, do you see -- oh, I'm sorry.

19        Mr. Trujillo, in front of you, do you see Defendant's

20 Exhibit C?  It should be a papers, not inside the binder.

21        Yes.

22        On the bottom there's a number.

23 A   Yes.

24 Q   Do you recognize Exhibit C?

25 A   Yes.

1  Q    Is that your signature and title on top of Exhibit C?

2  A    Yes.

3  Q    Can you read down to the third paragraph on the first and

4  second lines of this affidavit, this exhibit?

5  A    Where?

6  Q    It says, Following the incident, on the third paragraph,

7  first line.

8  A    Yes.

9  Q    Can you read this for me?

10  A    Morones yelled, right there?

11  Q    No, it says, Following the incident.

12  A    Right.

13  Q    Third paragraph.

14  A    Right.  Officer Riddle, Officer Riddle pulled me out of the

15  way and closed the door, outer door to the cell.

16  Q    After an assault takes place the common practice is to

17  close the outer door, correct?

18  A    Right.

19  Q    Why would Officer Riddle have to pull you away?

20  A    Because he feared you were going to throw more stuff at us,

21  that's why.

22  Q    Excuse me?

23  A    He feared you were going to throw more, more substance at

24  us.

25  Q    So he pulls you away and closes the door.

1  A    Yes.

2  Q    He didn't pull you away because you were angry and maybe --

3  A    No.

4  Q    -- he was afraid you might come in there and try to attack

5  me some more?

6         MR. HOSLEY:  Your Honor, this is all speculation as to

7  what was in the mind of Officer Riddle.

8         THE COURT:  Sustained.

9  BY THE DEFENDANT:

10  Q    Mr. Trujillo, you also stated earlier that the defendant

11  inmate Morones threw a tray at you.  But the tray did not hit

12  you.  Is that correct?

13  A    Yes.

14  Q    Now, if somebody throws a tray at you, what is your

15  reaction, sir?

16  A    Well, you threw it at the floor, so I picked it up.

17  Q    So if someone is trying to assault you and they throw a

18  tray at the floor, you're going to pick it up?

19  A    How can it be trying to assault me if you throw it at the

20  floor.  You just threw it at the floor.  I picked it up.

21         THE DEFENDANT:  Your Honor, I move to ask the

22  Government if they can show the video and set it at 6:32:07.

23         THE COURT:  Okay.

24         MR. GUILLORY:  What time?

25         THE DEFENDANT:  6:32:07.

1          MR. GUILLORY:  6:32?

2          THE DEFENDANT:  Yes.

3      (Videotape played but not reported.)

4          MR. GUILLORY:  Is this all right?

5          THE DEFENDANT:  Can you pause it.

6  BY THE DEFENDANT:

7  Q    So when you see that video, Mr. Trujillo, if somebody threw

8  a tray at you, wouldn't you try to counter, flinch, block it,

9  instead of just looking down.

10  A    You threw it at the floor.  You knew what you were doing.

11  Q    So the tray don't fall off the bars?

12  A    You pushed them off the bars.

13  Q    I --

14  A    Threw them off the bars.

15  Q    That's what you saw, pushed or thrown?

16  A    Pushed, thrown, same thing.  Threw them.  You threw them.

17  Q    I don't think it's the same thing, sir.

18          THE DEFENDANT:  Your Honor, can we play the ending

19  part of the video --

20          THE COURT:  Yes.

21          THE DEFENDANT:  -- on the Government's exhibit.

22          THE COURT:  You just want it to run to completion from

23  here?

24      (Videotape played but not reported.)

25  BY THE DEFENDANT:

1  Q    What are you doing now, Mr. Trujillo, in the video?

2  Engaging in dialogue?

3  A    I'm telling you what kind of man are you for you to throw

4  feces and substance at an officer.

5  Q    And you smell feces.

6  A    Yes.

7  Q    But there was never any evidence of feces and we do not see

8  any feces on your clothes?

9  A    You mix it in, you mix it in with your urine.

10  Q    And your shirt was never taken into evidence.

11  A    No.

12  Q    No.

13          THE DEFENDANT:  Your Honor, I need a second to consult

14  with advisory counsel.

15          THE COURT:  Please go ahead.

16          THE DEFENDANT:  Your Honor, I have no further

17  questions for the witness.

