IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 09-cr-00261-JLK

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DANIEL ANDRES MORONES,

    Defendant.
_____

REPORTER'S TRANSCRIPT
Trial to Jury, Day 3
_____

        Proceedings before the HONORABLE JOHN L. KANE, JR.,

Senior Judge, United States District Court for the District of

Colorado, commencing at 9:10 a.m., on the 15th day of December,

2010, in Courtroom A802, Alfred A. Arraj United States

Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

1                         APPEARANCES

2              RICHARD HOSLEY and JAMES HEARTY, Assistant United

3    States Attorneys, 1225 17th Street, Suite 700, Denver, CO

4    80202, for plaintiff.

5              DANIEL MORONES, pro se.

6              ROBERT BERGER, P.O. Box 201088, Denver, CO  80222,

7    and MATTHEW CONNELL, Connell – Savela, P.C., 250 Arapahoe

8    Avenue, Suite 301, Boulder, CO  80302, advisory counsel to pro

9    se defendant.

10                    P R O C E E D I N G S

11       (In open court at 9:10 a.m.)

12       (Jury in at 9:10 a.m.)

13             THE COURT:  Thank you.  Good morning, and be seated,

14   everyone.

15             Call your next witness, please.

16             MR. HEARTY:  Your Honor, the United States calls

17   Thomas Watson.

18             THE COURTROOM DEPUTY:  Stand there.

19             Raise your right hand.

20              (**THOMAS WATSON, GOVERNMENT'S WITNESS, SWORN**)

21             THE COURTROOM DEPUTY:  Please be seated.

22             State your full name for the record and spell your

23   last name.

24             THE WITNESS:  Thomas Robert Watson.  Watson is

25   W-A-T-S-O-N.

1 **DIRECT EXAMINATION**

2 BY MR. HEARTY:

3 Q   Sir, how are you employed?

4 A   I work for the federal Bureau of Prisons as an operations

5 lieutenant at FCI Englewood.

6 Q   And as an operations lieutenant, what are your

7 responsibilities?

8 A   We oversee the institution after hours, we are the head of

9 the institution.  At that time responsible for inmate

10 discipline, all activities in the institution.

11 Q   And the institution, you said FCI Englewood, that's federal

12 correctional institute?

13 A   That is.  Also there's a complex, so there's a federal

14 detention center and also the federal center located at that

15 complex.

16 Q   Prior to that position, what did you hold?

17 A   In security for past five years.  And I was an operations

18 lieutenant at FCI Three Rivers, and for approximately four and

19 a half years.

20 Q   Where is Three Rivers?

21 A   South Texas.

22 Q   How long have you been with the Bureau of Prisons?

23 A   Approximately 16 years.

24 Q   I want to direct your attention to August of this year,

25 2010.  What was your position in August of 2010?

Thomas Watson - Direct

1    A    Operations lieutenant, I was actually assigned to the

2    special housing unit.

3    Q    Okay.

4         And that's referred to as the SHU, correct?

5    A    That is correct.

6    Q    And in your years with the Bureau of Prisons; have you

7    received any specialized training?

8    A    Received training for lieutenant, supervisory, management

9    training, EEO, also recruiter, also the emergency preparedness

10   officer, and also the disturbance-control team leader at Three

11   Rivers for three years.

12   Q    What is the disturbance-control team?

13   A    The disturbance-control team is basically group of

14   individuals.  We put together approximately 25 individuals that

15   have specialized training in dealing with inmates that have

16   become disruptive.  We use them for disturbance control, also

17   confrontation, within the institution for calculated uses of

18   force, things of that nature.

19   Q    And so with the training associated with being a

20   disturbance-control team leader, does that include tactical

21   training?

22   A    Yes, sir, it does.  Both lethal and less than lethal.

23   Q    In just -- FCI Englewood is located in the greater Denver

24   area, right?

25   A    Yes, sir.

Thomas Watson - Direct

1   Q   Just southwest of Denver?

2   A   Kipling and Quincy.

3   Q   Now, do you know an inmate, Daniel Morones?

4   A   I do.

5   Q   How do you know him?

6   A   He was assigned to the special housing unit and I

7   transported him several times.  I'm also one of the bus

8   lieutenants at FCI Englewood.

9   Q   What does that mean?

10  A   We're responsible for the transport from the institution to

11  the transport facilities or other institutions, whether it be

12  Florence or actually our air lift site is Pueblo.

13  Q   Let me ask you a little bit about the institution, FCI

14  Englewood.  How many inmates, roughly, just kind of

15  generalizing, how many inmates are there on a daily basis at

16  FCI Englewood?

17  A   Approximately a thousand 400 at all three facilities.

18  Q   1,400?

19  A   Yes, sir.

20  Q   And how many correctional officers would be employed at any

21  one time at that institution?

22  A   That varies.  Depending on the shift, during day watch,

23  maybe 35 that are working the shift.  Evenings, that number

24  could drop down to 20 or so.

25  Q   So 20 or so correctional officers for 1400 inmates; do I

Thomas Watson - Direct

1  have that right?

2  A   Yes, sir.

3  Q   And do correctional officers carry weapons?

4  A   No, sir, we do not.

5  Q   Why not?

6  A   Because of the inmate-to-staff ratio, a lot of times we're

7  looking at a ratio of approximately one to 215 in the housing

8  units.  So with that ratio, it's not feasible for us to carry

9  weapons.  We carry radios and we have in this response

10  procedures associated with body alarms, things of that nature.

11  Q   Okay.

12      On August 19, 2010, were you working at the special

13  housing unit, FCI, Englewood?

14  A   Yes, sir.

15  Q   What was your position?

16  A   Special housing unit.  The SHU lieutenant.

17  Q   The SHU lieutenant.

18      And as SHU lieutenant, what are your responsibilities?

19  A   We oversee the special housing unit, to ensure there's no

20  separation concerns, that the inmates are managed in an

21  appropriate manner, housing space, things of that nature.

22  Q   Would it be fair to say that you're basically the

23  operations boss, you supervise the operations of the SHU?

24  A   Yes, sir.

25  Q   What time did you come in that day on the 19th, do you

Thomas Watson – Direct

1   recall?

2   A   I believe it was approximately 6 a.m.

3   Q   Okay.

4       And did you learn about an incident involving Daniel

5   Morones assaulting a correctional officer, Ismael Trujillo?

6   A   Yes, sir, I did.

7   Q   And after you learned about that assault, did you attempt

8   to contact Mr. Morones?

9   A   Yes, sir, I did.

10  Q   All right.

11      Let me ask you, before we talk about that, I want to

12  ask you little bit about inmates, if inmates have a problem and

13  think that they've been wronged somehow by a correctional

14  officer, is there a process that they have to, to raise that

15  concern?

16  A   Yes, sir, there is.

17  Q   Could you describe generally that process.

18  A   There's a formal grievance process which is the BP 8s, BP

19  9s that they can file against a staff member.  We have time

20  frames that ensure that we investigate those allegations and

21  that they are followed up on and that the inmates receive

22  responses as far as that goes.

23      If it's an allegation against a staff member at the

24  institution, then those are forwarded out so that we ensure

25  that it's impartiality.

Thomas Watson - Direct

1    Q    So in this instance, for example, if inmate Morones had a

2    grievance against correctional officer Trujillo, that would

3    have been investigated by someone other than the staff at FCI

4    Englewood; do I have that right?

5    A    Yes, sir.  We could have done a preliminary investigation

6    there.  Once we were aware of the allegation -- as a special

7    housing unit lieutenant, the inmate would usually bring that to

8    my attention -- and then we would attempt to resolve that.  If

9    we were incapable of resolving that for him at that time, then

10   he has the opportunity to file a grievance, yes, sir.

11   Q    Okay.

12        How about when inmates are found violating the rules

13   of the institution, what is it called?  What is the -- if a

14   staff member discovers the inmate violating rules of the

15   institution, what is that incident?

16   A    An incident report.

17   Q    Incident report?

18   A    Yes, sir.

19   Q    And do inmates have the opportunity to appeal an incident

20   report that's filed against them?

21   A    Not necessarily appeal.  They have an opportunity to make a

22   statement during the course of the investigation.  Once we

23   become aware, we have 24 hours to notify the inmate of the

24   allegation.  And provide him an opportunity to tell us, you

25   know, his side of the story.

Thomas Watson - Direct

1  Q   Okay.

2  A   They have an opportunity to make a statement.

3  Q   So can they challenge the report against them or the

4  allegation against them?

5  A   Yes, sir.  They can make a statement saying that the report

6  is inaccurate.  They also have an opportunity during that time

7  frame to call any witnesses they feel are applicable to the

8  situation.

9  Q   So if they're calling witnesses, what's that process?  Is

10  there a hearing?

11  A   It's basically a hearing.  But we do the initial

12  investigation as the lieutenants, and then after that, within

13  three days, they go to see their unit disciplinary committee

14  and after that, if it's severe enough, then would go to the

15  discipline hearing officer, which is appropriately like a court

16  hearing.

17  Q   Okay.

18       All right.  Now, going back to August 19, after you

19  learned of the assault on Officer Trujillo, what did you do

20  with regard to inmate Morones?

21  A   Went down and attempted to contact inmate Morones and found

22  out what was going on.  At that time he was still disruptive.

23  He had a sheet up, obscuring staff's view.

24  Q   So you went to his cell, and there was a sheet up.  He had

25  tied a sheet up across the bars, the cell door?

1  A   Yes, sir.

2  Q   Does that present a problem in the institution?

3  A   Yes, sir, it does.

4  Q   I'm sorry?

5  A   Yes, sir, it does.  That obscures our vision of the cell.

6  We can't tell what the inmate is doing, if he's injured

7  himself, if he's attempting to fashion a weapon, there is no

8  way for us to determine what his actions are.  And after an

9  inmate has displayed disruptive behavior, that's a serious

10 concern for us.

11 Q   Do you recall what cell the defendant was in at that time?

12 A   Yes, sir.  A3.

13 Q   And that's in the special housing unit?

14 A   Yes, sir.

15 Q   All right.

16         Did you talk to or have a conversation with inmate

17 Morones when you approached his cell and saw that there was

18 this sheet tied up across the cell?

19 A   Yes, sir, I did.

20 Q   What did you tell him?

21 A   Just basically asked him what was going on.  Advised him he

22 needed to take down the sheets.  Understand there was an

23 altercation between him and Officer Trujillo.  Need him to come

24 out and have him medically assessed and I need to see in the

25 cell to make sure that he was okay.

1  Q   Why did you want to have him come out of the cell to have

2  him medically assessed?

3  A   We have them medically assessed anytime there's a

4  altercation, to make sure that we have documentation, that the

5  inmate did not receive any injuries and just to make sure that

6  the inmate is all right.

7  Q   When you use the term "altercation," did you have any

8  reason to believe that there was direct physical contact

9  between inmate Morones and Officer Trujillo?

10  A   No, sir.

11  Q   So altercation can be some kind of conflict, then; is that

12  right?

13  A   Yes, sir.

14  Q   All right.

15          So when you, when you ordered the defendant to remove

16  the sheet and did you also then tell him to submit to

17  restraints?

18  A   Yes, sir.

19  Q   And that would be submit to handcuffs; is that correct?

20  A   Yes, sir, that's correct.

21  Q   And what did he do or say in response to that direction?

22  A   He refused the order.  Said he was not going to do that.

23  Q   Okay.

24          And after he refused the order, told you he was not

25  going to do that, what did you tell him.

Thomas Watson – Direct

1  A   Again asked him several times to take down the sheet, that

2  we needed to speak to him.  I needed him to come out of the

3  cell so we could check him, make sure he was okay.  He

4  continued to refuse these orders.

5  Q   Okay.

6       Did you warn him what the, the fallout would be or

7  what your next course of action would be if he continued to

8  refuse the orders?

9  A   Yes, sir, I did.

10 Q   What did you tell him?

11 A   I advised him that if he continued to refuse the orders to

12 come out, we would have to assemble a team, notify the warden

13 of his actions and that would end up causing him more problems

14 than what he was currently dealing with.  In order to avoid

15 further conflict, I again requested him to remove the sheet and

16 comply with the order.

17 Q   And what did I say in response?

18 A   No.

19 Q   All right.

20      So after you had that contact with the defendant, how

21 did you proceed from there?

22 A   After that, we notified the captain and executive staff of

23 the situation, informing them of what was going on.  We

24 obtained another staff member to come up and conduct

25 confrontation avoidance at that time, also, to again try to

Thomas Watson - Direct

1    talk to inmate Morones and try to comply with staff

2    instructions.

3    Q    You mentioned confrontation avoidance?

4    A    Yes, sir.

5    Q    Is that a term that is related to the procedures of the

6    institution?

7    A    Yes, sir, it is.

8    Q    Would you just describe what that is, what confrontation

9    avoidance is?

10   A    Yes, sir.  In order to try and resolve situations, we rely

11   heavily on our verbal skills and our communication abilities

12   with the inmates.  So if one person is unsuccessful in dealing

13   with an inmate, getting him to comply with staff instruction,

14   then we may try to have another staff member talk to him, also,

15   who we feel has more of a rapport with the inmate, to try to

16   get him to comply with our instructions.

17   Q    Is the process that you're now starting down, is this a

18   process towards a use of force?

19   A    The process is geared hopefully to be able to resolve it

20   through the confrontation-avoidance procedures.  However if

21   that is not a possibility, we are incapable of resolving it

22   with the confrontation-avoidance procedures, then, yes, sir,

23   that could result in a calculated use of force.

24   Q    And what kind of authorization is required in order for you

25   to order a calculated use of force?

Thomas Watson - Direct

384

A    We notify the captain and that has to go all the way up

through the chain of command to the warden and the use of force

has to be authorized from the warden.

Q    Now, when you were dealing with inmate Morones, that

morning on August 19, were you familiar with his background

within the institution?

A    Yes, sir.

Q    And generally, without specifics, what were you familiar

with about his conduct within the institution?

A    He's been very assaultive towards staff.  He's had several

write-ups for refusing to obey orders.  He goes through some

periods where, you know, he's good for behavior and does well,

and then, you know, he has outbursts.

Q    And was that relevant to how you dealt with inmate Morones?

A    Yes, sir, it is.

Q    Can you describe how that was relevant?

A    Just the fact that he has an extremely assaultive history

towards staff.  We've had conversations in the past where we've

talked to him and stuff and he's indicated to me also during

transport and stuff that he has had issues with staff and has

become assaultive during that process.  So it was my concern

for my staff's safety that he does have a history of that.

Q    Were you aware that he had previously defeated hand

restraints?

A    Yes, sir.

385

1   Q   We were talking a little bit about the

2   confrontation-avoidance process?

3   A   Yes, sir.

4   Q   So I think what you described is attempts to defuse the

5   situation verbally, right?

6   A   Correct.

7   Q   All right.

8        And is there more of a process than that?  You said

9   trying to find other people that maybe have a better rapport.

10  Can you take us through in a little more detail that process

11  with respect to inmate Morones on August 19?

12  A   Yes, sir, if we feel that there's a staff member that we

13  know gets along well with the inmate, whether it's unit team or

14  someone from psychology, that's not necessarily correctional

15  services, then we may make an attempt to contact them and have

16  them speak to him and get him to comply with the instructions

17  verbally.

18  Q   Did you do that on August 19 with inmate Morones?

19  A   Yes, sir, there were several people that went down and

20  spoke to him.

21  Q   When you say "several," approximately how many people spoke

22  with inmate Morones and tried to have him comply with the

23  orders through verbal commands?

24  A   Prior to the actual calculated use of force?

25  Q   Correct.

Thomas Watson - Direct

1  A    Approximately three or four, sir.

2  Q    Okay.

3          All right.  So when you use the term "calculated use

4  of force," can you explain and kind of contrast "calculated use

5  of force" with "immediate use of force"?

6  A    Yes, sir.  Calculated use of force is what we considered a

7  situation, such as the special housing unit where the inmate is

8  in a controlled scenario, and we have an opportunity to put a

9  team together and try confrontation avoidance, things of these

10 nature.  And immediate use of force would be something where

11 maybe we were escorting an inmate and he became assaultive and

12 had to be taken to the ground to regain control of his actions.

13 That would be an immediate use of force, 'cause we don't have

14 the opportunity to assemble a team, start videotaping, things

15 of this nature.

16 Q    All right.

17          Now, in the situation on August 19 with inmate

18 Morones, what was the purpose of the use of force?

19 A    The purpose for the use of force was to have him removed

20 from the cell, so we could medically examine him and also check

21 the cell to ensure that he wasn't trying to fashion weapons or

22 had destroyed the cell or had done anything that would be a

23 hazard to staff.  As he had obscured our view, we were unable

24 to tell what he was doing in the cell at that time.

25 Q    Now, have you had, in your years with the Bureau of

1  Prisons, have you had prior experience, prior to August 19,

2  with calculated use of force?

3  A   Yes, sir.

4  Q   Approximately how many times?

5  A   At FCI Englewood, approximately three times over the last

6  year, year and a half.  And at Three Rivers, as the

7  disturbance-control team leader and operations lieutenant down

8  there, approximately seven or eight times over the course of

9  four years.

10 Q   All right.

11         So you just mentioned three times in the past year and

12 a half, year to year and a half at FCI Englewood?

13 A   Yes, sir.

14 Q   Do you know, was that all of the use-of-force incidents for

15 the entire facility?

16 A   Yes, sir, that I'm aware of.

17 Q   So it's not a common occurrence?

18 A   No, sir.  Usually we're very successful with confrontation

19 avoidance.

20 Q   All right.

21         So you mentioned assemble a team.  Is there a standing

22 team for calculated uses of force?

23 A   No, sir, there is not.

24 Q   So how do you go about assembling a team for the use of

25 force?

Thomas Watson - Direct

1   A   We have to take a look at the institutional resources at

2   that time, and we end up pulling from other departments.  To

3   put the team together.  We look at people who have prior

4   experience, whether it's disturbance-control teams, special

5   operations response teams, or, you know, people we feel have

6   experience which would be an asset on the team.

7   Q   So these team members, their primary responsibility at the

8   institution is not to be part of the calculated use-of-force

9   team?

10  A   That's correct.

11  Q   All right.

12          And when you're assembling your team, would you use

13  correctional officers from the SHU, for instance,

14  Officer Trujillo?

15  A   No, sir, we would not.

16  Q   Why not?

17  A   They are exempt from any use of force.  We need to ensure

18  that the team didn't have any personal feelings and is involved

19  in the situation in any way, shape, or form, so we can ensure

20  impartiality.  So those members that are assigned to those

21  units are exempt.

22  Q   Would you describe for us -- and let's be specific to the

23  use-of-force team involved in the incident with inmate Morones

24  on August 19 -- describe for us the use-of-force technique, how

25  many team members there are, and just kind of cover that with

1  the operation, what the provisional protocols are.

2  A   Yes, sir.  When we establish a use-of-force team, we put

3  together five individuals for the use-of-force team.  There's

4  the camera operator; gas operator, person that's going to be

5  dispersing chemical agents; and myself as the supervisor for

6  the calculated use of force.

7       Each individual on the team members of the five team

8  members, the first primary team member is responsible for

9  pinning the inmate toward the back of the cell.  The second

10 individual responsible for securing the upper right portion of

11 the inmate's body.  Third person is upper left.  Fourth is

12 lower right.  And fifth is lower left.

13 Q   Do the team members, the five team members that you just

14 described, do they wear protective clothing?

15 A   Yes, sir, they do.

16 Q   And you mentioned the responsibility of the team member

17 no. 1?

18 A   Yes, sir.

19 Q   Placing the inmate either against the wall or on the

20 ground; is that correct?

21 A   Yes, sir.

22 Q   Now, is there, is there a standard protocol or direction

23 for correctional officers in confrontation with inmates

24 regarding an objective to get them on the ground?

25 A   Yes, sir.  That's usually where they are placed in order to

1    secure restraints.

2    Q    Why is that?

3    A    Because that way it's harder for the inmates to resist.

4    The staff members are better able to control the inmate's body

5    and apply restraints at that point.

6    Q    If they're on the ground versus standing up?

7    A    Yes, sir.

8    Q    You mentioned that there was a cameraman that was also

9    assembled as part of the team?

10   A    Yes, sir.

11   Q    What's the cameraman's responsibility?

12   A    To document the incident on the videotape.  To ensure that

13   we have a video record of the use of force.

14   Q    Was that done in this case?

15   A    Yes, sir, we had two cameras.

16   Q    Okay.

17        And you also mentioned gas.

18   A    Yes, sir.

19   Q    What, what kind of gas is used?

20   A    OC, capsicum.

21   Q    Is that a pepper spray?

22   A    Yes, sir, it is.

23   Q    What's the purpose of the pepper spray that's used?

24   A    It's an incapacitating agent that we utilize to

25   incapacitate the inmate if we feel that he may pose a threat to

Thomas Watson - Direct

1  staff, whether it be assault or something of that nature, or if

2  they're barricaded.  And it has to be authorized through the

3  warden.

4  Q    That has to be authorized through the warden as well?

5  A    Yes, sir, it does.

6  Q    And how about the person that deploys the gas, does that

7  person have to have specialized training?

8  A    Yes, sir, does he.

9  Q    In this case who was that person?

10 A    Lock shop, Morse.

11 Q    So that's Micah Morse?

12 A    Yes, sir.

13 Q    Can you tell me who was the team member no. 1?

14 A    Dominic Davis, I believe.

15 Q    And how about the camera operator?

16 A    Lieutenant Browning.

17 Q    That's Lieutenant Michael Browning?

18 A    Yes, sir.

19 Q    Prior to, when you assembled the use-of-force team, is

20 there a briefing?

21 A    Yes, sir, there is.

22 Q    And generally what has to occur in the briefing?

23 A    During the course of the briefing, we introduce the camera

24 operator, myself, we explain on the videotape during the

25 briefing what exactly was the reason for the assembly of the

1  use-of-force team.  We have each the use-of-force team members

2  introduce themself and state whether or not they have any

3  injuries and if they have volunteered to participate in that

4  use of force.

5  Q   Okay.

6       Is there -- once the use-of-force team is assembled

7  and enters the range, in this case the A range where inmate

8  Morones's cell was --

9  A   Yes, sir.

10 Q   -- is there an additional attempt, a final attempt at

11 confrontation avoidance?

12 A   Yes, sir, there is.

13 Q   And I take it from your testimony, that this final attempt

14 wasn't the only attempt at confrontation avoidance?

15 A   That is correct.

16 Q   So your testimony before about three or four people that

17 went downrange to attempt to avoid the confrontation, that was

18 in addition to this final attempt?

19 A   Yes, sir, it is.

20 Q   And is the final attempt documented, then, on the video?

21 A   Yes, sir, it is.

22 Q   All right.

23       So can you take us through what happened when the

24 use-of-force team goes downrange and then makes contact with

25 inmate Morones at CA 3?

Thomas Watson – Direct

1  A    Basically what happened is we went downrange with the team.

2  We have the team stand by off to the side while we again

3  attempted to conduct confrontation avoidance with counselor

4  Morgan.  Counselor Morgan contacted inmate Morones, again

5  attempted to provide him an opportunity to lower the sheet and

6  comply with staff instructions to be placed in hand restraints.

7  He continued to refuse to comply with the orders.

8         At that time we initiated the calculated use of force.

9  He was advised to cuff up.  He refused.  Mouse or Officer

10  Morse, lock shop, dispersed two-second burst of chemical agent

11  in an attempt to incapacitate the inmate.  At that time he

12  became compliant, took down his sheet, came towards the back of

13  the cell, placed his hands through the slot.

14  Q    Let me stop you there for a second.

15  A    Yes, sir.

16  Q    First of all, you referred to Officer Morse from the lock

17  shop?