18          THE COURT:  Thank you, Mr. Morones.

19          Any redirect.

20          MR. HOSLEY:  Your Honor, we would ask that the entire

21  statement of Defendant's Exhibit C be offered under the rule of

22  completeness, since he has taken a selected portion from that

23  exhibit.

24          THE COURT:  All right.  It will be.

25          MR. HOSLEY:  We'd ask to admit Defendant's Exhibit C

1    and make that a part of the exhibits that go back to the jury.

2           THE COURT:  Exhibit C is admitted.

3       (Exhibit C admitted.)

4           MR. HOSLEY:  Thank you, Your Honor.

5                    **REDIRECT EXAMINATION**

6    BY MR. HOSLEY:

7    Q    Officer Trujillo, was it your understanding that naked

8    photographs were contraband?

9    A    Yes.

10   Q    What did you do with the photograph you confiscated?

11   A    I confiscated it and put it in the lieutenant's box.

12   Q    What did you tell Mr. Morones that you had done with that

13   photograph?

14   A    I told him that I confiscated a nude picture that he had in

15   his, in his legal work.  I told him that I gave it to the

16   lieutenant.  I put it in his lieutenant box, and that if the

17   lieutenant would give back to him, that I had no problem with

18   it.

19   Q    But he didn't simply request from the lieutenant that he

20   could get that photograph back, did he?

21   A    No.

22   Q    What did he do to you in response to you confiscating that

23   photograph?

24   A    He threw shit on me.

25   Q    Now, we were looking at the pictures earlier.  Let's take a

Ismael Trujillo - Redirect

1   look at the two photographs again.

2        MR. HOSLEY:  And let's zoom in on, up here where the

3   stains are on the shirt.

4   BY MR. HOSLEY:

5   Q   Now, defendant Morones was asking if you this was puddling

6   or pooling on your shirt; is that right?

7   A   Yes.

8   Q   What type of bodily fluid adheres to a shirt like that?

9   A   Sperm.

10       THE DEFENDANT:  Objection, Your Honor, leading.

11       THE COURT:  Sustained.

12  BY MR. HOSLEY:

13  Q   What type of material is it that you see there that you

14  believe is adhering to your shirt?

15  A   I believe that it is sperm.

16  Q   Now, you said you did not take the photograph?

17  A   No, I did not.

18  Q   This shirt as you see it, does it look any different or

19  does it look the same as when you removed that shirt

20  immediately following the incident?

21  A   To me it looks the same.  I just took it off.

22  Q   We heard a lot about the video.  We saw part of it.  I'd

23  like to take a look at it again.

24       And I'd like to go specifically -- sorry, I'd retrieve

25  my note here.  I'd like to go to 6:31:30, which is the 1816

Ismael Trujillo - Redirect

1  marker.

2         Now, defendant Morones said that you attacked him with

3  the tray following this incident; is that correct?

4  A    That's what he was saying.

5  Q    Did you attack him with the tray?

6  A    No.

7  Q    Let's watch this again.

8       (Videotape played but not reported.)

9         MR. HOSLEY:  Let's pause it.

10  BY MR. HOSLEY:

11  Q    Why are you bending down?

12  A    That's where he threw the tray.

13  Q    Who is he?

14  A    Morones.

15  Q    Okay.

16         MR. HOSLEY:  Let's start it up again.

17       (Videotape played but not reported.)

18         MR. HOSLEY:  Pause it.

19  BY MR. HOSLEY:

20  Q    What was that substance we just saw flying across the

21  screen?

22  A    That was, what I'll describe as shit, feces, urine.  First

23  thing in my mind was urine 'cause it felt so warm, it felt warm

24  in my face.

25  Q    Who threw that substance?

1   A   Morones did.

2   Q   Now, and we'll play this forward.

3       (Videotape played but not reported.)

4   BY MR. HOSLEY:

5   Q   Did you assault the defendant with the tray at that time?

6   A   No.

7   Q   Now, the defendant asked you, he said, Is it normal BOP

8   procedure for you to go towards an inmate.  Do you remember

9   that question?

10  A   Yes.

11  Q   He said if that cell door wasn't there, that grille wasn't

12  there, that you would have been able to get to him; is that

13  correct?