18  A    Yes, sir.

19  Q    What does that mean?

20  A    That's where he's assigned to.

21  Q    Okay.

22  A    Is the lock shop.

23  Q    What is the lock shop?

24  A    The lock shop is just the area where we have an individual

25  maintains the locks in the institution, security, basically

1  like a security officer.  They do maintenance on the locks,

2  things of that nature, help in conducting training, maintain

3  the restraints, the weapons, chemical agents.

4  Q   So he gets called to be part, assemble part of this

5  calculated use-of-force team when this incident arises, then?

6  A   Yes, sir.

7  Q   So the -- when he goes in to disperse the chemical agent,

8  that is Officer Morse.

9  A   Yes, sir.

10  Q   What does Dominic Davis, the team no. 1, do?

11  A   He is the shield man.  He's attempting to ensure that none

12  of the team members are injured.  As he approached the cell and

13  they got ready to disperse the chemical agents, inmate Morones

14  assaulted the team members by throwing urine and feces out of

15  the cell, striking several of the team members, myself

16  included.  I believe he threw twice during the course of that

17  time frame.

18  Q   And when you're saying that he's throwing urine and feces,

19  how is he throwing it, and where is it coming from?

20  A   I would assume containers that he had in the cell.  And he

21  was throwing it over the top of the sheet with the intent to

22  strike the team.

23  Q   So the sheet still up?

24  A   Yes.

25  Q   Across the bars in front of the cell, correct?

1  A   Yes, sir.

2  Q   And then inmate Morones has what you believe to be cups

3  full of urine and feces, and he's throwing them over the top of

4  the sheet?

5  A   Yes, sir, at the team.

6  Q   So at this point you still don't have a visual on inmate

7  Morones; is that correct?

8  A   That is correct.

9  Q   Were you struck by the substance that he threw?

10  A   Yes, sir, I was.

11  Q   Where were you struck?

12  A   Right-hand side of my body.  Upper shoulder.

13  Q   Okay.

14          And you testified that it was urine and feces was the

15  substance?

16  A   Yes, sir.

17  Q   How do you know it was urine and feces?

18  A   You can smell it and you could see by the color.

19  Q   Do you know who else the urine and feces struck of the

20  team?

21  A   Lieutenant Browning I know was struck also.  He received a

22  pretty good amount on his upper torso.  And also Dominic Davis

23  was also struck.

24  Q   How about Micah Morse, who was to disperse the chemical

25  agent?

Thomas Watson - Direct

1  A   Yes, sir.

2  Q   All right.

3       When you and the other team members involved in the

4  use of force were struck with the urine and feces, were you

5  engaged in the performance of your duties?

6  A   Yes, sirs, we were.

7  Q   Were they also?

8  A   Yes, sir.

9  Q   The other team members?

10  A   Yes, sir.

11  Q   I think where I cut you off there, you said that after

12  dispersing the chemical agent and after the assault, that

13  inmate Morones did take down the sheet --

14  A   Yes, sir.

15  Q   And come over with his hands behind his back in the window

16  in the cell to submit to restraints?

17  A   Yes, sir, that is correct.

18  Q   Was he cuffed at that time?

19  A   No, sir, he was not.

20  Q   Why not?

21  A   At the time I saw his hands placed out the food slot, they

22  were parallel to each other.  That's one of the things the

23  inmates do when they intend to be assaultive towards staff,

24  versus placing their hands together.  When they place their

25  hands this way, it makes harder for the staff member to fit

1    from wrist to wrist and close the restraints.  That ends up

2    with additional room in the restraints.

3            I realized that inmate Morones has extensive history

4    of assault toward staff.  I noticed that the chemical agents

5    dispersed, he had things on his body, and I didn't feel that

6    had fully worked at that time.  So I order him to be placed on

7    the ground before the staff members entered.

8    Q    You ordered him to be placed on the ground after he took

9    the sheet down?

10   A    Yes.

11   Q    Did he do that?

12   A    Yes, he took the mattress and placed it on the floor prior

13   to lying down.

14   Q    You mentioned there that inmate Morones had coverings on

15   his body?

16   A    Yes, sir.

17   Q    Could you describe that and what significance there is to

18   that?

19   A    Just articles from the cell that he had covered around his

20   body.  And the intent that is to obscure the effectiveness of

21   the chemical agents that had been dispersed into the cell.

22   Q    When you say an article, are we talking about a blanket?

23   A    Yes, sir.

24   Q    After inmate Morones lays on the ground, does the team then

25   enter the cell?

Thomas Watson - Direct

1   A   Yes, sir, they do.

2   Q   Okay.

3           And what do they do?

4   A   At that point, they pin him to the ground and apply the

5   hand restraints.

6   Q   And what's, what is inmate Morones doing at that time?

7   A   He's being very verbal, very vocal.  However, the team

8   members during the course of the use of force, you can see no

9   one strikes him that's not authorized.  They're merely pin him

10  to the ground and attempt to place the hand restraints on him.

11  And that's one of the things as the lieutenant for the move, we

12  supervise.

13  Q   And what about leg restraints?

14  A   Yes, sir.  Leg restraints are applied.

15  Q   Are the hand restraints applied with his hands behind his

16  back?

17  A   Yes, sir.

18  Q   All right.

19          So after the hand restraints and leg restraints are

20  placed on inmate Morones, then is he brought to his feet?

21  A   Yes, sir.

22  Q   And what, do you escort him somewhere after that?

23  A   Yes, sir, we do.  At that point, anytime there's chemical

24  agents utilized, we have to decontaminate him.  So he was

25  escorted down the hall to a shower decontamination.

Thomas Watson - Direct

1  Q   Why to a shower?

2  A   The shower rinses off the chemical agents.

3  Q   Okay.

4  A   Once they've had the desired effect, then we remove the

5  chemical agents by the decontamination.

6  Q   So the purpose of the pepper spray doesn't affect him by

7  being breathed in, it's more surface?

8  A   Surface, and there's also alcohol carrying agents so there

9  is some aerosol capability, yes.

10  Q   I forgot to ask you when we were talking about the

11  components of the use-of-force team.  Is there a medical person

12  that's part of the use-of-force team?

13  A   Yes, sir, there is required.

14  Q   And who is the medical person, not by name, but just by

15  position?

16  A   I believe she's a nurse.

17  Q   Okay.

18       And what's her role in the use-of-force team?

19  A   She just checks the restraints and stuff after we've

20  completed to ensure that the inmate has adequate circulation

21  and that he doesn't have any respiratory issues or anything or

22  received any injuries during the course of the use of force.

23  Q   In this case, after the use of force was completed, so

24  after inmate Morones was placed in the shower and

25  decontaminated, where was he taken from there?

Thomas Watson - Direct

1  A   From there, he's taken to a new cell, which is A5.  So a

2  cell that hasn't been contaminated with the chemical agents.

3  That area will have to be cleaned up and stuff.

4  Q   And was a medical assessment done on inmate Morones after

5  this use of force?

6  A   Yes, the nurse attempted to.  However, the inmate refused

7  to comply with instructions and stated repeatedly that he did

8  not want a test, wanted the nurse to step away from him.  So

9  she checked his capillary refill to make sure that the

10 restraints were not restricting.

11 Q   You testified that there was a video recording made to

12 document this use of force?

13 A   Yes, sir.

14 Q   Prior to coming here today, have you reviewed the video of

15 the use of force?

16 A   Yes, sir, I have.

17 Q   Let me have you look at, in your notebook in front of you,

18 Government's Exhibit 8.

19 A   All right.

20 Q   Do you recognize what's in there as Government Exhibit 8?

21 A   Yes, sir, I do.

22 Q   What is it?

23 A   Videotape recording of the use of force.

24 Q   Okay.

25         It's a DVD disk, isn't it?

1  A   Yes, sir.

2  Q   And have you reviewed that exact DVD disk?

3  A   Yes, sir, my initials and the date it was reviewed on, yes.

4  Q   Okay.

5       And does that, does the recording on that disk; that

6  is, Exhibit 8, fairly and accurately show the events that took

7  place during the use of force?

8  A   Yes, sir, it does.

9       MR. HEARTY:  Your Honor, I'm going to offer

10 Government's Exhibit 8.

11      THE DEFENDANT:  I have no objection, Your Honor.

12      THE COURT:  Thank you.  It's admitted.

13    (Exhibit 8 admitted.)

14      MR. HEARTY:  Permission to publish, Your Honor?

15      THE COURT:  Yes.

16 BY MR. HEARTY:

17 Q   All right.

18      So, Lieutenant Watson, you just testified about this,

19 but I think what may be helpful as we go through the video, I'm

20 going to ask Lieutenant Guillory to stop it periodically and

21 have you explain what's going on in the video and why certain

22 things are occurring, okay?

23 A   Yes, sir.

24 Q   And the other thing, let me ask you this, too, the

25 surveillance cameras in the SHU, they don't have audio, do

1    they?

2    A    No, sir, I don't believe so.

3    Q    And what about this videotape, is there audio as well?

4    A    Yes, sir, there is audio on this one.

5         MR. HEARTY:  All right, so Lieutenant Guillory, can

6    you go ahead and start.

7         (Videotape played but not reported.)

8         MR. HEARTY:  Could you stop for a second.

9    BY MR. HEARTY:

10   Q    You heard that there was a beep there, didn't you,

11   Lieutenant?

12   A    Yes, sir, I did.

13   Q    That wasn't on the original, correct?

14   A    That's correct, it was not.

15   Q    That's something we added for presentation in the

16   courtroom; is that correct?

17   A    Yes, sir, it was.

18   Q    Thank you.

19        MR. HEARTY:  Please proceed.

20        (Videotape played but not reported.)

21        MR. HEARTY:  Stop it.

22   BY MR. HEARTY:

23   Q    Lieutenant Watson, let me ask you a question about that,

24   that kind of introduction there.

25   A    Yes, sir.

Thomas Watson - Direct

1  Q   Obviously you went through and the five team members who

2  were going to enter the cell introduced themselves, right?

3  A   Yes, sir.

4  Q   Why use five team members to put restraints on one inmate?

5  A   That's so they're able to overpower the inmate without

6  having to actually get involved in a physical altercation.

7  Q   And the protective clothing that the use-of-force members

8  are wearing there, can you just tell us what that is?

9  A   They wear a helmet.  The gas mask.  They have elbow, shins,

10  protective vests.  A lot of that is to help reduce injuries for

11  staff members that are going in, in the event that the inmate

12  becomes combative and also we have the opportunity, if the

13  inmate has a weapon.  Just to reduce staff injury.

14        MR. HEARTY:  All right.  Lieutenant Guillory, if you

15  could continue, please.

16     (Videotape played but not reported.)

17        MR. HEARTY:  Stop.

18  BY MR. HEARTY:

19  Q   You just introduced or Lieutenant -- I'm sorry,

20  Officer Kemp just introduced himself there.  I couldn't hear

21  what he said his job was?

22  A   His job is strictly, he's assigned to special housing unit.

23  His job is to open the cell door.  He's the officer assigned to

24  the SHU that has the key to the door.

25  Q   So he's not really participating in the use of force?

1    A    No, sir, he is not.

2    Q    You testified that the SHU officers would not be authorized

3    to participate in use of force?

4    A    That is correct, other than opening the door.  They are the

5    ones that are assigned keys for the different cell ranges; it's

6    their area.

7    Q    Okay.

8    A    So they're utilized just to open the door.

9    Q    Okay.

10    (Videotape played but not reported.)

11   BY MR. HEARTY:

12   Q    Lieutenant Watson, there, that was what you testified

13   previously about that was the final attempt at confrontation

14   avoidance?

15   A    Yes, sir, it is.  By the time we assemble a team and go to

16   the door, we have one final opportunity for confrontation

17   avoidance.

18   Q    So there was three or four prior attempts at confrontation

19   avoidance?

20   A    Yes, sir.

21   Q    That voice that we hear coming from the cell, is that

22   inmate Morones?

23   A    Yes, sir, it is.

24   Q    Okay.

25    (Videotape played but not reported.)

BY MR. HEARTY:

Q   All right, Lieutenant Watson, so the shield man there, that

we can see in the screen right now, who is that?

A   Dominic Davis.

Q   All right.

Can you also identify the other gentleman to his left?

A   His left is security Officer Morse, Michael Morse.

Q   Okay.

And this substance that we see there, what is that

substance?

A   Urine and feces.

Q   All right.

And that substance hit both of those two men there?

A   Yes, sir, and at that time, also myself and the camera

operator.

Q   All right.

The other thing was when Officer Morse went in there

with the canister, what was that?

A   That's where he was dispersing the chemical agents.

Q   And that's the pepper spray?

A   Yes, sir.

Q   Okay.

MR. HEARTY:  Please.

(Videotape played but not reported.)

BY MR. HEARTY:

Thomas Watson – Direct

Q   Lieutenant Watson, I just want to ask you.  Would it appear there that inmate Morones came back and stuck his hands through the opening in the cell door, right?

A   Yes, sir.

Q   And would you just explain again your reason for not putting hand restraints on there and ordering him to the ground?

A   Inmate Morones has a previous history of assaulting staff. He just assaulted the staff with the urines and feces.  He has a history of slipping the hand restraints, defeating the hand restraints.  As I indicated, when he put his hands through, he put them side by side, which is an indication that they're trying to get additional room in the handcuffs, it's harder to cuff, just due to the length of the chain in the handcuffs, so it was my decision to have him placed on the ground to ensure the team's safety.  That way, if he attempted to assault the staff, he would have to make a movement to do so.  Getting up off the ground, putting his hands down, it would be easier for staff to see if he had a weapon.

Q   You had testified earlier about the fact that inmate Morones had blankets and items on his body?

A   Yes, sir, that is correct.

Q   Could you see that in the video?

A   Yes, and those are articles he put on his body to try to defeat the chemical agents.

Thomas Watson – Direct

1  Q   You've seen the video; there appears to be substance even

2  on the camera?

3  A   Yes, sir, there was.

4  Q   And is the Lieutenant Michael Browning who is holding the

5  camera?

6  A   Yes, sir, it is.

7          MR. HEARTY:  Lieutenant.

8      (Videotape played but not reported.)

9          MR. HEARTY:  Stop.

10 BY MR. HEARTY:

11 Q   What's going on right there, as you're asking for

12 clarification from the use-of-force team members there?

13 A   Was just indicating to them that they needed to clarify to

14 me whether or not the inmate had been secured, and once he had

15 been secured, then time for us to move him from the cell and

16 get him into a decontamination area, but prior to giving that

17 order, I needed to make sure that his legs and hands were

18 secure prior to that movement.

19 Q   Of course, you can hear on the video moaning and screaming

20 from inmate Morones?

21 A   Yes, sir, that's correct.

22 Q   What are the team members doing at that time?

23 A   It's just direct pressure, pinning him to the ground so

24 that we're able to place the restraints, so he cannot become

25 combative.  You note the staff members leaned over the top of

1  him, that's direct pressure to keep the inmate so we can apply

2  the hand and leg restraints.

3  Q   In your experience as a correctional officer, is it common

4  to inmates to make a big show, if you will, in front of a

5  camera?

6  A   Yes, sir, it is.

7  Q   Why do they do that?

8  A   Because they realize we're video-taping and just something

9  they do.

10        MR. HEARTY:   Lieutenant Guillory, if you could

11  continue, please.

12      (Videotape played but not reported.)

13  BY MR. HEARTY:

14  Q   Lieutenant Watson, you just heard in the camera there what

15  sounded like spitting?

16  A   Yes, sir, that is correct.

17  Q   Could you tell the jury what happened there?

18  A   At that point in time, inmate Morones became assaultive

19  again toward staff and spit at Officer Kemp, striking him with

20  the spit.

21  Q   And Officer Kemp we saw earlier on the video, he was the

22  officer you described as the SHU no. 2?

23  A   Yes, that's correct.  He's opening the shower at that time

24  for us to place him into the shower for decontamination.

25  Q   And do you know the incident that the day prior, that

Thomas Watson - Direct

1  Officer Trujillo was involved in, that is the confiscation of

2  the nude photograph.

3  A   Yes, sir.

4  Q   Was Officer Kemp involved in that?

5  A   No, sir, not that incident.

6      (Videotape played but not reported.)

7  BY MR. HEARTY:

8  Q   All right.

9      Lieutenant Watson, right there, kind of that last

10  excerpt, it sounds like you could be heard ordering the

11  use-of-force team to take inmate Morones to the ground, is that

12  correct?

13  A   That is correct.

14  Q   And why did you give that order?

15  A   Anytime inmates become disruptive, in order to better

16  control them, we take them to the ground and pin them to the

17  ground, it's a common technique until we regain control of the

18  inmate and they regain control of their actions and they become

19  calm enough for us to attempt to move them again.

20  Q   After inmate Morones was removed from the shower, from the

21  decontamination --

22  A   Yes, sir.

23  Q   -- were his clothes changed?

24  A   Yes, sir, they were.

25  Q   Why was that?

A   Because the clothes may have had some of the chemical

agents on them.  The intent is to incapacitate the inmate at

the time of the use of force.  It's not an ongoing issue.  So

we ensure that we showered him and decontaminated him and

remove any clothing that may be effected with the chemical

agent.

Q   At what point is the medical assessment done or attempted

to be done?

A   After we finish up, we get the inmate into the cell and

medical will assess and take a look at them and document

whether or not they received any injuries, just to make sure

that they're okay at that time.

Q   Now, do you see the man who threw the feces and urine that

struck you on that day, on April 19, 2010, in the courtroom

today?

A   Yes, sir, I do.

Q   Could you please point to him and describe where he's

sitting there and an article of clothe?

A   He's sitting right there, a blue shirt, blue tie.

        MR. HEARTY:  Your Honor, may the record reflect that

the witness has identified the defendant.

        THE COURT:  Yes, it will.

BY MR. HEARTY:

Q   Lieutenant, you've been a correctional officer with the

Bureau of Prisons for quite sometime, right?

Thomas Watson - Direct

1   A   16 years as an officer and ten years as a lieutenant.

2   Q   And are you familiar or concerned about hazards with being

3   struck by bodily fluids in a prison?

4   A   Yes, sir, very much so.

5   Q   What are your concerns about that?

6   A   Obviously infection from bodily fluids, could be AIDS or

7   hepatitis, it's high-risk category because of the inmate

8   population that we deal with.

9   Q   And are you aware of the different inmates and whether or

10  not they do have any kind of infectious disease?

11  A   No, sir, you are not.  That is not released by medical.

12  Q   And let me ask you, back at the beginning, you talked about

13  when you made contact with inmate Morones initially, part of

14  the point was to do a medical assessment on inmate Morones.

15  A   Yes, sir.

16  Q   And that was after you were, you were -- it was reported to

17  you that inmate Morones had assaulted Officer Trujillo?

18  A   Yes, sir.

19  Q   Could you explain why do you do a medical assessment on

20  inmate Morones when he had just assaulted a guard?

21  A   It's just documentation for our purposes and liability, to

22  ensure that we're documenting that he did not receive any form

23  of retaliation or anything that they could allege later on at a

24  later given date.

25  Q   And your experience, is that at least not an uncommon

1  event, that inmates make allegations against guards?

2  A    That is correct, that is not uncommon.

3  Q    All right.

4          MR. HEARTY:  One moment, Your Honor.

5  BY MR. HEARTY:

6  Q    Lieutenant, later, while inmate Morones is being moved to

7  the other cell, cell A5, and the medical assessment is

8  attempted, did inmate Morones make statements about

9  Officer Trujillo?

10  A    I don't recall.

11  Q    All right.  Thank you, Lieutenant.

12          THE DEFENDANT:  Your Honor, I'd like to make note of

13  the record real quick.  This video, the Government's exhibit

14  that was shown right now, I've never received this video, and I

15  believe it was discoverable video.

16          MR. HOSLEY:  Your Honor, that's absolutely untrue.  At

17  the time of this indictment, as you can see from the video,

18  there were two camera men, both videos were provided to defense

19  counsel for the defendant and then this redacted version, prior

20  to this trial was also provided to the defense.  This is an

21  untrue allegation, Your Honor.

22          THE COURT:  All right.

23          THE DEFENDANT:  Your Honor, let me state, there was

24  two camera men operating.  One of the camera men operating,

25  that video, that physical video, I received.  But not the video

1  that is playing here today, Your Honor.

2          MR. HOSLEY:  Your Honor, that's just frankly untrue.

3  He has received both videos to his counsel prior to him going

4  *pro se* in this case.

5          THE COURT:  All right.

6          THE DEFENDANT:  Well, if the video was given to

7  counsel, I never received it, Your Honor.  I just like to make

8  that clear.

9          THE COURT:  Okay.  You've made your record on that.

10          Go ahead, please.

11                        **CROSS-EXAMINATION**

12  BY THE DEFENDANT:

13  Q   Mr. Watson.

14  A   Yes.

15  Q   Out of your approximately 15 years' experience working with

16  the federal Bureau of Prisons, how many cell extractions have

17  you directed?

18  A   At FCI Englewood or --

19  Q   Yes, sir, at FCI Englewood, I'm sorry, let me rephrase, at

20  FCI Englewood.

21  A   Sure.  At FCI Englewood, approximately three within the

22  last year, year and a half.

23  Q   Now, would you say that your conduct in these cell

24  extractions or calculated use of forces, would you say that you

25  go in with an incentive to minimize confrontation; would you

Thomas Watson - Cross

1  say that?

2  A   Could you state that again?  I don't understand what you're

3  looking for.

4  Q   Do you go into these cell extractions with an incentive in

5  your mind to minimize confrontation?

6  A   If what you're asking is do we try to avoid physical

7  confrontation, then the answer would be yes.

8  Q   I'm asking if it's a incentive in your mind to minimize the

9  confrontation, to avoid something on a grand scale of taking

10  place, of happening?

11  A   If I understand what you're asking, then, we try to avoid

12  staff members being involved in the conflict due to the risk of

13  staff injuries and also the inmates, so, yes, it's always

14  better for us if we're able to resolve things through verbal

15  confrontation.

16  Q   On that day, on the day that you seen this video played

17  before us, did you go in with an incentive in your mind to

18  minimize conflict, to minimize altercation?

19  A   I'm not really understanding what you mean by incentive.

20  But as I stated previously, it's always beneficial to us and

21  the individuals involved if we're able to resolve things with

22  confrontation avoidance.  Anytime there's a physical

23  confrontation, between staff and inmates, there's a risk for

24  injury.  So, yes, we do everything we can to avoid that.

25  Q   Can inmates in the BOP refuse medical assessments?  Can

Thomas Watson – Cross

1  they refuse to be medically assessed?

2  A    You can refuse to be medically assessed.

3  Q    You earlier stated that an Officer Davis was struck with

4  this substance.  Was Officer Davis wearing a full body

5  protective gear?

6  A    Yes, sir.

7  Q    Can you shows us again how the defendant, inmate Morones,

8  placed his hands outside of the tray slot.

9  A    Outside of the tray slot, you had your hands together, side

10 by side.

11 Q    Side by side.

12 A    Correct.

13 Q    When, when a inmate is directed to place their hands

14 outside of the tray slot, their hands behind them; isn't it

15 common for the motion to be what you're showing me, but hands

16 up -- palms up instead of palms down?

17 A    Hands usually together in this manner.  Place them side by

18 side, it makes it difficult for the officer to place restraints

19 and actually close them in an appropriate manner because the

20 chain between the cuffs is very limited.  Therefore, it makes

21 it more difficult to apply restraints in that manner.

22 Q    Is there in the exhibit in front of you, Defendant's

23 Exhibit F, it should be in a stack of paper?

24 A    Just a second.

25 Q    Outside of the binder.

Thomas Watson - Cross

1   A    Outside of the binder?

2   Q    Yes.

3            Exhibit F.

4   A    Yes, there is.

5   Q    Are you familiar with this form?

6   A    Yes, I am.

7   Q    Can you tell me what number atop of the form -- what's the

8   number on top of the form?