14  A   That's what he's saying.

15  Q   What is the standard Bureau of Prisons procedure in use of

16  force by a guard after a guard is assaulted by an inmate?

17  A   To contain a situation.

18  Q   How do you contain a situation?

19  A   If that bar wouldn't have been there, we would have taken

20  him in, brought him down, and contained him.

21  Q   So are you allowed, if you've just been assaulted by an

22  inmate, are you allowed to use reasonable force to protect

23  yourself?

24  A   Yes.

25  Q   Are you allowed to use reasonable force to contain the

Ismael Trujillo - Redirect

1  situation?

2  A    Yes.

3  Q    So what was your initial instinct at the moment you were

4  struck by the flying substance?

5  A    To contain the situation.  To protect myself.

6  Q    And as you stepped forward, what did you see between you

7  and the defendant?

8  A    A big grille, bars.

9  Q    And so what did you do at that point?

10  A    Stepped back.

11          MR. HOSLEY:  I have nothing further, Your Honor.

12          THE COURT:  Thank you.

13          Thank you, Officer, you may stand down.

14          THE WITNESS:  Thank you, sir.

15          THE COURT:  Ladies and gentlemen, we'll be in recess

16  until tomorrow morning at nine o'clock.

17          If there's any reason that you might be delayed,

18  please call us and let us know.

19          THE COURTROOM DEPUTY:  All rise.

20      (Jury out at 4:52 p.m.)

21          THE COURT:  It looks to me from the way we're going,

22  that you might be finishing with your witnesses tomorrow.

23          MR. HOSLEY:  We believe so, Your Honor.

24          THE COURT:  And can you give us some idea so I can

25  tell Mr. Morones so he can be ready to go.

1          MR. HOSLEY:  We are hopeful to be finished by

2    lunchtime tomorrow, Your Honor.

3          THE COURT:  All right.

4          We'll be in recess until tomorrow at 9 a.m.

5          MR. CONNELL:  Thank you, Your Honor.

6       (Recess at 4:53 p.m.)

7                    REPORTER'S CERTIFICATE

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10   Dated at Denver, Colorado, this 25th day of November, 2011.

11

12                         s/Kara Spitler_____
                                 Kara Spitler

13   JURY INSTRUCTIONS                                    124

14   OPENING STATEMENTS

15     By Mr. Hearty                                     149

16     By The Defendant                                  162

17   WITNESSES

18     STEVEN HANSEN

19        Direct Examination By Mr. Hearty              164

20        Cross-examination By The Defendant            191

21        Redirect Examination By Mr. Hearty            204

22     THOMAS VIALPANDO

23        Direct Examination By Mr. Hosley              208

24        Cross-examination By The Defendant            223

25        Redirect Examination By Mr. Hosley            228

1    DANIEL SHERIFF

2         Direct Examination By Mr. Hosley              233

3         Cross-examination By The Defendant            240

4         Redirect Examination By Mr. Hosley            243

5    JACQUE BROWN-ELDRED

6         Direct Examination By Mr. Hosley              246

7    CEDRIC BRADLEY

8         Direct Examination By Mr. Hearty             259

9    NORMA HILDE

10        Direct Examination By Mr. Hearty             266

11        Voir Dire Examination By The Defendant        274

12        Direct Examination Continued By Mr. Hearty    277

13   SHYAM MANSUKHANI

14        Direct Examination By Mr. Hosley              282

15        Cross-examination By The Defendant            307

16        Redirect Examination By Mr. Hosley            314

17   SHAWN RAFFERTY

18        Direct Examination By Mr. Hosley              320

19        Cross-examination By The Defendant            323

20        Redirect Examination By Mr. Hosley            326

21   ISMAEL TRUJILLO

22        Direct Examination By Mr. Hosley              329

23        Cross-examination By The Defendant            349

24        Redirect Examination By Mr. Hosley            363

25                  GOVERNMENT'S EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 1 | 181 | 181 | | | |
| 2A | 189 | 189 | | | |
| 2B | 190 | 191 | | | |
| 3 | 273 | 276 | | | |
| 4 | 299 | 299 | | | |
| 5A,5B,5C | 303 | 304 | | | |
| 6 | 341 | 341 | | | |
| 7A,7B | 347 | 347 | | | |

DEFENDANT'S EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| C | | 363 | | | |