9   A    Are you referring to the Exhibit 4?

10  Q    Exhibit F.

11  A    Yeah.  It looks like a four.

12  Q    Form 586; is that correct?

13  A    Form 586.

14  Q    Okay.

15           If you move down with me to "discrepancies noted"?

16  A    Uh-huh.

17  Q    Can you, can you read the first line of this form for me,

18  please.

19  A    Sure.

20           Time does not appear unless viewed by analog.  More

21  emphasis should be placed on confrontation avoidance.

22  Q    Can you stop right there, please.

23  A    Yes.

24  Q    Now earlier you stated that confrontation avoidance is

25  where a designated officer who doesn't have any conflicts with

Thomas Watson - Cross

1  the inmate goes in with . . . I want to get it right.

2          You said to rely heavily on verbal skills to avoid the

3  confrontation; is that correct?

4  A    That is correct.

5  Q    So there wasn't a essence of heavily applied verbal skills

6  on this --

7  A    By the time we get to this point, on the videotape, several

8  opportunities for confrontation avoidance have been attempted.

9  And had proved to be futile.  It's viewed at this point --

10 Q    That is not my question, sir.  My question to you here

11 today is was there an appliance of heavily verbal skills to, to

12 avoid confrontation?

13 A    At that, at that point, we do not do overly extensive

14 confrontation avoidance.  We just provide you the opportunity

15 to --

16 Q    I didn't state overly, sir, I just stated from your words,

17 you said confrontation avoidance is a heavily -- is applied

18 with heavily verbal skills?

19 A    Throughout the course of the entire process, yes.

20 Q    But we did not see that in this video here today, did we?

21 A    The video is merely the end documentation of the actual

22 calculated use of force itself.

23 Q    It is the video of the alleged charge that I am here today

24 on.

25 A    Correct.

Thomas Watson - Cross

1    Q    We did not see that, am I correct?

2    A    At that point in time, that is correct.

3    Q    Mr. Watson, can you read line 4 of this after-action review

4    port, please?

5    A    Lieutenant did not give final order to submit to hand

6    restraints prior to dispensing gas.

7    Q    Can you keep going.  To the next line.

8    A    Lieutenant did not cuff inmate when he placed his hands

9    through the slot prior to team entering the cell.

10   Q    Mr. Watson, where is this form coming from?

11   A    It's an after-action review from the institution.

12   Q    And who are -- who, who is making these discrepancies

13   noted?

14   A    That's a review team that oversees the use-of-force team.

15   Q    Who is this review team?

16   A    Captain, representative from medical.

17   Q    So basically they're your overseers?

18   A    That is correct.

19   Q    Your supervisors?

20   A    That is correct.

21   Q    And their discrepancy is that when the defendant inmate

22   Morones placed his hands out of the slot, you should have

23   cuffed him up; is that correct?

24   A    That was their opinion at the time, that is correct.

25   Q    That was their opinion at the time.

1          I'm asking you now if heavily confrontation avoidance

2     was applied that day, heavily verbal confrontation avoidance

3     was applied that day and you would have had Mr. Morones, the

4     defendant, cuff up, we would not be here today; is that

5     correct?

6     A    I had spoken to you several times during the use of force

7     and provided you quite a few opportunities to be placed in hand

8     restraints and had asked you repeatedly not to go down this

9     road, that this was going to result in this and that that was

10    not what you wanted to do and asked you repeatedly to not make

11    it go that far.

12    Q    That was not the question.  I'm asking you, though?

13    A    Okay, then I misunderstood the question.  Could you

14    restate.

15    Q    Looking at the video, we see the confrontation avoidance

16    applied and Mr. Morgan goes in and says, inmate Morones, cuff

17    up.  And he tells him, take that sheet down, cuff up.  Does

18    that strike you as heavily verbal skills being applied?

19    A    As I had indicated previously, this is the last and final

20    opportunity for confrontation avoidance.  At that point

21    confrontation avoidance had been tried on multiple occasions,

22    without success.

23    Q    And how come there is no video of that?

24    A    How come there is no video of that?  That's something that

25    goes through the ongoing process.  I, myself, went down and

Thomas Watson - Cross

1    spoke to you repeatedly and asked you not to let this get to

2    this point, and you refused.

3    Q    On line 5, the second sentence, can you read.

4    A    Which portion?

5    Q    It says, Medical should?

6    A    Medical should not direct anything during the move.  Inmate

7    refused medical treatment, but medical continued anyway.

8    Q    Okay.

9         So an inmate can refuse to be assessed by medical.

10   A    For the blood pressure and stuff.  During the use of force,

11   there is a required documentation --

12   Q    I'm just asking you if the inmate can refuse medical

13   assessments?

14   A    Portions thereof.

15   Q    Portions.

16        Why do your supervisors say that medical still

17   proceeded anyways.

18   A    Because she, it was an error on her part.  She attempted to

19   get blood pressure and stuff.  Trying to get your vitals to

20   ensure that you were okay, after the application of chemical

21   agents.

22   Q    Why do your supervisors see that medical, a medical

23   assessment should have been refused?

24   A    Not that it should have been refused.  The portion that is,

25   the extent that she was going to.

1  Q    It indicates in this form that the refusal should have been

2  accepted, am I correct?

3  A    It indicates on there . . . medical should not direct

4  anything during the move.  Inmate refused medical treatment,

5  but medical continued anyways.

6        My assumption would be that they were referring to her

7  attempting to take the blood pressure and things of this

8  nature.  The restraints are required to be formed.

9  Q    Excuse me, I'm sorry.

10       If you will read this form, you will see that

11  yourself, Lieutenant Watson, is noted by making six

12  discrepancies throughout this form.  On line 3, Lieutenant did

13  not wear protective eye wear downrange.

14  A    Initially.  Correct.

15  Q    Line 4, Lieutenant did not give final order to submit to --

16  for inmate to submit to hand restraints prior to dispersing

17  gas.

18       Again on line 4, Lieutenant did not cuff inmate when

19  inmate placed hands through slot prior to team entering cell.

20       Line 6, Lieutenant did not do a final check of

21  restraints prior to departing cell.

22       Line 7, Lieutenant did not explain hard ambulatory

23  restraints were used.

24       And line 8, Lieutenant should have requested

25  four-point, and if you read further on, inmate was placed on

1    bunk without a mattress, staff viewed laughing at conclusion.

2        Why were the staff viewed laughing, Mr. Watson?

3    A   That could have been the staff members that were in the

4    general area could have been talking about anything.

5    Q   Talking about anything.

6    A   Correct.

7    Q   If -- now, are cell extractions noted as serious throughout

8    the facility?

9    A   They are.

10   Q   At sometimes, you have to lock down the facility and assort

11   your team and bring them on in.  So it's kind of a serious

12   issue, is it?

13   A   It is.  Staff members are required to be pulled from

14   various areas, sometimes in order to accommodate uniformity;

15   and that does impede on times operations of the institution

16   entirely, correct.

17   Q   Now, the segregation unit, the area where these staff are

18   viewed laughing, is a real small area, correct?

19   A   Fairly small.  Approximately 38 inmates assigned.

20   Q   At this time the top subject, the top subject would be the

21   cell extraction on inmate, defendant Morones, correct?

22   A   I can't indicate that that would be the case.

23   Q   I'm sorry.  You can't indicate.

24        Well, staff were viewed laughing, and this, this does

25   not go.  With your supervisors, correct?

1    A    During the, on the videotape, no, it does not.

2    Q    Earlier you stated that when using officers to be involved

3    in the use of force, a calculated use of force and cell

4    extraction, you use officers who have no conflicts with, with,

5    with the inmate; is that correct?

6    A    That is correct.  That are actively involved in the

7    incident with the inmate.

8    Q    Now, isn't it true that Officer Brian Kemp had a conflict

9    recently, I think two days before, with inmate Morones.  Am I

10   correct?

11   A    There was an incident previously with inmate Morones.

12   However, that was viewed as resolved at that time.  We don't

13   reassign staff members from areas because they have an incident

14   with a inmate.  If that were the case, I wouldn't have anyone

15   to work anywhere.

16   Q    Earlier you stated you do not use staff that have prior

17   conflicts with inmates for your use of force.

18   A    In the capacity of the use of force, he was not directly

19   involved in the incident that resulted in the use of force, and

20   his actions were limited to opening the door.

21   Q    Now . . . .

22        THE DEFENDANT:  Your Honor, I need a second to consult

23   with advisory counsel.

24        THE COURT:  All right.

25        THE DEFENDANT:  Your Honor, I have no further

Thomas Watson - Cross

1  questions.

2          THE COURT:  Thank you.

3          Any redirect.

4          MR. HEARTY:  Yes, Your Honor.

5          THE COURT:  Please go ahead.

6          MR. HEARTY:  Your Honor, first, I'd like to offer the

7  admission of Defendant's Exhibit F.

8          THE COURT:  It's admitted.

9      (Exhibit F admitted.)

10                    **REDIRECT EXAMINATION**

11 BY MR. HEARTY:

12 Q   Lieutenant Watson, the purpose of the after-action review

13 report that the defendant was asking you about, is that to, for

14 the institution to get better at the way you do things?

15 A   Yes, sir, that is correct.

16 Q   Do you recall what the ultimate conclusion of the

17 after-action report review was?

18 A   It was appropriate use of force, we accomplished the move

19 without staff injury or injury to inmate Morones.

20 Q   And in section 3 of the report that the defendant was

21 asking you about --

22 A   Yes, sir.

23 Q   -- that conclusion is noted there, isn't it?

24          It reads, the after-action review has determined the

25 actions taken with respect to the use of force and/or

Thomas Watson - Redirect

1    restraints were reasonable and appropriate and have been

2    reviewed with staff involved?

3    A    That is correct.

4    Q    The defendant asked about the medical assessment, that

5    inmates can refuse medical assessment.  Do you remember that?

6    A    Yes, I do.

7    Q    And that was one of the, under the heading "discrepancies

8    noted" in the report that he has shown you, that was one of the

9    points made in there, right?

10   A    Yes, sir, it was.

11   Q    And what was being referred in the after-action review

12   wasn't the medical assessment that you went down to attempt to

13   conduct that morning, was it?

14   A    No, sir, it was not.

15   Q    What medical assessment were they referring to in the

16   report?

17   A    It would be my assumption the extent of the medical

18   assessment, not even medical assessment itself, as I had

19   indicated previously, but simply that she wanted to take the

20   blood pressure, things of this nature.  Usually at the

21   conclusion of a calculated use of force, we simply check the

22   restraints to make sure that there's no impediment to

23   circulation and make an overall check of the inmate involved

24   and make sure there's no injury sustained and document any

25   injuries that may require medical treatment and that the

1  chemical settings have been appropriately decontaminated.

2  Q   And the "she" you're referring to is nurse Wagner that we

3  saw introducing herself as part of the use-of-force team?

4  A   That is correct.

5  Q   And that attempted assessment at the conclusion of the use

6  of force was documented on the full video, right?

7  A   Yes, it was.

8  Q   The defendant asked you about confrontation avoidance and

9  the efforts at confrontation avoidance.  From the time period

10 when you went down to initially make contact with the defendant

11 after the Trujillo assault to the beginning of that video where

12 we see counselor Morgan attempt the final confrontation

13 avoidance, how much time had elapsed?

14 A   Approximately two hours.

15 Q   The defendant also asked you about the, the note in the

16 discrepancies on submitting to hand restraints, right, that --

17 and this is what we talked about earlier, that the defendant

18 put his hands back, and you explained why you decided to order

19 him to the ground rather than putting the handcuffs on, right?

20 A   Yes, sir, that is correct.  It was a decision I made at the

21 time.  It was my belief to ensure team safety.

22 Q   And part of that, you testified that you were taking into

23 account the defendant's prior conduct.

24 A   Correct.  That and also his actions after the application

25 of gas and noting that he had several articles about his person

1  in an attempt to defeat the chemical agents, after we had

2  utilized them and the placement of his hands outside the food

3  slot, all indicated that he may be attempting to circumvent or

4  assault staff members on entry.  It was my belief placing him

5  on the ground would be more of a deterrent.

6  Q   And by the time he actually put his hands back into the

7  tray slot there, he had already assaulted you, Dominic Davis,

8  Micah Morse, and Lieutenant Browning, correct?

9  A   That is correct.

10 Q   Were you aware of the incident that occurred in Florence,

11 Colorado, at the FCI SHU there, where inmate Morones slipped

12 his handcuffs during a lieutenant move and struck the

13 lieutenant in the face?

14 A   Yes, sir, I was advised.

15 Q   The note at the end of the discrepancies noted portion of

16 the after-action review, it mentions that staff was viewed

17 laughing at the conclusion of that video.  Do you know from

18 viewing the video, was that staff, the staff that was viewed

19 laughing, were they members of the use-of-force team?

20 A   No, sir, they were not.

21 Q   They were bystanders?

22 A   Yes, sir, they were.

23 Q   Obviously, when I say "bystanders," they were Bureau of

24 Prisons employees, of course?

25 A   Yes, they were.  However, they were not directly involved

1  in the use of force.

2  Q   The defendant asked you about your, I can't remember the

3  word he used, but trying to avoid conflict or something at the

4  beginning of his cross-examination.  When you use a five-man

5  team to go in for the cell extraction or to apply the

6  restraints, is part of the rationale for using the five-man

7  team to avoid actual -- a fight?

8  A   Yes, sir.

9  Q   Blows being struck, that sort of thing?

10 A   The inmate indicated on the videotape that we can't take

11 him one on one.  That would be correct with the assumption of

12 not being involved in a physical altercation, exchanging blows

13 him.  The intent of the five-man team is that we have enough

14 individuals to be able to go in and overpower him and place him

15 on the ground and in restraints without an actual physical

16 altercation.

17 Q   And part of the incentive for avoiding a physical

18 confrontation where blows are exchanged isn't only to protect

19 the officers that are members of the use-of-force team, is it?

20 A   No, sir.  It's also to protect the inmate from injury.

21 Q   Okay.

22      The defendant asked you about Officer Kemp.  And

23 Officer Kemp's role in the use of force and that there was a

24 prior conflict between the defendant and Officer Kemp.

25 A   Yes, sir.

Q   And are you aware of what that prior conflict was between

defendant and Officer Kemp?

A   I believe he had spit on him or something of that nature,

also.

Q   And that was just two days prior to this incident, wasn't

it?

A   Yes, sir.

Q   The -- you testified earlier that in the last year and a

half, there have been three, maybe four uses of force in the

entire institution, right?

A   Yes, sir.

Q   When you assemble a use-of-force team, is that disruptive

to the operations of the prison?

A   Yes, sir, it was.  As I had indicated before and inmate

Morones also indicated, sometimes that's disruptive to the

point that we have to shut down activities in order to obtain

the required individuals for that use of force.  So it can be

viewed as very disruptive.

Q   Thank you, Lieutenant.

A   Yes, sir.

        THE COURT:  Lieutenant, you may stand down, thank you.

        THE WITNESS:  Thank you, sir.

        THE COURT:  And we will be in recess for approximately

15 minutes.

        THE COURTROOM DEPUTY:  All rise.

1    (Jury out at 10:32 a.m.)

2         THE COURT:  We'll be in recess.

3    (Recess at 10:33 a.m.)

4    (Reconvened at 10:58 a.m.)

5    (Jury in at 10:59 a.m.)

6         THE COURT:  Thank you very much.  Be seated, everyone.

7         Call your next witness, please.

8         MR. HOSLEY:  Thank you, Your Honor.  The United States

9    will call Lieutenant Michael Browning.

10        THE COURTROOM DEPUTY:  Raise your right hand.

11        (**MICHAEL BROWNING, GOVERNMENT'S WITNESS, SWORN**)

12        THE COURTROOM DEPUTY:  Please be seated.

13        State your full name for the record and spell your

14   last name.

15        THE WITNESS:  Michael Anthony Browning.

16   B-R-O-W-N-I-N-G.

17                        **DIRECT EXAMINATION**

18   BY MR. HOSLEY:

19   Q   Mr. Browning, how are you employed?

20   A   I'm a lieutenant at FCI Englewood.

21   Q   Are you a member or an employee of the federal Bureau of

22   Prisons?

23   A   Yes, I am.

24   Q   And that's an agency of the Department of Justice?

25   A   Yes, sir.

Michael Browning - Direct

1   Q    United States government?

2   A    Yes.

3   Q    How long have you been a lieutenant at FCI Englewood?

4   A    Since September 27, 2009.

5   Q    And prior to becoming a lieutenant, what were your -- what

6   was your title at FCI Englewood?

7             What was your title with the Bureau of Prisons?

8   A    I was senior officer specialist at FCC Lompoc for three

9   years.  Prior to that was correctional officer down at FCI

10  Florence.  Started in 2001.  There.

11  Q    So you've been employed with the Bureau of Prisons since

12  2001?

13  A    Yes.

14  Q    Have there been any break in your employment from that time

15  until today?

16  A    No.

17  Q    How long have you been at FCI Englewood?

18  A    Since date of September 2009.

19  Q    Were you working on August 19 of 2010, August 19 of this

20  year?

21  A    Yes.

22  Q    Were you on duty that day at FCI Englewood?

23  A    Yes.

24  Q    While you were on duty, were you called upon to participate

25  in a use-of-force incident in the SHU at FCI Englewood on

1  August 19, 2010?

2  A    Yes.

3  Q    And who was the inmate involved in that use-of-force

4  incident?

5  A    Inmate Morones.

6  Q    And so is that the defendant who's seated here today?

7  A    Yes.

8  Q    What were your responsibilities during the use-of-force

9  incident on August 19, 2010?

10  A    I was a cameraman.  Cameraman no. 1, I guess you could say.

11  Q    You were the primary camera operator?

12  A    Primary camera operator.

13  Q    What were the duties and responsibilities of a primary

14  camera operator during a use-of-force incident?

15  A    Basically record the whole action from start to beginning

16  when they announce the use-of-force team members, all the way

17  to the end when they do a debriefing of the use-of-force team

18  members.

19  Q    What are your normal duties when you're not participating

20  in use of forces?

21  A    I'm a lieutenant at the institution.  Currently I'm an a.m.

22  activities lieutenant.  I run main line.  I go do crew kit

23  audits, whatever else is in my job description.

24  Q    So even though you're a lieutenant normally, once you're

25  called upon to participate in the use of force as a camera

Michael Browning - Direct

1  operator, does that become your primary place of duty at that

2  time?

3  A    Yes.

4  Q    And that is your within your role -- excuse me, that is

5  within your responsibilities as a Bureau of Prisons

6  correctional officer --

7  A    Yes.

8  Q    -- to parts in those use of forces?

9  A    Yes.

10 Q    On that August 19, 2010 incident, who was the lieutenant

11 that was running the use of force?

12 A    Lieutenant Tom Watson.

13 Q    And you said that you were the primary camera operator.

14 Was there a person who was responsible for dispensing chemical

15 agents or gas in that use of force as well?

16 A    Yes, there was.

17 Q    And who was that?

18 A    Security officer Micah Morse.

19 Q    Okay.

20       And do you remember who the no. 1 or the use-of-force

21 no. 1 was during that incident?

22 A    Yeah.  UNICOR foreman Dominic Davis.

23 Q    All those people, Tom Watson, Dominic Davis, Micah Morse,

24 are they all officers and employees of the Bureau of Prisons?

25 A    Yes.

1  Q   I want to talk about that use-of-force incident, and we've

2  already watched the video, so I'm not going to do that again;

3  but I just want to go to the point where you guys assemble

4  outside of the inmate's cell.

5        Do you remember what range of the SHU the cell was on?

6  A   A range.

7  Q   As you assemble outside the cell, where do you position

8  yourself as the camera operator?

9  A   As the camera operator, I wanted to be able to get a good

10  view of the whole incident getting ready to take place.  So

11  looking, say, the cell was in front of me, I wanted to be, I

12  was off to the left of it.

13  Q   Were you able to view into the cell?

14  A   Yes.

15  Q   With your camera?

16  A   Yes.

17  Q   As you and the rest of the members of the use of force

18  assembled outside of the cell, can you describe what you saw

19  taking place inside the cell?

20  A   I really couldn't see inside the cell.  There was a sheet

21  tied to the cell to kind of disrupt our view.  We didn't know

22  what was going on behind that sheet.  I couldn't see.  At that

23  moment.

24  Q   You mentioned that the use of force involved inmate Morones

25  or defendant Morones.  Were there any other inmates present

1  within that cell?

2  A    No.

3  Q    He was all by himself?

4  A    Yes.

5  Q    And he was the only inmate assigned to that cell?

6  A    Yes.

7  Q    So you and the rest of the use-of-force members assembled

8  outside that cell and you saw the sheet obstructing your view.

9  Was confrontation avoidance attempted?

10 A    Yes.

11 Q    Was that successful?

12 A    No.

13 Q    After confrontation avoidance was proved unsuccessful, what

14 was the next step taken in the use of force?

15 A    I believe there was a couple orders given for him to, you

16 know, come up to the grille.

17 Q    Who is "him"?

18 A    Inmate Morones.

19 Q    Okay.

20 A    Lieutenant Watson was directing the use of force.  And he

21 would give couple orders.  After that was proved ineffective, I

22 believe, you know, the sheet was still tied up there.  And

23 chemical agents were dispersed.

24 Q    Okay.

25       Now, you said that Lieutenant Watson gave orders to

1  take down the sheet.  Did defendant Morones take down the

2  sheet?

3  A   No.

4  Q   And what did defendant Morones do as the team was assembled

5  outside beginning to give chemical agents?

6  A   As the chemical agents were getting dispersed, inmate

7  Morones kind of winged a couple of cups of urine and feces

8  filled at the team.

9  Q   When you say "winged a couple of cups," I'll note that you

10  moved your arm in a manner looking as if you were throwing

11  something.  Can you describe what you saw?

12  A   Yeah.  He -- the way it was thrown was kind of like a side

13  arm around the sheet.  There was an open area that didn't --

14  wasn't covered by the sheet.  Not all the whole grille was

15  covered.  So he winged it side arm, and --

16  Q   Where did the feces and urine go?

17  A   Well, I was holding the camera like this, and looking

18  through it, and you can see the feces splatter the camera.  I

19  had a gas mask on at the time.  It went across my chest.  I was

20  up against a wall.  Bounced off the wall.  And my whole back

21  was covered and my head.

22  Q   Now, were you wearing -- we saw the video again, and some

23  of the team members were wearing what appeared to be protective

24  gear, helmets, vests, et cetera.  As the camera operator, were

25  you wearing any protective gear?

1  A    No, I wasn't.

2  Q    You mentioned that you were wearing a gas mask?

3  A    Yes.

4  Q    Other than the gas mask, did you have anything covering

5  your body other than your regular clothes?

6  A    No.

7  Q    Were you wearing a uniform as you are today?

8  A    Yes.

9  Q    As the feces and urine was thrown from the cell, did it

10 strike your skin?

11 A    Yes.

12 Q    Where?

13 A    Across here -- there was a couple cups thrown, so I would

14 believe right here and it splattered up against the wall and it

15 hit the back of my head, right down my neck, the back of my

16 neck, on the shirt.  I was covered.

17 Q    And for the record to indicate, you had motioned with your

18 right hand that the feces and urine struck you approximately on

19 the neck, under the chin, then you also touched the back of

20 your head.

21 A    Yes.

22 Q    Were you bald at that time, too?

23 A    Yes.

24 Q    So didn't have any hair to block the stuff from striking

25 you on the head?

Michael Browning - Direct

1  A   That's right.

2  Q   What did your head look like after you peeled that gas mask

3  off after the use-of-force incident?

4  A   It looked like there was feces covering it.  The way I had

5  the gas mask on, there was a line of feces slash urine, you

6  know, I mean, you can see a definitive line right there.

7  Q   Now, you keep saying that this was feces and urine.  How do

8  you know it wasn't just some other sort of brown liquid?  How

9  do you know what it was?

10  A   You can tell the smell of feces.  I mean, just driving by a

11  manure plant, you can tell.

12  Q   This is going to be a silly question, but have you ever

13  smelled feces before?

14  A   Yes.

15  Q   And the smell of the substance that struck you on the head,

16  was it consistent with the smell of feces?

17  A   Absolutely.

18  Q   Now, you said that you were wearing a gas mask.  So were

19  you able to smell it, even though you were wearing a gas mask?

20  A   Yes.

21  Q   The person -- let me ask you this.  What's the concern in a

22  prison setting with being struck by an inmate with bodily

23  fluids?

24  A   Well, you don't know what the inmate, what kind of

25  potential harmful diseases the inmate has.  There's a lot that

1  go into that, you know, medical-wise.  I didn't know what his

2  medical history was.  So -- but, I mean, I stayed there, kept

3  on filming, and I could just tell it was just all over me and,

4  you know, I couldn't break away from the action, I just wanted

5  to keep on doing my job.

6  Q   That was your job that day, to film that incident?

7  A   My job was to film that incident.

8  Q   The inmate Morones, who you have described, the inmate who

9  threw that feces and urine onto your body on August 19, 2010,

10  is he seated in this courtroom today?

11  A   Yes, he is.

12  Q   Can you please point to him and identify what he's wearing?

13  A   He's wearing a dress shirt and tie.

14          MR. HOSLEY:  And, Your Honor, may the record reflect

15  that the witness has pointed to and identified the defendant.

16          THE COURT:  Yes.  It will.

17  BY MR. HOSLEY:

18  Q   At the moment that you were struck by the feces and urine

19  in the SHU housing unit at FCI Englewood on August 19, 2010,

20  were you in the in performance of your official duties?

21  A   Yes, I was.

22          MR. HOSLEY:  One moment, please, Your Honor.

23          I take that back, Your Honor.  We have no additional

24  questions.

25          THE COURT:  Thank you.

1        Mr. Morones, any questions?

2        THE DEFENDANT:  I have no questions for the witness at

3   this time, Your Honor.

4        THE COURT:  Thank you.

5        You may step down, Mr. Browning, at this time.  Thank

6   you.

7        Next witness.

8        MR. HEARTY:  Your Honor, the United States calls Micah

9   Morse.

10        (**MICAH MORSE, GOVERNMENT'S WITNESS, SWORN**)

11        THE COURTROOM DEPUTY:  Please be seated.

12        State your full name for the record and spell your

13   last name.

14        THE WITNESS:  Micah McCawley Morse, M-O-R-S-E.

15                    **DIRECT EXAMINATION**

16   BY MR. HEARTY:

17   Q   Mr. Morse, are you employed as a security officer for the

18   United States Bureau of Prisons assigned to the federal

19   correctional institute Englewood, Colorado?

20   A   Yes, sir.

21   Q   And were you -- did you hold that position on August 19 of

22   this year?

23   A   Yes, sir.

24   Q   How long have you been an employee with the Bureau of

25   Prisons?

1  A    17 years, eight months.

2  Q    And what did you do prior to your employment with the

3  Bureau of Prisons?

4  A    United States Army.

5  Q    On August 19 of 2010, what was your position at the Bureau

6  of Prisons?

7  A    Lock and security specialist, security officer.

8  Q    Please explain what that means, a lock and security

9  specialist?

10 A    I'm in charge of the lock shop, armory, I'm armorer,

11 locksmith.

12 Q    Sir, in that role, do you deal with inmates on a regular

13 basis?

14 A    If I choose to.  Otherwise, no, I'm dealing with security.

15 Locks, the fencing, that kind of stuff.

16 Q    On August 19, 2010, were you involved in a calculated

17 use-of-force team?

18 A    Yes, sir.

19 Q    And who was the inmate that was involved in that use of

20 force?

21 A    Inmate Morones.

22 Q    What was your role on the use-of-force team?

23 A    To deploy chemical agents if needed.

24 Q    Okay.

25        So to deploy chemical agents.  Do you have specialized

Micah Morse - Direct

1  training in the use of chemical agents?

2  A   Yes, sir.

3  Q   And was that training when you were in the Army or with the

4  Bureau of Prisons?

5  A   Bureau of Prisons.

6  Q   Can -- is that the reason that you were contacted from the

7  lock shop to participate in this use-of-force event?

8  A   Yes, sir.

9  Q   Okay.

10         Do you know who has to authorize the use of chemical

11  agents within the institution?

12  A   Yes, sir.

13  Q   Who is that?

14  A   The warden.

15  Q   And in this case did the warden authorize the use of

16  chemical agents?

17  A   To my knowledge, yes, sir.

18  Q   When you say to your knowledge, who told you that the

19  warden had authorized them?

20  A   The lieutenant in charge of the team.

21  Q   Who was the lieutenant in charge of the team?

22  A   Lieutenant Watson.

23  Q   The jury's already viewed the video that was taken with

24  that use-of-force team, so we're not going to go into a lot of

25  detail about that; but your, your role was to deploy the

1 chemical agent, you said.  What was the chemical agent?

2 A    OC pepper spray and Mark 21.

3 Q    And how do you deploy it?  What's it contained in?

4 A    It's like a fire extinguisher canister.  It's under

5 pressure, under air pressure.

6 Q    The other members of the team, the no. 1 through 5, they

7 wear protective clothing; is that correct?

8 A    Yes.

9 Q    Do you have protective clothing on that day?

10 A    Protective clothing, no, not as far as clothing goes.  I

11 had a gas mask.

12 Q    And can you just describe for us at the time that you're at

13 the cell, so the team is assembled at the cell and then what

14 you do and what happens when you're attempting to deploy the

15 chemical.

16 A    Once the team is assembled, the lieutenant have the team

17 move up to the cell.  Depending on the circumstances, what's

18 going on inside the cell, if chemical agents are going to be

19 deployed or not, then I would step up and deploy the chemical

20 agents.

21 Q    And can you tell us what happened in this event on

22 August 19, 2010, when the team was assembled outside inmate

23 Morones's cell and you deployed the chemical agents?

24 A    There was a barricade up, it was shielded.  We couldn't see

25 what was going on behind it.  That is part of our criteria of

deploying chemical agents, for safety.  I've got a wand on the

end of a hose that's connected to like the fire extinguisher.

You reach up underneath, pull the handle, and just push the

chemical agent.

Q   When you approached the cell -- and we're talking about the

bars here, right?

A   Yes, sir.

Q   When you approached the cell to deploy the chemical agent,

what happened?

A   I stepped up to reach underneath the sheet that was hanging

as a barricade, and inmate Morones threw feces and urine at the

team, at the shield man and myself.

Q   And when you say "the shield man," who was the shield man?

A   Dominic Davis.

Q   And he was there next to you when you stepped forward to

deploy the chemical agent?

A   Yes, sir.

Q   You said that inmate Morones threw feces and urine.  How

did he throw it?

A   Around the sheet with a Styrofoam cut.  It was up over top.

To splash it on the team.

Q   And were there multiple times that the defendant threw the

substance at you?

A   Yes, sir.  When he first threw it, we stepped back.  I

stepped up to deploy the chemical agent again, and another cup

Micah Morse - Direct

1   of feces came back out.

2   Q   Okay.

3       And were you struck by the urine and feces that the

4   defendant threw?

5   A   Yes, sir.

6   Q   I'm sorry?

7   A   Yes, sir.

8   Q   Where were you struck?

9   A   On my head, down my left side.

10  Q   And you had a gas mask on but no helmet; is that correct?

11  A   Yes, sir.

12  Q   And how do you know that it was feces and urine?

13  A   Calculated guess, until I removed my mask.  Once I removed

14  my mask, it was very evident what it was.

15  Q   What did you do to clean yourself or your clothing

16  afterwards?

17  A   I sent my clothing to the laundry.  I went up, I took a

18  shower.  And then I had to sanitize the masks.

19  Q   Now, when you were deploying the chemical agent, when you

20  were hit by the urine and feces that inmate Morones threw, were

21  you engaged in the performance of your duties as a security

22  officer for the United States Bureau of Prisons?

23  A   Yes, sir.

24  Q   And do you see the individual who threw urine and feces at

25  you here in court?

Micah Morse - Direct

1   A   Yes, sir.

2   Q   Would you please point to him and identify an article of

3   clothing that he's wearing and where he's sitting?

4   A   Black tie.

5   Q   Is he sitting here at the head of the table?

6   A   Yes.

7   Q   Okay.

8         MR. HEARTY:  Your Honor, would the record please

9   reflect that the witness identified the defendant.

10        THE COURT:  Yes, it will.

11        MR. HOSLEY:  Thank you.  No further questions.

12        THE DEFENDANT:  No questions for the witness at this

13  time, Your Honor.

14        THE COURT:  Thank you.

15        You may stand down.  Thank you, Mr. Morse.

16        THE WITNESS:  Thank you.

17        THE COURT:  Next witness, please.

18        MR. HOSLEY:  Your Honor, the United States will call

19  Dominic Davis.

20        THE COURTROOM DEPUTY:  Turn here.

21        Please raise your right hand.

22         (**DOMINIC DAVIS, GOVERNMENT'S WITNESS, SWORN**)

23        THE COURTROOM DEPUTY:  Please be seated.

24        State your full name for the record and spell your

25  last name.

1        THE WITNESS:  Dominic Patrick Davis, D-A-V-I-S.

2                    **DIRECT EXAMINATION**

3   BY MR. HOSLEY:

4   Q   Mr. Davis, how are you employed?

5   A   Federal Bureau of Prisons -- I work for the federal Bureau

6   of Prisons.

7   Q   And where are you assigned within the federal Bureau of

8   Prisons?

9   A   FCI Englewood.

10  Q   How long have you been with the federal Bureau of Prisons?

11  A   14 years.

12  Q   And what are your current duties at FCI Englewood?

13  A   I'm a fabric worker supervisor for UNICOR.

14  Q   What is UNICOR?

15  A   It's a factory program that employs inmates to help them

16  learn skills.

17  Q   And that's located on the grounds of the federal

18  correctional institution in Englewood?

19  A   Correct.

20  Q   In the state and district of Colorado?

21  A   Yes.

22  Q   Now, I want to talk to you about a use of force that

23  occurred on August 19 of 2010.  Were you involved in that use

24  of force?

25  A   Yes.

1   Q   And where did that take place?

2   A   In the special housing unit.

3   Q   At FCI Englewood?

4   A   At FCI Englewood, correct.

5   Q   What was your role within that use of force?

6   A   I was the point man.  The first guy.

7   Q   And is that the no. 1 member?

8   A   Correct.

9   Q   Now, you said that normally, as a Bureau of Prisons

10  employee, you're employed with UNICOR.  When there's a use of

11  force, does the use of force become your primary place of duty

12  at that time?

13  A   Correct.

14  Q   If you're selected?

15  A   Correct.

16  Q   And on this occasion, on August 19, 2010, were you selected

17  to participate in that incident?

18  A   Yes.

19  Q   Now, I want to talk to you about some special training that

20  you have received.  Have you actually received special training

21  related to disturbances with inmates?

22  A   Yes.

23  Q   And what's the nature of that training?

24  A   Disturbance-control team.

25  Q   What is a disturbance-control team?

1    A    We do training, we do riot control and stuff.  And

2    forced-cell moves, we train in how to, to conduct these.  These

3    moves.

4    Q    You ever testify in court before?

5    A    Have I ever?

6    Q    Yeah.

7    A    No.

8    Q    You little nervous?

9    A    I'm okay.

10   Q    All right.

11        So even though you normally work at UNICOR, you have

12   specialized training with the disturbance-control team; is that

13   correct?

14   A    Yes.

15   Q    And when there are use-of-force incidents, are you

16   typically the no. 1 man because of your specialized training?

17   A    Yes.

18   Q    Okay.

19        Do you have specialized training in the use of

20   tactical shields?

21   A    Yes.

22   Q    And restraint techniques?

23   A    Yes.

24   Q    And have you received specialized training in the

25   application of restraints to an inmate?

1   A    Yes.

2   Q    So let's go to the actual use of force involved in this

3   case, August 19, 2010, at the SHU.  And we've already watched

4   the video, so we're going to fast-forward to when the team is

5   assembled outside of the inmate's cell.  Who is the inmate who

6   was involved in this August 19, 2010 use of force?

7   A    Mr. Morones.

8   Q    Okay.

9        And where was this -- you said this was in the special

10  housing unit.  Do you know the range that it was on?

11  A    Off the alpha range.

12  Q    Alpha?

13  A    Yeah.

14  Q    You have military background?

15  A    Yes.

16  Q    Alpha meaning what?

17  A    A.

18  Q    Okay.

19       So where were you positioned immediately outside the

20  cell as the use of force began?

21  A    I was right inside the sally port of his cell.  His door

22  and the outer door.

23  Q    Okay.

24       Describe again what a sally port is.  There's two

25  doors to the cell; is that correct?

A    Yes, there's an outer door and then an inner bar sliding

door, and I was placed, I was in the middle of the two.

Q    Did you have any protective equipment with you at that

time?

A    I had a plastic shield.

Q    And were you wearing any protective gear?

A    Yes.  I had helmet.  I had full protective gear.  Helmet,

stab-proof vest, jump boots, elbow pads, knee pads.

Q    Why is it necessary or important to have a tactical shield

when you're attempting to enter an inmate's cell?

A    To protect yourself from stuff being thrown and hitting you

or any other members that are on the party.

Q    What are the dangers that face the no. 1 man as he's the

first person into the cell in one of these use-of-force

incidents?

A    Anything from, anything an inmate can get his hands on to

throw at you from knives to homemade, I've seen plastic pieces

of food trays broken and sharpened.  I've seen metal pieces,

feces, urine.

Q    Now, if an inmate had an obstruction up over the cell to

where you, the no. 1 man, cannot see into the cell, what

dangers does that pose to the use-of-force team?

A    Well, I can't see what he's doing, so it could be anything.

I mean anything he could possibly want to do behind there.  I

have no visual, so he could -- I'm pretty much just got the

1  shield out in front just to keep me from getting hit by

2  anything that might come out.

3  Q   So I want to go to the point where confrontational

4  avoidance had been tried and failed and Lieutenant Watson has

5  now given the order for the defendant -- first of all, let me

6  rewind a little bit.

7           When you went to the cell, were there any

8  obstructions?

9  A   Yes, there was a sheet hanging up across the bars.

10  Q   After confrontational avoidance has been tried and failed,

11  what did Lieutenant Watson do to try to get inmate Morones to

12  try to remove the sheet?  Did he give any orders?

13  A   Yes, he ordered him to remove the sheet.

14  Q   Did inmate Morones remove the sheet?

15  A   No.

16  Q   What did inmate Morones do as the team was assembled

17  getting ready to go into that cell?

18  A   He proceeded to throw Styrofoam cups full of feces and

19  urine and whatever else he could put in there; I'm not sure of

20  all the ingredients, but I know there was some feces and urine

21  in there.

22  Q   You said he was throwing it.  Where was he throwing it?

23  A   Looked like he was just whipping it across through the

24  bars.  He'd come up over the sheet or around it like this and

25  whip it out.

1  Q   Was he throwing it at the team?

2  A   Correct.

3  Q   You said you were up in front; is that correct?

4  A   Yes.

5  Q   Was there anyone in front of you?

6  A   No.

7  Q   What did you do as this substance, this feces, urine, and

8  other substance starts throwing through the cell bars?

9  A   I tried use the shield to block most of it; but since it

10 was in liquid form, it was splattering and it was coming out

11 and I got as much as I could on the shield, but there was still

12 plenty that didn't get on the shield.

13 Q   Who was responsible that day for dispersing the chemical

14 agents?

15 A   Mike Morse.

16 Q   Where was Mike Morse or Micah Morse positioned in relation

17 to you?

18 A   He was at my, on my left side.  I was facing forward.  And

19 he was on my left side.

20 Q   Now, you mentioned the protective gear that you had on.

21 Other than the gas mask, was Mike Morse wearing any protective

22 gear?

23 A   No.

24 Q   So as the feces and urine starts flying through the cell,

25 what did you do with your shield?

Dominic Davis - Direct

1  A   I moved in to the left like this try to cover Mike Morse.

2  Q   As you moved your shield, were you struck with any of the

3  substance that was flying through the bars?

4  A   Yes.

5  Q   Where did it strike you?

6  A   Throughout the helmet, the face mask, and it ran down the

7  top of my helmet and into my back, down my neck and into my

8  back.

9  Q   So even though you were wearing protective gear, did this

10  substance get onto your skin?

11  A   Yes.

12  Q   Now, you mentioned that it was feces and urine and maybe

13  some other things.  How do you know that it was feces and

14  urine?

15  A   It was a terrible smell.  It was brown and it was nasty.

16  Just smelled really, really bad.  Made me gag.

17  Q   Were you wearing any sort of gas mask, because there were

18  going to be chemical agents?

19  A   Yes, I had a gas mask on.  I could still smell it.  I think

20  if you watch the video, you might be able to hear me gagging.

21  I had to stop myself from gagging, try to stop myself from

22  gagging.

23  Q   So even though you were wearing a gas mask, you were

24  gagging inside of the mask at the smell?

25  A   Yes.

Dominic Davis - Direct

1    Q    Now, after the defendant threw this, this feces, was

2    chemical munition, were they sprayed into the cell?

3    A    Yes.

4    Q    And did you in fact make entry into the cell?

5    A    Yes.

6    Q    And the defendant did in fact remove the sheet after the

7    chemical munitions; is that correct?

8    A    Yes.

9    Q    And he laid down on the cell floor?

10   A    Correct.

11   Q    What was your responsibility as the no. 1 man once you

12   entered into the cell to apply restraints?

13   A    I didn't apply restraints.  My responsibility was to

14   control the inmate's body and his head.

15   Q    Why is it important to control the inmate's head?

16   A    To keep him from biting or spitting or head-butting any of

17   the other staff.

18   Q    And so the other -- there are five members of the

19   use-of-force team, not including the camera, lieutenant, and

20   everybody else; is that correct?

21   A    Yes.

22   Q    You were the no. 1?

23   A    Correct.

24   Q    What are the nos. 2, 3, 4, and 5 doing, while you're

25   controlling an inmate's head?

1   A    They're trying to get his arms to apply the arm and leg

2   restraints.

3   Q    In your training and experience, when you're dealing with

4   an assaultive inmate, who has just then assaulted guards, is it

5   easier to deal with that inmate if he is lying on the ground or

6   if he is standing up?

7   A    It's definitely easier if he's lying on the ground.

8   Q    Why is that?

9   A    He poses less of a threat.  Obviously he can't get -- he

10  can't throw punches or -- he can quick, but not with as much

11  force.  He has less control.

12  Q    And do you attempt to get inmates to lie facedown or

13  faceup, if you get them on the ground?

14  A    Facedown.

15  Q    Why is that?

16  A    Because they can still punch and kick when they're on their

17  back.  It's a less control for them to be on their stomach.

18  Q    We've watched the video and we saw you and the other

19  members of the team going in and restraining the defendant.

20  And the defendant is screaming and making a lot of noise,

21  hollering while you guys are on top of him.  You were present.

22  You were in the mix of all this going on; is that correct?

23  A    Yes.

24  Q    Was anyone punching, harming the defendant in any way when

25  they were attempting to restrain him?

1    A    No.

2    Q    And you've been in a number of these uses of force based

3    upon your training and experience.  Is it common for inmates to

4    attempt to play to the camera or make a lot of noises that they

5    know will be caught on the camera?

6    A    Yes.  And when he laid down, he was -- when we came in, he

7    was still fighting and wouldn't give up his arms and was

8    fighting around on the bottom, too, so that when I was in

9    there, everybody was still trying to get control at first.  To

10   put him in his restraints.

11   Q    And after he was restrained, he was stood up and moved to

12   the decontamination shower; is that correct?

13   A    Correct.

14   Q    Now, on the video, you continued to hold his head down even

15   as he was restrained.  Why is that important?

16   A    I had asked him to, to keep his head down, and I'd put my

17   hand over his head because he had spit at another officer on

18   the way to the decontamination.

19   Q    Okay.

20        The inmate who you just described, inmate Morones, the

21   inmate involved in that use of force, is he seated in this

22   courtroom today?

23   A    Yes.

24   Q    The inmate who threw the feces upon you that rolled down

25   your neck, is he seated in this courtroom today?

1  A    Yes.

2  Q    Can you please point to him and identify what he's wearing,

3  for the court reporter?

4  A    He's right there.  He has a blue tie and a dress shirt,

5  looks purple.

6           MR. HOSLEY:  Your Honor, and may the court reporter

7  please reflect that the witness has pointed to and identified

8  the defendant.

9           THE COURT:  Yes, it will.

10           MR. HOSLEY:  One moment, please.

11           I believe we have no further questions of this

12  witness, Your Honor.

13           THE COURT:  Thank you.

14           THE DEFENDANT:  I have no questions for the witness,

15  Your Honor.

16           THE COURT:  Thank you, Mr. Morones.

17           You may stand down, sir; thank you very much.

18           Next witness, please.

19           MR. HOSLEY:  Your Honor, the United States will call

20  Charles Simms.  And this will be our last witness.

21           THE COURT:  All right.

22           THE COURTROOM DEPUTY:  Raise your right hand.

23           THE COURT:  May we have your attention while the oath

24  is being administered, please.

25           Thank you.

1            (**CHARLES SIMMS, GOVERNMENT'S WITNESS, SWORN**)

2            THE COURTROOM DEPUTY:  Please be seated.

3            State your full name for the record and spell your

4    last name.

5            THE WITNESS:  My name is Charles Wesley Brian Simms.

6    S-I-M-M-S.

7                        **DIRECT EXAMINATION**

8    BY MR. HOSLEY:

9    Q   Mr. Simms, are you an employee with the federal Bureau of

10   Prisons --

11           THE DEFENDANT:  Your Honor, I object.  There is no

12   record of a Charles Simms being on the witness list.  We had no

13   prior knowledge.

14           MR. HOSLEY:  Your Honor, that's incorrect.  The

15   Government was given an opportunity to file an amended witness

16   list last week on Wednesday, and Mr. Simms' name is on the

17   amended witness list.

18           THE COURT:  It is.  I've seen it.  Your objection is

19   overruled.  Thank you.

20   BY MR. HOSLEY:

21   Q   Mr. Simms, how are you employed with the federal Bureau of

22   Prisons?

23   A   I work for the special investigative services office.  I'm

24   an SIS tech.

25   Q   Where are you an SIS tech?

 1  A   FCI Florence.

 2  Q   What is an SIS tech?

 3  A   My job mainly is I deal with getting intel at the

 4  institution.  I help the lieutenants with any kind of assault

 5  reports, fights, disturbances.  So pretty much I'm our

 6  lieutenants' right-hand man.  I run the cameras, the phones,

 7  e-mails.

 8  Q   And by "lieutenant," you're referring to an SIS lieutenant,

 9  not, for example, a SHU lieutenant?

10  A   SIS lieutenant.

11  Q   Are you familiar with the camera placements in the special

12  housing unit at FCI Florence?

13  A   Yes, sir.

14  Q   I'd like to show you Government Exhibit No. 1, which has

15  already been entered into evidence.

16          Were you employed as an SIS tech at FCI Florence in

17  April of 2009?

18  A   Yes.

19  Q   Now, I want to you show you Government Exhibit No. 1.  Do

20  you recognize the area depicted on Government Exhibit No. 1?

21  A   Yes, I do.

22  Q   Where is that?

23  A   That is the special housing unit hallway on the, it would

24  be the west side of special housing facing the unit officer

25  station, which we call the bubble.

1    Q    And just for clarification here, this is the bubble; is

2    that correct?

3    A    Yes, sir.

4    Q    Now, are you familiar a incident that occurred between the

5    defendant, Daniel Morones, and Lieutenant Steve Hansen at the

6    SHU on April 20, 2009?

7    A    Yes, I am.

8    Q    And have you reviewed video footage from the SHU from that

9    day?

10   A    Yes, I have.

11   Q    Now, how many cameras are in the SHU?

12   A    There's four ranges.  So there's eight cameras there.

13   There's two ranges -- two cameras per range, and where this

14   video is taken, there's another camera further down the hall

15   behind it, so there's eight on the ranges, nine, ten.  The

16   entryway to SHU is one.  So there's eleven, and the SHU door is

17   12.  And then there's three out on the rec cages.

18   Q    How are those cameras oriented?  What are you trying to

19   capture on video with those cameras?

20   A    This camera mainly you've got, on the left-hand side, you

21   kind of see a screen door that is the orderly's area and right

22   next to it is the staff bathroom.  Right in front of the camera

23   to the right, you can't really see it, you can see a frame,

24   that's a holding cell.  When inmates come into the SHU, we'll

25   place them into that holding cell.  There's two holding cells.

1   And right on the other side of that holding cell is the

2   entrance to seg.

3   Q    The cameras do not have any audio capability?

4   A    No.

5   Q    Just video?

6   A    Just video.

7   Q    We've watched that video, and it shows the aftermath or the

8   second half of the incident between the defendant and Steve

9   Hansen.  Are there any videos that show what occurs on the

10  other side of that bubble?

11  A    No, there will not be because the way the camera placement

12  is, on the ranges -- our SHU is like a tri-level house.  You've

13  got a bottom floor, middle floor, and upper floor.  There's two

14  cameras on each range.  One faces west, one faces east.  And

15  they're mainly to watch the cell door in the movement of

16  inmates in and out of cells.  When you look at the range

17  cameras, when we reviewed this, when you look at the upper

18  range, all it's showing is barely the tops of their heads.  You

19  can barely even see anything because they are on the ceiling.

20  The floor, the way the stairs go up because this picture right

21  here would be like the middle section after tri-level house.

22  So you've got to go either upstairs or downstairs to get to the

23  ranges.  You're not -- on the downstairs ranges, you're going

24  to catch maybe the shoes of people walking by, and that's it.

25  Q    So in essence, where this altercation occurred, on the

1  other side of that window, that's a dead space in the

2  surveillance cameras?

3  A    Yes, it is, it's a blind spot.

4  Q    And you said the cameras are there primarily to catch the

5  ingress and egress of inmates from their cells?

6  A    On the ranges.

7  Q    And the ranges are actually separated from this area by

8  doors?

9  A    Correct.

10        MR. HOSLEY:  Nothing further, Your Honor.

11                       **CROSS-EXAMINATION**

12  BY THE DEFENDANT:

13  Q    Mr. Simms, aren't institutions designed with the federal

14  Bureau of Prisons to eliminate blind spots; and if there is a

15  blind spot, a camera being -- a camera would be placed in the

16  area to eliminate this?

17  A    In an institution, you're going to have a blind spot no

18  matter what.  You place a camera somewhere, inmates look, they

19  see where the cameras are placed, they know where to go, they

20  know the blind spots are there.  No matter -- you would have to

21  put couple thousand cameras in each institution to cover every

22  single blind spot.

23  Q    Isn't there a sort of tool that you guys use to deter

24  inmates from learning how the cameras are positioned and

25  defeating the, the blind spot or defeating the way the camera

Charles Simms - Cross

1    is set up?

2    A    We don't have a tool to do that.  The cameras do have a

3    smoke glass cover over them to where it's harder to see, but if

4    you look at it long enough, you're going to see exactly where

5    the camera is pointing.

6              THE DEFENDANT:  I need a second to consult with

7    counsel.

8              THE COURT:  Yes, sir.

9              THE DEFENDANT:  No further questions for the witness.

10             THE COURT:  Thank you.

11             Any redirect.

12             MR. HOSLEY:  No redirect, Your Honor.

13             THE COURT:  Thank you, sir.

14             You may stand down.

15             MR. HOSLEY:  Your Honor, the United States has no

16   additional evidence.  We rest at this time.

17             THE COURT:  All right.

18             Ladies and gentlemen of the jury, I'm going to excuse

19   you now.  We will have some other things to do.  So let's be

20   prepared at one-thirty to come back, and we will stand while

21   the jury leaves the courtroom.

22             THE COURTROOM DEPUTY:  All rise.

23        (Jury out at 11:40 a.m.)

24             THE COURT:  Thank you.  And be seated, please.

25             Mr. Morones, as I told you earlier, it is not my --

it's not appropriate for me to advise you and so I'm not, but I

do want to make the record clear that at this time you do have

the right, since the Government has rested its case, to make a

motion, if you wish. And I would only suggest that you consult

with your advisory counsel about that to determine whether you

wish to make such a motion or not.

THE DEFENDANT: Your Honor, for the record, I'd like

to make a motion for judgment of acquittal.

THE COURT: All right.

Your record is made on that. The motion is denied.

Now, do you plan on testifying in this case?

THE DEFENDANT: No, Your Honor, I do not plan on

testifying in this case.

THE COURT: Do you have any witnesses to call?

THE DEFENDANT: No, Your Honor, I do not have any

witnesses to call.

THE COURT: All right.

I will -- then we will present this case to the jury

at one-thirty, and I'll ask the prosecutors to be ready with

their closing argument at that time, and then, Mr. Morones, you

may make yours, and then I will instruct the jury.

I think it's appropriate that at -- we come back here

at 1:15 so that we can make a final record on the instructions.

You've already made a record, and I'm not intending by any

means to suggest that there's any waiver, but I ask you to look

1    at those instructions.  If there are any other changes to be

2    made or any objections that you have, then we'll make them at

3    that time.

4           Until then, we will stand in recess.

5       (Recess at 11:43 a.m.)

6       (Reconvened at 1:27 p.m.)

7           THE COURT:  Thank you all.  Good afternoon and be

8    seated, please.

9           Okay.  Before the closing arguments, we need to go

10   over these instructions one last time.

11          Do you have any additional instructions?

12          MR. HOSLEY:  No, Your Honor.

13          THE COURT:  Do you have any objections in addition to

14   the ones you've already made?

15          MR. HOSLEY:  Your Honor, I don't believe I've made any

16   objections.  I think all the Court's changes to the tendered

17   instructions have made them better --

18          THE COURT:  Well, good.

19          MR. HOSLEY:  -- and we're happy with the final

20   instructions.

21          THE COURT:  Well, thank you.

22          Mr. Morones.

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  You're accepting the instructions as

25   submitted, then?

1          THE DEFENDANT:  As submitted.

2          THE COURT:  And your record is already made on them.

3    Okay.

4          Now, I just want to point out that in closing

5    arguments, it is permissible to make an objection if it relates

6    to something not in the evidence but not as to anything you

7    disagree with.

8          Let me go back to one of the things that happened

9    where you were asking one of these corrections officers a

10   question and there was an objection made and I sustained it and

11   it had to do with your speculation.  You may recall that.  The

12   objection was this is calling for speculation.  Well, now in

13   closing argument, you can speculate.  That's what I want to

14   point out because you're able to take the evidence that came

15   from the witness stand and comment about that and give your

16   interpretations to it.  And that's permissible to do.

17         But it is usually considered to be best to -- not to

18   object in somebody else's argument, if you can.  I mean, if

19   there's a reason for it, yes; but what I want to, I guess,

20   advise you, and I really shouldn't be doing this, but if you

21   pop up and down a lot during somebody else's closing, it tends

22   to aggravate the jury.  'Cause they want to hear what that

23   other person has to say.  So I think we need to give

24   Mr. Morones a little leeway in his closing argument.

25         MR. HOSLEY:  I understand, Your Honor, and I can tell

1   the Court, I rarely, if ever, object during closing arguments,

2   but I do understand that Mr. Morones is new to this process.

3          THE COURT:  Right.

4          MR. HOSLEY:  And if he attempts to, in essence,

5   testify to facts that are not in evidence, we may be forced to

6   object.

7          THE COURT:  You might be, or save it for rebuttal,

8   either one.  But you might.  But I want to keep that at a

9   minimum.

10         MR. HOSLEY:  Yes, sir.

11         THE COURT:  It's difficult enough for a lawyer to give

12  a closing argument without having his train of thought

13  derailed, and somebody that hasn't done it before, I think is

14  even more difficult.  It's like my trying to say something at

15  the dinner table.  I'm constantly overruled.

16         Let's bring in the jury now.

17         MR. HOSLEY:  Your Honor, I assume that we are confined

18  to the podium and the area behind the ELMO.

19         THE COURT:  Right.

20         The other thing I should tell you is that we have

21  these certificates of jury service, and you'll see me writing

22  up here while you're giving your arguments.  I'm signing my

23  name to a bunch of certificates, but I'll be listening.

24     (Jury in at 1:32 p.m.)

25         THE COURT:  Thank you very much.  Good afternoon, and

1  be seated, everyone.

2         Ladies and gentlemen, the evidence has come to a

3  close.  We're now going to hear closing arguments, first from

4  the prosecution, then from the defendant, and then a final

5  rebuttal argument from the prosecution; and then I will

6  instruct you with the instructions you already had, some of

7  which I've already given, but I'm going to go through all of

8  them with you.  The very first one I won't go through again

9  because if you don't know why you're here, then I certainly

10 haven't done my job up till now.

11        When you listen to the closing arguments, you have to

12 bear in mind that what the attorneys say and the defendant,

13 representing himself, says, is not evidence 'cause it doesn't

14 come from the witness stand.  But it's their way of looking at

15 these things and interpretation, inference, things that they

16 have thought about and they want you to consider in the context

17 of what you have heard from the witness stand.

18        Bear in mind that this decision is still and always

19 will be your decision, not mine, and not the attorneys'.  But I

20 think you should listen to -- or the defendant.  And I think

21 you should listen to these closing arguments to see what it

22 does to help you and perhaps you've thought about something one

23 way and this gives you a chance to look at it in a different

24 way.

25        Mr. Hosley, you ready, please?

1       MR. HOSLEY:  I am, Your Honor, thank you.

2       THE COURT:  Thank you.  Go ahead.

3                       **CLOSING ARGUMENT**

4       MR. HOSLEY:  Ladies and gentlemen, the defendant is a

5   federal inmate.  And you have heard over the last two days

6   about what in essence was a campaign of terror that he, that he

7   engaged in against the BOP officers that were supervising him.

8   This is not a campaign of terror involving bombs and guns.  It

9   was involving the weapons that he had at his disposal which

10  were his fists and were bodily fluids that he used as

11  projectiles.  He did these things in a deliberate manner, they

12  were planned, they were not reactionary, they were not

13  reflexive.  They were planned and they were deliberate, and

14  we're going to talk about that.

15      Before we discuss the evidence that you have actually

16  heard, I'd like to discuss what is evidence.  And the Judge

17  just touched upon it.  And the instructions are very detailed

18  on this, and I'm going to have you look at your binders there

19  at no. 6, if you will.

20      Hopefully we can get this up on the ELMO, if we can.

21      I'm sorry.

22      Evidence.  What is evidence.  I'll direct you to the

23  second paragraph.  The evidence in this case includes only what

24  the witnesses say while they are testifying under oath, the

25  exhibits the Judge allowed into evidence, the stipulations that

1    any lawyers agreed to, and any facts that the Judge judicially

2    noticed.

3          Then if you skip down, nothing else is evidence.

4    Lawyers' statements and arguments are not evidence.  Questions

5    and objections are not evidence.  Legal rulings are not

6    evidence.  And questions and comments during the course of the

7    trial are not evidence.

8          That's especially important here when you consider

9    that the defendant is acting as his own attorney.  And

10   instruction no. 5 and the Judge's comments just a moment ago

11   explain that.  Mr. Morones is represented to -- excuse me --

12   has decided to represent himself in this trial and not use the

13   services of an attorney.  He has an absolute constitutional

14   right to do that.

15         But, and skip down, because he has decided to act as

16   his own lawyer, you will hear Mr. Morones speak at various

17   times during the trial.  He may make opening statement and

18   closing arguments.  That's what we're doing now, making closing

19   arguments.  These things that I say, the things that he's about

20   to tell you in a few moments, these are not evidence.  You

21   heard the evidence.  The evidence are the statements and

22   testimony made by the witnesses over the last two days, the

23   photographs that you have received, the videos that you have

24   viewed, and the documents that have been received into

25   evidence.

1        And you're going to have an opportunity to take all of

2    that back into the deliberation rooms.  You're going to have a

3    laptop where you can watch the videos, where you can view the

4    photographs, where you can look at the documents, and you will

5    be able to remember after talking amongst yourselves what the

6    witnesses told you.  And I ask you to remember as you listen to

7    our closing arguments today, remember what you know to be the

8    evidence.

9        As I mentioned, this is a case about a federal inmate

10   who assaults correctional officers, specifically officers at

11   the federal Bureau of Prisons.  And as Mr. Hearty told you

12   yesterday morning, you have now viewed a little glimpse into a

13   very different world than the one we are accustomed to.  It's a

14   world of bars and doors and walls and regulations.  And those

15   regulations and those bars and those doors and those things are

16   important because it protects not only the people inside the

17   facility, but the people outside of the facilities.  It

18   protects the staff members, it protects the security of the

19   facility, it protects the other inmates that are within that

20   facility.  That's why those regulations must be followed by

21   inmates, and that's why inmates cannot decide which regulations

22   they choose to follow and which ones they do not.

23       And defendant, Daniel Morones, had a problem with

24   that.  He had a problem with the fact that he could not have

25   contraband items, such as intoxicants, in his cell.  He had a

problem with the fact that he could not have naked photographs

or other contraband in his cell.  And when officers did their

jobs and confiscated those items or when officers did their

jobs, watching him in that A100 observation cell at Florence,

he responded by attacking them.  Either through fists or

through projectiles.

The defendant ended up in the situation that he was in

entirely because of his own action, and that's important to

remember.  The defendant is an inmate because he has been

convicted of a crime.  And he is in a federal prison because he

has been convicted of a federal crime.  The defendant

originally was in general population when he was at FCI

Florence, but he was moved over to the SHU, the special housing

unit, due to his own disciplinary problems.  And as you heard

from Lieutenant Steve Hansen yesterday, inmates are moved into

a special housing unit because of serious disciplinary

infractions.  The types of infractions that affect the security

of the facility.  And so that's how the defendant found himself

in the special housing unit at the federal correctional

institution in Florence, Colorado, which is the basis for count

one.

But the defendant, his disciplinary problems didn't

stop once he moved into the SHU.  He actually had additional

problems that caused him to go into a even, an even different

and more solitary form of confinement, which was the A100

1    observation cell.  And you heard that through the

2    cross-examination of Lieutenant Steve Hansen yesterday.

3    Because if you remember, when the defendant was originally

4    moved from the -- excuse me, into the special housing unit, he

5    was placed in a normal cell, a cell that has a toilet, a window

6    to the outside world, and while he was in solitary confinement,

7    he had his own room and his own level of privacy.

8         But the defendant destroyed that cell, and you heard

9    from Lieutenant Hansen that he destroyed the toilet, kicked out

10   the window, hung out a sheet to the courtyard below.  And

11   because of that conduct, he was then moved into the A100

12   observation cell, which was immediately outside of the bubble,

13   which is, as we now know, is the officer area within the

14   special housing unit.

15        And the purpose of that cell is when you have inmates

16   who are severe disciplinary problems that go even beyond what

17   the SHU can handle, you now have an observation cell where

18   people can watch them 24 hours a day.

19        And that's actually very time-consuming on the

20   officers, as they note.  It takes away from their job because

21   they have to take that person in and out of the cell, to take

22   them to have bathroom facilities or other types of things,

23   whereas had he not destroyed his cell and he remained behind in

24   the other cell, they wouldn't have had to do those things.

25        Well, let's go to April 20 of 2009.  The defendant is

1    in that observation cell.  But he decides that he doesn't like

2    it, and he creates a disturbance.  What was the disturbance --

3    he broke the fire sprinkler within the A100 cell.  And the fire

4    sprinkler, as we know, looks very much the same as the fire

5    sprinklers in the courtroom today.

6           So now water is now flooding throughout the A100

7    observation cell and the defendant must be moved from the A100

8    cell to the B100.  And we know that the defendant is on what is

9    called a three-man lieutenant hold because not only is he in

10   the special housing unit, but the observation cell, but because

11   of his disciplinary infraction, he must be moved by a

12   lieutenant and with two other officers present.

13          And in the normal course of business, as you heard

14   through the testimony, was a one-on-one, any guard would move

15   any inmate.  But because of Morones' special circumstances, it

16   required a lieutenant and two additional officers.

17          So as the maintenance staff came to clean up the A100

18   cell and to fix the fire sprinkler, Morones was cuffed in the

19   A100 cell.  And he was moved from the A100 cell over to the

20   B100 cell, where he remained for approximately a half an hour

21   as the fire sprinkler was being fixed in the A100 cell.

22          And he remained in the cuffs while he was in the B100

23   cell.  Meaning that he had a half an hour by himself while the

24   maintenance staff in the SHU were dealing with the sprinkler in

25   the A100 cell to manipulate those cuffs and to figure out a way

out of those cuffs.  We don't know exactly how he was able to get out of the cuffs.  We heard that inmates have certain ways they can use to manipulate the cuffs.  They have a way that they can make it difficult to get a tight ratchet on the wrist.

You heard from Lieutenant Watson, when he was talking about the August 19, 2010 incident, that that's exactly how Morones placed his hands when he put his hands through the bar. He placed them side by side, not together, which would make it easier, but side by side, which the lieutenant said is one method that he has learned from his experience is a way for inmates to escape the cuffs.

We also know because we heard from the guards yesterday that a little piece of metal, a simple piece of metal, such as a piece of metal from a fire extinguisher, can be used to pick those cuffs.  So defendant Morones was taken over to the B100 cell while the A100 cell was being fixed.

And at approximately one-thirty this afternoon, Lieutenant Hansen was coming down to the B100 cell, along with Officer Vialpando, who was the SHU no. 1, and Daniel Sheriff, who was the other SHU officer, who was present up on the landing in the area where you would have to move from B100 up over the landing down to A100.  And you actually saw Mr. Sheriff at the very start of that video, which was Government Exhibit No. 1 yesterday.

And they went down and they retrieved Mr. Morones from

his cell and they began to walk him -- or excuse me, from the B100 cell and they began to walk him up those stairs to the landing which would then take them down to the A100 cell.

And we also know that there are surveillance cameras throughout the special housing unit. But those surveillance cameras are not perfect. And they do not cover every single portion of the special housing unit. There is a blind spot, a blind spot in the camera footage right there at the top of the landing on the other side of the bubble. And you heard from Officer Simms today, special SIS tech Charles Simms, who testified that while they do take some measures to attempt to conceal how the cameras are pointed, they have a, I think he called it a smoked glass bulb over the cameras that if an inmate looks long enough, he can determine where the cameras are pointed and where there are black spots or dead zones within the camera footage.

And that dead zone was immediately in front of the bubble, which was right next to the observation cell where Daniel Morones was living.

So as they came up the steps, and there was only room, and these are big men, and there's only room on those steps, really, for the lieutenant and Daniel Morones. Inmate Morones. And so as they walked up those steps, Lieutenant Hansen was holding onto inmate Morones; and in a flash, an instant, inmate Morones turned and punched Lieutenant Hansen in the face. And

 1   you heard that same testimony not only from Lieutenant Hansen

 2   himself, but also from a Officer Vialpando who was immediately

 3   behind Lieutenant Hansen and also from Officer Sheriff -- I

 4   would say Lieutenant Vialpando, he's been promoted since this

 5   time, you also heard from Officer Sheriff, who was standing up

 6   on the landing observing the incident.

 7          As a reminder, I'd like to play a portion of that

 8   video for you.  And let's take a look at Government Exhibit

 9   No. 1.

10      (Videotape played but not reported.)

11          MR. HOSLEY:  We need to rewind back to the beginning.

12          Okay.  Here we go.

13      (Videotape played but not reported.)

14          MR. HOSLEY:  Pause it for a moment.  What's important

15   to note, there is a dead zone.  When you take this video back

16   to your deliberation room, I ask you to take a look at the

17   window through the bubble, because you can see the scrum, the

18   scuffle, taking place out through the bubble on the far side of

19   the window.

20          Keep playing the video.

21      (Videotape played but not reported.)

22          MR. HOSLEY:  You heard Lieutenant Hansen talk about

23   what happened, when he stepped up onto the landing along with

24   defendant Morones, the defendant turned and punched him in the

25   face and it was the hand that contained the handcuff.

1   Lieutenant Hansen felt the blow, he said it was painful.  He

2   grabbed the defendant, wrapped him up, they went over to the

3   bubble, and eventually he was able to take them down to the

4   ground, and this is what you're viewing.

5          Officer Sheriff and Officer Vialpando and some of the

6   other officers also responded as quickly as they could.  They

7   weren't fast enough to block the blow certainly, but they were

8   fast enough to assist taking the defendant to the ground,

9   restraining him, and moving him into the A100 cell block.

10         And as they were restraining him, the defendant was

11  resisting, and you heard from the officers talk about how he

12  would stiffen his arm, he was refusing to go back into the

13  cuffs, and he was yelling things because the other inmates in

14  the SHU, they couldn't see what had happened, but they could

15  hear.

16         And you heard from Lieutenant Hansen, as he talked

17  about how Morones was yelling things downrange, in an attempt

18  to brag to his buddies about what just occurred.  And yelling

19  things such as it takes five of you to take me down, which is

20  actually very similar, you saw the video today, of the incident

21  that took place on August 19 of 2010, and in that video, when

22  you go back and watch it, listen to what Morones is saying as

23  he's being taken down the hallway and as he's being placed into

24  the shower, you can't take me one on one.  You can't take me

25  one on one.  Almost identical or at least similar theme to what

1    he was yelling back in April, on April of 2009.

2          I'd like to take a look at the elements of count one

3    because count one is different than the other offenses.  Count

4    one, if we can show the ELMO here, please.

5          While all of these offenses deal with an assault on a

6    federal officer or employee, count one has something a little

7    extra.  It alleges that there was physical contact.  It also

8    alleges that there was bodily injury.  And I'm looking

9    specifically at instruction no. 15, if you want to follow along

10   with me.

11         The law makes it a crime to forcibly assault, resist,

12   oppose, impede, intimidate, or interfere with a federal officer

13   or employee while the officer or employee is engaged in the

14   performance of his physical -- excuse me -- in the performance

15   of his official duty.  Count one alleges there was physical

16   contact by the defendant upon the victim and that the victim

17   suffered bodily injury as a result.

18         Now, to prove that offense, the Government must prove

19   the following material elements and only the following material

20   elements.  We don't have to prove that the defendant knew who

21   Lieutenant Hansen was.  Although, important to note, that

22   Lieutenant Hansen was the only SHU lieutenant at FCI Florence.

23   That means that he was the highest-ranking officer in the

24   special housing unit, that unit where this defendant resided,

25   the unit where he was now in observation cell.

Lieutenant Hansen, as he testified, ran the day-to-day operations of the SHU. And you can imagine that as the defendant finds his freedom increasingly restrained based upon his disciplinary actions, who was the person that you would associate with that, other than the person who runs the special housing unit. And that was Lieutenant Hansen.

Well, we do have to prove is that the defendant assaulted, resisted, opposed, impeded, intimidated or interfered with Steve Hansen, the victim of count one.

Second, the victim, or Steve Hansen, was a federal officer or employee who was then engaged in the performance of his official duties.

Third, that the acts were intentional.

Fourth, that in doing the acts, the defendant made physical contact with Lieutenant Hansen.

And fifth, as a result of the physical contact, the defendant -- excuse me, the lieutenant suffered bodily injury.

Well, we know there was physical contact. Because when Lieutenant Hansen made it to the top of those stairs, he was punched by this defendant. And you heard testimony from the three guards, Lieutenant Hansen, Officer Vialpando, Officer Sheriff, and they said that it was not a, it was not a spastic, out-of-control movement, it wasn't an accidental movement. They said his hand came free, he turned, and he punched Lieutenant Hansen on the right side of the face. And

1  Lieutenant Hansen was on the left side of the defendant.  So if

2  the defendant turns and punches with his right hand, he would

3  strike the lieutenant on the right side of the face.

4         Now, the lieutenant told you, I don't know if I was

5  punched with his fist or if it was the handcuff that hit me,

6  but something hit me and it hit me hard.  The other officer

7  said that he punched him in the face with a closed fist, he

8  struck him.

9         Either way, let's take a look at physical contact,

10  which is on the next page.  Whether it was the handcuff or the

11  fist, in either case, it's an assault and it's a physical

12  contact.  Physical contact means an intentional and wrongful

13  physical contact by the defendant upon the victim.  The contact

14  by the defendant and the victim need not be direct.  So it

15  doesn't have to be skin on skin.  It can be the result of an

16  indirect application of force by some substance or agency

17  placed in motion by the defendant.

18         That obviously is very important as to counts two

19  through nine, where defendant's throwing bodily fluids as a

20  projectile; but here, if you believe, well, maybe it was the

21  handcuff that caused the mark on his face and not the fist

22  itself, in either case, the defendant set that action in

23  motion.  He set forth the application of force that had the

24  substance or agency placed in motion that struck

25  Lieutenant Hansen on the face.

1           Count one also alleges bodily injury.  Now, it's

2    important here to talk about what bodily injury does not mean.

3    It does not mean that it must be serious bodily injury.  It

4    does not mean that it must be severe bodily injury.  It does

5    not mean that it must be life-threatening bodily injury.  Those

6    things are not required.  What is required and the definition

7    on page 28, it is a injury, bodily injury is an injury that is

8    painful and obvious and is the type for which medical attention

9    ordinarily would be sought.

10          Let's take a look at Government Exhibit 2A, please,

11   Lieutenant.

12          Is that obvious to you?  Do you notice that injury

13   immediately?  It seems small, but you can see the red mark

14   below the lieutenant's cheekbone, and you can see what was

15   described by the medical officer as a tear of the skin.

16          I'm having trouble with my erasing here.

17          I think my screen is frozen up on the erasing.

18          But you heard testimony from the officer himself,

19   Lieutenant Hansen, and what he told you yesterday was that it

20   hurt.  It was painful.  He noticed it immediately.  Painful and

21   obvious.  He also told you that when he went home to his family

22   that night, his wife and kids immediately asked him, what

23   happened, because they saw the obvious marks that he had on his

24   face.

25          You heard from the other officers that were present on

the scene that said that they saw that he had the marks on his
face, the red marks on his face; and you also heard testimony
from Jacque Brown-Eldred, who is now retired but she was a
paramedic at FCI Florence at the time of this injury.  And
she's the one that conducted the medical assessment and she
noted the injuries and she testified as an expert, and she told
you, my question was was the injury obvious.  And she said, it
was very obvious.  Those were her exact words.  And she told
you that it was a tear of the skin.

        Now, it could be painful and obvious or it can be the
type of injury for which medical attention ordinarily would be
sought.  And now while walking down the street here in Denver,
Colorado, if you were to get a small cut on your face, you
might not think that medical attention needs to be sought for
that.  But if you're in a prison setting and you heard of the
dangers of disease within a prison setting, and you heard that
from all of the officers who said, we don't know, we're not
allowed to know which inmates have which diseases, and you also
heard from Jacque Brown-Eldred yesterday, where she said
there's high rates of hepatitis C, HIV is a concern, there's
certain staph infections that resist antibiotics, and these
things are rampant in a prison setting.  I asked her directly,
is the injury that Steve Hansen suffered the type of injury for
which medical attention should be sought.

        And she said, yes, absolutely.  In that setting, you

1  should ordinarily seek medical attention, when you receive an

2  open wound on your face from an inmate, when you don't know his

3  medical history, especially concerning the medical diseases

4  when you have hundreds and thousands of individuals together in

5  those confined spaces such as a prison.

6        Let's go back to the elements here.  The acts must

7  have been intentional.  The defendant did such acts

8  intentionally.  Well, as the Judge explained you to yesterday,

9  it's difficult to determine someone's intent.  You can't read

10 their mind, and so you have to look at the surrounding

11 circumstances to determine if the acts were intentional.

12        Well, one thing we know is that the acts were

13 deliberate.  Because as we mentioned a moment ago, the officer

14 said, this was not a flailing motion, this was not a spastic

15 motion, he turned and he punched the lieutenant.  We also know

16 that he bragged downrange about what he had just done.  And we

17 also heard that the defendant himself admitted, one, to the SIS

18 technician, Cedric Bradley, as he was being entered into the

19 United States penitentiary following this incident, that he

20 assaulted Lieutenant Hansen or assaulted a staff officer who

21 was a lieutenant.  And he also bragged about it in a letter

22 that he wrote to an outside party.

23        And let's take a look at Government Exhibit No. 3.

24        You heard testimony from SIS tech Norma Hilde.  Her

25 job, her responsibility is to monitor the mail that is coming

in and out of the United States penitentiary facility.  And she

said that there are certain inmates, such as inmate Morones,

who are targeted because of their history.  And they want to

know the types of things that they are sending out.

So in this case, she was assigned to defendant

Morones, to read his mail, to determine what he was sending out

and what he was receiving in.  And there's a process in place

to determine that the mail is in fact coming from the inmate

they think it's coming from.  And the process is that when

they're in the SHU, in the special housing unit, they are

assigned to a cell 23 hours a day.  They don't go and drop

their mail in the mailbox.  They don't have a drop box.  They

must place it outside their bars or hand it to an officer who

comes by and retrieves the mail.  And the officer checks the

name on the mail from the outgoing inmate to make sure that the

name matches the inmates in that cell and the officer checks

the registration number to make sure that the registration

number matches the letter.

And now I ask you to go back, when you watch the

August 19 video from this year, the use of force, the only

video that has audio, the one we saw today, the lieutenant,

Lieutenant Watson, as he's debriefing or as he's doing the

initial briefing, before the use of force, he talks about

inmate Morones, and he actually states out loud inmate

Morones's registration number, and it's the same registration

1  number that is on the piece of mail that is Government Exhibit

2  No. 3.

3         And in that letter, which was in May of 2009, only a

4  few weeks after this incident on April 20, 2009, inmate Morones

5  wrote to his friend, I busted this lieutenant's dome piece,

6  punk was disrespect.  Thought I was a punk or something.  He

7  explained not only that he had done it, but why he did it.  It

8  was intentional.  It was not accidental.

9         Now, there's something called a lesser-included

10  offense, and we need to go over this, and it's only true with

11  respect to count one.  A lesser-included offense is an offense

12  that is naturally within a greater offense.  And that means

13  it's something where there is an element, in this case, a

14  single element, that needs not be proven for the

15  lesser-included offense.  What this means is count one actually

16  encompasses two offenses.  The physical contact that results in

17  bodily injury assault or an assault that doesn't result in

18  bodily injury.

19         If you believe -- and if you take a look, compare the

20  instruction no. 16 to instruction no. 15.  And this has the

21  elements, and you'll notice that the only element that is

22  missing is the bodily injury.  And the Court itself states that

23  in, in the second paragraph, the difference between these two

24  offenses is that to convict the defendant of the lesser

25  offense, the Government does not have to prove that Steve

1   Hansen suffered bodily injury.

2          The Government submits to you that that was painful

3   and obvious and that was the testimony that you received.  You

4   can look at that photograph for yourself and see how obvious

5   the injury was actually was.  We also submit to you that that

6   was the type of injury where medical attention ordinarily

7   should be sought because of the high risk of diseases within a

8   federal prison.  If, however, you decide that does not

9   constitute bodily injury, that doesn't mean that the defendant

10  is necessarily entirely not guilty of count one.  You then have

11  to look to the lesser-included offense; and if all the other

12  elements are satisfied, but not the bodily injury, you would

13  find him guilty of the lesser-included.  And the verdict form

14  represents that.

15         Please turn over to page 46.

16         Count one as written includes the bodily injury.  And

17  if you look at the jury form, there's two blanks, a not guilty

18  and a guilty.  And whoever is selected as the foreperson will

19  be responsible for ensuring that this verdict form is filled

20  out correctly.

21         If you believe that there was an assault that resulted

22  in physical contact and bodily injury, then you will check

23  guilty as to count one.  And then you're done with count one,

24  and you move on to count two.  You do not need to consider the

25  lesser-included offense.

1          If, for some reason, you do not believe that there was

2     bodily injury but you believe that all the other elements have

3     been proven beyond a reasonable doubt, then you are to look

4     down to the lesser-included offense and you would find the

5     defendant guilty of physical contact but not bodily injury.

6          I point this out to you only because it's different

7     than all of the other counts, because it must make you consider

8     if you believe that that one element is not there, you still

9     must consider the rest of the offense and the rest of the

10    elements to determine if the lesser-included should be found

11    rather than the greater.  The Government submits the greater is

12    present because that bodily injury was painful and obvious.

13         But now I wanted to explain to you how to fill out

14    that verdict form.

15         Counts two through nine are different.  Counts two

16    through nine do not consider whether or not there was bodily

17    injury because there wasn't bodily injury in counts two through

18    nine.  But there were assaults.  And they were the same types

19    of assaults in terms of the deliberation and the reasoning as

20    count one, but they were different in how they were actually

21    carried out.  Because we know that after the incident that took

22    place in April of 2009, the defendant was moved up to the

23    United States penitentiary.  At the time of his introduction,

24    again, he talked to SIS tech Cedric Bradley, and he admitted

25    that he had assaulted the lieutenant.  He also wrote that

1  letter.

2          At a point after that, he was transferred from FCI

3  Florence, which is in Florence, Colorado, to FCI Englewood,

4  which we know is in the greater Denver area, here in the state

5  and district of Colorado as well.  And once he was placed into

6  FCI Englewood, he was again taken to the special housing unit

7  based upon his disciplinary history.

8          Now, the defendant, in October of 2009 decided that he

9  was going to brew his own intoxicants.  And so in his cell on

10  the A range of the special housing unit, Officer Mansukhani, on

11  October 25, 2009, smelled the odor of intoxicants coming from

12  the defendant's cell.  And we know that that is a bad thing.

13  It is a bad thing to have inmates in a federal prison getting

14  drunk.  For all the reasons that Officer Mansukhani discussed

15  yesterday.  Which is that it endangers the security of the

16  facility.  It endangers the other inmates.  It endangers the

17  staff.

18          And so the following morning on October 26, 2009,

19  Officer Mansukhani, who is the SHU no. 1, decided that he had

20  an opportunity to go in and search the cell.  He waited for the

21  defendant to be removed from his cell and taken to recreation.

22  And you remember from the testimony that while they are in

23  their cell for 23 hours a day, there is an hour where they are

24  removed from the cell and they are taken to get recreation

25  time.  And the reason why he waited is because by waiting for

defendant to leave his cell, there is less of a risk of a

confrontation.  The person is not there, you don't have to

physically remove him.  You can then go into the cell and

search the belongings in the cell.

Let's remember, too, while it may seem somewhat

offensive to us, oh my gosh, they're coming in and searching

his things, this is a prison.  And inside of prisons are people

who have lost the freedoms that they have in the outside world

through their own actions and conduct.  And the guards within

those prisons must ensure there are not things such as weapons,

contraband, intoxicants, drugs, or other items that pose a

security threat to the facilities.

And so since Officer Mansukhani the day before had

smelled those intoxicants, he went into the cell; and what did

he find, some plastic containers that contained a homemade

brew, prison hooch, and he explained to you how prison hooch or

homemade intoxicants are made, that they use food-service items

and they essentially let them sit and rot and ferment until

there's an alcohol content.  And to determine that that was

actually what it was, he used a intoximeter and came back with

a reading that had showed it had a alcohol base to it.

So Officer Mansukhani, once the defendant returned,

instructed the defendant about what had happened.  He went to

him face to face, he talked to him man to man, explained to

him, I found these intoxicants, I confiscated them, you're

going to get a disciplinary report.  Disciplinary reports are

bad, inmates don't like them, because they lose privileges, and

the defendant was upset.

But he didn't do anything at that moment, and actually

Officer Mansukhani said to you, he actually seemed pretty calm,

stared at him, did not have any response.  These are not

immediate actions or reflexive, these are actions that are

deliberate, because Officer Mansukhani left for approximately a

half an hour.  And during that time, the defendant staged a cup

of feces and urine and prepared to throw it on

Officer Mansukhani.

How do we know that it was targeted specifically at

Officer Mansukhani?  Well, because you heard from Shawn

Rafferty yesterday, who was working with Officer Mansukhani

that day.  And he explained that as they went by to pick up the

trays from the food, the meal, that defendant Morones asked

specifically to speak to Officer Mansukhani.  And Shawn

Rafferty said, well, hey, is it something I can help with you?

No, I need to talk to Officer Mansukhani.

So Rafferty went down to find Officer Mansukhani, who

was the SHU no. 1, informed him that defendant Morones wanted

to speak to him.  And Officer Mansukhani walked down to

defendant Morones' cell, and we saw what happened.

And let's take a look at the video here.  This is

Government Exhibit No. 4.  We're going to start this, because

there is a long lag at the beginning, we're going to start this
where Officer Mansukhani is talking to defendant Morones at
Morones's cell, and he's explaining to him why he took the
intoxicants and why it was necessary to take the intoxicants.

(Videotape played but not reported.)

MR. HOSLEY:  Defendant Morones he said was becoming
agitated, angry, upset that Officer Mansukhani had gone into
his cell.

Let me stop there.  We've all seen this video.  You
can watch it in the back room.  It's hard to see on the big
monitors, but when you watch it on the laptop, you can see the
substance flying out of the cell on Mansukhani.  Let's take a
look at 5C, because this was the wall behind Mansukhani.  And
again, it's more difficult on these big monitors where you see
these far away, but that is where the feces and the urine
struck the wall behind Mansukhani after it was thrown by the
defendant from a cup.

How do we know it's feces and urine.  Let's be honest
here, we didn't do scientific testing.  We didn't send this off
to the FBI lab in Quantico, we didn't have Colorado Bureau of
Investigations conduct forensic analysis.  We know things are
feces and urine because we all have common sense and we're all
adults, and at some point in our life, either from ourselves or
our children, we have smelled feces and urine, and you know
what it is when you see it.

1      And Officer Mansukhani knew what it was as it struck

2  him in the face, the torso, he said it hit him on the forehead,

3  and then the defendant also stated a few things.  Now, with

4  Officer Trujillo, he said something far worse, but he told

5  Officer Mansukhani, this is my house, stay out of my house.

6  This was an intentional act.  This was not an accident.  You

7  don't stage a cup of feces and urine and throw it onto an

8  officer and tell him to stay out of your cell.  It was a direct

9  response to the fact that the officer found and confiscated the

10  homemade intoxicants in the defendant's cell that morning.

11      But that wasn't the end of this conduct.  As we know,

12  there was another incident.  In August, specifically August 19

13  of 2010, this very year, and that involved Officer Trujillo.

14  Now similar to Officer Mansukhani, the day before, when the

15  defendant was out of his cell, on August 18, Officer Trujillo

16  participated in a search of the defendant's cell, along with

17  Officer Brian Kemp.  The search was being done because they

18  were moving the defendants' things from one cell to another.

19  And he explained to you that there's a 21-day period where they

20  move defendants, move inmates from their cells because they

21  don't want them to get too comfortable in that cell, they don't

22  want them to attempt to escape and to have to keep them

23  constantly moving in order to ensure the security of the

24  facilities.

25      So as they were conducting the cell move, the officers

searched the belongings of the defendant to ensure that there

are no contraband, weapons, homemade intoxicants.  And they

found a photograph of a naked woman.  Which Officer Trujillo

explained to you is not permitted at FCI Englewood.  And so

Officer Trujillo took the naked photograph, gave it to his

supervisor.  He didn't see Morones that day.

He did see him the following morning when

Officer Trujillo reported for work and began the breakfast

hand-out on the A range at the SHU on FCI Englewood.  And as he

handed the breakfast tray to defendant Morones, through the

little slot in the grille, as you heard it called, which is the

set of bars, there's the sliding solid metal door and then

there's the bars.  And he handed the food through the slot,

Morones asked him, why did you take my stuff, or there was a

different word, four-letter word, used, but I'll stick with

stuff.  Why did you take my stuff.  And he explained to

defendant Morones that it was contraband, that he had handed it

off to his supervisor; if the supervisor determined that he

could have it back, he would get back, but it was his belief

that this was a not permitted item.

Now, now, there is a system in place, if a defendant

has a conflict with a guard.  And you heard that today from

Lieutenant Watson; you can report the guard, the act will be

investigated, the initial investigation will happen there, and

then there could be an outside team brought in to investigate

1  if there was something substantiated.

2         Defendant Morones didn't want to avail him several of

3  this process, he wanted retaliation.  Mansukhani searched his

4  cell and he got things thrown on him.  And Officer Trujillo was

5  about to get the exact same conduct.  Because when

6  Officer Trujillo came back later that day to pick up the trays,

7  Morones had something waiting for him as well, just like he had

8  something waiting for Mansukhani back in October of 2009.

9         And let's watch that video.

10        Let's skip ahead to the point -- you'll have the

11  entire video, but I'm going to go to the point Officer Trujillo

12  goes to retrieve the tray from inmate Morones' cell.  And

13  remember hearing the testimony from Officer Trujillo that as he

14  went to get the tray --

15     (Videotape played but not reported.)

16        MR. HOSLEY:  -- inmate Morones threw the tray out of

17  the tray slot and it fell on the floor.  And this is what

18  happened as Officer Trujillo bent down to get it.  And even on

19  this big screen here, you can see the substance flying out of

20  the cell at Officer Trujillo.

21        And Officer Trujillo took a step forward, maybe he

22  lost his cool, maybe he was defending himself; but let's be

23  sure about something, the assault happened before

24  Officer Trujillo made that step towards the cell.  The assault

25  was done; when that liquid, when that bodily fluid was thrown

onto Officer Trujillo, striking him in the body, striking him

in the face, the arm, the assault was completed.

Now, Officer Trujillo said his initial instinct was to

step forward and to protect himself.  Defendant yesterday in

his cross-examination tried to hint and say, is it your

practice to assault inmates with a tray.  You didn't see that,

there's no assaulting with a tray.

And there's another important point here as well.  Is

that the inmates, once again, have a process by which they can

complain.  And after an incident or altercation between a guard

and inmate, even if it's an inmate assaulting a guard, the

standard operating procedure is to do a medical assessment of

the inmate to assure that there were no injuries sustained.

Now, it's protection measure for the officers, to protect

against false claims, and it's also to determine if there was

an incident that needs medical attention.

And the defendant, rather than submitting to a medical

assessment, if he actually was assaulted, which he wasn't, he

barricaded himself in his room, hung up a sheet, and refused to

be seen by Lieutenant Watson when he was doing the

confrontational avoidance that led up to the last incident.

And that tells you that there was no assault by

Officer Trujillo, but there was certainly an assault by

defendant Morones upon Officer Trujillo.  And what person who

has just had bodily fluids, semen, urine, feces, thrown upon

1    your body and then had someone tell them, now you got AIDS,

2    after they just had that bodily fluid thrown upon them, what

3    person would not have an immediate emotional reaction.  That's

4    natural.  That's natural.

5           There was a lot of talk about what was this substance.

6    Again, we don't have forensic laboratory testing on the

7    substance.  Let's take a look at Officer Trujillo's shirt.

8    This photograph was taken by a different officer, but

9    Officer Trujillo said that the shirt itself was in the same

10   condition it was when he took it off for the photographs to be

11   taken, and it was taken a short time after the incident that

12   you've just watched.

13          Let's go to the corner there.  And if you can zoom in

14   for me just a little.  Right where you were.

15          Now, we are all adults.  We have all seen various

16   types of bodily fluids, and I ask you to go back in

17   deliberation and ask yourself, what type of bodily fluid

18   adheres to a shirt like that.  Water doesn't puddle up and sit

19   on a shirt for minutes and minutes afterwards.  Semen does.

20   And defendant Morones himself alerted Officer Trujillo to

21   exactly what that substance was when he told him that he had

22   AIDS.

23          And again, these officers, they don't know the medical

24   history.  Because of privacy rules, they're not privy to that

25   information.  And you saw the anguish from Officer Trujillo as

he had to recount what was running through his mind after he
had had that substance thrown upon him and after the defendant
told him that he had AIDS, and you heard Officer Trujillo as he
talked about, I have a family.  And imagine what these officers
must think when they go home, am I going to transmit something
to my wife, did I get something from this inmate, they don't
know.  They don't know what he has.  They do know that
hepatitis, HIV, and these other types of communicable diseases
are rampant throughout these facilities.

So defendant Morones decided that he was not going to
submit to the medical exam, to come out of the cell, and he was
not going to allow himself to be cuffed.  He was going to
string a sheet up across his cell, obscuring from the guards
eye vision what was going on.  Was he making weapons.  Did he
have other types of contraband.

Now we know what he was doing.  Over the two plus
hours, Lieutenant Watson repeatedly explained that he attempted
to get Morones to come out of the cell, attempting
confrontational avoidance, the officers don't want a
confrontation.  The officers don't want to risk their careers
through injury by going into a cell, they don't want to risk
their health by getting injured going into a cell, especially
when there's a sheet tied up and they don't know what's waiting
on them from the other side of the sheet.  They don't know what
the defendant has in there.

1          We know now.  When these officers went to the cell and

2     they saw the defendant, he was preparing himself in that two

3     hours for the use of force that was to come, the use of force

4     that he easily could have avoided by just simply submitting to

5     the request to come out, get a medical assessment and get

6     restraints.  He was staging feces, urines and other vile bodily

7     fluids behind that sheet.

8          And we know that, because when they got there, those

9     things were ready; and more than once, he threw those over the

10    sheet onto the officers waiting outside of the cell.  And he

11    was also preparing himself because these inmates know how these

12    processes take place.  What did defendant Morones do.  He had

13    garments, blankets, things wrapped around his body that would

14    resist in some ways the pepper spray that was going to be

15    sprayed into his cell.  Because, remember, that's not just --

16    they said there is a small inhaling-type effect, but it's

17    mostly a bodily contact effect.  Whether it gets onto your

18    skin, it burns, those types of things.  And the inmate prepared

19    himself against that.

20         And so as the officers came to his cell, I'm sorry to

21    show this to you again, because I know it's disturbing; but

22    we're going to watch a portion of the incident from August 19,

23    2010, as the officers go and attempt to get Morones to leave

24    the cell.

25         MR. HOSLEY:  Let's begin.

1    (Videotape played but not reported.)

2          MR. HOSLEY:  Pause it a moment.

3          Something important there.  There's a lot discussion

4    today in the cross-examination of Lieutenant Watson by

5    defendant about you should have tried harder, maybe you could

6    have been, done more verbally to avoid a confrontation.  What's

7    important there and let's remember, this video is taken as it

8    happens.  This is not something that's occurring for purposes

9    of a courtroom.  And what did the lieutenant just say to him.

10   He said we're going to attempt confrontational avoidance again,

11   we're opening your door again.  Because they had been trying

12   for two hours to get him to come out of his cell, to avoid the

13   very incident that was about to happen.  And this is all

14   avoidable by this defendant, but he was making preparations for

15   this.

16          Play.

17     (Videotape played but not reported.)

18          MR. HOSLEY:  Threw my pictures away.

19     (Videotape played but not reported.)

20          MR. HOSLEY:  All right.

21          So you saw what occurred when the officers went to

22   attempt to get the defendant out of his cell.  They tried

23   confrontational avoidance again, the final option, the final

24   chance to come out and avoid all this.  But he didn't want

25   that, because they had thrown his pictures away.  And that's

why this occurred.  That's why the assault on Officer Trujillo

occurred, and that's why this occurred.

And so you saw from the video Dominic Davis and you

heard testimony from, he's the one up front holding the shield

and he saw that shield and the officers being doused with that

vile concoction of feces and urine as it was flying over that

sheet onto those officers.  And you heard from Officer Davis as

he testified, that even through the gas mask, he could smell it

and he was retching almost, almost gagging inside of his gas

mask because of the stench.  And he said that even with all of

that protective gear, that the fluid was dripping down into his

neck, onto his back, where he did not have any protective gear,

onto his clothing onto his bare skin.

And you saw Officer Micah Morse, he's the trained man

authorized to administer the gas, authorized by the warden

himself.  And he also testified as to how he did not have any

protective gear, and that he was struck.

And you saw the video that was being taken by

Lieutenant Michael Browning, and you heard his testimony.  And

you saw the splatter hitting the camera, and you could even

hear it as it's hitting the microphone; and the rest of that

video, there is a droplet of bodily fluid up in the right-hand

corner of the, of the lens.  And you heard him testify about

how it was hitting his bare head, bouncing off the walls; and

when he removed his gas mask, he actually had a line from the

1 bodily fluids that struck him.

2        And you heard from Lieutenant Watson as he testified

3 that like the -- like Lieutenant Browning, and like Micah

4 Morse, he did not have protective gear on other than the mask

5 and the bodily fluid hit him as well.  Hit him on the skin, on

6 the body.

7        These were the defendant's actions.  The defendant --

8 well, why didn't you cuff me up after I assaulted you.  Well,

9 Lieutenant Watson explained that he was going to take the risk

10 that this defendant, who had a history of assaultive conduct, a

11 history of getting out of handcuffs was going to assault him

12 further.  So he had him lay down on the ground.

13        Why didn't you, you know, give me one more chance, why

14 didn't you talk more.

15        The assault ends when that liquid, that feces strikes

16 those officers.  Could the officers have done things better

17 from that point on, maybe.  Can we Monday morning quarterback

18 them and go in from an office months later or weeks later,

19 watching a video in an office, not there, saying maybe you

20 should have done this; ultimately you'll have a chance to look

21 at that after-action report, that we submitted into evidence,

22 after the defendant read selected portions and the ultimate

23 finding was that was a reasonable use of force.  There were

24 some things that they can do better, and the officers are not

25 perfect, but they're doing their jobs, and they're only acting

1  in the course of their duties when they have been repeatedly

2  assaulted by this defendant.

3         I want to look at the elements briefly of counts two

4  through nine.

5         Now, like the lesser-included offense, no physical

6  contact is necessary.

7         First that the defendant forcibly assaulted, resisted,

8  opposed, impeded, or intimidated the named victim.

9         What is a forcible assault.  That's on the next page.

10  Flip over.  Forcible assault means an intentional attempt or

11  threat to inflict injury upon someone else, when coupled with

12  an apparent ability to do so, and it includes an intentional

13  display of force that would give a reasonable person cause to

14  expect immediate bodily harm regardless of whether or not the

15  threat is or the attempt is actually carried out or the victim

16  is injured.

17         The fact that these guards didn't get AIDS, the fact

18  that they didn't get hepatitis C, that doesn't mean it's not an

19  assault.  The fact that the injury did not actually occur does

20  not mean that it's not an assault.  When you're throwing bodily

21  fluids on someone, when you're telling them that they're going

22  to get AIDS, is that not at least a threat to bodily injure.

23  To injure someone's body.  Would a reasonable person not expect

24  immediate bodily harm as an inmate in a prison setting is

25  throwing, semen, urine, feces upon them?

1    It's not just the forcible assault.  We talk about

2  this as an assault on a federal officer.  That's the heading.

3  But there are also other things here as well.  The person, the

4  defendant forcibly assaulted or resisted or opposed or impeded

5  or intimidated or interfered with the named victim.  When you

6  go and do your job and confiscate an item from a defendant's

7  cell that they're not allowed to have, such as homemade

8  intoxicants, and then you go and you tell that defendant,

9  here's what I did, here's why I did it, and then that defendant

10  assaults you by throwing feces and urine on your face and then

11  tells you, stay out of my house, is that intimidation?

12    Don't come back here and search my things again.  Is

13  that not interference?

14    Have you not interfered with that officer's ability to

15  do his job if every time he goes and confiscates an unlawful

16  item, he's going to get slimed with feces and urine?

17    Is that not opposition, have you not opposed that

18  guard's ability or attempt to do his job by throwing those

19  items upon him.  Has he not opposed the individuals who are

20  attempting to go into the cell to get him to take down that

21  sheet so they can see what he's doing behind that sheet.

22    Is it not intimidation when you throw feces or urine

23  or semen on someone and tell them they have AIDS?  Does that

24  not make people hesitate to do their jobs again.

25    You heard from Officer Mansukhani say in some ways,

that in some ways he's changed his behavior.  He doesn't go down face to face with inmate Morones.  He sends someone else when he can avoid to go down there.  I hate to say it, but to a certain degree, it works.  Defendants, inmates do not get to set the terms and conditions of their imprisonment; guards do. The Bureau of Prisons does.

And these guards are doing their jobs.  They're all employees of the federal Bureau of Prisons.  And they're doing the job of keeping the public safe.  Safe from people like the defendant, and now they're asking you to protect them from the defendant.  He is guilty.  He needs to be found accountable for his actions, he needs to be held accountable.  And we ask you to return guilty on all counts, including the greater count in count one.

We thank you for your service.

### CLOSING ARGUMENT

THE DEFENDANT:  Ladies and gentlemen of the jury, I thank you for your time and patience during this trial.  I was happy to tell you in the beginning that it would be a quick one.  I know that all of you more than likely have families, jobs, homes, pets, friends, and even cattles to attend to.

We have seen during this short court -- I'm sorry -- what you have seen during this short court is this trial -- there are trained professionals speaking of professionalism but not showing professionalism.  You heard a lot of talk about

that today when numerous officers were on the stand.  And the

only answer is there, there was a lot of I don't know, I don't

know, when asked about policy, procedures, protocol, and

regulation, that was lot of I don't know.  I don't know if that

was a tactic that they were told to do to perform while under

questioning; I don't know if it worked or not.

Now, what Mr. Hansen, there's no evidence saying that

I hit him.  In fact, the video shows that he hit his head on

the floor.  I move to ask the Government to show Exhibit 1 at

1:33:07.

MR. GUILLORY:  1:33:07?

THE DEFENDANT:  Yes, sir.

(Videotape played but not reported.)

THE DEFENDANT:  You see right to -- stop it.  He, he

hits his head.  It's clearly.  I asked Mr. Hansen if he felt

that impact.  I also asked him how much he weighed.  He said, I

believe it was 260 or 250, around that.  If you're a heavy

fellow and you hit your head like that, I'm sure the hit will

register.  But he said that he didn't.  He didn't know.

You were shown pictures of his face, the injuries that

he received they said that it was from a handcuff striking him.

But now if we go back to Mr. Sheriff's statement,

Mr. Sheriff wrote a report on the date of the incident.

Several officers wrote reports.  And several officers state

that they saw Mr. Morones strike Lieutenant Hansen, but

1   Mr. Sheriff said that, in his report, he said that he didn't

2   see that.  He didn't make note of it.

3          Now, when I asked him, he said that I hit him.  But I

4   know one thing about the BOP, and I know they do not leave the

5   most important piece of their incident out.  That's just

6   something they don't do.  Despite all the stepping outside of

7   professionalism and integrity.

8          You also heard Mr. Mansukhani's testimony about how he

9   wasn't supposed to step outside of official duty.  But he did.

10  Instead of dispatching an officer assigned to perform the duty,

11  like when Mr. Rafferty, the officer of that day spoke, he said

12  it's normally done by another officer, they do that.  We, I

13  asked Mr. Mansukhani, is it a common practice to take the no. 1

14  key down cell block range, and you know, he stated that it was

15  a common practice that they all do, but Mr. Rafferty said that,

16  no, we do not do that, that's something we don't do.  That's

17  jeopardizing the security.  What happens when you jeopardize

18  security?  You put everything in a unstable environment.

19         Now -- excuse me.  As you seen, after I questioned the

20  officers, then Mr. Hosley, the Government gets, another

21  reproach to it, he gets to kind of lessen what I said or

22  lighten it up or I believe it's to clarify.  For you guys to

23  see.

24         If you turn to page 32 of your jury instructions, if

25  you go down to the bottom, it says -- if you look at the

screen, you'll see a arrow pointing.  It says a federal officer

is engaged in the performance of his official duties if he is

acting within the scope of what he is employed to do rather

than engaging in a personal frolic of his own.

I asked him several times if he was supposed to do

that, and he said no.  I also stated clearly was that your

official duty.  He danced around the subject, said, well, you

know, we normally do this, we normally do this.  In his line of

corrections work, he normally performs a cell shakedown search.

Now, instead of dispatching the official officer to do that,

which was the proper thing to do, he didn't do that.  And

that's around a lot of issues or subjects that I brought to the

attention during cross-examination.

You heard Mr. Trujillo's shaky testimony yesterday

about whether he was uncertain what semen was compared to

feces.  But he made it clear several times that he said, no, I

smelled feces.  He also said, I smelled shit, that's what it

was and he felt that he had to yell about me, are you a man of

this or a man of that.  And you also see he, what he did with

the tray.

Let me make note, there was never any feces that day.

There would have been pictures of it and more notation of it.

That morning, breakfast was oatmeal.  He picked up the tray, he

also told you guys he normally wears gloves because the trays

tend to spill and the contents leak out.  So I dropped the

tray, he picks up the tray off the floor, and does a motion

like that.  I asked him if contents would have spilled out and

leaked on him.  He said he didn't know or he was more likely

sure that that wouldn't happen.  But he also stated earlier

that he wore the gloves because that type of thing happens.

So then again, we hear a lot of shaky testimonies, we

hear a lot of I don't knows, I don't know, I do not know.  And

it makes you wonder, it's what I pointed out in my opening

statement when, when, when I met you guys, when the jury was

brought into the court.  I said . . . the Government,

Mr. O'Hilly, Mr. Hosley seemed to spend a lot of their time

telling you what they think the evidence means and who they

think the defendant is; and I also said, I would advise you to

listen to the evidence and let your common sense tell you what

it all means.  And even though most of the case appears to be a

one-sided spectacle, there are two lenses, two sides of the

story.  What happened and why.

I also said that there are thin lines that yield sharp

points and they are at risk of being overlooked.  That here is

what I am talking about today.  What I am bringing to your

attention in my closing statement, my closing argument.  I'm

not going to go into a big shindig of, of kind of in comparison

to Mr. Hosley's because I'm not a trained lawyer, I'm not a

trained attorney.  I'm not a professional attorney.  I'm not a

professional correctional officer or correctional lieutenant.

1  So there's a lot of things I'm limit to -- limited to because I

2  do not have the training to do.  I am merely another civilian,

3  like yourselves, and if you were in my shoes, I'm pretty much

4  doing what, the best of my ability, could do with the best of

5  your ability could do.

6       I'm not going to ask you don't sign guilty or not

7  guilty, I'm not going to go there.  I'm just going to leave

8  what you guys seen today and what I've brought you to today as

9  my closing argument.  And I'm not going to waste your time and

10 carry this on 'cause I know I shouldn't.  And there's more

11 things I should have brought to your attention, but I'm going

12 to leave it at that.

13       Thank you, Your Honor.

14       Thank you, jury.

15       Thank you.

16       MR. HOSLEY:  I'll be brief, Your Honor.

17       THE COURT:  All right.

18                    **REBUTTAL ARGUMENT**

19       MR. HOSLEY:  Ladies and gentlemen, oatmeal doesn't

20 give you AIDS, common sense tells us that.

21       THE DEFENDANT:  I object, Your Honor.

22       THE COURT:  Overruled.

23       MR. HOSLEY:  Oatmeal does not give you AIDS, and when

24 that substance is flying through the door, that's not

25 Officer Trujillo slipping and spilling something on his hands

from the tray.  Common sense tells us that as well.

Professionalism, the defendant wants you to believe that these officer are unprofessional.  Maybe they have something out for him, there's a vast conspiracy out to get him.  Go back and take a look at that video you watched today. I know it's uncomfortable; if you desire, you can slip over the flying feces striking the camera.  Watch the beginning.  Watch the professionalism by which those officers operate.  It's regiment, it's structure.  This is not a bunch of officers on a personal frolic.  These are officers doing their jobs.

And for the defendant to imply that Officer Mansukhani was on a personal frolic when, as requested by the defendant, he walked down there to address what the problem was in the SHU.  Officer Mansukhani was the SHU no. 1.  He was responsible for what was going on in the special housing unit that day, and he went there to take care of an issue and talk to an inmate, and he was assaulted as a result of it.

When you're in the facility dealing with inmates, you're on Bureau time, you're not on personal time.  When you're in the facility dealing with the security of the facility, that all officers are required to deal with, you're on Bureau time.  You're not on personal time.  These officers are professionals.  These officers were doing their jobs, and as a result of doing their job, they were assaulted by this defendant.  Hold him accountable.  Do not allow him to dictate

 1  how these officers do their job.  Do not allow him to

 2  intimidate these officers.  Hold him accountable.  Find him

 3  guilty.

 4       THE COURT:  Ladies and gentlemen, if you get the

 5  instructions out, we'll go over them now.

 6                        **JURY INSTRUCTIONS**

 7       THE COURT:  The preliminary instruction on page 1 was

 8  given, and it's not necessary to repeat it.

 9       The instruction no. 2 is the introduction, and it's on

10  page 13.  I need not repeat that.  I've gone over that with you

11  in detail.

12       I'm going to start with instruction no. 3 on page 14.

13  You as jurors are the judges of the facts, but in determining

14  what actually happened; that is, in reaching your decision as

15  to the facts, it is your sworn duty to follow all the rules of

16  law as I explain them to you.  You may not disregard or give

17  special attention to any one instruction or question the wisdom

18  or correctness of any rule I may state to you.  You must not

19  substitute or follow your own notion or opinion as to what the

20  law is or ought to be.  It is your duty to apply the law as I

21  explain it to you regardless of the consequences.

22       In your deliberations, you must see to it that no one

23  else on the jury ignores the instructions or attempts to decide

24  the case on anything other than the law and the evidence.  It

25  is always to be borne in mind that our collective commitment is

to equal justice under the law.  Matters of race, creed, color,

nationality, and gender have no place in this process.  To the

best of your ability, you are to judge others as you would want

others to judge you under the law I give you.  The very heart

of justice is that all apply the same law to the same evidence

and leave our personal desires out of it.

You should not read into these instructions or

anything else I may have said or done any suggestion as to what

your verdict should be.  That is entirely up to you.  It is

also your duty to base your verdict solely upon the evidence

without prejudice or sympathy.  That was the promise you made

and the oath you took.

No. 4 on page 15, the presumption of innocence, burden

of proof, and reasonable doubt.

The indictment or formal charge against the defendant

is not evidence of guilt.  Indeed, Mr. Morones is presumed by

the law to be innocent.  The law does not require him to prove

his innocence or produce any evidence at all.  The Government

has the burden of proving the defendant guilty beyond a

reasonable doubt, and if it fails to do so, you must find

Mr. Morones not guilty.

Proof beyond a reasonable doubt is proof that leaves

you firmly convinced of the defendant's guilt.  There are few

things in this world that we know with absolute certainty, and

in criminal cases, the law does not require proof that

overcomes every possible doubt.  It is only required that the

Government's proof exclude any reasonable doubt concerning

Mr. Morones's guilt.

A reasonable doubt is a doubt based on reason and

common sense after careful and impartial consideration of all

the evidence in the case.  It is a doubt based on the evidence

and not on a hunch, a guess, or a whim.  If, based on your

consideration of the evidence, you are firmly convinced that

the defendant is guilty of the crimes charged, you must find

him guilty.  If, on the other hand, you think there is a real

possibility that the Government has failed to prove his guilt,

you must give the benefit of the doubt and find him not guilty.

No. 5, *pro se* defendant, on page 16.

*Pro se* is a Latin term meaning "for himself."

Mr. Morones has decided to represent himself in this

trial and not to use the services of a lawyer.  He has a

constitutional right to do that.  His decision has no bearing

on whether he is guilty or not guilty, and it must not affect

your consideration of the case.  Because he has decided to act

as his own lawyer, you will hear Mr. Morones speak at various

times during the trial.  He may make an opening statement and

closing argument.  He may ask questions of witnesses, make

objections, and argue to the Court.  I want to remind you that

when he speaks in these parts of the trial, he is acting as a

lawyer in the case, and his words are not evidence.  The only

1  evidence in this case comes from witnesses who testify under

2  oath on the witness stand and from exhibits that are admitted.

3          Instruction no. 6, evidence defined.  On page 17.

4          You must make your decision based only on the evidence

5  that you see and hear in court.  Do not let rumors, suspicions,

6  or anything else that you may have seen or heard outside of

7  court influence your decision in any way.  The evidence in this

8  case includes only what the witnesses say while they were

9  testifying under oath, the exhibits that I allow into evidence,

10  the stipulations that the lawyers agree to, and the facts that

11  I judicially notice.

12          Judicial notice is my recognition of commonly accepted

13  facts such as time, date, and place, as well as matters such as

14  existing government regulations.  Nothing else is evidence.

15  The lawyers' statements and arguments are not evidence.  Their

16  questions and objections are not evidence.  My legal rulings

17  are not evidence.  And my comments and questions are not

18  evidence.

19          During the trial, I may not let you hear the answers

20  to some of the questions that the lawyers or the defendant

21  asked.  I may also rule that you cannot see some of the

22  exhibits that the lawyers or defendant want you to see.  And

23  sometimes I may order you to disregard things that you saw or

24  heard or I may strike things from the record.  You must

25  completely ignore all of these things.  Do not even think about

them.  Do not speculate about what a witness might have said or

what an exhibit might have shown.  These things are not

evidence and you are bound by your oath not to let them

influence your decision in any way.

Instruction no. 7 on page 18, evidence direct and

circumstantial.  Inferences.

Generally speaking, two types of evidence are

available from which you may properly determine the facts of

the case.  One is direct evidence, such as the testimony of an

eyewitness.  The other is indirect or circumstantial evidence;

that is, the proof of a chain of facts which point to the

existence or nonexistence of certain other facts.

As a general rule, the law makes no distinction

between direct and circumstantial evidence.  The law requires

that you find the facts in accord with all the evidence in the

case, both direct and circumstantial.

While you must consider only the evidence in this

case, you are permitted to draw reasonable inferences from the

testimony and exhibits, inferences you think are justified in

the light of common experience.

An inference is a conclusion that reason and common

sense may lead you to draw from facts which have been proved.

By permitting such reasonable inference, you may make

deductions and reach conclusions that reason and common sense

lead you to draw from the facts which have been established by

1    the testimony and evidence in this case.

2            Instruction no. 8, credibility of witnesses, page 19.

3            It is your job to decide whether the Government has

4    proved the defendant's guilt beyond a reasonable doubt.   In

5    doing so, you must consider all of the evidence.   This does not

6    mean, however, that you must accept all of the evidence as true

7    or accurate.   You are the sole judges of the credibility or

8    believability of each witness and the weight to be given to the

9    witnesses' testimony.

10           An important part of your job will be making judgments

11   about the testimony of the witnesses who testify in this case.

12   This includes the defendant if he chooses to testify.   You

13   should think about the testimony of each witness you hear and

14   decide whether you believe all or any part of what each witness

15   has to say and how important that testimony is.   In making that

16   decision, I suggest that you ask yourself a few questions:

17           Did the witness impress you as honest?

18           Did the witness have any particular reason not to tell

19   the truth?

20           Did the witness have a personal interest in the

21   outcome in this case?

22           Did the witness have any relationship with either the

23   Government or the defense?

24           Did the witness seem to have a good memory?

25           Did the witness clearly see or hear the things about

1 which he or she testified?

2        Did the witness have the opportunity and ability to

3 understand the questions clearly and answer them directly?

4        Did the witness's testimony differ from the testimony

5 of other witnesses?

6        When weighing the conflicting testimony, you should

7 consider whether the discrepancy has to do with a material fact

8 or with an unimportant detail.  And you should keep in mind

9 that innocent misrecollection, like failure of recollection, is

10 not uncommon.

11        Defendant did not testify, and so the following

12 sentence does not apply in this case.  As I previously

13 instructed you, the Constitution provides that a defendant has

14 the right to elect not to testify.  That's what happened in

15 this case.  And you may not under any circumstance draw any

16 kind of adverse inference against him for exercising his right

17 or his election not to testify.

18        In reaching a conclusion on a particular point or

19 ultimately in reaching a verdict in this case, do not make any

20 decisions simply because there were more witnesses on one side

21 than the other.

22        No. 9, prior conviction, page 21.

23        You have heard evidence that the defendant has been

24 convicted of a felony and is a prison inmate.  A felony is a

25 crime punishable by imprisonment for a term of years.

Mr. Morones' conviction has been brought to your attention only because he was a prison inmate at the time of these alleged crimes.  The fact that the defendant has been convicted of another crime does not mean that he committed any crime charged in this case, and you must not use his previous conviction as proof of the crime charged in this case.  You may find him guilty of a crime charged here only if the Government has proved beyond a reasonable doubt that he committed it.

And then I did give this instruction.  I'll do it again.  If Morones, Mr. Morones, elects to testify, I will instruct you that the credibility of his testimony is to be judged the same as you will the testimony of any other.  He did not elect to testify, and therefore that does not apply as well.

Instruction no. 10, expert witness, on page 22.

Scientific, technical, or other specialized knowledge may assist you in understanding the evidence or in determining a fact in issue.  A witness who has knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters.  However, you are not required to accept such an opinion.  You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other

1  evidence in the trial.

2         Instruction no. 11.  I've already given you this

3  instruction, but I will, for the sake of order, repeat it.

4  It's instruction no. 11, nontestifying defendant, if

5  applicable, on page 23.

6         The defendant, Daniel Andres Morones, did not testify,

7  and I remind you that you cannot consider his decision not to

8  testify as evidence of guilt.  The Constitution of the United

9  States grants to a defendant the right to remain silent, and

10 that right is vigorously guarded.  That means the right not to

11 testify, and you must not presume or infer guilt from the fact

12 that a defendant does not take the witness stand and testify or

13 call any witnesses.

14        Instruction no. 12, statement voluntariness.

15        You heard evidence relating to statements attributed

16 to the defendant alleged to have been made after the commission

17 of the crimes charged in this case but not made in court.  You

18 should always consider such statements with caution and weigh

19 them with care.  You should consider any such statement

20 entirely -- you should disregard -- excuse me -- you should

21 disregard any such statement entirely unless the other evidence

22 in the case convinces you that it is more likely than not that

23 the statement was made knowingly and voluntarily.

24        In determining whether any such statement was

25 knowingly and voluntarily made, you should consider, for

example, the age, gender, training, education, occupation, and

physical and mental condition of the defendant.  You should

also consider any evidence concerning his treatment while under

interrogation, if the statement was made in response to

questioning by government officials, and all the other

circumstances in evidence surrounding the making of the

statement.

        If, after considering all this evidence, you conclude

it is more likely than not that the defendant's statement was

made knowingly and voluntarily, you may give such weight to the

statement as you feel it deserves under the circumstances.

        And instruction no. 13, jury's recollection controls

at page 25.

        If any reference by me or by counsel to matters of

testimony or exhibits does not coincide with your own

recollection of that evidence, it is your recollection which

controls during your deliberations and not my statements or

statements of counsel.  You are the sole judges of the evidence

received in this case.

        Instruction no. 14 on page 26, introduction to the

charged offenses.

        The defendant, Daniel Andres Morones, has been charged

in the second superseding indictment with seven counts of

alleged criminal violations.  In order for the Government to

prove that Daniel Andres Morones committed any one or more of

the alleged crimes, it must prove the material elements of the

crime beyond a reasonable doubt.  I will now tell you what

those elements are for each count.

Instruction no. 15, count one, on page 27.

Assault on a federal officer or employee, physical

contact, bodily injury.  The defendant is charged in count one

with a violation of 18 United States Code sections 111(a)(1)

and (b).  This law makes it a crime to forcibly assault,

resist, impose, impede, intimidate, or interfere with a federal

officer or employee while the officer or employee is engaged in

the performance of his official duties.

Count one alleges there was physical contact by the

defendant upon the victim and that the victim suffered bodily

injury as a result.  To find the defendant guilty of this

crime, you must be convinced that the Government has proved

each of the following beyond a reasonable doubt:

First, the defendant forcibly assaulted, resisted,

opposed, impeded, intimidated, or interfered with Steve Hansen;

Second, the person assaulted, resisted, opposed,

impeded, intimidated, or interfered with was a federal officer

or employee who was then engaged in the performance of his

official duties;

Third, the defendant did such acts intentionally;

Fourth, in doing such acts, the defendant made

physical contact with Steve Hansen; and

1        Fifth, as a result, Steve Hansen suffered bodily

2   injury.

3        The term "forcible assault" means any intentional

4   attempt or threat to inflict injury upon someone else when

5   coupled with an apparent present ability to do so and includes

6   any intentional display of force that would give a reasonable

7   person cause to expect immediate bodily harm whether or not the

8   threat or attempt is actually carried out or the victim is

9   injured.

10       The term "physical contact" means an intentional and

11  wrongful physical contact by the defendant upon the victim.

12  The contact between the defendant and the victim need not be

13  direct, but rather can result from the indirect application of

14  force by some substance or agency placed in motion by the

15  defendant.

16       The term "bodily injury" means an injury that is

17  painful and obvious or is of a type for which medical attention

18  ordinarily would be sought.

19       The term "federal officer or employee" refers to any

20  officer or employee of the United States or of any agency or

21  any branch of the United States government.  You are instructed

22  that the federal Bureau of Prisons is an agency of the United

23  States Department of Justice, within the executive branch of

24  the United States government.  Thus, an employee of the federal

25  Bureau of Prisons is a federal officer and/or employee.  A

federal officer is engaged in the performance of his official

duties if he is acting within the scope of what he is employed

to do rather than engaging in a personal frolic of his own.

It is not necessary to show that the defendant knew

the person being forcibly assaulted, resisted, opposed,

impeded, intimidated, or interfered with was at that time a

federal officer carrying out an official duty so long as it is

established beyond a reasonable doubt that the victim was in

fact a federal officer acting in the course of his official

duties and that the defendant intentionally, forcibly

assaulted, resisted, opposed, impeded, intimidated, or

interfered with that officer.

Instruction no. 16, count one, lesser-included

offense, assault on a federal officer, employee, physical

contact.

On page 30.

If you unanimously find the defendant not guilty of

the offense charged or if, after all reasonable efforts you are

unable to agree on a verdict as to that offense, then you must

determine whether the defendant is guilty or not guilty of

assault on a federal officer or employee -- physical contact.

The difference between these two offenses is that to convict

defendant of this lesser offense, the Government does not have

to prove that Steve Hansen suffered bodily injury.  This is an

element of the greater offense but not of the lesser-included

1   offense.

2          For you to find the defendant guilty of the

3   lesser-included offense, assault on a federal officer or

4   employee, physical contact, a violation of 18 United States

5   Code section 111(a)(1), the Government must prove each of the

6   following elements beyond a reasonable doubt:

7          First, the defendant forcibly assaulted, resisted,

8   opposed, impeded, intimidated or interfered with Steve Hansen;

9          Second, the person assaulted, resisted, opposed,

10  impeded, intimidated, or interfered with was a federal officer

11  or employee who was then engaged in the performance of his

12  official duties;

13         Third, the defendant did such acts intentionally and;

14         Fourth, in doing such acts, the defendant made

15  physical contact with Steve Hansen.

16         If you are convinced that the Government has proved

17  all of these elements beyond a reasonable doubt, you may find

18  the defendant guilty of the lesser-included offense.  If you

19  have a reasonable doubt about any of these elements, then you

20  must find the defendant not guilty of a lesser-included

21  offense.

22         Instruction no. 17, counts two through nine, assault

23  on a federal officer or employee, physical contact.

24         Counts two through nine charge the defendant with

25  violations of 18 United States Code section 111(a)(1).

1        This law makes it a crime to forcibly assault, resist,

2   oppose, impede, intimidate, or interfere with a federal officer

3   or employee while the officer or employee is engaged in the

4   performance of his official duties.  Counts two through nine

5   allege there was a physical contact by the defendant upon the

6   various victims named in each count.

7        For counts two through nine, the elements of the

8   offenses are the same, except for the identity of the named

9   victim.  To find the defendant guilty of these crimes, you must

10   be convinced that the Government has proved each the following

11   beyond a reasonable doubt:

12        First, the defendant forcibly assaulted, resisted,

13   opposed, impeded, intimidated, or interfered with the named

14   victim.  The named victim for counts two through nine are as

15   follows:

16        Count two, Shyam Mansukhani.

17        Count four, Ismael Trujillo.

18        Count five, Michael Browning.

19        Count six, Dominic Davis.

20        Count eight, Micah Morse.

21        Count nine, Thomas Watson.

22        Second, the person assaulted, resisted, opposed,

23   impeded, intimidated or interfered with was a federal officer

24   or employee who was then engaged in the official performance of

25   his duties;

1        Third, the defendant did such acts intentionally;

2        Fourth, in doing such acts, the defendant made

3 physical contact with the named victim.

4        The term "forcible assault" means any intentional

5 attempt or threat to inflict injury upon someone, when coupled

6 with an apparent present ability to do so and includes any

7 intentional display of force that would give a reasonable

8 person cause to expect immediate bodily harm whether or not the

9 threat or attempt is actually carried out or the victim is

10 injured.

11        The term "physical contact" means an intentional and

12 wrongful physical contact by the defendant upon the victim.

13 The contact between the defendant and the victim need not be

14 direct but rather can result from the indirect affliction of

15 force by some substance or agency placed in motion by the

16 defendant.

17        The term "federal officer or employee" refers to any

18 officer or employee of the United States or of any agency in

19 any branch of the United States government.  You are instructed

20 that the federal Bureau of Prisons is an agency of the United

21 States Department of Justice, within the executive branch of

22 the United States government.  Thus, an employee of the federal

23 Bureau of Prisons is a federal officer and/or employee.

24        A federal officer is engaged in the performance of his

25 official duties if he is acting within the scope of what he is

1  employed to do rather than engaging in a personal frolic of his

2  own.

3  It is not necessary to show that the defendant knew

4  the person being forcibly assaulted, resisted, opposed,

5  impeded, intimidated, or interfered with was at that time a

6  federal officer carrying out an official duty, so long as it is

7  established beyond a reasonable doubt that the victim was in

8  fact a federal officer acting in the course of his official

9  duties and that the defendant intentionally, forcibly

10  assaulted, resisted, opposed, impeded, intimidated, or

11  interfered with that officer.

12  Instruction no. 18, on or about, page 35.

13  The defendant is charged with having committed the

14  crimes, quote, on or about, close quote, a certain day.  This

15  means that the Government must prove beyond a reasonable doubt

16  that the defendant committed the crimes reasonably near the

17  dates charged.

18  Instruction no. 19.  Proof of knowledge or intent,

19  page 36.

20  The intent of a person or the knowledge that a person

21  possesses at any given time may not ordinarily be proved

22  directly because there is no way of directly scrutinizing the

23  workings of the human mind.  In determining the issue of what a

24  person knew or what a person intended at a particular time, you

25  may consider any statements made or acts done by that person

1  and all other facts and circumstances received in evidence

2  which may aid in your determination of that person's knowledge

3  or intent.  You may infer, but you are certainly not required

4  to infer, that a person intends the natural and probable

5  consequences of acts knowingly done.  It is entirely up to you,

6  however, to decide what facts to find from the evidence

7  received during this trial.

8         Instruction no. 20, page 37, caution, consider only

9  crime charged.

10         You are here to decide whether the Government has

11  proved beyond a reasonable doubt that the defendant is guilty

12  of each of the crimes charged.  The defendant is not on trial

13  for any act, conduct, or crime not charged in the second

14  superseding indictment.  It is not up to you to decide whether

15  anyone who is not on trial in this case should be prosecuted

16  for the crimes charged.  The fact that another person also may

17  be guilty is no defense to a criminal charge.  The question of

18  the possible guilt of others should not enter your thinking as

19  you decide whether the Government has proved this defendant

20  guilty of the crime charged.

21         Instruction no. 21, caution, punishment, on page 38.

22         If you find the defendant guilty on one or more of the

23  counts stated in the second superseding indictment, it will be

24  my duty to decide what the punishment will be.  You should not

25  discuss or consider the possible punishment in any way while

1  deciding your verdict.

2          Instruction no. 22, similar acts, page 39.

3          You have heard evidence of other acts or wrongs

4  engaged in by the defendant.  You may consider that evidence

5  only as it bears on the defendant's motive, opportunity,

6  intent, preparation, plan, knowledge, identity, absence of

7  mistake or accident, and for no other purpose.  Of course the

8  fact that the defendant may have previously committed an act

9  similar to the one charged in this case does not mean that the

10  defendant necessarily committed the act charged in this case.

11          No. 23.  Jury deliberations, beginning on page 40.

12          The parties have now made their closing arguments and

13  I have instructed you for the final time.  A court official

14  will soon escort you to the jury room so you can begin your

15  deliberations.  You will have a copy of the instructions and

16  verdict form that I will -- that I have just read and any

17  exhibits admitted into evidence will also be placed in the jury

18  room for your review.

19          When you go to the jury room, you must select one of

20  you to serve as your presiding juror.  He or she will preside

21  over your deliberations and speak for you here in court.  You

22  will then discuss the case with your fellow jurors to reach

23  agreement, if you can do so.  Your agreement, whether it is

24  guilty or not guilty, must be unanimous.  Each of you must

25  decide the case for yourself.  But you should do so only after

you have considered all of the evidence, discussed it with your

fellow jurors, and listened to the views of your fellow jurors.

I offer some suggestions on how you might do this in

the next jury instruction entitled, Jury, the deliberations

process.  One thing you should do in your deliberations is to

follow these jury instructions and the verdict form.  Not only

will your deliberations be more productive if you understand

the legal principles on which any verdict must be based, but

for a verdict to be valid, you must follow the instructions

throughout your deliberations.

Remember, you are judges of the facts, but you are

bound by your oath to follow the law stated in these

instructions.  Your deliberations will be secret.  You will

never have to explain your verdict to anyone.

If you need to communicate with me during your

deliberations, the presiding juror should write the message and

give to the court security officer.  I will reply in writing or

bring you back into the court to respond to your message.

Under no circumstances should you reveal to me, the court

security officer, or anyone else not on the jury where you

stand or what your vote might be until you have reached a

verdict or I have discharged you.

Please bear in mind that a response takes considerable

time and effort.  I must first notify the attorneys and the

defendant to return to court.  Then I must confer with them,

1    consider their arguments, and decide upon the correct answer.

2    In some instances, further research might be required.

3            A verdict firm has been prepared for your convenience.

4    The presiding juror will write the unanimous answer of the jury

5    in the space provided on the verdict form.  At the conclusion

6    of your deliberations, the presiding juror should date and sign

7    the verdict form and then all the other jurors should sign the

8    verdict form.  The presiding juror should then advise the court

9    security officer stationed outside the jury room that you have

10   reached a verdict.

11           Instruction no. 24, jury, the deliberations process,

12   beginning on page 42.

13           And I will make this clear in the text of this, but I

14   want you to understand, this is called an advisory instruction.

15   You are not bound to do these things, but you may, and this is

16   intended to assist you to the extent that you wish it to assist

17   you.

18           Once you have elected your presiding juror as directed

19   by the previous instruction, you are free to proceed as you

20   agree is appropriate.  Therefore, I am not directing you how to

21   proceed, but I offer the following suggestions that other

22   jurors have found helpful so that you can proceed in an orderly

23   fashion, allowing full participation by each juror and arrive

24   at a verdict that is satisfactory to each of you.

25           First, it is the responsibility of the presiding juror

1  to encourage good communication and participation by all jurors

2  and to maintain fairness and order.  Your presiding juror

3  should be willing and able to facilitate productive discussion

4  even when disagreements and controversy arise.

5      Second, the presiding juror should let each of you

6  speak and be heard before expressing his or her own views.

7      Third, the presiding juror should never attempt to

8  promote nor permit anyone else to promote his or her personal

9  opinions by coercion or intimidation or bullying of others.

10      Fourth, the presiding juror should make certain that

11  the deliberations are not rushed to reach a conclusion.

12      If the presiding jurors you select does not meet these

13  standards, he or she should voluntarily step down or be

14  replaced by a majority vote.

15      After you select a presiding juror, you should

16  consider electing a secretary who will tally the votes, keep

17  track of who has or hasn't spoken on the various issues, make

18  certain that all of you are present whenever deliberations are

19  under way and otherwise assist the presiding juror.

20      Some juries are tempted to start by holding a

21  preliminary vote on the case to, quote, see where we stand,

22  close quote.  It is more advisable, however, that no vote be

23  taken before a full discussion is had on the issue to be voted

24  on.  Otherwise, you might lock yourself into a certain view

25  before considering alternative and possibly more reasonable

1  interpretations of the evidence.  Experience has shown that

2  such early votes frequently lead to disruptive, unnecessarily

3  lengthy, inefficient debate and ineffective decision-making.

4       Instead, I suggest the presiding juror begin your

5  deliberations by directing the discussion to establishing

6  informal ground rules for how you will proceed.  These rules

7  should assure that you will focus upon, analyze, and evaluate

8  the evidence fairly and efficiently and that the viewpoints of

9  each of you is heard and considered before any decisions are

10  made.  No one should be ignored.  You may agree to discuss the

11  case in the order of the questions presented in the special

12  verdict form or in chronological order or according to the

13  testimony of each witness.

14       Whatever order you select, however, it is advisable to

15  be consistent and not jump from one topic to another.  To move

16  the process of deliberation along in the event you reach a

17  controversial issue, it is wise to pass it temporarily and move

18  on to the less controversial ones and then come back to it.

19  You should then continue through each issue in the order you

20  have agreed upon, unless a majority of you agrees to change the

21  order.

22       It is very helpful, but certainly not required of you,

23  that all votes be taken by secret ballot.  This will help you

24  focus on the issues and not be overly influenced by

25  personalities.  Each of you shall also consider any

disagreement you have with another juror or jurors as an
opportunity for improving the quality of your decision and
therefore should treat each other with respect.

Any differences in your views should be discussed
calmly, and if a break is needed for that purpose, it should be
taken.  As I mentioned at the beginning of this trial, each of
you is responsible for making sure that no juror bases a
decision on matters that are not in evidence.

Each of you should listen attentively and openly to
one another before making any judgment.  This is sometimes
called active listening, and it means that you should not
listen with only one ear while thinking about a response.  Only
after you have heard and understood what the other person is
saying should you think about a response.  Obviously this means
that, unlike TV talk shows, you should try very hard not to
interrupt.  If one of your number is going on and on, it is the
presiding juror who should suggest that the point has been made
and it is time to hear from someone else.

You each have a right to your individual opinion, but
you should be open to persuasion.  When you focus your
attention and best listening skills, others will feel respected
and even while they may disagree, they will respect you.  It
helps if you are open to the possibility that you might be
wrong or at least that you might change your mind about some
issues after listening to others.

1          Misunderstanding can undermine your efforts.  Seek

2    clarification if you do not understand or if you think others

3    are not talking about the same thing.  From time to time, the

4    presiding juror should set out the items on which you agree and

5    those on which you have not yet reached agreement.

6          In spite of all your efforts, it is indeed possible

7    that serious disagreements may arise.  In that event, recognize

8    and accept that getting stuck is often part of the

9    decision-making process.  It is easy to fall into the trap of

10   believing that there is something wrong with someone who is not

11   ready to move toward what may be an emerging decision.  Such a

12   belief is not helpful.  It can lead to focusing on

13   personalities rather than the issues.  It is best to be patient

14   with one another.  At times slower is usually faster.  There is

15   a tendency to set deadlines and seek to force decisions.

16   Providing a break or more time and space, however, often helps

17   to shorten the overall process.

18         You may wish from time to time to express your mutual

19   respect and repeat your resolve to work through any

20   differences.  With such a commitment and mutual respect, you

21   will most likely -- you will most likely render a verdict that

22   leaves each of you satisfied that you have indeed rendered

23   justice.

24         Following this is the verdict form.  And there's very

25   little complication to it, but I do want to point out one thing

1    to you.

2            Under count one, it says, We, the jury, upon our oath,

3    unanimously find the defendant, Daniel Andres Morones, in count

4    one of the second superseding indictment, and then there is a

5    line, and the words "not guilty" and then there is a line and

6    the word "guilty," and whichever your verdict would be, you

7    would so indicate where that line is.

8            If your verdict on count one as charged is guilty,

9    then proceed to count two.  If your verdict is not guilty, then

10   answer the following question before proceeding to count two,

11   and this is the question relating to the lesser-included

12   offense.

13           We, the jury, upon our oaths, having found the

14   defendant not guilty as charged in count one of the superseding

15   indictment, unanimously find the defendant, Daniel Andres

16   Morones, as a lesser-included offense of assault on a federal

17   officer or employee, physical contact, and then the line for

18   not guilty and a line for guilty.

19           As to count two, it's the same thing as to count four,

20   as to count five, as to count six, as to count eight, and as to

21   count nine.  The only difference being that in each case, a

22   different victim is mentioned in that count and so you have to

23   go to look at the names of those and come back and consider

24   each count separately.

25           Have I read those to your satisfaction so that you all

1  understand them?

2         The jury all says yes.

3         Is there any objection to the instructions as

4  delivered?

5         MR. HOSLEY:  No, Your Honor.

6         THE COURT:  Any objection as delivered?

7         THE DEFENDANT:  No, Your Honor.

8         THE COURT:  All right.

9         Would the court security officer come forward, please.

10         We now have Mrs. Mikita, you have been with us as the

11  alternate juror.  And I'm going to ask that you be excused when

12  the jury leaves and leave them to deliberations.  But

13  Mrs. Abiakam wants to talk with you to get your cell phone

14  number and contact so that in the event something should

15  happen, you can be reached right away.  But otherwise, assuming

16  that that doesn't happen, I know you got all dressed up and

17  then you don't have anyplace to go, but I do want to thank you

18  for your participation.  I'm sure your fellow jurors do, too,

19  and so does the prosecution and the defendant.  It's necessary

20  that you were here.  Believe me, it's very necessary you're

21  here.

22         The final thing I want to say to you are two things.

23  One is that there is a weather forecast that says we might have

24  snow this afternoon and this evening.  And you will have a

25  window there, so you can look out and see, but you can

1    decide -- the case is yours once you go back there.  And so you

2    can decide if you want to recess and come back tomorrow or if

3    you want to stay here and deliberate or at any time if you want

4    to recess and come back tomorrow.

5           There are only two things I want to mention about

6    that.  One, if one of you leave for whatever reason, to go to

7    the rest room or what have you, you cannot discuss the case

8    until all of you are present.

9           The second thing is this.  I may have emphasized words

10   here or there in my instructions.  That's simply because of the

11   way I read and trying to make it rather than a monotone, to

12   make it interesting, but there's no hidden message in the way

13   I've delivered this.  I want your verdict to be your verdict

14   and that's what my job is.

15          The last thing I will tell you is that if you do

16   decide to take a recess over the evening hours or not, the

17   admonition is even more important now that you not Google,

18   twix, tweet, do all those or other things or that you talk to

19   anybody about your deliberations because it's only the

20   deliberation of the 12 of you that must be made and not from

21   any outside influence; and as I already mentioned to you once

22   before, should anybody try to talk to you about this, I want

23   you to report that to me immediately.

24          Thank you very much.

25          Now, please administer the oath.

1     (The court security officer was sworn.)

2          THE COURT:  Ladies and gentlemen, if you will follow

3     the court security officer, he'll take you back to the jury

4     deliberation room.

5          And the rest of us will remain in the courtroom.

6          THE COURTROOM DEPUTY:  All rise.

7     (Jury out at 3:18 p.m.)

8          THE COURT:  Please be seated for a minute.

9          A couple of things I want to mention, and the first is

10    that I will speak directly to Mrs. Mikita, the alternate juror.

11    I certainly will not be talking to her about this case.  She

12    lives on a farm near Calhan, as we all know, and with this

13    weather, I want to make certain she understands that she can

14    stay at a motel if she wishes this evening and the government

15    will pay for that and for her day tomorrow, to the extent that

16    she wants to remain to -- and I'm going to ask her to do that,

17    so that in case something should happen to one of the jurors

18    over the night, that Mrs. Mikita would be readily available.

19    That's what I'm going to mention to her.  And also she gets a

20    certificate for having a served on this case and -- but I will

21    probably give that to her before she's actually discharged.

22          The final thing is this.  Please stay in close

23    contact.  I don't know that we're going to have any questions

24    from the jury, but if so, I want to get those handled right

25    away, and I think advisory counsel need to be available for

1   that as well.

2          The last thing I'll say, I want to thank the attorneys

3   and you, Mr. Morones, for the courtesies extended to me in this

4   trial.

5          Thank you very much.

6          MR. HOSLEY:  Thank you, Your Honor.

7          MR. CONNELL:  Thank you, Your Honor.

8       (Recess at 3:21 p.m.)

9                       REPORTER'S CERTIFICATE

10          I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12   Dated at Denver, Colorado, this 4th day of March, 2011.

13

14                          s/Kara Spitler_____
                                 Kara Spitler
15                          **INDEX**

16   **Item**                                            **Page**

17   Jury Instructions                                   513

18   WITNESSES

19      THOMAS WATSON

20          Direct Examination By Mr. Hearty            373

21          Cross-examination By The Defendant          413

22          Redirect Examination By Mr. Hearty          424

23      MICHAEL BROWNING

24          Direct Examination By Mr. Hosley            430

25      MICAH MORSE

1        Direct Examination By Mr. Hearty            440

2      DOMINIC DAVIS

3        Direct Examination By Mr. Hosley            447

4      CHARLES SIMMS

5        Direct Examination By Mr. Hosley            459

6        Cross-examination By The Defendant          463

7                    GOVERNMENT'S EXHIBITS

8   Exhibit      Offered  Received  Refused  Reserved  Withdrawn

9   8              401     401

10                   DEFENDANT'S EXHIBITS

11  Exhibit      Offered  Received  Refused  Reserved  Withdrawn

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   F                  424       424

2   CLOSING ARGUMENTS

3       By Mr. Hosley                                      470

4       By The Defendant                                   506

5       Rebuttal Argument By Mr. Hosley                    511

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25